UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
Grand Jury B-21-1

UNITED STATES OF AMERICA

v.

MAHESH PATEL,
ROBERT HARVEY,
HARPREET WASAN,
STEVEN HOUGHTALING,
TOM EDWARDS, and
GARY PRUS

Criminal No. 3:21CR220 (VAB)(RAR)

VIOLATION:

15 U.S.C. § 1
(Conspiracy in Restraint of Trade)

DEC 15 2021 PM 1:49
FILED - USDC - BPT - CT

INDICTMENT

The Grand Jury charges:

COUNT ONE
(Conspiracy in Restraint of Trade)

Background

At all times relevant to this Indictment, unless otherwise indicated:

1. Engineers and other skilled-labor employees working in the aerospace industry in the United States performed services such as electrical and mechanical engineering, design, testing, software development, supply chain management, and project management for the purpose of designing, manufacturing, and servicing, among other things, aircraft for both commercial and military purposes.

2. Company A was a wholly-owned subsidiary of a parent corporation organized and existing under the laws of Delaware with a principal place of business in East Hartford, Connecticut. Company A was one of the largest aerospace engine design, manufacture, and service companies in the United States. Company A relied upon different sources of labor to design, manufacture, and service its aerospace products, including through its own employees, contract labor, and outsource engineering.

3. As a general matter, in an outsource arrangement, an outsource engineering supplier ("Supplier") entered into a contract with a customer, such as Company A, to complete a particular project, assigned engineers and other skilled workers from among its own employees to complete that project, and then received an agreed-upon payment from the customer for such work. The Supplier was responsible for paying salary and benefits to its employees who worked on outsource projects, as well as for recruiting and hiring a sufficient number of employees with sufficient qualifications to complete the Supplier's outsourced projects.

4. Companies B-F, described below, were among the Suppliers whose employees worked on projects for Company A on an outsource basis. Together with Company A, these companies competed against one another to recruit and hire engineers and other skilled workers. As Suppliers, they also competed against one another for outsource work projects from certain customers, including Company A, including on the basis of (low) price.

5. Company B was an Ohio corporation with a principal place of business in East Hartford, Connecticut.

6. Company C was an Ohio corporation with a principal place of business in Windsor, Connecticut.

7. Company D was a California corporation with a principal place of business in East Hartford, Connecticut. Prior to 2014, Company D was known under a different corporate name.

8. Company E was a Florida corporation with a principal place of business in Jupiter, Florida.

9. Company F was a Florida corporation with a principal place of business in Palm Beach Gardens, Florida.

Defendants and Co-Conspirators

10. Defendant MAHESH PATEL ("PATEL") was the Manager and (later) Director of the unit within Company A in charge of managing the relationships between Company A and its Suppliers. Within that unit, he was the highest-ranking employee and managed a team of associates from his office in East Hartford, Connecticut. PATEL and his associates communicated frequently with representatives of the Suppliers, controlled the statements of work and payments for Supplier projects, and monitored the quality of Supplier work and progress on their projects for Company A. PATEL was also involved in master contract negotiations between Suppliers and Company A's parent company, which provided for maximum pricing charged by each Supplier to Company A for the completion of outsourced projects.

11. Defendant ROBERT HARVEY ("HARVEY") was employed by Company B beginning in or around 2010 as Senior Vice President, then President-Strategic Accounts, and, as of 2019, President-Global Business Head. He worked principally from an office in East Hartford, Connecticut.

12. Defendant HARPREET WASAN ("WASAN") was Vice President and Strategic Client Partner of Company B beginning in or around early 2015. He worked principally from offices in East Hartford, Connecticut and Tokyo, Japan.

13. Defendant STEVEN HOUGHTALING ("HOUGHTALING") was employed by Company C beginning in or around early 2013 as a General Manager, Vice President, and, as of 2019, Senior Vice President. He worked principally from an office in Windsor, Connecticut.

14. Defendant TOM EDWARDS ("EDWARDS") was employed by Company D beginning in or around 2010, and, as of in or around 2013, has been President of Company D's North America operations. He worked principally from an office in East Hartford, Connecticut.

15. Defendant GARY PRUS ("PRUS") was Chief Operating Officer/Executive Vice President and part owner of Company E, beginning at least as early as 2015. He worked principally from an office in Jupiter, Florida.

16. HARVEY, WASAN, HOUGHTALING, EDWARDS, and PRUS each had substantial responsibilities regarding maintaining and advancing their respective companies' business relationships with Company A, as well as hiring and recruiting at their respective companies. Each had communications with PATEL on those subjects.

17. Various corporations and individuals, not charged in this Indictment, participated as co-conspirators in the offense charged herein and performed acts and made statements in furtherance thereof.

18. Whenever in this Indictment reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, and other representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

Description of the Offense

19. Beginning at least as early as 2011 and continuing until as late as September 2019, the exact dates being unknown to the Grand Jury, in the District of Connecticut and elsewhere, over the course of the conspiracy, PATEL, HARVEY, WASAN, HOUGHTALING, EDWARDS, and PRUS ("Defendants") knowingly entered into and engaged in a combination and conspiracy between and among each other, Companies A-F, and others known and unknown to the Grand Jury, to suppress competition by allocating employees in the aerospace industry working on projects for Company A, specifically by agreeing to restrict the hiring and recruiting of engineers and other skilled-labor employees between and among Companies A-F in the United States. The combination and conspiracy engaged in by Defendants and co-conspirators was a *per se* unlawful,

4

and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (Title 15, United States Code, Section 1).

## Manner and Means of the Conspiracy

20.  It was part of the conspiracy that Defendants and their co-conspirators attended meetings and engaged in discussions between and among them concerning restricting the hiring and recruiting of engineers and other skilled-labor employees in the United States between and among Companies A-F.

21.  It was further part of the conspiracy that Defendants and their co-conspirators agreed during those meetings and discussions to restrict the hiring and recruiting of engineers and other skilled-labor employees between and among Companies B-F, including but not limited to the following:

(a)  not hiring such employees of Companies B-F; and

(b)  not proactively contacting, interviewing, and otherwise recruiting potential applicants to Companies B-F who were employed by another co-conspirator company.

22.  It was further part of the conspiracy that PATEL served as a leader and primary enforcer of the conspiratorial agreement, as well as an intermediary for communications between co-conspirators, due to his position and influence at Company A, a common customer of Companies B-F. For example:

(a)  In or around December 2015, PATEL attended a dinner with representatives of Companies B, C, and D, including EDWARDS and WASAN. An executive of Company C, who also attended the dinner, sent an email to HOUGHTALING and other Company C employees to summarize statements made by PATEL at the dinner. The email states "Mahesh did take the stage at the end. . . no poaching of each others' [sic] employees."

(b) In or around February 2017, WASAN responded to the news that Company C had made an employment offer to a Company B engineer, stating in an email: "[Company C] is not allowed to poach any of our employees and I will plan to block this immediately. I will send this to Mahesh today." WASAN subsequently forwarded the information about Company C's offer directly to PATEL, adding "I am very concerned that [Company C] believes they can hire any of our employees. . . . Could you please stop this person from being hired by [Company C]?"

(c) In or around May 2016, HOUGHTALING was informed by a colleague at Company C that "[a]nother employee" had been hired by Company E. The colleague asked HOUGHTALING "Did you ever discuss the last one with Mahesh?" HOUGHTALING responded: "Yes, he said he'd talk to [Company E] about it." HOUGHTALING subsequently emailed PATEL to complain that his company was "losing another employee to [Company E]."

(d) In or around November 2016, PRUS wrote an email to PATEL complaining about "[Company C] actively [r]ecruiting [Company E] employees." PATEL forwarded PRUS's email to HOUGHTALING and another Company C manager, saying, "[w]e must not poach each other [sic] partners [sic] employee [sic]. Please communicate to [Company C] HR not to interview or hire active employees working on [Company A] work."

23. It was further part of the conspiracy, from approximately 2015 through 2017, that PATEL, HARVEY, WASAN, and other co-conspirators agreed during meetings and discussions to restrict the hiring and recruiting of engineers and other skilled-labor employees of Company B by Company A, namely by agreeing upon periods of time during which Company A would not hire and not recruit Company B employees, with limited exceptions. For example:

6

(a) In or around January 2016, WASAN reported to a General Manager of Company B and another colleague via email that "I am planning to meet with Mahesh later this week to discuss the hiring matrix I developed to limit the hiring. Also I am going to tell him that he needs to block" two Company B engineers "from being hired until we come to an agreement on the acceptable limit to hire [from] our team."

(b) In or around July 2016, WASAN sent an email to PATEL regarding a Company B employee that Company A was interested in hiring, writing "we cannot lose him" and complaining to PATEL that "[Company A] keeps poaching this team." PATEL then emailed a Company A hiring contact and explained: "I checked with [Company B], They absolutely do not want to release [the employee]. Please do not extend offer to him. [Company A] has committed to [Company B] that we will not hire any more of their employees this year in 2016." (Emphasis in original.) PATEL sent the correspondence to WASAN, and WASAN thanked PATEL.

24. It was further part of the conspiracy that PATEL, HARVEY, WASAN, and other co-conspirators agreed during meetings and discussions that Company A would not hire engineers and other skilled-labor employees of Company B who had not yet worked for Company B for a certain length of time, with limited exceptions. For example:

(a) In or around September 2011, HARVEY and a Company B account manager had dinner with PATEL and a Company A Vice President to discuss, among other things, an agreement restricting Company A's hiring of Company B employees based on the length of their tenure with Company B. HARVEY summarized their dinner conversation in an email the next day, including their discussion of "personnel transfers" and "the new policy/guidelines" that related to a "min. 24 months." Thereafter, from time

7

to time, PATEL and representatives from Company B, including HARVEY and WASAN, reconfirmed the agreement between and among them that Company A would not hire Company B employees until they had worked at Company B for two years.

(b) In or around April 2017, a Company B manager noted in an internal email to another Company B manager that he had received notice from Company A that it wanted to hire a particular Company B employee, but the employee "wouldn't meet our requirements for two years." The same manager subsequently emailed PATEL and stated that the employee "does not meet tenure requirements." PATEL then told a Company A Human Resources employee: "[Company B]" will not release him. . . He has not completed 2 [y]ears as our verbal agreements."

25. It was further part of the conspiracy that Defendants and their co-conspirators took steps to effectuate the agreement, including by refraining from hiring, contacting, interviewing, and recruiting engineers and other skilled-labor workers employed by a co-conspirator company, and instructing others to do the same. For example:

(a) In or around September 2017, an email directive from PATEL to a Company A Vice President of Human Resources advised "direct your HR team not to hire [Company B] outsource resources currently deployed on [Company A] projects till end of this year."

(b) In or around January 2017, after a Company D executive sent an email to PATEL complaining of "[Company E] stealing our people" and naming a Company D employee who recently had been offered employment by Company E, PATEL forwarded the email to PRUS, writing: "Last time we talked you assured me that you will not hire any [Company A] partners employee [sic]. This must stop, otherwise others will also start

poaching your employees." PRUS subsequently forwarded the email to a Company E recruiting employee and said "Please make sure we stay away from [Company C], [Company D], [Company F] personnel moving forward."

(c) In or around February 2015, after Company D hired an employee of Company B, EDWARDS emailed another executive of Company D, stating "I let Mahesh know that this happened – [a]nd we are still looking into how exactly this happened." EDWARDS asks the executive "can you let Mahesh know the actions we're taking to prevent this from happening again?"

26. It was further part of the conspiracy that Defendants and their co-conspirators effectuated the agreement by rescinding offers of employment that violated the conspiracy. For example, in or around June 2018, emails and conversations occurred between and among PATEL and co-conspirators from Company C, including HOUGHTALING, discussing Company C's employment offer to an engineer at Company B. The discussion concluded with a Company C executive telling PATEL "Per our conversation yesterday, this email is to confirm that we have rescinded the offer letter for" the engineer being discussed.

27. It was further part of the conspiracy that Defendants and their co-conspirators encouraged compliance with the agreement to restrict the hiring and recruiting of engineers and other skilled-labor employees by pointing to the mutual financial benefits of the agreement, including that restricting the hiring and recruiting of engineers and other skilled-labor employees helped prevent wages and labor costs from rising and otherwise financially benefited co-conspirators. For example:

(a) In or around September 2019, after learning that Company F had hired employees from Company D, EDWARDS emailed the CEO of Company F to request

9

adherence to the hiring and recruiting restrictions. EDWARDS stated "I wanted to ask if your team could refrain from actively recruiting our [Company D] employees going forward," and assured the CEO of Company F that "I flat out ask our teams not to hire people from the other [Company A] suppliers." The CEO of Company F assured him: "Our general aim is NOT to recruit from the local 'competition' because no one wins; salaries rise, the workforce get [sic] unstable, and our margins all get hurt."

(b)  In or around January 2017, after chastising PRUS for Company E's making an employment offer to an employee of Company D, PATEL sent an email to another Company E employee, copying PRUS, and instructed "Please do not hire any partners [sic] employee, whether they approached or you approached. That is the only way we can pre[v]ent poaching and price war."

(c)  In or around April 2017, a General Manager of Company B emailed WASAN and PATEL to complain that Company D had hired an employee of Company B, stating "This is against our agreements with our employees and against our known expectations of [Company A] for the cooperation of the outsource companies," and if such hiring did not stop, it would "drive the price structure up."

(d)  In or around June 2017, a business proposal emailed from HARVEY to an executive of the parent company of Company A, which was shared with PATEL, requested hiring restrictions between Company A and Company B, stating that "[w]e have found that customer hiring of our resources puts pressure on [Company B]'s and our customers' ability to contain labor cost increases in our joint 'ecosystem' over time."

28.  It was further part of the conspiracy that Defendants and their co-conspirators monitored and enforced compliance with the agreement by, among other means:

(a) investigating whether employees were seeking employment with or had been offered employment by another co-conspirator;

(b) alerting co-conspirators, through direct communications and communications in which PATEL served as an intermediary, to instances in which those co-conspirators hired and recruited in a manner that violated the agreement;

(c) demanding, through direct communications and communications in which PATEL served as an intermediary, that co-conspirators cease hiring and recruiting in a manner that violated the agreement; and

(d) with respect to PATEL, threatening to reduce, withhold, and disrupt business transactions between Company A and co-conspirator companies if they did not conform to the agreement, including by withholding or withdrawing Company A statements of work and purchase orders from co-conspirator companies.

(e) For example, in or around September 2016, a Company C executive alerted PATEL to a recent incident of poaching by Company E. An email from PATEL to PRUS followed, in which PATEL stated "You had assured me that [Company E] will never soliciting [sic] [Company A]'s long term partners [sic] employees. . . . Please send me in writing that proper steps has [sic] taken place to curtail this practice." (Emphasis in original.) In response to PATEL's reprimand, PRUS instructed a Company E employee by email to "[p]lease stop speaking to any [Company C] or other [Company A] supplier companies about transitioning to a [Company E] Office immediately."

(f) For example, in or around December 2017, a Vice President from Company B emailed HOUGHTALING complaining about Company C's reported employment offers to two Company B employees in Illinois and stated "I would like to understand if

11

you are planning to address this immediately, or I will be forced to escalate to our mutual customers." HARVEY responded: "Spot on. This cannot be tolerated! We need to move quickly and forcibly when this is about to happen." Later, he added, speaking to Company B's management and executive team: "Push hard to have it reversed and consequences for [Company C]."

(g) For example, in or around November 2016, PRUS wrote to another executive at Company E: "Need to have a conversation with [a Company C manager] about them actively recruiting [Company E] employees. We do not EVER call their employees." Later that day, the Company E executive responded to PRUS: "I talked to him. He will talk to recruiting …. ."

29. It was further part of the conspiracy that Defendants and co-conspirators took steps to conceal the existence and operation of the conspiracy, including by:

(a) minimizing written discussions about the agreement and dissemination thereof;

(b) agreeing that the conspiratorial agreement will remain an unwritten understanding and not reflected in master terms agreements or other formal, written agreements between Company A and co-conspirators;

(c) holding and participating in meetings and discussions about the agreement in private, with limited audiences; and

(d) with respect to WASAN and other co-conspirators, providing false and misleading information to engineers and other skilled-labor workers regarding the existence of the agreement and the workers' ability to obtain employment at other co-conspirator companies, including by communicating that employment at other co-

12

conspirator companies was unavailable to them because of noncompete agreements rather than the conspiratorial agreement.

(e) For example, in a September 2011 email from HARVEY to PATEL and co-conspirators, HARVEY stated "Following Mahesh's previous counsel, I am not going into detail in writing" on the subject of the agreement by Company A not to hire certain employees from Company B.

(f) For example, in a January 2015 statement by a Company B manager to HARVEY and two other Company B executives regarding his recent discussion with HOUGHTALING about ceasing poaching between Company B and Company C, the Company B manager stated "While I want you to be informed, I would rather not have any other folks know where this info came from. I request that this email not be forwarded."

(g) For example, in April 2017, PATEL sent an invitation for a "private discussion" in his office to two Company B managers, as well as EDWARDS and another manager from Company D, immediately following a complaint of poaching that a General Manager of Company B made to PATEL regarding Company D.

Trade and Commerce

30. During the period covered by this Indictment, the business activities of Defendants and their co-conspirators that are a subject of this Indictment were within the flow of and substantially affected interstate trade and commerce. For example:

a. Companies B-F—incorporated in California, Ohio, and Florida—performed outsource engineering work for Company A in various states across the United States pursuant to contracts entered into between each of them and Company A's parent company, which was incorporated in Delaware.

13

14

      b.      Companies A-F employed engineers and other skilled-labor workers in various states across the United States, including Connecticut, Vermont, Massachusetts, Illinois, Ohio, Georgia, and Florida, and their agreement restricted interstate movement of such workers between those various states.

All in violation of Title 15, United States Code, Section 1.

                        A TRUE BILL

                        /s/
                        FOREPERSON

THE UNITED STATES OF AMERICA

_____
JONATHAN KANTER
Assistant Attorney General
Antitrust Division
U.S. Department of Justice

_____
PETER S. JONGBLOED
Counsel to the United States Attorney
District of Connecticut

_____
RICHARD A. POWERS
Deputy Assistant Attorney General

_____
DAVID T. HUANG
Assistant U.S. Attorney

_____
MARVIN N. PRICE
Director of Criminal Enforcement

_____
JOSEPH MUOIO
Chief, New York Office

_____
CARRIE A. SYME
Assistant Chief, New York Office

T. Jakob Sebrow
Kathryn B. Kushner
Trial Attorneys