Exhibit A

# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No 3:21CR220 (VAB) |
| v. | August 3, 2022 |
| MAHESH PATEL, *et al.*, | |
| Defendants. | |

**BRIEF OF *AMICUS CURIAE* SOCIETY OF HUMAN RESOURCE MANAGEMENT IN**
**SUPPORT OF DEFENDANT'S JOINT MOTION TO DISMISS INDICTMENT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

STATEMENT OF INTEREST ...................................................................................... 1

INTRODUCTION ...................................................................................................... 2

ARGUMENT ............................................................................................................ 3

I.      ONLY LIMITED ANTITRUST VIOLATIONS SHOULD BE SUBJECT TO
        CRIMINAL PROSECUTION ........................................................................... 3

II.     BUSINESS COLLABORATIONS BETWEEN A COMPANY AND ITS
        STAFFING PARTNERS MUST BE JUDGED UNDER THE RULE OF
        REASON ..................................................................................................... 4

        A.      Courts Have Insufficient Experience of Anticompetitive Effects to
                Warrant *Per Se* Treatment ................................................................. 4

        B.      The *Per Se* Rule Does Not Apply to Vertical Restraints or Principally
                Vertical Restraints ............................................................................. 6

        C.      The Hiring Practice at Issue is Ancillary to a Legitimate Business
                Collaboration between the Company and its Staffing Partners ............ 8

III.    THERE ARE SEVERAL PROCOMPETITIVE BENEFITS TO THE BUSINESS
        COLLABORATION AT ISSUE THAT PRECLUDE AN ANTITRUST CLAIM ........ 11

IV.     THE CRIMINALIZATION OF THE CONDUCT AT ISSUE WOULD HAVE
        EXTREME NEGATIVE AFFECTS ON BUSINESS OPERATIONS ..................... 13

CONCLUSION ........................................................................................................ 15

85200799v.2

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arrington v. Burger King Worldwide, Inc.*,
   448 F. Supp. 3d 1322 (S.D. Fla. 2020) ...................................................................5

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
   9 F.4th 1102 (9th Cir. 2021) ............................................................... *passim*

*Broad. Music, Inc. v. Columbia Broad Sys., Inc.*,
   441 U.S. 1 (1979)................................................................................................5

*Conrad v. Jimmy John's Franchise LLC*,
   No. 18-CV-00133, 2021 WL 3268339 (S.D. Ill. July 30, 2021) .............................5, 7, 12, 13

*Continental TV, Inc. v. GTE Sylvania Inc.*,
   433 U.S. 36, 97 S. Ct. 2549 (1977)....................................................................7, 8

*Copperweld Corp. v. Indep. Tube Corp.*,
   467 U.S. 679 (1978)..........................................................................................8

*Delandes v. McDonald's USA, LLC*,
   No. 17 C 4857, 2021 WL 3187668 (N.D. Ill. July 28, 2021) ............................6, 12

*Eichorn v. AT&T Corp.*,
   248 F.3d 131 (3d Cir. 2001)..............................................................................6

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972)..........................................................................................3

*Kforce Inc. v. Beacon Hill Staffing Group LLC*,
   No. 4:14-CV-1880, 2015 WL 128060 (E.D. Mo. Jan. 8, 2015) ............................11

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007).......................................................................................4, 5, 8

*Midwestern Waffles Inc. v. Waffle House, Inc.*,
   734 F.2d 705 (11th Cir. 1984) .........................................................................7

*Nat'l Bancard Corp. (NaBanco) v. VISA USA, Inc.*,
   779 F.2d 592 (11th Cir. 1986) .........................................................................9

*NCAA v. Alston*,
   141 S. Ct. 2141 (2021)......................................................................................5

85200799v.2

*nFinanSe, Inc. v. Interactive Commc'ns Int'l, Inc.*,
   No. 1:11-CV-3728-AT, 2012 WL 13009231 (N.D. Ga. July 24, 2012),
   amended, No. 1:11-CV-3728-AT, 2012 WL 13013003 (N.D. Ga. Oct. 15,
   2012) ..................................................................................................................8

*Ogden v. Little Caesar Enterprises, Inc.*,
   393 F. Supp. 3d 622 (E.D. Mich. 2019)........................................................5, 7, 8

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018)................................................................................................7

*Ondes v. Monsanto Co.*,
   No. 4:11-cv-197, 2011 WL 6152858 (E.D. Mo. Dec. 12, 2011)............................12

*Oreck Corporation v. Whirlpool Corporation*,
   579 F.2d 126 (2d Cir. 1978).......................................................................................7

*Polk Bros., Inc. v. Forest City Enterprises, Inc.*,
   776 F.2d 185 (7th Cir. 1985) ...............................................................................9, 10

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
   792 F.2d 210 (D.C. Cir. 1986) ...................................................................................9

*Schering-Plough Corp. v. F.T.C.*,
   402 F.3d 1056 (11th Cir. 2005) ..................................................................................9

*State Oil v. Khan*,
   522 U.S. 3 (1997)....................................................................................................4, 5

*Stiger v. Dough, Inc.*,
   No. 2:18-CV-00247 (E.D. Wash. Mar. 7. 2019).........................................................7

*In re Terazosin Hydrochloride Antitrust Litigation*,
   352 F. Supp. 2d 1279 (S.D. Fla. 2005) ......................................................................9

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*,
   530 F.3d 204 (3d Cir. 2008).......................................................................................8

*United States v. Aiyer*,
   33 F.4th 97 (2d Cir. 2022) ..........................................................................................9

## Statutes

Sherman Act...................................................................................................................7

## Other Authorities

Justice & Fed. Trade Comm'n, *Antitrust Guidance for Human Resource
   Professionals* (Oct. 2016) ................................................................................1, 4, 8

iii

U.S. Dep't of Just., *Antitrust Division Manual* (5th Ed.) III(C)(1) (2018) ..................................3, 4

**Exhibits**

*United States of America v. Adobe Systems, Inc. et al.,*
    case no. 10-cv-01629, U.S. District Court for the District of Columbia ..................................A

*United States of America v. Knorr-Bremse AG, et al.*,
    case no. 18-cv-00747, U.S. District Court for the District of Columbia ..................................B

85200799v.2

## STATEMENT OF INTEREST

SHRM, the Society of Human Resource Management submits this *amicus* brief in support of Defendants' motion to dismiss the indictment.  SHRM is the foremost expert, convener and thought leader on issues impacting today's evolving workplaces and understands the importance of collaboration with industries through use of staffing partners and temporary workers to promote continued efficiency.

SHRM has over 315,000 HR and business executive members spanning 165 countries. Specifically, SHRM supports its members, by among other things, providing evidence-based insights, recommendations and innovations for workplace standards, operations and solutions. Thus, SHRM is intimately familiar with the common practices, procedures, and processes of thousands of companies across the country, many of which partner with staffing agencies and utilize a temporary workforce as part of their business model.  This has become even more critical over the last several years, due to the pandemic and other factors.  Importantly, it is the HR department of these companies that grapple with the practicalities and logistics of any potential antitrust issues that may arise in dealing with staffing companies.  Indeed, that is why the antitrust guidance released by the Federal Trade Commission and the Department of Justice in 2016 was directed to Human Resource Professionals.  *See* U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidance for Human Resource Professionals*, (Oct. 2016).

The present case signals a material and disquieting departure from the previous predictabilities in antitrust law relied on by HR professionals and instead seeks to apply the *per se* rule and criminal sanctions to a business collaboration between a company and its staffing partners.  It is not uncommon for companies, big and small, to incorporate temporary workers in their business operations model as doing so helps them manage their costs, increase their efficiencies and remain competitive.  As part of these partnerships, certain collaboration,

1

including hiring coordination between the company and its staffing partners that supply the temporary workers, is necessary and highly beneficial to the successful operation of the projects on which the temporary workers are staffed.  Because of the unique and complex context out of which the antitrust allegations arise in this case and the procompetitive benefits that flow from these collaborations, SHRM respectfully submits that alleged antitrust violations in this context must be addressed under the rule of reason.

## INTRODUCTION

Companies that partner with staffing firms to supplement their workforce oftentimes simultaneously utilize the services of multiple staffing firms to provide labor on the same project and at the same locations. That occurred, for example, in this case and in the case resulting in the Ninth Circuit's recent decision in *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1111 (9th Cir. 2021). Utilizing multiple staffing firms in this context necessarily requires coordination among the staffing firms and the clients if the project is going to be performed efficiently, or perhaps even at all. As the Ninth Circuit noted in *Aya Healthcare*, staffing firms are unwilling to participate on a project if the cost of doing so is having their workforce, in which they invested substantial resources in recruiting and training, will simply be poached by another staffing firm working on the same project. We know from the Ninth Circuit's decision in *Aya Healthcare* that at least in some circumstances no-poaching agreements in this context are perfectly lawful. But which ones? The Department of Justice says that in this case the alleged no-poaching agreement was not only unlawful, but was *per se* unlawful, and indeed criminal.

Such mixed messages place HR professionals in an impossible conundrum. Nothing in the Joint DOJ/FTC 2016 guidance tells HR professionals under what circumstances they may use multiple staffing firms with confidence, and in which cases they cannot. No bright line test is described. So HR professionals are left with the Hobson's choice of not utilizing multiple

2

staffing firms and accepting the inefficiencies that result or risk going to prison because whoever is running DOJ's or some state agency's antitrust division at the time believes it to be unlawful, criminally so. SHRM is aware of no study or analysis undertaken by DOJ or the FTC that has correctly concluded that the utilization of multiple staffing firms on single projects or at a single location for a client is inefficient or anticompetitive. Yet, the effect of prosecuting no-poaching agreements criminally in this context will ban them.

SHRM, therefore, respectfully submits that pursuit of criminal sanctions in this context is anticompetitive and wrong. Any hire restrictions in this context should be judged under the rule of reason, not the *per se* rule, for the following reasons: (i) courts do not have enough experience with these types of arrangements to say that they are always anticompetitive and have no redeeming value; (ii) restraints that are primarily vertical, as they are here, are judged under the rule of reason; (iii) the hiring restraint is ancillary to a legitimate business collaboration between the staffing partners and their client; and (iv) there are several procompetitive benefits that flow from this arrangement and declaring such arrangements to be *per se* unlawful would actually stifle competition and efficiencies in the distribution of products and services in the marketplace.

## ARGUMENT

### I.    ONLY LIMITED ANTITRUST VIOLATIONS SHOULD BE SUBJECT TO CRIMINAL PROSECUTION

Criminal prosecution is a severe sanction and should only be reserved for violations of established laws where there are clear lines as to what is criminal and what is not.  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (individuals should have a "reasonable opportunity to know what is prohibited, so that he may act accordingly").  Indeed, the DOJ's Antitrust Division has adopted a policy restricting criminal prosecution of antitrust violations to only clearly unlawful cases. U.S. Dep't of Just., *Antitrust Division Manual* (5th Ed.) III(C)(1) (2018).  The

DOJ states that it will criminally investigate and prosecute only cases "involving horizontal, per se unlawful agreements, such as price fixing, bid rigging, and customer and territorial allocations." *Id.* Whereas civil actions are more appropriate for other suspected antitrust violations, including those that require analysis under the rule of reason; where the case law is unsettled or uncertain; or where there is a novel issue of facts presented. *Id.* Similarly, the DOJ/FTC guidance issued to HR professionals in 2016 states: "the DOJ intends to proceed criminally against *naked* wage fixing or no-poaching agreements." U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidance for Human Resource Professionals*, p. 4 (Oct. 2016) (emphasis added).

As demonstrated below, the business collaboration between staffing partners and their clients and any hiring restrictions that flow from that relationship are far from naked restraints that are clearly *per se* unlawful.

## II. BUSINESS COLLABORATIONS BETWEEN A COMPANY AND ITS STAFFING PARTNERS MUST BE JUDGED UNDER THE RULE OF REASON.

### A. Courts Have Insufficient Experience of Anticompetitive Effects to Warrant *Per Se* Treatment

Courts, including the United States Supreme Court, have repeatedly affirmed that the *per se* standard applies only to restraints "that would always or almost always tend to restrict competition" and lack "any redeeming virtue." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* 551 U.S. 877, 886 (2007). Restraints that are unlawful *per se* are those that "have such predictable and pernicious anticompetitive effect and such limited potential for procompetitive benefit" that it is *obvious* they are unreasonable restraints on trade. *State Oil v. Khan*, 522 U.S. 3, 10 (1997). To that end, the *per se* rule is reserved for restraints with respect to which "courts have considerable experience" such that they "can predict with confidence that [the restraint] would be invalidated in all or almost all instances under the rule of reason." *Leegin*, 551 U.S. at

85200799v.2

886-87.  On this point, the Supreme Court notes, "we take special care not to deploy these condemnatory tools until we have amassed 'considerable experience with the type of restraint at issue.'"  *NCAA v. Alston*, 141 S. Ct. 2141, 2156 (2021) (citing *Leegin*, 551 U.S. at 886-87). Thus, most restraints are not *per se* unlawful, but instead are presumptively analyzed under the rule of reason where the finder of fact will take into account a variety of factors, including specific information about "the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature and affect."  *Khan*, 522 U.S. at 10; *Broad. Music, Inc. v. Columbia Broad Sys., Inc.*, 441 U.S. 1, 19, n. 33 (1979) ("[T]he per se rule is not employed until after considerable experience with the type of challenged restraint.").

The restraints at issue here are unique for several reasons which preclude use of the *per se* standard. Of particular importance is that this case involves an *intra*firm agreement where the staffing agencies are all providing temporary workers for the same client in order to enhance that client's *inter*brand competitiveness.  This type of arrangement is analogous to no-hire provisions in the franchise context where courts have consistently found that the rule of reason applies. *Conrad v. Jimmy John's Franchise LLC*, No. 18-CV-00133, 2021 WL 3268339, at *10-11 (S.D. Ill. July 30, 2021) (finding "the rule of reason applies in this monopsony case challenging a nationwide franchise's use of intrabrand restraints that were arguably designed to help the company for effectively compete with other brands) (relying on *NCAA,* 141 S. Ct. at 2156)); *Arrington v. Burger King Worldwide, Inc.*, 448 F. Supp. 3d 1322, 1331-32 (S.D. Fla. 2020) (concluding that a franchisor's no-hire provision constituted "an internal agreement to implement a single unitary firm's policy"); *Ogden v. Little Caesar Enterprises, Inc.,* 393 F. Supp. 3d 622, 634 (E.D. Mich. 2019) (finding application of the rule of reason appropriate "where the no-poaching clause explicitly prohibits only intrabrand hiring").  Additionally, the Ninth Circuit

5

recently analyzed a similar case involving a no-hire agreement between staffing firms and likewise determined that the rule of reason is the applicable standard. *Aya Healthcare,* 9 F.4th at 1111.

It is clear then, that courts do not have sufficient experience with the type of restraints at issue—an intrabrand agreement involving vertical hiring coordination between a client and its staffing partners to support the client's competitiveness in the overall market—to say that the business collaboration has no redeeming value and to condemn these business arrangements as *per se* unlawful. *See Eichorn v. AT&T Corp.*, 248 F.3d 131, 143 (3d Cir. 2001) (finding "no support" for the proposition that a "non-hire agreement [i]s *per se* illegal."); *Delandes v. McDonald's USA, LLC*, No. 17 C 4857, 2021 WL 3187668, *7 (N.D. Ill. July 28, 2021) (finding that the no-poach provision in the franchise agreement between McDonald's and its franchisees falls in 'the great-in-between' of restraints that the require rule-of-reason analysis" because the "court cannot say that it has enough experience with no-hire provisions of franchise agreement to predict with confidence that they must always be condemned"). This Court, therefore, should find that the rule of reason is the appropriate standard.

**B.    The *Per Se* Rule Does Not Apply to Vertical Restraints or Principally Vertical Restraints**

While the agreement at issue in this case may involve certain coordination among horizontal competitors (the staffing partners), they are principally vertical arrangements between each staffing company and the client. Because these bilateral agreements are between entities at different levels of the distribution chain, they are classic "vertical" agreements for purposes of antitrust law:

> It is important to distinguish between 'horizontal' restraints, i.e., agreements between competitors at the same level of the market structure, and 'vertical' restraints, i.e., combinations of persons at different levels of the market structure, such as manufacturers and distributors. Horizontal restraints alone have been

6

characterized as 'naked restraints of trade with no purposes except stifling competition, and therefore, per se violations of the Sherman Act. On the other hand, while vertical restrictions may reduce intrabrand competition . . . they also promote interbrand competition by allowing a manufacturer to achieve certain efficiencies in the distribution of its products. They are, therefore, to be examined under the Rule of Reason standard.

*Oreck Corporation v. Whirlpool Corporation,* 579 F.2d 126, 131 (2d Cir. 1978) (internal citations omitted); *Continental TV, Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 51, 97 S. Ct. 2549, 53 (1977) ("The market impact of vertical restrictions is complex because of their potential for a simultaneous reduction of intrabrand competition and stimulation of interbrand competition.").

In an analogous line of cases, courts consistently found that no-hire restrictions in the franchise context are *vertical* restraints and the rule of reason applies. *Midwestern Waffles Inc. v. Waffle House, Inc.*, 734 F.2d 705, 720 (11th Cir. 1984) (recognizing that an agreement between franchisor and franchisee is of a vertical nature because it is between the parties at different levels of the market structure); *Ogden,* 393 F. Supp. 3d 622, 633 (same); *Conrad,* 2019 WL 2754864, *1 (same). Indeed, the DOJ, in a statement of interest, explicitly agreed:

The per se rule does not apply to all no-hire and no-solicitation agreements, however. The franchise relationship is in many respects a vertical one because the franchisor and franchisee normally conduct business at different levels of the market structure. Restraints imposed by agreement between the two are usually vertical and thus assessed under the rule of reason. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018).

DOJ Statement of the United States of America filed in *Stiger v. Dough, Inc.,* No. 2:18-CV-00247 (E.D. Wash. Mar. 7. 2019) at p. 11. Like in the franchise context, the primary business collaboration from which the hiring restriction stems is the relationship between the company and its staffing partners—a vertical relationship. In other words, the company and the staffing partners are not direct competitors and are clearly at different levels of the market structure. Thus, this Court should find that the rule of reason is the appropriate standard since the hiring restriction at issue involves primarily vertical arrangements.

7

Even if this arrangement were characterized as a hybrid horizontal-vertical arrangement where the staffing agencies are deemed competitors, the potential horizontal component does not change the outcome since the principal arrangement is vertical. Courts consistently find that where the allegations involve mixed horizontal and vertical relationships, the rule of reason applies. That is because, as the Supreme Court recognizes, "the analysis of any agreement having some vertical component is complex and not amenable to the *per se* approach." *Ogden*, 93 F. Supp. 3d at 634 (citing *Continental TV, Inc.*, 433 U.S. at 51); *see also Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 225 (3d Cir. 2008) (finding that "the rule of reason analysis applies even when . . . the plaintiff alleges that the purpose of the vertical agreement between a manufacturer and its dealers is to support illegal horizontal agreements between multiple dealers) (relying on *Leegin*, 127 S. Ct. at 2717); *nFinanSe, Inc. v. Interactive Commc'ns Int'l, Inc.,* No. 1:11-CV-3728-AT, 2012 WL 13009231, at *7 (N.D. Ga. July 24, 2012), amended, No. 1:11-CV-3728-AT, 2012 WL 13013003 (N.D. Ga. Oct. 15, 2012) (dismissing per se claim challenging conduct which involved both vertical and horizontal restraints).

### C.    The Hiring Practice at Issue is Ancillary to a Legitimate Business Collaboration between the Company and its Staffing Partners

Even if the Court were to consider the hiring coordination at issue here horizontal restraints between competitors, which it is not, not all horizontal restraints are *per se* unlawful. Instead, only naked horizontal restraints are treated as *per se* unlawful. In fact, as mentioned previously, it is only naked restraints that the DOJ announced it would prosecute criminally. U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidance for Human Resource Professionals*, (Oct. 2016). Where the horizontal restraint is ancillary to legitimate transactions, then the rule of reason must be applied. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 679,

689 (1978) ("The Rule of Reason . . . has been regarded as a standard for testing the enforceability of covenants in restraint of trade which are ancillary to a legitimate transaction.") Courts consider a restraint ancillary if it "promoted enterprise and productivity when it was adopted." *Polk Bros., Inc. v. Forest City Enterprises, Inc.,* 776 F.2d 185, 189 (7th Cir. 1985); *Nat'l Bancard Corp. (NaBanco) v. VISA USA, Inc.*, 779 F.2d 592, 603 (11th Cir. 1986) (noting that close attention must be paid "to procompetitive, efficiency-creating integration that is accomplished as the result of an anticompetitive, yet ancillary, restraint"); *In re Terazosin Hydrochloride Antitrust Litigation*, 352 F. Supp. 2d 1279, 1314 (S.D. Fla. 2005) (noting that "ancillary" restraints resulting "in an efficiency-enhancing integration among the parties to the agreement" are not *per se* illegal).

The ancillary restraints doctrine governs the validity of restrictions imposed by a legitimate business collaboration and exempts those agreements from the *per se* rule. *United States v. Aiyer*, 33 F.4th 97, 115 (2d Cir. 2022). The doctrine is applicable where the restraints are subordinate to a legitimate transaction and make the main transaction more effective in accomplishing its purpose. *Schering-Plough Corp. v. F.T.C.,* 402 F.3d 1056, 1072 (11th Cir. 2005) (citing *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986)). Here, any hiring coordination between the staffing partners and the client is clearly ancillary to the overarching business collaboration and thus application of the ancillary restraints doctrine is warranted. The rule of reason should apply.

The Ninth Circuit's decision in *Aya Healthcare* is instructive here. Similar to this case, *Aya Healthcare* involves staffing firms and their ability to service a client with temporary workers. There, the threshold question was whether the no-hire agreement between the staffing firms was "naked or ancillary, and in turn, whether it [was] *per se* unlawful." *Aya,* 9 F.4th at

9

1009.  The district court found, and the Ninth Circuit agreed, that the agreement was "part of a collaboration agreement to fulfill the demand of hospitals for travel nurses, which constitutes a procompetitive purpose." *Id.* (internal quotations omitted).  To that end, the court found that restraint assisted in achieving the parties' objective of supplying hospitals with travelling nurses because it ensured that AMN will not lose its personnel during the collaboration, and without the restraint, "AMN "would likely be less willing or unwilling to deal with other agencies to supply travel nurses." *Id.* at 1110. In other words, with the restraint, AMN could "collaborate with its competitor for the benefit of its client without cutting [its] own throat." *Id.* (citing and quoting *Polk Bros*, 776 F.2d at 189).  Because the restraint was ancillary, the rule of reason, not the *per se* standard, applied.  *Id.*

The same analysis is applicable here.  The restraint allows the staffing partners to collaboratively service their client by providing temporary workers for specific projects without fear that the other staffing partners will recruit and steal their employees.  But for the restraint, it is unlikely that the staffing partners would be willing to work alongside each other in service of the client, and it would limit the necessary resources available to the client.  This collaboration and the corresponding restraint, therefore, has a procompetitive effect because without it, the client would not likely be able to fulfill its demand for workers and its output would decrease. *See Polk*, 776 F.2d at 189 ("A restraint is ancillary when it may contribute to the success of a cooperative venture that promises greater productivity and output.").  As discussed in the next section, there are procompetitive benefits that result from these collaborations.  Since the ancillary restraints doctrine is applicable, the rule of reason analysis is required.

### III.     THERE ARE SEVERAL PROCOMPETITIVE BENEFITS TO THE BUSINESS COLLABORATION AT ISSUE THAT PRECLUDE AN ANTITRUST CLAIM

Sourcing workers from staffing partners is a common practice among employers, particularly businesses with large workforces.  *See e.g., Kforce Inc. v. Beacon Hill Staffing Group LLC*, No. 4:14-CV-1880, 2015 WL 128060, at *1 (E.D. Mo. Jan. 8, 2015) ("The staffing industry is highly competitive and there is substantial customer and client overlap within the industry. Companies often request multiple staffing agencies in filling the same job openings.") The conduct alleged in this case—coordination between a company and its staffing partners about hiring—is a practical necessity and have several procompetitive benefits and effects.  From a human resources perspective, the ability to collaborate with and rely on staffing partners to fulfill its staffing needs is particularly crucial to the operation of their business.

First, companies sometimes rely on their staffing partners to recruit, hire, and train their employees in order to perform the services needed by the company.  Such recruitment and training is particularly important when looking for skilled workers such as engineers, because the employees sought to fill the role are highly specialized with a particular set of skills needed for the project.  Logically, staffing firms are highly accomplished at recruiting the specialized talent needed, as they have resources to devote specifically to recruitment and hiring efforts, as well as training.  Staffing firms also have substantial experience locating skilled workers in particular markets.  Indeed, their entire business model is devoted to finding and providing specialized workers for their clients. Accordingly, these type of hiring agreements provide confidence for the staffing partners that their efforts will not be in vain, and the staffing firms are therefore incentivized to contribute more resources and effort in recruitment, hiring and training.  Having staffing partners incentivized to devote time and effort for hiring and training is particularly important for the companies that these staffing partners work with.  The companies benefit by

11

having skilled and trained temporary workers that can immediately and meaningfully contribute to the project. *Delandes v. McDonald's USA, LLC*, No. 17 C 4857, 2021 WL 3187668, *7 (N.D. Ill. July 28, 2021) (recognizing that there are several conceivable procompetitive effects that flow from the no-hire restriction in the franchise agreement such as the "free-rider" problem); *Conrad,* 2021 WL 3268339, *10 (acknowledging that most workers "likely *benefited* from the No-Poach Provision because it gave franchisees an added incentive to provide more training, thus promoting employee advancement.") (emphasis in original).  Moreover, by being able rely on staffing partners to identify and train the right talent and highly skilled workers for a particularly complex project without fear of other staffing companies poaching those employees, human resources departments are relieved of that burden and can focus their efforts on the efficiencies of their operation and the particulars of a project.  In turn, companies increase output and overall demand for their brand or product.

Second, a procompetitive benefit to this type of hiring coordination is that when the staffing partners are restricted from simply recruiting and hiring each other's employees, they are incentivized to find new candidates and talent to fill the roles needed by the companies and invest more resources into recruitment and training.  One of the main reasons that companies may use multiple staffing partners for a single project is because often a single staffing company cannot fully meet a company's demand.  *See Aya Healthcare,* 9 F.4th at 1106 (describing how staffing agency would refer and contract our assignments to other staffing agencies to meet client demands); *Ondes v. Monsanto Co.*, No. 4:11-cv-197, 2011 WL 6152858, at *4 (E.D. Mo. Dec. 12, 2011) (noting that company used employees from nine different staffing agencies for a single department).  SHRM is aware of no study that says that utilizing multiple staffing firms for a single project or within a single facility is inherently anti-competitive.  Rather, there is a

12

substantial benefit to companies and the labor market when staffing partners must consistently recruit and train new talent rather than simply recycling existing talent. In other words, if no new talent is hired and the staffing partners are consistently hiring each other's workers for the same projects, then no other workers are being given an opportunity to work on the project. Likewise, the company's demand for workers is likely not being fulfilled and the output therefore is likely lower. Succinctly stated, the hiring restriction at issue is an *intra*brand limitation that is designed to enhance the competitiveness of a company in the *inter*brand market.

Third, as is evident in cases like this one, it is not uncommon for a company to use multiple staffing partners to fill its need for a single project. It is imperative that those staffing partners can work together in a cooperative manner in order to minimize workplace disruptions and offer a positive, stable work environment for the employees. Thus, having procedures in place that minimize poaching workers between staffing partners promotes comradery and cooperation among the staffing partners, and creates more—not less—stability and opportunity for temporary employees. *See Condon*, 2021 WL 3268339, *10 (acknowledging that a "pro-competitive justification" of the no-hire provision is "promot[ing] cooperation between franchisees, increasing coordination and thus increasing the overall demand for the brand."); *Aya Healthcare*, 9 F.4th at 1110 (acknowledge that a procompetitive benefit of the restraint is that it allows AMN to "collaborate with its competitor for the benefit of the client without 'cutting its own throat'"). These procompetitive benefits flow directly from the hiring restriction and the business collaboration between the company and its staffing partners.

## IV. THE CRIMINALIZATION OF THE CONDUCT AT ISSUE WOULD HAVE EXTREME NEGATIVE AFFECTS ON BUSINESS OPERATIONS

Finally, courts should be mindful of the chilling effect that application of the *per se* rule would have on collaborations that would otherwise be procompetitive. This chilling effect is

13

particularly powerful where, as here, criminal sanctions are being pursued. Companies employ HR professionals to make sound business decisions with respect to its business needs, operations, hiring, and outsourcing. If those professionals fear that certain decisions or collaborations with other companies could lead to them to being criminally prosecuted for those decisions, they will be much less willing, or entirely unwilling, to engage in those collaborations. This could, in turn, severely stifle, if not eliminate, the procompetitive benefits discussed above. It is not fanciful to assume that the threat of criminal prosecution for coordination will simply lead employers away from utilizing temporary workers whose lifeblood for opportunities and experience is the staffing agencies that have existing relationships with employers.

Moreover, HR professionals should be able to rely on the past conduct of the Government as guidance for how to make business decisions for the companies for which they work. Importantly, in the recent past, the business collaborations at issue has been expressly or impliedly authorized by the Government. Indeed, the Government's position in this case is contrary to its former guidance and directly contradicts positions it has taken in other cases. In *United States of America v. Adobe Systems, Inc. et al.,* case no. 10-cv-01629, pending in the U.S. District Court for the District of Columbia, the Government stipulated to a final judgment that resolved an alleged antitrust violation involving a no-hire agreement. In agreeing to the judgment, the Government specifically carved out as "non-prohibited conduct" non-solicitation agreements entered into with recruiting agencies or providers or temporary workers. Specifically, the Final Judgment stated:

> Nothing in Section IV, shall prohibit a Defendant or any other person from attempting to enter into, entering into, maintaining or enforcing a no direct solicitation provision, provided the no direct solicitation provision is: . . . (3) reasonably necessary for contracts with consultants or recipients of consulting services, auditors, outsourcing vendors, recruiting agencies, or *providers of temporary workers or contract workers.*

14

(*Adobe Systems* Final Judgment, Section V(A)(3) attached as Exhibit 1) (emphasis added). Likewise, in *United States of America v. Knorr-Bremse AG, et al.*, case no. 18-cv-00747, pending in the U.S. District Court for the District of Columbia, the Government stipulated to a final judgment that carved out non-solicitation agreements that are "ancillary to a legitimate business collaboration." (*Knorr-Bremse AG* Final Judgment, Section V(A), attached as Exhibit 2). The Government has now done an about-face seeking the most severe sanctions against individuals engaged in conduct that was previously permitted.

In the end, what is abundantly clear is that the hiring restraint that is part of the business collaboration between a company and its staffing partners has several procompetitive effects causing it to fall in the "great in-between" of restraints and operates to make the principal collaboration between the client and the staffing partners more effective in accomplishing their objectives that are the focus on the ancillary agreement between the two. Thus, the rule of reason must apply so that a full analysis can be conducted.

## CONCLUSION

The Society of Human Resource Management therefore respectfully requests that this Court find that it must analyze the hiring restraint that is part of the business collaboration between the company and its staffing partners under the rule of reason. Because the Government has committed to only pursuing criminally, and only alleged a, *per se* claim here, the Court should dismiss the indictment.

Dated: August 3, 2022                    Respectfully submitted,

                                         */s/William Hanlon*
                                         William Hanlon (ct02886)
                                         Christopher F. Robertson
                                         Kristine Argentine
                                         Seyfarth Shaw LLP
                                         Two Seaport Lane, Suite 1200
                                         Boston, MA 02210
                                         Tel: (617) 946-4800
                                         Fax: (617) 946-4801
                                         whanlon@seyfarth.com
                                         crobertson@seyfarth.com
                                         kargentine@seyfarth.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2022, a copy of the foregoing document was filed electronically through the Court's ECF system. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                                         */s/ William Hanlon*
                                         William Hanlon

85200799v.2

**Exhibit 1**

# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

                    *Plaintiff*,

    v.

KNORR-BREMSE AG

and

WESTINGHOUSE AIR BRAKE
TECHNOLOGIES CORPORATION,

                    *Defendants*.

## STIPULATION AND ORDER

It is hereby stipulated and agreed by and between the undersigned parties, subject to approval and entry by the Court, that:

1.    The Court has jurisdiction over the subject matter of this action and over each of the parties hereto; Defendants waive service of summons of the Complaint; and venue of this action is proper in the United States District Court for the District of Columbia.

2.    The parties stipulate that a Final Judgment in the form attached hereto as Exhibit A may be filed with and entered by the Court, upon the motion of any party or upon the Court's own motion, at any time after compliance with the requirements of the Antitrust Procedures and Penalties Act ("APPA"), 15 U.S.C. § 16, and without further notice to any party or other proceedings, provided that the United States has not withdrawn its consent, which it may do at any time before the entry of the proposed Final Judgment by serving notice thereof on each Defendant and by filing that notice with the Court.

3.      Defendants agree to arrange, at their expense, publication as quickly as possible of the newspaper notice required by the APPA, which shall be drafted by the United States in its sole discretion.  The publication shall be arranged no later than three business days after the Defendants' receipt from the United States of the text of the notice and the identity of the newspaper within which the publication shall be made.  Defendants shall promptly send to the United States (1) confirmation that publication of the newspaper notice has been arranged, and (2) the certification of the publication prepared by the newspaper within which the notice was published.

4.      Defendants shall abide by and comply with the provisions of the proposed Final Judgment, pending the proposed Final Judgment's entry by the Court, or until expiration of time for all appeals of any Court ruling declining entry of the proposed Final Judgment, and shall, from the date of the signing of this Stipulation by the parties, comply with all the terms and provisions of the proposed Final Judgment. The United States shall have the full rights and enforcement powers in the proposed Final Judgment as though the same were in full force and effect as an order of the Court.

5.      This Stipulation shall apply with equal force and effect to any amended proposed Final Judgment agreed upon in writing by the parties and submitted to the Court.

6.      In the event: (1) the United States has withdrawn its consent, as provided in Paragraph 2 above, or (2) the proposed Final Judgment is not entered pursuant to this Stipulation, the time has expired for all appeals of any Court ruling declining entry of the proposed Final Judgment, and the Court has not otherwise ordered continued compliance with the terms and provisions of the proposed Final Judgment, then the parties are released from all

2

further obligations under this Stipulation, and the making of this Stipulation shall be without prejudice to any party in this or any other proceeding.

7.    The Defendants represent that the actions they are required to perform pursuant to the proposed Final Judgment can and will be performed, and that the Defendants will later raise no claim of mistake, hardship or difficulty of compliance as grounds for asking the Court to modify any of the provisions contained therein.

Dated: April 3, 2018

Respectfully submitted,

FOR PLAINTIFF UNITED STATES:

Doha Mekki
United States Department of Justice
Antitrust Division
Defense, Industrials, and Aerospace Section
450 Fifth Street N.W., Suite 8700
Washington, D.C. 20530
Telephone: (202) 598-8023
Facsimile: (202) 514-9033
doha.mekki@usdoj.gov

FOR DEFENDANT KNORR-BREMSE AG:

Mark H. Hamer
Baker & McKenzie LLP
815 Connecticut Avenue, NW
Washington, DC 20006
Telephone: (202) 452-7077
Facsimile: (202) 416-7177
mark.hamer@bakermckenzie.com

FOR DEFENDANT WESTINGHOUSE AIR
BRAKE TECHNOLOGIES CORPORATION:

Craig A. Waldman
Jones Day
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 875-5765
Facsimile: (415) 963-6813
cwaldman@jonesday.com

3

ORDER

IT IS SO ORDERED by this Court, this _____ day of

_____.

_____
United States District Judge

4

# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

*Plaintiff*,

v.

KNORR-BREMSE AG,

and

WESTINGHOUSE AIR BRAKE
TECHNOLOGIES CORPORATION,

*Defendants*.

## [PROPOSED] FINAL JUDGMENT

WHEREAS, Plaintiff, United States of America, filed its Complaint on April 3, 2018, alleging that Defendants Knorr-Bremse AG and Westinghouse Air Brake Technologies Corporation violated Section 1 of the Sherman Act, 15 U.S.C. § 1, the United States and the Defendants, by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law;

AND WHEREAS, this Final Judgment does not constitute any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, the Defendants agree to be bound by the provisions of this Final Judgment pending its approval by this Court;

AND WHEREAS, the United States requires the Defendants to agree to undertake certain actions and refrain from certain conduct for the purpose of remedying the anticompetitive effects alleged in the Complaint;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED, AND DECREED:

## I.    JURISDICTION

This Court has jurisdiction over the subject matter and each of the parties to this action. The Complaint states a claim upon which relief may be granted against the Defendants under Section 1 of the Sherman Act, as amended, 15 U.S.C. § 1.

## II.    DEFINITIONS

As used in this Final Judgment:

A.    "Knorr" and "Defendant" (when that term is applicable to Knorr) means Knorr-Bremse AG, a German corporation with its headquarters in Munich, Germany, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

B.    "Wabtec" and "Defendant" (when that term is applicable to Wabtec) means Westinghouse Air Brake Technologies Corporation, a Delaware corporation with its headquarters in Wilmerding, Pennsylvania, its successors and assigns, and its subsidiaries (including Faiveley Transport), divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees. Wabtec acquired Faiveley Transport S.A., a French société anonyme based in Gennevilliers, France, on November 30, 2016.

C.    "Agreement" means any agreement, understanding, pact, contract, or arrangement, formal or informal, oral or written, between two or more persons.

D.     "HR Management" means directors, officers, and human resource employees of the Defendant who supervise or have responsibility for recruiting, solicitation, or hiring efforts affecting the United States.

E.     "No-Poach Agreement" or "No-Poach Provision" means any Agreement, or part of an Agreement, among two or more employers that restrains any person from cold calling, soliciting, recruiting, hiring, or otherwise competing for (i) employees located in the United States being hired to work in the United States or outside the United States or (ii) any employee located outside the United States being hired to work in the United States.

F.     "Person" means any natural person, corporation, company, partnership, joint venture, firm, association, proprietorship, agency, board, authority, commission, office, or other business or legal entity, whether private or governmental.

G.     "Management" means all officers, directors, and board members of Knorr-Bremse AG or Westinghouse Air Brake Technologies Corporation, or anyone with management or supervisory responsibilities for Knorr's or Wabtec's U.S. business or operations.

## III.    APPLICABILITY

This Final Judgment applies to Knorr and Wabtec, and to all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

## IV.    PROHIBITED CONDUCT

Each Defendant is enjoined from attempting to enter into, entering into, maintaining, or enforcing any No-Poach Agreement or No-Poach Provision.

## V.     CONDUCT NOT PROHIBITED

A.     Nothing in Section IV shall prohibit a Defendant from attempting to enter into, entering into, maintaining, or enforcing a reasonable Agreement not to solicit, recruit, or hire employees that is ancillary to a legitimate business collaboration.

B.     All Agreements not to solicit, recruit, or hire employees described in Paragraph V(A) that a Defendant enters into, renews, or affirmatively extends after the date of entry of this Final Judgment shall:

     1.     be in writing and signed by all parties thereto;

     2.     identify, with specificity, the Agreement to which it is ancillary;

     3.     be narrowly tailored to affect only employees who are reasonably anticipated to be directly involved in the Agreement;

     4.     identify with reasonable specificity the employees who are subject to the Agreement; and

     5.     contain a specific termination date or event.

C.     Defendants shall not be required to modify or conform, but shall not enforce, any No-Poach Provision to the extent it violates this Final Judgment if the No-Poach Provision appears in a Defendant's agreement in effect as of the date of entry of this Final Judgment (or in effect as of the time a Defendant acquires a company that is a party to such an Agreement).

D.     Nothing in Section IV shall prohibit a Defendant from unilaterally deciding to adopt a policy not to consider applications from employees of another person, or to solicit, cold call, recruit, or hire employees of another person, provided that Defendants are prohibited from:

    1.     requesting, encouraging, proposing, or suggesting that any person other

than the Defendant and its agents adopt, enforce, or maintain such a

policy; or

    2.     notifying the other person that the Defendant has decided to adopt such a

policy.

## VI.    REQUIRED CONDUCT

A.    Within ten (10) days of entry of this Final Judgment, each Defendant shall appoint an Antitrust Compliance Officer and identify to Plaintiff his or her name, business address, and telephone number.

B.    Each Antitrust Compliance Officer shall:

    1.     within sixty (60) days of entry of the Final Judgment, furnish to all of the

Defendant's Management and HR Management a copy of this Final

Judgment, the Competitive Impact Statement, and a cover letter in a form

attached as Exhibit 1;

    2.     within sixty (60) days of entry of the Final Judgment, in a manner to be

devised by each Defendant and approved by the United States, provide the

Defendant's U.S. employees reasonable notice of the meaning and

requirements of this Final Judgment;

    3.     annually brief the Defendant's Management and HR Management on the

meaning and requirements of this Final Judgment and the antitrust laws;

    4.     within sixty (60) days of such succession, brief any person who succeeds a

person in any position identified in Paragraph VI(B)(3);

5.     obtain from each person designated in Paragraph VI(B)(3) or VI(B)(4),

within sixty (60) days of that person's receipt of the Final Judgment, a

certification that he or she (i) has read and, to the best of his or her ability,

understands and agrees to abide by the terms of this Final Judgment; (ii) is

not aware of any violation of the Final Judgment that has not been

reported to the Defendant; and (iii) understands that any person's failure

to comply with this Final Judgment may result in an enforcement action

for civil or criminal contempt of court against the Defendant and/or any

person who violates this Final Judgment;

6.     maintain (i) a copy of all Agreements covered by Paragraph V(A) and (ii)

a record of certifications received pursuant to this Section;

7.     annually communicate to the Defendant's employees that they may

disclose to the Antitrust Compliance Officer, without reprisal, information

concerning any potential violation of this Final Judgment or the antitrust

laws;

8.     within sixty (60) days of entry of the Final Judgment, furnish a copy of

this Final Judgment, the Competitive Impact Statement, and a cover letter

in a form attached as Exhibit 2 to all recruiting agencies or providers of

temporary employees or contract workers retained by the Defendant for

recruiting, soliciting, or hiring efforts affecting the Defendant's business

activities in the United States at the time of entry of the Final Judgment or

subsequently retained by the Defendant during the term of the Final

Judgment; and

6

9.      furnish a copy of all materials required to be issued pursuant to Paragraph

VI(B) to the United States within seventy-five (75) days of entry of the

Final Judgment.

C.      Within thirty (30) days of entry of the Final Judgment, Defendants shall furnish

notice of this action to the rail industry through (1) the placement of an advertisement, at the

expense of Knorr and Wabtec equally, to be run in one monthly edition of an industry trade

publication approved by the United States in a form approved by the United States prior to

publication and containing the text of Exhibit 3, and (2) the creation of website pages linked to

the corporate websites of Knorr and Wabtec, respectively, to be posted for no less than one (1)

year after the date of entry of the Final Judgment, containing the text of Exhibit 3 and links to the

Final Judgment, Competitive Impact Statement, and Complaint on the Antitrust Division's

website.

D.      Each Defendant shall:

1.      upon Management or HR Management learning of any violation or

potential violation of any of the terms and conditions contained in this

Final Judgment, promptly take appropriate action to terminate or modify

the activity so as to comply with this Final Judgment and maintain all

documents related to any violation or potential violation of this Final

Judgment;

2.      within sixty (60) days of Management or HR Management learning of any

violation or potential violation of any of the terms and conditions

contained in this Final Judgment, file with the United States a statement

describing any violation or potential violation, which shall include a

7

description of any communications constituting the violation or potential

violation, including the date and place of the communication, the persons

involved, and the subject matter of the communication; and

3.      have its CEO or CFO, and its General Counsel, certify to the United States

annually on the anniversary date of the entry of this Final Judgment that

the Defendant has complied with the provisions of this Final Judgment.

## VII.   DEFENDANTS' COOPERATION

A.      Each Defendant shall cooperate fully and truthfully with the United States in any

investigation or litigation examining whether or alleging that the Defendant entered into a No-

Poach Agreement with any other person in violation of Section 1 of the Sherman Act, as

amended, 15 U.S.C. § 1.  Each Defendant shall use its best efforts to ensure that all current and

former officers, directors, employees, and agents also fully and promptly cooperate with the

United States.  The full, truthful, and continuing cooperation of each Defendant shall include, but

not be limited to:

1.      providing sworn testimony to the United States regarding each No-Poach

Agreement between the Defendant and any other person;

2.      producing, upon request of the United States, all documents and other

materials, wherever located, not protected under the attorney-client

privilege or the attorney work-product doctrines, in the possession,

custody, or control of that Defendant, that relate to any No-Poach

Agreement between that Defendant and any other person;

3.      making available for interview any officers, directors, employees, and

agents if so requested by the United States; and

8

4. testifying at trial and other judicial proceedings fully, truthfully, and under oath, subject to the penalties of perjury (18 U.S.C. § 1621), making a false statement or declaration in court proceedings (18 U.S.C. § 1623), contempt (18 U.S.C. §§ 401-402), and obstruction of justice (18 U.S.C. § 1503, *et seq.*) when called upon to do so by the United States;

5. provided however, that the obligations of each Defendant to cooperate fully with the United States as described in this Section shall cease upon the conclusion of all the United States' investigations and the United States' litigation examining whether or alleging that the Defendant agreed to any No-Poach Agreement with any other person in violation of Section 1 of the Sherman Act, as amended, 15 U.S.C. § 1, including exhaustion of all appeals or expiration of time for all appeals of any Court ruling in each such matter.

B. Subject to the full, truthful, and continuing cooperation of each Defendant, as defined in Paragraph VII(A), the United States agrees that it will not bring any further civil actions or criminal charges against that Defendant for any No-Poach Agreement with any other person that:

1. was entered into and terminated on or before the date of the filing of the Complaint in this action;

2. was disclosed to the United States before the date of the filing of the Complaint in this action; and

3. does not in any way constitute or include an agreement to fix wages, compensation, or other benefits.

9

C.    The United States' agreement set forth in Paragraph VII(B) does not apply to any acts of perjury or subornation of perjury (18 U.S.C. §§ 1621-22), making a false statement or declaration (18 U.S.C. §§ 1001, 1623), contempt (18 U.S.C. §§ 401-402), or obstruction of justice (18 U.S.C. § 1503, *et seq.*) by the Defendant or its officers, directors, employees, and agents.

## VIII.   COMPLIANCE INSPECTION

A.    For the purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally-recognized privilege, from time to time authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to each Defendant be permitted:

1.    access during each Defendant's office hours to inspect and copy, or at the option of the United States, to require each Defendant to provide electronic or hard copies of, all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of each Defendant, relating to any matters contained in this Final Judgment; and

2.    to interview, either informally or on the record, each Defendant's officers, employees, or agents, who may have counsel, including their individual counsel, present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by any Defendant.

10

B.      Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, each Defendant shall submit written reports or responses to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C.      No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.      If at the time information or documents are furnished by a Defendant to the United States, the Defendant represents and identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and the Defendant marks each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," then the United States shall give the Defendant ten (10) calendar days' notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## IX.    RETENTION OF JURISDICTION

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

11

## X.    ENFORCEMENT OF FINAL JUDGMENT

A.    The United States retains and reserves all rights to enforce the provisions of this Final Judgment, including its right to seek an order of contempt from this Court. Defendants agree that in any civil contempt action, any motion to show cause, or any similar action brought by the United States regarding an alleged violation of this Final Judgment, the United States may establish a violation of the decree and the appropriateness of any remedy therefor by a preponderance of the evidence, and they waive any argument that a different standard of proof should apply.

B.    In any enforcement proceeding in which the Court finds that the Defendants have violated this Final Judgment, the United States may apply to the Court for a one-time extension of this Final Judgment, together with such other relief as may be appropriate. In connection with any successful effort by the United States to enforce this Final Judgment against a Defendant, whether litigated or resolved prior to litigation, that Defendant agrees to reimburse the United States for any attorneys' fees, experts' fees, and costs incurred in connection with that enforcement effort, including the investigation of the potential violation.

## XI.    EXPIRATION OF FINAL JUDGMENT

Unless this Court grants an extension, this Final Judgment shall expire seven (7) years from the date of its entry, except that after five (5) years from the date of its entry, this Final Judgment may be terminated upon notice by the United States to the Court and the Defendants that the continuation of the Final Judgment no longer is necessary or in the public interest.

12

## XII.   NOTICE

For purposes of this Final Judgment, any notice or other communication required to be provided to the United States shall be sent to the person at the address set forth below (or such other addresses as the United States may specify in writing to the Defendants):

Chief
Defense, Industrials, and Aerospace Section
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8700
Washington, D.C. 20530

## XIII.   PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest. The parties have complied with the Procedures of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States' responses to comments. Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this final judgment is in the public interest.

Date: _____

Court approval subject to procedures of Antitrust Procedures and Penalties Act, 15 U.S.C. § 16

_____
United States District Judge

13

## EXHIBIT 1

[Company Letterhead]

[Name and Address of Antitrust Compliance Officer]

     Re:    *Agreements Not to Solicit Employees from Other Companies*

Dear [XX]:

     I am providing you this notice regarding a judgment recently entered by a federal judge in Washington, D.C. affecting our employee recruiting, soliciting, and hiring practices. The judgment applies to our company and all of its employees, including you, so it is important that you understand the obligations it imposes on us. [CEO Name] has asked me to let each of you know that [s/he] expects you to take these obligations seriously and abide by them.

     The judgment prohibits us from agreeing with any other employer not to solicit, cold call, or recruit each other's employees. This includes seeking permission or approval before considering or approaching an employee of the employer about a potential opportunity or requiring the other employer to seek permission or approval from us before considering or approaching one of our employees. There are limited exceptions to this restriction. You must consult me before determining whether a particular employer is subject to an exception under the judgment.

     A copy of the court order is attached. Please read it carefully and familiarize yourself with its terms. The judgment, rather than the above description, is controlling. If you have any questions about the judgment or how it affects your recruiting and hiring activities, please contact me as soon as possible.

     Thank you for your cooperation.

                             Sincerely,
                             [Defendant's Antitrust Compliance Officer]

**EXHIBIT 2**

[Company Letterhead]

[Name and Address of Antitrust Compliance Officer]

    *Re:    Agreements Not to Solicit Employees from Other Companies*

Dear [XX]:

I am providing you this notice regarding a judgment recently entered by a federal judge in Washington, D.C. affecting [Defendant's] employee recruiting, soliciting, and hiring practices. The judgment applies to [Defendant] and all of its employees, so it is important that you understand the obligations it imposes on your recruiting activities for [Defendant]. [CEO Name] has asked me to let you know that [s/he] expects you to take these obligations seriously and abide by them, irrespective of any contrary instructions you may receive from any other employee or officer of [Defendant].

The judgment prohibits [Defendant] from agreeing with another employer not to solicit, cold call, or recruit each other's employees. This includes seeking permission or approval before considering or approaching an employee of the other employer about a potential opportunity or requiring the other employer to seek permission or approval from [Defendant] before considering or approaching one of [Defendant's] employees. There are limited exceptions to this restriction. You must consult me before determining whether a particular employer is subject to an exception under the judgment. If any employee of [Defendant] has asked or asks you to refrain from recruiting, cold calling, soliciting, or otherwise approaching an employee from a particular company, you must notify me immediately before doing so.

A copy of the court order is attached. Please read it carefully and familiarize yourself with its terms. The judgment, rather than the above description, is controlling. If you have any

questions about the judgment or how it affects your recruiting and hiring activities for

[Defendant], please contact me as soon as possible.

     Thank you for your cooperation.

                                      Sincerely,
                                      [Defendant's Antitrust Compliance Officer]

## EXHIBIT 3

Please take notice that Knorr-Bremse AG (Knorr) and Westinghouse Air Brake Technologies Corporation (Wabtec) have entered into a settlement with the United States Department of Justice relating to their respective employee recruiting, solicitation, and hiring practices.

On April 3, 2018, the United States filed a federal civil antitrust Complaint alleging that Knorr and Wabtec entered into agreements that restrained cold calling, soliciting, recruiting, hiring, or otherwise competing for employees (collectively, "no-poach agreements") in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. At the same time, the United States filed a proposed settlement that prohibits each of Knorr and Wabtec from entering into, maintaining, or enforcing no-poach agreements with another employer subject to limited exceptions. This prohibition includes seeking permission or approval before considering, approaching, or hiring an employee or requiring the other employer to seek permission or approval from Knorr and Wabtec before considering or approaching one of their employees.

As part of its settlement with the United States, Knorr and Wabtec confirmed that each company has unilaterally withdrawn from and will not enforce any prohibited no-poach agreements it may have had with any other employer relating to employees located or being hired to work in the United States.

The Final Judgment, which was recently entered by a federal district court, is effective for seven years. Copies of the Complaint, Final Judgment, and Competitive Impact Statement are available at:

[Link to Complaint]
[Link to Final Judgment]
[Link to Competitive Impact Statement]

17

Exhibit 2

# Exhibit 2

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

        *Plaintiff,*

    v.

ADOBE SYSTEMS, INC.;
APPLE INC.;
GOOGLE INC.;
INTEL CORPORATION;
INTUIT, INC.; and
PIXAR,

        *Defendants.*

## [PROPOSED] FINAL JUDGMENT

WHEREAS, the United States of America filed its Complaint on September 24, 2010, alleging that each of the Defendants participated in at least one agreement in violation of Section One of the Sherman Act, and the United States and the Defendants, by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law;

AND WHEREAS this Final Judgment does not constitute any admission by the Defendants that the law has been violated or of any issue of fact or law, other than that the jurisdictional facts as alleged in the Complaint are true;

AND WHEREAS, the Defendants agree to be bound by the provisions of this Final Judgment pending its approval by this Court;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the Defendants, it is ORDERED, ADJUDGED, AND DECREED.

## I. JURISDICTION

This Court has jurisdiction over the subject matter and each of the parties to this action. The  Complaint states a claim upon which relief may be granted against the Defendants under Section One of the Sherman Act, as amended, 15 U.S.C. § 1.

## II. DEFINITIONS

As used in this Final Judgment:

A.    "Adobe" means Adobe Systems, Inc., its (i) successors and assigns, (ii) controlled subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and (iii) their directors, officers, managers, agents acting within the scope of their agency, and employees.

B.    "Apple" means Apple Inc., its (i) successors and assigns, (ii) controlled subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and (iii) their directors, officers, managers, agents acting within the scope of their agency, and employees.

C.    "Google" means Google Inc., its (i) successors and assigns, (ii) controlled subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and (iii) their directors, officers, managers, agents acting within the scope of their agency, and employees.

D.    "Intel" means Intel Corporation, its (i) successors and assigns, (ii) controlled subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and (iii) their directors, officers, managers, agents acting within the scope of their agency, and employees.

2

E.    "Intuit" means Intuit, Inc., its (i) successors and assigns, (ii) controlled subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and (iii) their directors, officers, managers, agents acting within the scope of their agency, and employees.

F.    "Pixar" means Pixar, its (i) successors and assigns, (ii) controlled subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and (iii) their directors, officers, managers, agents acting within the scope of their agency, and employees.  Pixar shall include directors, officers, managers, agents, or employees of any parent of or any entity under common control with Pixar, only when such individuals are acting in their capacity as directors, officers, managers, agents, or employees of Pixar.

G.    "Agreement" means any contract, arrangement, or understanding, formal or informal, oral or written, between two or more persons.

H.    "No direct solicitation provision" means any agreement, or part of an agreement, among two or more persons that restrains any person from cold calling, soliciting, recruiting, or otherwise competing for employees of another person.

I.    "Person" means any natural person, corporation, company, partnership, joint venture, firm, association, proprietorship, agency, board, authority, commission, office, or other business or legal entity, whether private or governmental.

J.    "Senior manager" means any company officer or employee above the level of vice president.

3

### III. APPLICABILITY

This Final Judgment applies to Adobe, Apple, Google, Intel, Intuit, and Pixar, as defined in Section II, and to all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

### IV. PROHIBITED CONDUCT

Each Defendant is enjoined from attempting to enter into, entering into, maintaining or enforcing any agreement with any other person to in any way refrain from, requesting that any person in any way refrain from, or pressuring any person in any way to refrain from soliciting, cold calling, recruiting, or otherwise competing for employees of the other person.

### V. CONDUCT NOT PROHIBITED

A.      Nothing in Section IV shall prohibit a Defendant and any other person from attempting to enter into, entering into, maintaining or enforcing a no direct solicitation provision, provided the no direct solicitation provision is:

1.      contained within existing and future employment or severance agreements with the Defendant's employees;

2.      reasonably necessary for mergers or acquisitions, consummated or unconsummated, investments, or divestitures, including due diligence related thereto;

3.      reasonably necessary for contracts with consultants or recipients of consulting services, auditors, outsourcing vendors, recruiting agencies or providers of temporary employees or contract workers;

4

4.      reasonably necessary for the settlement or compromise of legal disputes; or

5.      reasonably necessary for (i) contracts with resellers or OEMs; (ii) contracts with providers or recipients of services other than those enumerated in paragraphs V.A. 1 - 4 above; or (iii) the function of a legitimate collaboration agreement, such as joint development, technology integration, joint ventures, joint projects (including teaming agreements), and the shared use of facilities.

B.      All no direct solicitation provisions that relate to written agreements described in Section V.A.5.i, ii, or iii, that a Defendant enters into, renews, or affirmatively extends after the date of entry of this Final Judgment shall:

1.      identify, with specificity, the agreement to which it is ancillary;

2.      be narrowly tailored to affect only employees who are anticipated to be directly involved in the agreement;

3.      identify with reasonable specificity the employees who are subject to the agreement;

4.      contain a specific termination date or event; and

5.      be signed by all parties to the agreement, including any modifications to the agreement.

C.      For all no direct solicitation provisions that relate to unwritten agreements described in Section V.A.5.i, ii, or iii, that a Defendant enters into, renews, or affirmatively

extends after the date of entry of this Final Judgment, the Defendant shall maintain documents sufficient to show:

    1.    the specific agreement to which the no direct solicitation provision is ancillary;

    2.    the employees, identified with reasonable specificity, who are subject to the no direct solicitation provision; and

    3.    the provision's specific termination date or event.

D.    Defendants shall not be required to modify or conform, but shall not enforce, any no direct solicitation provision to the extent it violates this Final Judgment if the no direct solicitation provision appears in Defendants' consulting or services agreements in effect as of the date of this Final Judgment (or in effect as of the time a Defendant acquires a company that is a party to such an agreement).

E.    Nothing in Section IV shall prohibit a Defendant from unilaterally deciding to adopt a policy not to consider applications from employees of another person, or to solicit, cold call, recruit or hire employees of another person, provided that Defendants are prohibited from requesting that any other person adopt, enforce, or maintain such a policy, and are prohibited from pressuring any other person to adopt, enforce, or maintain such a policy.

## VI. REQUIRED CONDUCT

A.    Each Defendant shall:

    1.    furnish a copy of this Final Judgment and related Competitive Impact Statement within sixty days of entry of the Final Judgment to each Defendant's officers, directors, human resources managers, and senior

6

managers who supervise employee recruiting, solicitation, or hiring efforts;

2.    furnish a copy of this Final Judgment and related Competitive Impact Statement to any person who succeeds to a position described in Section VI.A.1 within thirty days of that succession;

3.    annually brief each person designated in Sections VI.A.1 and VI.A.2 on the meaning and requirements of this Final Judgment and the antitrust laws;

4.    obtain from each person designated in Sections VI.A.1 and VI.A.2, within 60 days of that person's receipt of the Final Judgment, a certification that he or she (i) has read and, to the best of his or her ability, understands and agrees to abide by the terms of this Final Judgment; (ii) is not aware of any violation of the Final Judgment that has not been reported to the Defendant; and (iii) understands that any person's failure to comply with this Final Judgment may result in an enforcement action for civil or criminal contempt of court against each Defendant and/or any person who violates this Final Judgment;

5.    provide employees reasonably accessible notice of the existence of all agreements covered by Section V.A.5 and entered into by the company; and

6.    maintain (i) a copy of all agreements covered by Section V.A.5; and (ii) a record of certifications received pursuant to this Section.

7

B.      For five (5) years after the entry of this Final Judgment, on or before its anniversary date, each Defendant shall file with the United States an annual statement identifying and providing copies of any agreement and any modifications thereto described in Section V.A.5, as well as describing any violation or potential violation of this Final Judgment known to any officer, director, human resources manager, or senior manager who supervises employee recruiting, solicitation, or hiring efforts.  Descriptions of violations or potential violations of this Final Judgment shall include, to the extent practicable, a description of any communications constituting the violation or potential violation, including the date and place of the communication, the persons involved, and the subject matter of the communication.

C.      If any officer, director, human resources manager, or senior manager who supervises employee recruiting, solicitation, or hiring efforts of a Defendant learns of any violation or potential violation of any of the terms and conditions contained in this Final Judgment, that Defendant shall promptly take appropriate action to terminate or modify the activity so as to comply with this Final Judgment and maintain all documents related to any violation or potential violation of this Final Judgment.

## VII. COMPLIANCE INSPECTION

A.      For the purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, from time to time authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to each Defendant, subject to any legally recognized privilege, be permitted:

8

    1.    access during each Defendant's regular office hours to inspect and copy, or at the option of the United States, to require each Defendant to provide electronic or hard copies of, all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of each Defendant, relating to any matters contained in this Final Judgment; and

    2.    to interview, either informally or on the record, each Defendant's officers, employees, or agents, who may have their counsel, including any individual counsel, present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by any Defendant.

B.    Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, each Defendant shall submit written reports or responses to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C.    No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.    If at the time information or documents are furnished by a Defendant to the United States, the Defendant represents and identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal

Rules of Civil Procedure, and the Defendant marks each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," then the United States shall give the Defendant ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## VIII. RETENTION OF JURISDICTION

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## IX. EXPIRATION OF FINAL JUDGMENT

Unless this court grants an extension, this Final Judgment shall expire five (5) years from the date of its approval by the Court.

## X. NOTICE

For purposes of this Final Judgment, any notice or other communication shall be given to the persons at the addresses set forth below (or such other addresses as they may specify in writing to Adobe, Apple, Google, Intel, Intuit, and Pixar):

> Chief
> Networks & Technology Enforcement Section
> U.S. Department of Justice
> Antitrust Division
> 450 Fifth Street, NW, Suite 7100
> Washington, DC 20530

## XI. PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest.  The parties have complied with the

Procedures of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making

copies available to the public of this Final Judgment, the Competitive Impact Statement, and any

comments thereon and the United States' responses to comments.  Based upon the record before

the Court, which includes the Competitive Impact Statement and any comments and response to

comments filed with the Court, entry of this final judgment is in the public interest.


Date:_____

                                    Court approval subject to procedures
                                    of Antitrust Procedures and Penalties
                                    Act, 15 U.S.C. § 16


                                    _____
                                    United States District Judge

11