UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA | : | Crim. No. 3:21-CR-220 (VAB) |
|---|---|---|
| | : | |
| v. | : | |
| | : | |
| MAHESH PATEL, | : | |
| ROBERT HARVEY, | : | |
| HARPREET WASAN, | : | August 10, 2022 |
| STEVEN HOUGHTALING, | : | |
| TOM EDWARDS, and | : | |
| GARY PRUS | : | |

**MEMORANDUM OF LAW OF THE UNITED STATES
IN OPPOSITION TO DEFENDANTS'
JOINT MOTION TO DISMISS THE INDICTMENT**

i

## Table of Contents

TABLE OF AUTHORITIES ..................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................ 1

PRINCIPLES OF ESTABLISHED LAW ................................................................................. 3

   I.   Dismissing an Indictment is an Extraordinary and Rare Remedy ...................................... 3

   II.   The Sherman Act and the Per Se Rule are Key Safeguards of Economic Justice ............. 4

   III.  Market Allocations, including in Labor Markets, are Per Se Illegal Restraints.................. 7

   IV.  The Doctrine of Ancillary Restraints is a Question of Fact, not Relevant on a Motion to Dismiss, and is Limited in Scope .............................................................................................. 9

ARGUMENT ........................................................................................................................... 13

   I.   The Charged Crime is a Market-Allocation Conspiracy, A Type of Conspiracy Well-Established as Per Se Illegal.................................................................................................... 13

     A.   The Law Asks Whether the Indictment Alleges a Per Se Illegal Restraint of Trade—Market Allocation—Not Whether the Charge is "Novel"..................................................... 13

     B.   No-Poach Agreements, if Well-Pleaded as Market Allocations, are Per Se Illegal....... 16

     C.   Because the Indictment Pleads a Per Se Illegal Offense, the Court Should Deny the Motion Without Examining Procompetitive Justifications .................................................... 22

   II.   The Ancillary Restraints Doctrine is a Fact-Based Defense that Cannot Lead to Dismissal and, Depending on Defendants' Showing, May Never Even Reach the Jury.......................... 26

     A.   The Existence of an Ancillary Restraint is a Question of Fact That Cannot Be Resolved on a Motion to Dismiss.................................................................................................... 26

     B.   Defendants Must Meet Their Burden Before Receiving an Ancillary Restraint Instruction, and May Never Even Reach the Jury ................................................................ 33

     C.   Defendants' Estoppel-Like Argument Against the Government Has no Basis in Fact or Law. ...................................................................................................................................... 38

   III.   The Indictment Alleges a Horizontal, not a Vertical, Restraint of Trade ...................... 39

     A.   The Per Se Rule Bars Horizontal Restraints of Trade, which Is the Only Type of Restraint Alleged in the Indictment................................................................................... 39

     B.   The Mere Presence of a Vertical Participant in a Horizontal Conspiracy Does Not Disturb Proper Application of the Per Se Rule.................................................................... 43

   IV.   Defendants' Constitutional Arguments Lack Merit. ...................................................... 47

CONCLUSION......................................................................................................................... 50

## Table of Authorities

**Cases**

*1-800 Contacts, Inc. v. FTC*,
  1 F.4th 102 (2d Cir. 2021) .................................................................................................. 9

*2238 Victory Corp. v. Fjallraven USA Retail, LLC*,
  No. 19-cv-11733 (PKC), 2021 WL 76334 (S.D.N.Y. Jan. 8, 2021) ........................................ 42

*Ace Arts, LLC v. Sony/ATV Music Pub., LLC*,
  56 F. Supp. 3d 436 (S.D.N.Y. 2014) .................................................................................... 8

*Anderson News, LLC v. American Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012) ............................................................................................... 40

*Anderson v. Shipowners' Ass'n*,
  272 U.S. 359 (1926) ............................................................................................... 15, 17, 48

*Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.*,
  80 F. Supp. 3d 1257 (D. Colo. 2015) ................................................................................... 38

*Arizona v. Maricopa Cnty. Med. Society*,
  457 U.S. 332 (1982) ..................................................................................................... passim

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
  No. 17CV205-MMA (MDD), 2018 WL 3032552 (S.D. Cal. June 19, 2018) ............. 28, 29, 35

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
  No. 17CV205-MMA (MDD), 2020 WL 2553181 (S.D. Cal. May 20, 2020) ................... 29, 35

*Bd. of Regents of Univ. of Oklahoma v. NCAA*,
  707 F.2d 1147 (10th Cir. 1983) ........................................................................................... 11

*Blackburn v. Sweeney*,
  53 F.3d 825 (7th Cir. 1995) ........................................................................................... 28, 32

*Bogan v. Hodgkins*,
  166 F.3d 509 (2d Cir. 1999) ............................................................................................... 21

*Bouie v. City of Columbia*,
  378 U.S. 347 (1964) ........................................................................................................... 47

*Boyce Motor Lines v. United States*,
  342 U.S. 337 ......................................................................................................................... 4

*Brennan v. Concord EFS, Inc.*,
   369 F. Supp. 2d 1127 (N.D. Cal. 2005) .................................................................... 27

*California Dental Ass'n v. FTC*,
   526 U.S. 756 (1999) ................................................................................................. 25

*Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*,
   996 F.2d 537 (2d Cir. 1993) ..................................................................................... 20

*C-E Mins., Inc. v. CARBO Ceramics, Inc.*,
   No. 1:11-CV-02574-JOF, 2012 WL 13008801 (N.D. Ga. Mar. 14, 2012) ........................ 34, 37

*Compact v. Metro. Gov't of Nashville & Davidson Cnty.*,
   594 F. Supp. 1567 (M.D. Tenn. 1984) ......................................................................... 9

*Conrad v. Jimmy John's Franchise, LLC*,
   No. 318CV00133NJRRJD, 2019 WL 2754864 (S.D. Ill. May 21, 2019) .............................. 28

*Copy-Data Sys., Inc. v. Toshiba Am., Inc.*,
   663 F.2d 405 (2d Cir. 1981) ...................................................................................... 25

*DeLoach v. Philip Morris Cos.*,
   No. 1:00CV01235, 2001 WL 1301221 (M.D.N.C. July 24, 2001) ........................................ 7

*Deslandes v. McDonald's USA, LLC*,
   No. 17-C-4857, 2018 WL 3105955 (N.D. Ill. June 25, 2018) .................................................. 28

*Eichorn v. AT&T Corp.*,
   248 F.3d 131 (3d Cir. 2001) ............................................................................... 12, 22

*Elizabeth Place, LLC v. Atrium Health Sys.*,
   922 F.3d 713 (6th Cir. 2019) ..................................................................................... 11

*Gelboim v. Bank of America Corp.*,
   823 F.3d 759 (2d Cir. 2016) ...................................................................................... 16

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*,
   386 F.3d 485 (2d Cir. 2004) ..................................................................................... 20

*Hunt v. Mobil Oil Corp.*,
   410 F. Supp. 10 (S.D.N.Y. 1975) .............................................................................. 27

*In re ATM Fee Antitrust Litig.*,
   554 F. Supp. 2d 1003 (N.D. Cal. 2008) ............................................................... 13, 36

iv

*In re Delta Dental Antitrust Litig.*,
    484 F. Supp. 3d 627 (N.D. Ill. 2020) ......................................................... 30

*In re High-Tech Emp. Antitrust Litig.*,
    856 F. Supp. 2d 1103 (N.D. Cal. 2012) .......................................... 18, 19

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ............................................................. passim

*In re Ry. Indus. Emp. No-Poach Antitrust Litig.*,
    395 F. Supp. 3d 464 (W.D. Pa. 2019) ............................................ 19, 27

*In re Sulfuric Acid Antitrust Litig.*,
    743 F. Supp. 2d 827 (N.D. Ill. 2010) .............................................. 11, 34

*Januszewski v. Manson*,
    525 F. Supp. 805 (D. Conn. 1981) ........................................................ 10

*Klor's Inc. v. Broadway-Hale Stores, Inc.*,
    359 U.S. 207 (1959) ................................................................................. 44

*Law v. NCAA*,
    134 F.3d 1010 (10th Cir. 1998) ............................................................. 38

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ......................................................................... 23, 43

*Lischewski v. United States*,
    142 S. Ct. 2676 (2022) ........................................................................... 48

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
    726 F.2d 1381 (9th Cir. 1984) ............................................................... 10

*Mandeville Island Farms v. Am. Crystal Sugar Co.*,
    334 U.S. 219 (1948) ................................................................................. 16

*Markson v. CRST Int'l, Inc.*,
    No. 5:17-cv-01261-SB-SP, 2021 WL 1156863 (C.D. Cal. Feb. 10, 2021) ............................ 19

*MLB Props., Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008) ........................................................... passim

*Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*,
    779 F.2d 592 (11th Cir. 1986) ............................................................... 12

*Nat'l Basketball Ass'n v. Williams,*
    45 F.3d 684 (2d Cir. 1995) ................................................................................ 32

*NCAA v. Alston,*
    141 S. Ct. 2141 (2021) ...................................................................................... 17

*NCAA v. Bd. of Regents of Univ. of Oklahoma,*
    468 U.S. 85 (1984) .................................................................................... 4, 5, 40

*New York ex rel. Spitzer v. Saint Francis Hosp.,*
    94 F. Supp. 2d 399 (S.D.N.Y. 2000) ............................................................ 7, 25

*N. Pacific Ry. Co. v. United States,*
    356 U.S. 1 (1958) ......................................................................................... 6, 23

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.,*
    472 U.S. 284 (1985) ..................................................................................... 7, 15

*NYNEX Corp. v. Discon, Inc.,*
    525 U.S. 128 (1998) ................................................................................... 21, 45

*Ogden v. Little Caesar Enterprises, Inc.,*
    393 F. Supp. 3d 622 (E.D. Mich. 2019) ........................................................... 28

*Ohio v. Am. Express Co.,*
    138 S. Ct. 2274 (2018) ..................................................................................... 5, 6

*Palmer v. BRG of Georgia, Inc.,*
    498 U.S. 46 (1990) ............................................................................................... 5

*Philip Morris, Inc. v. Heinrich,*
    No. 95 CIV 0328(LMM), 1996 WL 363156 (S.D.N.Y. Mar. 13, 2013) ................ 45

*Polk Bros. v. Forest City Enterprises, Inc.,*
    776 F.2d 185 (7th Cir. 1985) ...................................................................... 12, 36

*Quinonez v. Nat'l Ass'n of Secs. Dealers, Inc.,*
    540 F.2d 824 (5th Cir. 1976) ...................................................................... 18, 49

*Roman v. Cessna Aircraft Co.,*
    55 F.3d 542 (10th Cir. 1995) ...................................................................... 18, 49

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,*
    792 F.2d 210 (D.C. Cir. 1986) ......................................................... 9, 12, 32, 36

*SCFC ILC, Inc. v. Visa USA, Inc.*,
  36 F.3d .............................................................................................................. 32

*Schering-Plough Corp. v. FTC*,
  402 F.3d 1056 (11th Cir. 2005) .................................................................... 12, 36

*Smith v. United States*,
  568 U.S. 106 (2013) ........................................................................................... 11

*Standard Oil Co. v. United States*,
  221 U.S. 1 (1911) ................................................................................................. 4

*State Oil Co. v. Khan*,
  522 U.S. 3 (1997) ............................................................................................ 4, 42

*Sullivan v. Nat'l Football League*,
  34 F.3d 1091 (1st Cir. 1994) ............................................................................. 32

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006) ............................................................................................ 9, 12

*Tower Air, Inc. v. Fed. Exp. Corp.*,
  956 F. Supp. 270 (E.D.N.Y. 1996) ................................................................... 32

*Toys 'R' Us, Inc. v. FTC*,
  221 F.3d 928 (7th Cir. 2000) ............................................................................. 45

*United States v. Aiyer*,
  33 F. 4th 97 (2d Cir. 2022) ......................................................................... passim

*United States v. Alfonso*,
  143 F.3d 772 (2d Cir. 1998) ................................................................................ 4

*United States v. Andreas*,
  216 F.3d 645 (7th Cir. 2000) ............................................................................... 7

*United States v. Apple, Inc.*,
  791 F.3d 290 (2d Cir. 2015) ................................................................... 8, 43, 44

*United States v. Apple, Inc.*,
  952 F. Supp. 2d 638 (S.D.N.Y. 2013) ............................................................... 44

*United States v. Best*,
  No. 3:20-CR-28(VAB), 2022 WL 1605495 (D. Conn. May 20, 2022) .................... 3

*United States v. Bok,*
   156 F.3d 157 (2d Cir. 1998) .................................................................................... 11

*United States v. Bout,*
   731 F.3d 233 (2d Cir. 2013) ................................................................................ 3, 14

*United States v. Brown,*
   936 F.2d 1042 (9th Cir. 1991) .................................................................................. 7

*United States v. Cadillac Overall Supply Co.,*
   568 F.2d 1078 (5th Cir. 1978) ................................................................................ 18

*United States v. Carr,*
   582 F.2d 242 (2d Cir. 1978) ................................................................................... 10

*United States v. Consolidated Laundries Corp.,*
   291 F.2d 563 (2d Cir. 1961) ........................................................................... 7, 8, 17

*United States v. Coop. Theatres of Ohio, Inc.,*
   845 F.2d 1367 (6th Cir. 1988) ............................................................................. 8, 18

*United States v. DaVita, Inc.,*
   No. 1:21-cr-0029-RBJ, 2022 WL 266759 (D. Colo. Jan. 28, 2022) ................................. passim

*United States v. De La Pava,*
   268 F.3d 157 (2d Cir. 2001) ..................................................................................... 3

*United States v. eBay Inc.,*
   968 F. Supp. 2d 1030 (N.D. Cal. 2013) ............................................. 18, 19, 28, 30

*United States v. Gaines,*
   No. 20-CR-20 (MJD-HB), 2020 WL 5215386 (D. Minn. Aug. 4, 2020) ..................... 27

*United States v. General Motors Corp.,*
   384 U.S. 127 (1966) ............................................................................................... 45

*United States v. Harriss,*
   347 U.S. 612 (1954) ............................................................................................... 47

*United States v. Hoskins,*
   73 F. Supp. 3d 154 (D. Conn. 2014) ...................................................................... 11

*United States v. Jindal,*
   No. 4:20-CR-00358, 2021 WL 5578687 (E.D. Tex. Nov. 29, 2021)................... 20, 21, 49

*United States v. Kay,*
    513 F.3d 432 (5th Cir. 2007) ................................................................. 48

*United States v. Kinzler,*
    55 F.3d 70 (2d Cir. 1995) ...................................................................... 48

*United States v. Koppers,*
    652 F.2d 290 (2d Cir. 1981) ......................................... 5, 7, 40, 47, 50

*United States v. Lanier,*
    520 U.S. 259 (1997) ............................................................................... 47

*United States v. Litvak,*
    No. 3:13-CR-19 JCH, 2013 WL 5740891 (D. Conn. Oct. 21, 2013) ........................................ 4

*United States v. Lucasfilm Ltd.,*
    No. 110-cv-02220, 2010 WL 5344347 (D.D.C. Dec. 21, 2010) ................................. 18

*United States v, Manahe,*
    2022 WL 3161781 ........................................................................... passim

*United States v. MMR Corp.,*
    907 F.2d 489 (5th Cir. 1990) ................................................................. 45

*United States v. Realty Multi-List, Inc.,*
    629 F.2d 1351 (5th Cir. 1980) ............................................................... 32

*United States v. Sampson,*
    898 F.3d 270 (2d Cir. 2018) .................................................................. 24

*United States v. Socony-Vacuum Oil Co.,*
    310 U.S. 150 (1940) ....................................................................... passim

*United States v. Standard Ultramarine & Color Co.,*
    137 F. Supp. 167 (S.D.N.Y. 1955) ......................................................... 4

*United States v. Topco Assocs.,*
    405 U.S. 596 (1972) ....................................................................... passim

*United States v. Usher,*
    No. 1:17-cr-00019, 2018 WL 2424555 (S.D.N.Y. May 4, 2018) ............................... 40

*United States v. Vill. Voice Media, LLC,*
    No. CIV.A. 1:03 CV 0164, 2003 WL 21659092 (N.D. Ohio Feb. 12, 2003) .................. 34

*United States v. Wedd*,
   993 F.3d 104 (2d Cir. 2021) .................................................................. 30

*Weisfeld v. Sun Chem. Corp.*,
   84 Fed. Appx. 257 (3rd Cir. 2004) ........................................................ 22

**Other Authorities**

Phillip Areeda & Herbert Hovenkamp,
   *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (5th ed. 2021) .. 31, 36

Br. for Def.-Appellant, *United States v. Aiyer*,
   No. 20-3594-cr, 2021 WL 1759216 ........................................................ 27

Brian Callaci, et al.,
   *The Effect of No-poaching Restrictions on Worker Earnings in Franchised Industries* (July 16,
   2022) ...................................................................................................... 23

Complaint, *Adobe Sys., Inc.*,
   No. 1:10-cv-01629-CKK (D.D.C. Nov. 24, 2010) .................................. 18

Complaint, *United States v. eBay, Inc.*,
   No. CV 12 5869 PSG, 2012 WL 5727488 (N.D. Cal. Nov. 16, 2012) ..................................... 18

Complaint, *United States v. Lucasfilm Ltd.*,
   No. 110-cv-02220, 2010 WL 5344347 (D.D.C. Dec. 21, 2010) ............. 18

Matthew Gibson
   *Employer Market Power in Silicon Valley* (2021) ................................. 23

Herbert Hovenkamp,
   *Notes on Competition Policy for Labour Markets, Directorate for Financial & Enterprise
   Affairs Competition Committee, Organisation for Economic Cooperation & Development*
   (2019) .................................................................................................... 22

Jury Instr., *United States v. DaVita*,
   No. 21-cr-228 (D. Colo. Apr. 13, 2022), ECF No. 254 .......................... 20

Tr. of Hr'g., *United States v. Aiyer*,
   No. 18-cr-333 (S.D.N.Y. Jun. 11, 2019), ECF No. 66 ........................... 27

Tr. of Proceedings of Nov. 20, 2019, *United States v. Aiyer*,
   No. 18-cr-333(JGK), Dkt. 180 ............................................................... 50

U.S. Dep't. of Justice,
   Justice Manual, 7-2.200 (The Sherman Act)
   https://www.justice.gov/jm/jm-7-2000-prior-approvals#7-2.200 ............................................... 5

**Rules**

Fed. R. Crim. P. 16(b).................................................................................................................. 40

## PRELIMINARY STATEMENT

For nearly a decade, as the Indictment alleges, Defendants and their co-conspirators used their executive positions to orchestrate a collusive scheme within the aerospace engineering industry by which they froze the employment prospects of workers below them, effectively trapping many of them in place. As the Government will prove at trial, this conspiracy stalled careers and mired workers in underpaid, unwanted jobs, while Defendants and their co-conspirators reaped the financial benefits. They no longer had to compete to earn each worker's labor and loyalty; for many, they could simply force it.

In an effort to forestall the presentation of this case to a jury, Defendants ask this Court to decide—as a matter of law—that the Indictment fails to allege a crime. The Court should decline this invitation to usurp the role of the jury and to decide questions of fact now. At this stage in the proceedings, this Court need only review the four corners of the Indictment to determine whether it states the essential elements of an offense. If the Court does so, the conclusion will be clear: the Indictment is well-pleaded, and the motion must be denied.

*First*, the Indictment plainly alleges a horizontal agreement to allocate employees in a labor market. This is precisely the type of secret agreement between competitors that has been deemed per se illegal under the Sherman Act for over one hundred years, and it is strikingly similar to other civil and criminal allegations that have been allowed to proceed to trial, including in a criminal no-poach and wage-fixing case, *United States v. Manahe* (D. Me.), decided just two days ago. The per se rule categorically proscribes certain inherently anticompetitive restraints of trade without, as Defendants insist upon here, a case-by-case examination of their actual effects or supposed procompetitive benefits. As the Second Circuit stated just three months ago: "Simply put, in a criminal antitrust case, a district court has no

1

pretrial obligation to consider a defendant's evidence of competitive effects in order to determine whether or not the indictment properly charges an actual *per se* offense." *United States v. Aiyer*, 33 F.4th 97, 117 (2d Cir. 2022).

*Second*, the Court need not—and, indeed, should not—address Defendants' argument regarding the doctrine of ancillary restraints. As a matter of procedure, this argument is premature. Whether Defendants can prevail under that defense is a fact-intensive question that can be resolved only by the jury, *after* Defendants meet their burden of production establishing a sufficient evidentiary basis for such a defense, and not on the face of an Indictment that clearly alleges a non-ancillary restraint of trade. As a matter of substantive law, Defendants' argument also fails. An ancillary restraint defense is not a blanket "business privilege" to the Sherman Act that permits any collusion that is beneficial to Defendants, their employers, and their common customer, regardless of the consequences to their employees. Rather, it is a limited exception to the per se rule only for those collaborations between competitors subordinate and collateral to, and reasonably necessary to achieve, a procompetitive purpose of that collaboration. In the event that Defendants have not met their burden of production under this correct construction of the ancillary restraints defense—or reveal pretrial that, as a matter of law, they *cannot* meet their burden, which may very well be the case—the Government may seek to preclude the defense from the jury charge, or from trial altogether.

*Third*, Defendants are accused of engaging in a purely *horizontal* restraint between competing employers in an aerospace *labor* market. The existence of a *vertical* business relationship between some of those conspirators in a *services market* is irrelevant to the Court's resolution of this motion. As the Second Circuit has recently confirmed, the per se rule applies to conspiracies alleging horizontal restraints, even when the conspirator group includes a common

2

customer who helped orchestrate the scheme—which is precisely what is alleged here, with Customer A and its employee, Defendant Patel, serving key roles as organizers and enforcers of the conspiracy to restrict worker mobility between competing employers, including Company A itself.

*Finally*, Defendants' constitutional arguments, concerning the Due Process Clause and the elements of the crime on which Defendants may properly be convicted, have already been rejected by the Second Circuit and other courts, and should be rejected here as well.

As their brief reveals, it is Defendants, not the Government, who want to expand the antitrust laws beyond recognition. Defendants also evince a stubborn refusal to accept that their conduct must conform to the law regardless of whether they deem it "good for business." This case is well-pleaded and Defendants should face accountability before a jury of their peers.

## PRINCIPLES OF ESTABLISHED LAW

I.     **Dismissing an Indictment is an Extraordinary and Rare Remedy.**

"It bears recalling," the Second Circuit reminds us, that "we have consistently upheld indictments that do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Bout,* 731 F.3d 233, 240 (2d Cir. 2013) (cleaned up). An indictment must only charge a crime with "sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *Id.* at 241 (cleaned up). As this Court recently confirmed, dismissal of an indictment is "an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." *United States v. Best*, No. 3:20-CR-28(VAB), 2022 WL 1605495, *8 (D. Conn. May 20, 2022) (citing *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001)).

A motion to dismiss is no time to dispute facts or predict how the case may fare when tried to a jury. "[T]he sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." *United States v. Alfonso,* 143 F.3d 772, 776-77 (2d Cir. 1998). Accordingly, "in ruling on a motion to dismiss, a court views the indictment as a whole and assumes its factual allegations to be true." *United States v. Litvak*, No. 3:13-CR-19 JCH, 2013 WL 5740891, at *2 (D. Conn. Oct. 21, 2013) (citing *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952).

## II.      The Sherman Act and the Per Se Rule are Key Safeguards of Economic Justice.

The Sherman Act was enacted by Congress 130 years ago as one of the primary means of ensuring economic justice in the United States. As Justice Marshall has explained, "Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. Topco Assocs.*, 405 U.S. 596, 610 (1972). In brief, the Act outlaws attempts by monopolists and conspirators to manipulate market forces to benefit themselves to the detriment of competition, thereby harming consumers and other victims, as well as the U.S. economy at large. Antitrust crimes are not mere business mistakes. "The concept that antitrust violations really are 'minor' and 'technical' infractions, involve no wrongdoing, and merely constitute 'white collar' offenses, has no place in the administration of justice." *United States v. Standard Ultramarine & Color Co.*, 137 F. Supp. 167, 170 (S.D.N.Y. 1955).

Section 1 of the Sherman Act, 15 U.S.C. § 1 (hereinafter "Section 1"), outlaws "[e]very contract, combination . . . or conspiracy" that unreasonably restrains trade. *NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 98 (1984). Restraints can be unreasonable in one of two ways. Congress condemned some restraints as per se unreasonable based on their inherently

4

anticompetitive "nature and character." *Standard Oil Co. v. United States*, 221 U.S. 1, 64-65 (1911); *see also State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) ("Some types of restraints . . . have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*.").[1] Restraints that are not unreasonable per se are judged under the "rule of reason," which involves a "fact-specific assessment" of "the restraint's actual effect on competition." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018).

The law has been well-settled for decades that certain horizontal restraints of trade— including price fixing, bid rigging, and market allocations—are per se illegal. *See, e.g., Arizona v. Maricopa Cnty. Med. Society*, 457 U.S. 332, 356 (1982) (medical societies consisting of competing physicians engaged in per se illegal price fixing by agreeing to set maximum fees); *United States v. Koppers*, 652 F.2d 290, 297 (2d Cir. 1981) (competing road tar providers engaged in per se illegal bid rigging by agreeing to coordinate bid pricing); *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49 (1990) (competing test preparation service providers engaged in per se illegal market allocation by agreeing to allocate territories). Congress recently expressly confirmed courts' longstanding per se treatment of these restraints, stating that "[c]onspiracies among competitors to fix prices, rig bids, and allocate markets are categorically and irredeemably anticompetitive and contravene the competition policy of the United States." 15 U.S.C. § 7a note (Findings; Purpose of 2020 Amendment).

---

[1] The Justice Manual, which provides internal guidance to prosecutors but does not create enforceable rights, states that the United States generally "reserves criminal prosecution under Section 1 for per se unlawful restraints of trade among competitors." *See* JUSTICE MANUAL, 7-2.200 (The Sherman Act), available at https://www.justice.gov/jm/jm-7-2000-prior-approvals#7-2.200.

Horizontal restraints are imposed by agreements between actual or potential competitors, located at the same level of the market, regarding "the way in which they will compete with one another." *NCAA*, 468 U.S. at 99; *Topco Assocs.*, 405 U.S. at 608. Vertical agreements, in contrast, are "imposed by agreement between firms at different levels of distribution" on matters over which they do not compete with one another, and are subject to the rule of reason. *See, e.g.*, *Ohio v. Am. Express Co.*, 138 S. Ct. at 2284 (noting that rules imposed by a credit card company in contracts with merchants concerning in-store use of its cards is a vertical restraint).

As Defendants acknowledge, Defs.' Mem. at 11, whether a particular restraint of trade is per se illegal, as pleaded in an indictment or complaint, is a question of law for the court.[2] *See Aiyer*, 33 F.4th at 116-17 (finding "no procedural error" when a trial court, on a motion to dismiss, rejected defendant's proffered facts and instead "decide[d] which rule under the Sherman Act applied").

Once a court determines that the pleaded restraint of trade falls within the per se category, that is the end of the legal inquiry. "Per se" illegal restraints are exactly that: restraints "unreasonable and therefore illegal" by their nature, "without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *N. Pacific Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). Competitors are thus forbidden to enter into per se illegal agreements even if, in an individual case, there is a possibility that the agreement is benign or even beneficial. *See Maricopa Cnty. Med. Soc'y*, 457 U.S. at 351 ("The anticompetitive potential inherent" in all per

---

[2] The Government *disagrees* with Defendants when they later assert the polar opposite: that the *jury* must decide whether the charged restraint is unreasonable. *See* Defs.' Mem. at 45. They were correct the first time. At trial, the jury is charged only with deciding whether the government has proven beyond a reasonable doubt that the defendant committed the charged per se offense, not whether the restraint of trade underlying that offense was unreasonable. *See Aiyer*, 33 F.4th at 120, 122-23, 126.

se illegal agreements "justifies their facial invalidation even if procompetitive justifications are offered for some."); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940) ("Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness. They are all banned because of the actual or potential threat to the central nervous system of the economy."). In this way, the "per se approach permits categorical judgments with respect to certain business practices." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985).

**III.      Market Allocations, including in Labor Markets, are Per Se Illegal Restraints.**

Market allocations are one of the traditional per se illegal restraints of trade. *See New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 399, 414 (S.D.N.Y. 2000) ("Like price fixing, a horizontal agreement among competitors to eliminate competition by allocating markets is a per se violation of Section One of the Sherman Act.") (citing *Topco Assocs.*, 405 U.S. at 608). Defendants concede this point in passing (Defs.' Mem. at 9). But nowhere do they discuss the long and well-established history of horizontal market allocations as per se offenses. This is a curious omission, given that Defendants stand accused of precisely that crime: conspiring "to suppress competition by allocating employees in the aerospace industry." Indictment (hereinafter "Ind.") ¶ 19.

An "allocation" refers to an agreement between horizontal competitors to divide between them any aspect of a market, whether by territory, resources, products, services, customers, or— in this case—labor. *Topco Assocs.*, 405 U.S. at 609-11 (allocation of marketing rights by territory); *Koppers*, 652 F.2d at 295-96 (territorial and customer allocation effected by bid rigging); *United States v. Consolidated Laundries Corp.*, 291 F.2d 563, 574-75 (2d Cir. 1961) (customer allocation); *United States v. Andreas*, 216 F.3d 645, 667 (7th Cir. 2000) (allocation of sales volume); *United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir. 1991) (allocation of

7

billboard advertising sites); *New York ex rel Spitzer*, 94 F. Supp. 2d at 405, 415 (allocation of medical services provided); *United States v. DaVita, Inc.*, No. 1:21-cr-0029-RBJ, 2022 WL 266759, at *3 (D. Colo. Jan. 28, 2022) (allocation of labor market); *DeLoach v. Philip Morris Cos.*, No. 1:00CV01235, 2001 WL 1301221, at *8 (M.D.N.C. July 24, 2001) (allocation of supply of tobacco at auction).

Allocation agreements need not wholly *eliminate* competition over a given aspect of the market in order to be per se illegal. *See United States v. Apple, Inc.*, 791 F.3d 290, 326 (2d Cir. 2015) (holding that even if price-fixing agreement is unsuccessful or "not . . . aimed at complete elimination of price competition" it nonetheless poses a "threat to the central nervous system of the economy") (cleaned up). Agreements to merely restrict or minimize competition qualify as per se offenses. *See Topco Assocs.*, 405 U.S. at 608 (observing that "[o]ne of the classic examples of a violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to *minimize* competition" (emphasis added)); *Ace Arts, LLC v. Sony/ATV Music Pub., LLC*, 56 F. Supp. 3d 436, 447 (S.D.N.Y. 2014) ("[A]greements between competitors at the same level of the market structure to allocate territories, fix prices or otherwise *minimize* competition…are classic examples of per se violations." (emphasis added)). Accordingly, even agreements that allow some competition to remain among conspirators—for example, by limiting the conspiracy to certain subcategories of a given market element or to certain methods for competing over that element—are per se illegal. *See Consolidated Laundries*, 291 F.2d at 574-75 (in customer allocation case, rejecting assertion that the "agreement to suppress all competition as to one phase of their business, i.e., old customers" is defensible in light of "their competition for new customers"); *United States v. Coop. Theatres of Ohio, Inc.*, 845 F.2d 1367, 1371, 1373 (6th Cir. 1988) (finding per se illegal

8

agreement between competitors not to solicit each other's current customers, even though competitors remained free to accept unsolicited business from those customers).

In sum, however competitors agree to slice and dice different aspects of a market—whether the entire market or just one part of it, and on whatever aspect of the market—"market allocation" is a universally recognized and unquestionably per se illegal restraint of trade. *See Compact v. Metro. Gov't of Nashville & Davidson Cnty.*, 594 F. Supp. 1567, 1577 (M.D. Tenn. 1984) (recognizing it is per se illegal to allocate by agreement "any element of the market for which businessmen or professionals compete").

## IV.     The Doctrine of Ancillary Restraints is a Question of Fact, not Relevant on a Motion to Dismiss, and is Limited in Scope.

The doctrine of ancillary restraints provides a limited defense to the per se rule. It applies when a restraint of trade is (i) subordinate and collateral to a legitimate joint venture or similar business collaboration between competitors and (ii) is "reasonably necessary" to achieve one of the collaboration's "legitimate and competitive purposes." *See Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006); *MLB Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 339 (2d Cir. 2008) (Sotomayor, J., concurring); *Aiyer*, 33 F.4th at 115-16; *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986). The doctrine is limited to this narrow application because, as then-Judge (now Justice) Sotomayor noted in her concurrence in *Salvino*, which has been cited as encapsulating the Second Circuit view of ancillary restraints,[3] it permits "competitors engaged in joint ventures … to engage in a variety of activities that would normally be illegal under a per se rule." *Salvino*, 542 F.3d at 337; *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300,

---

[3] Then-Judge Sotomayor's concurrence has been cited approvingly within and outside the Second Circuit on the issue. *See, e.g., 1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 120 n.12 (2d Cir. 2021); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 345 (3d Cir. 2010).

345 (3d Cir. 2010) ("The quintessential example of an ancillary restraint is a restrictive agreement that is an integral part of a joint venture."). If the restraint of trade is found to be ancillary, it is "exempt…from the per se rule, such that the rule of reason applies." *Aiyer,* 33 F.4th at 115-16 (cleaned up); *see also Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1395 (9th Cir. 1984) (the practical "effect of a finding of ancillarity is to remove the *per se* label from restraints otherwise falling within that category") (cleaned up).

Resolving the merits of an ancillary restraint defense is an inherently fact-intensive exercise, and thus cannot be done on the face of an indictment. As the Second Circuit recently emphasized while discussing the ancillary restraints defense, such defenses are a matter for trial, not pretrial, determination. *Aiyer*, 33 F.4th at 120. This is because a trial court "cannot resolve a factual dispute that is inextricably intertwined with a defendant's potential culpability, *as that is a role reserved for the jury*." *Id.* 33 F.4th at 116 (emphasis added).

Moreover, a defendant must do more than simply claim the ancillary restraints defense before it can become a live issue at trial. In criminal cases, the government bears the burden of proving each element of the crime beyond a reasonable doubt. But if the defendant asserts that he or she has a defense that tends to negate an element of the offense—as Defendants appear to anticipate doing here with respect to the doctrine of ancillary restraints—the defendant bears at least a burden of production before the jury can be charged regarding the potential defense. *See United States v. Carr*, 582 F.2d 242, 246 (2d Cir. 1978); *Januszewski v. Manson*, 525 F. Supp. 805, 810-11 (D. Conn. 1981). A defendant may satisfy the burden of production by making "an initial showing on each key element of the [defense] theory" with "credible" and "admissible evidence" so that the court can determine that "an adequate basis in fact exists for the [jury]

charge." *United States v. Bok*, 156 F.3d 157, 163-64 (2d Cir. 1998) (discussing "return of capital

theory" defense to tax evasion).[4]

A defendant's burden of production will require him or her to produce evidence on each

element of the ancillary restraints defense.

*First*, the defendant must make an evidentiary showing of "the nature of [the defendant's]

greater collaborative activity"—which must be separate from the restraint of trade itself—from

which the restraint allegedly flows. *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 882

(N.D. Ill. 2010). This is not as simple as just pointing to some contract between the conspirators,

or some sales made from one to the other. While the doctrine is not limited to formalized joint

ventures, the Second Circuit has recently confirmed it is a "joint venture-related exception."

*Aiyer*, 33 F.4th at 118, 120 (adding that per se is rule subject to "only a few, narrow

exceptions"). Accordingly, courts have recognized ancillary restraints in connection with those

business relationships between competitors that *resemble* joint ventures, such as joint operating

agreements (*see, e.g.*, *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713,

719, 728-31 (6th Cir. 2019)), agreements to build joint facilities (*see, e.g.*, *Polk Bros. v. Forest*

---

[4] As these cases demonstrate, a defendant bears a burden of *production* when asserting a defense that tends to negate an element of the crime. With respect to other defenses, such as self-defense or insanity, that provide a justification or excuse but do not tend to negate any element, the defendant may bear the burden of production *and persuasion*. *See Smith v. United States*, 568 U.S. 106, 110-11 (2013); *see also United States v. Hoskins*, 73 F. Supp. 3d 154, 160 (D. Conn. 2014). The doctrine of ancillary restraints is generally treated as the latter type of defense in civil cases. *See Bd. of Regents of Univ. of Oklahoma v. NCAA*, 707 F.2d 1147, 1154 n.9 (10th Cir. 1983), *aff'd*, 468 U.S. 85 (1984). And earlier this week, the District of Maine suggested the same, in a criminal case. *United States v. Manahe*, No. 2:22-cr-00013-JAW, 2022 WL 3161781 at *13 ("As an affirmative defense, the burden of proof [regarding ancillary restraints] would be on the Defendants, not on the Government."). The United States respectfully suggests that this issue, whether Defendants will bear the burden of persuasion in addition to the burden of production on the ancillary restraints defense, be addressed at a time closer to trial, if and when it appears the defense will in fact be placed before the jury.

*City Enterprises, Inc.*, 776 F.2d 185, 189-90 (7th Cir. 1985)), and integrated distribution or supply networks, *see, e.g.*, *Rothery Storage*, 792 F.2d at 214, 229-30.)[5]

All these relationships involve some form of "economic integration" between competitors—that is, a "fusion of [the conspirators'] productive capacities"—in ways that achieve otherwise unattainable "procompetitive" results, *Rothery Storage*, 792 F.2d at 214, 230, such as the production of a greater quantity of goods, the creation of a new type of product, or the introduction of market-wide economic efficiencies. *Salvino*, 542 F.3d at 337; *In re Ins. Brokerage.*, 618 F.3d at 345 ("[D]etermining ancillarity requires [courts] to consider first, whether any aspect of the defendants' association contains a significant promise of integration or cooperation yielding an increase in output."); *Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 779 F.2d 592, 601–02 (11th Cir. 1986) (applying ancillary restraints doctrine to business collaboration that "exhibits characteristics of a joint venture … It is an entity that has partially integrated some functions…to develop a product…that none of its members could produce individually.").

*Second*, and only after the defendant has established a qualifying business collaboration, he or she must proffer facts demonstrating that the charged price fixing, bid rigging, or allocation of markets was "subordinate and collateral" to that collaboration, meaning that it was related and "secondary" to the parties' collaboration. *Schering-Plough Corp. v. FTC*, 402 F.3d 1056, 1073 (11th Cir. 2005).

---

[5] The doctrine has also been applied in the context of non-compete provisions incorporated into contracts for the sale of a business and employment agreements. *See, e.g.*, *Eichorn v. AT&T Corp.*, 248 F.3d 131, 146 (3d Cir. 2001). Defendants do not appear to rely on these limited alternative applications of the ancillary restraints doctrine in this case, instead referring to its more common application to "legitimate business collaboration[s], such as a business association or joint venture." *Dagher*, 547 U.S. at 7.

*Third*, a defendant must proffer facts showing that the restraint of trade was "reasonably necessary" to achieve an "efficiency-enhancing" or "procompetitive" purpose of that collaboration. *Salvino*, 542 F.3d at 339. The defense thus fails when the facts show only that the restraint of trade may have *helped* achieve a potentially procompetitive purpose, but was not *necessary* for achieving it. *In re Ins. Brokerage*, 618 F.3d at 346 ("[A] restraint is not automatically deemed ancillary simply because it 'facilitates' a procompetitive arrangement.").

This standard is appropriately stringent. The doctrine of ancillary restraints is not intended to provide a generic "business excuse" that would essentially erase the per se rule for those who are clothed with corporate authority, or for those who find colluding to be more lucrative than competing. As one court phrased it, the doctrine of ancillary restraints "promotes, rather than diminishes, competition" in that it "serves not just to generate profits for the recipient." *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1015 (N.D. Cal. 2008).

## ARGUMENT

The Indictment here clearly and thoroughly states a per se illegal restraint of trade in violation of Section 1. Accordingly, the motion to dismiss should be denied.

I.   **The Charged Crime is a Market-Allocation Conspiracy, A Type of Conspiracy Well-Established as Per Se Illegal.**

A.   **The Law Asks Whether the Indictment Alleges a Per Se Illegal Restraint of Trade—Market Allocation—Not Whether the Charge is "Novel."**

Horizontal market allocations are one of the traditional categories of restraints deemed to be per se illegal, *see supra* at 7-9, a point that Defendants do not dispute. Defs.' Mem. at 9. The Indictment in this case describes Defendants' conduct as a horizontal market-allocation scheme and provides an expansive factual basis supporting that charge. It alleges (*inter alia*) that:

- Defendants' employers, Companies B-F (the "Suppliers"), "[t]ogether with Company A," their common customer, "competed against one another to recruit and hire engineers and other skilled workers" (¶ 4);

- Defendants "knowingly entered into and engaged in a combination and conspiracy…*to suppress competition by allocating employees* in the aerospace industry working on projects for Company A, *specifically by agreeing to restrict the hiring and recruiting of engineers and other skilled-labor employees* between and among Companies A-F" (¶ 19, Description of the Offense) (emphasis added);

- As part of the conspiracy, Defendants and their co-conspirators engaged in many activities, including attending meetings and discussions, monitoring and enforcing compliance with the agreement, and taking steps to conceal their activities, all with the stated objective of "restricting the hiring and recruiting of engineers and other skilled-labor employees between and among" them (¶¶ 20-29, Means and Methods of the Conspiracy); and

- As part of that conspiracy, Defendants and their co-conspirators made numerous statements showing that the object of the agreement was to restrict hiring and recruiting, e.g., "no poaching of each others' [sic] employees" (¶ 22(a)), "Could you please stop this person from being hired?" (¶ 22(b)), "Please do not extend offer to him" (¶ 23(b)); "direct your HR team not to hire [Company B] outsource resources …." (¶ 25(a)).

These allegations—which describe, in plain language, an agreement between employers to allocate employees in a labor market in which they directly competed—provides a clear and concise statement of the crime alleged, sufficient to put Defendants on notice and prevent double jeopardy. The Indictment thus meets the legal standard. *See Bout,* 731 F.3d at 240-41.

14

Defendants never squarely address the fact that, both in word and substance, the grand jury has charged them with engaging in a per se illegal market-allocation scheme. Instead, they focus on the factual context of this crime, remarking repeatedly how novel it is for a no-poach agreement to be the subject of antitrust enforcement under the per se rule. It is hardly novel; the Supreme Court first invalidated a no-hire agreement nearly one hundred years ago in *Anderson v. Shipowners' Ass'n*, 272 U.S. 359, 361-62 (1926). *See infra* at 17. More important, factual variations between this case and others are irrelevant. When faced with a motion to dismiss an indictment, the correct question is whether the indictment properly charged conduct that, if proven at trial, would establish a per se violation of the law, whether it is the first time such conduct has been charged or the thousandth.

Whether the charged conduct falls within the per se rule depends on the *category of restraint* pleaded—which the grand jury in this case has plainly identified as a market allocation—not the means and methods by which that restraint was intended to be achieved, that is, recruiting and hiring restrictions. *See Nw. Wholesale Stationers, Inc.*, 472 U.S. at 290 (explaining that the per se rule is a rule of "categories" and thus the question on a motion to dismiss is whether the agreement "should fall within this [per se illegal] category of activity"); *Aiyer*, 33 F.4th at 117 (in a criminal case, noting that the government's ability to prevail will "rise or fall solely on its ability to prove the per se categories of restraint alleged in the indictment").

The Supreme Court has foreclosed any attempt to avoid the per se rule merely because the precise means and methods by which the conspirators achieved an illegal restraint look different from ones past. In *Socony-Vacuum*, for example, the Court rejected the argument that defendants did not engage in price fixing when they acted to stabilize price rather than to set a

15

firm price, as alleged in a prior, seminal case. "The machinery employed by a combination for price-fixing is immaterial," the Court held, because price fixing "is illegal per se." *Socony-Vacuum*, 310 U.S. at 223. Neither this Court, nor the United States, needs to reestablish per se treatment for a restraint that falls into a per se unlawful category for each new industry or permutation of the facts. *Maricopa Cnty. Med. Soc'y*, 457 U.S. at 351. The Second Circuit follows this bedrock principle. *See Gelboim v. Bank of America Corp.*, 823 F.3d 759, 771 (2d Cir. 2016) ("The unfamiliar context of appellants' horizontal price-fixing claims," involving corruption of an interest-rate setting process that affected prices of securities, "provides no basis to disturb application of the per se rule.").

### B.    No-Poach Agreements, if Well-Pleaded as Market Allocations, are Per Se Illegal.

For many years, courts have held that agreements between competing employers regarding who and how they hire and recruit workers, when properly pleaded as market allocations, constitute per se violations of the Sherman Act, whether brought under criminal or civil authority. This was a straightforward application of the established law of market allocation to redress the varied ways in which market participants seek to cheat rather than compete.

From its earliest days, the per se rule has operated the same way whether the conspirators compete on the sell-side or buy-side of a market. In fact, the case in which the Supreme Court coined the phrase "unlawful per se" was a criminal case featuring a cartel of surplus gasoline buyers. *See Socony-Vacuum*, 310 U.S. at 166-67. *See also Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235 (1948) ("It is clear that the agreement is the sort of combination condemned by the [Sherman] Act, even though the price-fixing was by purchasers, and the persons specially injured … are sellers, not customers or consumers.").

Buyer cartels can also occur in labor markets, in which employers compete to "buy" workers' labor through higher salaries, better working conditions, and the like. The Supreme Court first recognized this nearly one hundred years ago when it ruled that a no-hire rule observed by competing shipowners that targeted a certain class of seamen was unreasonable as a matter of law. *See Anderson*, 272 U.S. at 361-62.[6] The Court has recently reaffirmed that labor markets come within the ambit of Section 1. *See NCAA v. Alston*, 141 S. Ct. 2141, 2161 (2021) (noting no "meaningful[] dispute" over existence of a "market for student-athletes' labor" in which NCAA exercised power to set wages).

In *Anderson*, the Court analogized employee no-hire agreements to customer no-poach agreements, which were unquestionably illegal. 272 U.S. at 362-63 (noting that if shipowners had instead agreed not to transport goods for certain shipper-customers, "the unlawful restraint would be clear"). Indeed, civil plaintiffs and criminal prosecutors have been bringing customer no-poach cases under Section 1 as per se illegal market allocations for decades. When faced with such a case, the Second Circuit explicitly rejected an argument that an allocation of one aspect of the market (customers) should be treated differently from an allocation of another aspect of the market (territories) that had previously been established as per se illegal. *See Consolidated Laundries*, 291 F.2d at 574-75 ("Assuming that customers were allocated in the case at bar, no more need be proved; we agree that the per se rule should be applied. We fail to see any significant difference between an allocation of customers and an allocation of territory."). Other courts have found customer non-solicitation agreements to be illegal per se, citing the Second

---

[6] *Anderson* was decided 14 years before the Supreme Court's first explicit use of the phrase "per se" illegal in *Socony-Vacuum*. Yet *Anderson* is properly viewed as a per se case, implicating both market allocation and price fixing. The Court held that the agreements at issue were "precisely what this language [i.e. the Sherman Act] condemns." *Anderson*, 272 U.S. at 363.

Circuit's reasoning. *See, e.g., Coop. Theatres of Ohio, Inc.*, 845 F.2d at 1372-73; *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1081, 1088 (5th Cir. 1978).

Consistent with this long history, the question of whether *employee* allocation agreements between competing employers (often referred to as "no-hire," "nonsolicit," or "no-poach" agreements) are similarly barred by the per se rule was answered—with a yes—at least as early as the 1970s. *See Quinonez v. Nat'l Ass'n of Secs. Dealers, Inc.*, 540 F.2d 824, 826, 828-29 & n.9 (5th Cir. 1976) (holding that plaintiff had alleged a per se violation where securities dealers agreed "not [to] hire a person who had either been rejected or discharged by another member firm," citing *Anderson*); *Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 543-45 (10th Cir. 1995) (recognizing that alleged conspiracy to "horizontally divid[e] the market…by not hiring each other's engineers" would be an "illegal agreement"). This continued into the 2010s, after the Government filed civil lawsuits, including *United States v. eBay, Inc.*, asserting that agreements between technology firms not to hire or solicit one another's employees were per se unreasonable restraints of trade[7] and several private civil actions followed. In the cases that reached the motion to dismiss stage, courts confirmed that the plaintiffs had pleaded viable, per se violations. *See In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1120-22 (N.D. Cal. 2012) (agreements "whereby each company . . . instructed recruiters not to cold call the employees of the other company" stated a "*per se* violation of the Sherman Act for purposes of surviving a 12(b)(6) motion."); *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1038-39 (N.D.

---

[7] *See* Complaint, *United States v. Adobe Sys., Inc.* No. 1:10-cv-01629-CKK (D.D.C. Nov. 24, 2010); Complaint, *United States v. Lucasfilm Ltd.,* No. 110-cv-02220, 2010 WL 5344347 (D.D.C. Dec. 21, 2010); Complaint, *United States v. eBay, Inc.,* No. CV 12 5869 PSG, 2012 WL 5727488 (N.D. Cal. Nov. 16, 2012)*.* The first two cases settled at the time of filing via consent decrees. Only *eBay* proceeded to the motion to dismiss stage, discussed above; it eventually settled as well.

Cal. 2013) (holding that no-poach agreement presents a "classic horizontal market allocation"; it is, "in fact, a service division agreement, analogous to a product division agreement"). While these courts left the ultimate decision of whether to apply the per se rule to the plaintiffs' claims until the fact-finding stage, as may be appropriate in civil matters, both unquestionably held that the plaintiffs had alleged a per se violation of Section 1. *See High-Tech*, 856 F. Supp. 2d at 1122; *eBay*, 968 F. Supp. 2d. at 1039-40. More civil cases followed, with the same results. *See In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 471, 481-85 (W.D. Pa. 2019) (no-poach agreements constitute "horizontal service division agreements . . . like product division agreements."); *Markson v. CRST Int'l, Inc.*, No. 5:17-cv-01261-SB-SP, 2021 WL 1156863, at *4 (C.D. Cal. Feb. 10, 2021) (plaintiffs "alleged a per se violation" where employers agreed "not to poach drivers that are under contract with another competitor" (cleaned up)).

The same legal reasoning has been used, with the same result, in the criminal context. Earlier this year, a district court in Colorado ruled that an employee non-solicitation agreement between competing employers had been properly charged as a per se illegal horizontal market allocation agreement, a straightforward conclusion given that the indictment identified the object of the conspiratorial agreement—as it does here—as an agreement to "allocate … employees." *United States v. DaVita, Inc.*, 2022 WL 266759 at *3. While the court allowed that there may be "less precedent on per se treatment of horizontal market allocation agreements allocating employment markets" than other types of markets, it concluded "that makes no difference." *Id.* "[A]nticompetitive practices in the labor market are equally pernicious—and are treated the same—as anticompetitive practices in markets for goods and services." *Id.*[8] Just two days ago,

---

[8] Defendants point to the *DaVita* jury instruction that the government must prove not only that defendants knowingly joined the conspiracy with competing employers to restrict recruiting between them, but also that they specifically intended to "allocate a market" as a result. Defs.'

another district court explicitly followed the *DaVita* court's reasoning and denied a motion to dismiss an indictment alleging a conspiracy between home health care agencies not to hire one another's workers and fix rates paid to those workers. Order on Mot. to Dismiss, *Manahe*, 2022 WL 3161781 at *1-*2. The court was not persuaded by defense arguments identical to those here, including that courts lack sufficient experience with no-poach charges and that procompetitive justifications for the conduct exist. "[T]he indictment alleges a recognized per se illegal form of market allocation among purchasers of labor," and thus Defendants may claim no exemption from criminal liability under "a category of restraints long condemned as inherently anticompetitive." *Id.* at 16, 21.

Similarly, a Texas district court recently denied a motion to dismiss a criminal wage-fixing charge, rejecting an argument that price fixing in a labor market is conduct outside the heartland of per se restraints. *See United States v. Jindal*, No. 4:20-CR-00358, 2021 WL 5578687, at *5-8 (E.D. Tex. Nov. 29, 2021). As the court noted, it was not expanding the per se rule; it was simply applying it. "[That] no appellate court has ever specifically found that a price-fixing agreement among employers in the labor market is *per se* illegal does not mean the Court is recognizing a new *per se* rule…[A] restraint that is 'tantamount to' per se unlawful conduct 'falls squarely within the tradition [of the] per se rule." *Id.* at *7 (cleaned up).

---

Mem. at 42 n.26 (citing Jury Instr. at 15, *United States v. DaVita*, No. 21-cr-228 (D. Colo. Apr. 13, 2022), ECF No. 254). While the judge's reasoning for giving such an instruction is unclear, it was unquestionably error. Section 1 conspiracies are general intent crimes. "The evidence must prove defendants had an intent to adhere to an agreement that was designed to achieve an unlawful objective," namely a per se illegal restraint, but "specific intent to restrain trade is not required." *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 507 (2d Cir. 2004) (citing *Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 545 (2d Cir. 1993)).

To date, *no* court has granted a motion to dismiss an indictment charging a defendant with violation of Section 1 by engaging in a no-poach agreement or other horizontal restraint of trade between competing employers. In all three such cases to date—*Jindal*, *DaVita*, and now *Manahe*—the courts have confirmed the application of the per se rule and allowed the cases to proceed to trial.

The civil cases Defendants rely upon do not diminish the force of this authority. They merely stand for the uncontroversial point that a plaintiff's allegations cannot survive under the per se rubric if they are not well-pleaded as such. In *Bogan*, the plaintiff complained about an insurance company's policy requiring its own general agents to promise not to hire away other agents' employees without permission, arguing the policy was per se illegal. The court interpreted these allegations as describing single-firm conduct (an intrafirm restraint), which is not subject to the per se rule. *Bogan v. Hodgkins*, 166 F.3d 509, 515 (2d Cir. 1999). By contrast, the restraint here is clearly between several independent firms. While Defendants point out that the *Bogan* court, in dicta, stated it would still decline to afford per se treatment to the no-hire agreement even if it had been interfirm, Defs.' Mem. at 13, the Second Circuit made this statement only with respect to the no-hire rule pleaded as a *group boycott*.[9] *Id.* It also observed that the plaintiffs "might have" successfully pleaded a per se claim on some basis but for their failure to support a critical allegation "factually." *Id.* at 515-16. Similarly, the other cases cited by Defendants (Defs.' Mem. at 13-14) were additional failed attempts to plead inter-firm conduct

---

[9] Group boycotts have sometimes been held to be per se antitrust offenses, but they are distinct from market allocations. A classic group boycott is an act by one group of competitors to protect themselves from competition from outside rivals, such as by inducing suppliers not to sell to them or otherwise harm them. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136 (1998). A group boycott and a market allocation agreement, even in the same market, could look very different.

(*Fonseca*), failed attempts to plead facts sufficient to qualify a no-hire agreement as a per se illegal group boycott and/or price fixing (*Union Circulation*, *Eichorn*,[10] *Molinari*, and *Yi*), or failed attempts to assert any cognizable restraint of trade under the Sherman Act at all (*Ulrich*, *Mooney*, *Nichols*). Most of them do not even mention market allocation. Given that Defendants' cases are easily distinguishable based on pleading failures, the Court need not turn its focus away from the facts alleged in the Indictment in this case.

### C.   Because the Indictment Pleads a Per Se Illegal Offense, the Court Should Deny the Motion Without Examining Procompetitive Justifications.

Because the Indictment alleges a per se violation, this ends the inquiry on a motion to dismiss and the Court need not—and should not—go further. This means the Court must disregard a significant portion of Defendants' brief, Defs.' Mem. at 23-27, as well as some or all of the amicus briefs from the American Staffing Association and Society of Human Resource Management, devoted to economists' and commentators' opinions that no-poaches[11] are beneficial. None of these facts appears in the Indictment, and the Government disputes them. The United States could counter with a similar body of scholarship demonstrating that no-poaches and other horizontal restrictions on workers' freedom of movement can lead to suppressed wages, worse working conditions, and lower market productivity.[12]

---

[10] The Third Circuit has since clarified that *Eichorn* had unique facts and was not intended to remove all no-poach agreements from the per se rule. *See Weisfeld v. Sun Chem. Corp.*, 84 Fed. Appx. 257, n.2 (3rd Cir. 2004) (distinguishing *Eichorn* from facts at bar, an alleged long-running agreement between competing manufacturers "not to hire each other's employees").

[11] Many of Defendants' and the amici's policy arguments actually concern the supposed benefits of non-competition agreements, also known as covenants not to compete, between an employer and its own employee. These are *not agreements between competing employers*, and thus not agreements to allocate employees. Even if these policy-based arguments were cognizable on a motion to dismiss, therefore, they would not be helpful here.

[12] *See, e.g.,* Herbert Hovenkamp, Note on Competition Policy for Labour Markets, Directorate for Financial & Enterprise Affairs Competition Committee, Organisation for Economic Co-

Such dueling policy presentations, however, are not appropriate for this Court to consider. The foundational premise of the per se rule is that it "treat[s] categories of restraints as necessarily illegal" and thereby "eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* 551 U.S. 877, 886 (2007). As the Supreme Court elaborated:

> The respondents' principal argument is that the *per se* rule is inapplicable because their agreements are alleged to have procompetitive justifications. The argument indicates a misunderstanding of the *per se* concept. The anticompetitive potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some.

*Maricopa Cnty. Med. Soc'y*, 457 U.S. at 351. *See also N. Pacific Ry. Co.*, 356 U.S. at 5 (the principle of per se unreasonableness "avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken.").

The Second Circuit's recent opinion in *Aiyer* is particularly instructive on the proper application of the per se rule on a motion to dismiss. Defendant Aiyer, convicted at trial under

---

operation & Development, at 2-4, 14 (June 5, 2019), available at https://one.oecd.org/document/ DAF/COMP/WD(2019)67/en/pdf (observing that employer no-poach agreements are harmful to both individuals and markets "because they suppress wages by reducing the demand for labour" whereas higher market output requires more demand for labor); Matthew Gibson, Employer Market Power in Silicon Valley, IZA Institute of Labor Economics, Discussion Paper No. 14843 (2021), available at https://www.iza.org/en/publications/dp/14843/ employer-market-power-in-silicon-valley (study finding that no-poach agreement between competing technology firms reduced job satisfaction and worker salaries by 4.8%); Brian Callaci, et al., The Effect of No-poaching Restrictions on Worker Earnings in Franchised Industries, July 16, 2022, available at http://dx.doi.org/10.2139/ ssrn.4155577 (study showing that after widespread cessation of no-poach agreements between fast food franchisees due to state enforcement efforts, worker earnings rose 3.3%, and noting evidence that no-poaches are "costly for workers in franchised industries" both in terms of wages and reduction in the number of outside job options available to workers).

23

Section 1 for conspiring with other foreign currency traders to fix prices and rig bids, premised his appeal in large part on the trial judge's "refus[al] to conduct a pre-trial assessment as to whether the *per se* rule or the rule of reason applies in this case." *Aiyer*, 33 F.4th at 105. Aiyer insisted the trial court should have considered the many procompetitive justifications for his conduct that he had proffered in his motion to dismiss, including via third-party affidavits from purported experts in the field. *Id.* at 105, 109. The Second Circuit found no error in allowing the case to go to the jury as a per se antitrust charge, without any second-guessing of the per se designation. In fact, as the Court held, that was the *only* permissible approach:

> Once the trial court "concluded that the indictment adequately alleged a conspiracy to fix prices and rig bids…the government was entitled to present its per se case against Aiyer to the jury without any pre-trial determination…as to the sufficiency of the government's proof of the alleged per se charges….Simply put, in a criminal antitrust case, a district court has no pretrial obligation to consider a defendant's evidence of competitive effects in order to determine whether or not the indictment properly charges an actual *per se* offense."

*Id.* at 116-17. The *Aiyer* court also noted that it would have been error for the district court to engage in the type of factfinding suggested by the defendant, not only in light of the "well-settled antitrust jurisprudence" cited *supra*, but also in light of federal criminal procedure, which contains no mechanism for summary judgment. 33 F.4th at 116-18 (citing *United States v. Sampson*, 898 F.3d 270, 281 (2d Cir. 2018)). Thus "[h]aving correctly determined that the indictment charged price fixing and bid rigging as *per se* violations of criminal antitrust laws," the trial court properly foreclosed consideration of "the competitive effects—*i.e.*, reasonableness—of that alleged conduct in an attempt by [the defendant] to avoid the *per se* rule." *Id.* at 117-18.

*Aiyer* and preceding Supreme Court precedent are therefore fatal to Defendants' demands to be heard regarding the supposed "efficiencies" created by their misconduct— a point that Defendants implicitly acknowledge by barely mentioning these cases, if at all. Instead,

Defendants miscite cases to suggest the rule is the polar opposite: that any suggestion of procompetitive benefits by a defendant immediately triggers application of the rule of reason. Defs.' Mem. at 9. These cases in no way support such an argument, which would be incompatible with *Aiyer* et al. in any event. In the cases Defendants cite, the courts had already determined that the challenged conduct did *not* fall into an established per se category, which made procompetitive justifications a live issue, because the courts then needed to decide whether to create a new per se category or use the intermediate "quick look" standard available in civil cases. *See California Dental Ass'n v. FTC*, 526 U.S. 756, 769-71 (1999) (considering whether to apply rule of reason or "quick look" review); *Copy-Data Sys., Inc. v. Toshiba Am., Inc.*, 663 F.2d 405, 408-09 (2d Cir. 1981) (considering restraints "emanating from a dual distributorship").

The law places limits on how Defendants run their businesses and may foreclose them, in certain ways, from justifying their conduct. This may run contrary to Defendants' wishes. But as one district court noted when faced with a similar group of defendants—competing medical centers who stood behind their blatant market-allocation scheme as good business, which had even garnered some measure of "community support"—they need to face the law as it stands. "Although defendants' actions may be applauded by some members of the community, the antitrust laws were written pursuant to a firmly-held belief that free competition ultimately enures to the benefit of consumers." *New York ex rel Spitzer*, 94 F. Supp. 2d at 419. To the extent Defendants, the amici, or their cohorts in industry dislike the policy implications of this established law, the court suggested "[t]he remedy here may lie with the legislature." *Id.* It does not lie in a court of law.

II.     **The Ancillary Restraints Doctrine is a Fact-Based Defense that Cannot Lead to Dismissal and, Depending on Defendants' Showing, May Never Even Reach the Jury.**

Faced with an Indictment alleging a restraint of trade that even Defendants admit is a per se violation of the Sherman Act—a horizontal market allocation—Defendants retreat to a small corner of antitrust law in the hopes of avoiding trial: the doctrine of ancillary restraints.

Nearly all courts that have addressed the ancillary restraints doctrine—including the Second Circuit, just three months ago—have recognized it as a fact-intensive question unfit for resolution on a motion to dismiss. Whether Defendants can meet their burden of production and thereby demand a charge to the jury on the ancillary restraints defense is a question for another day. When that day comes, the Court may find that Defendants have fallen far short of the legal mark. Contrary to the assertions in their motion—in which Defendants mischaracterize the ancillary restraints defense as an expansive business justification that, if credited, would effectively nullify the per se rule—the defense is a limited "joint venture-related exception" not intended to exempt broad, competitor cartels like that alleged here.

A.     **The Existence of an Ancillary Restraint is a Question of Fact That Cannot Be Resolved on a Motion to Dismiss.**

A restraint is ancillary only if it is "reasonably necessary to achieve any of the efficiency-enhancing purposes" of a qualifying business collaboration. *Salvino*, 542 F.3d at 339. This is a question of fact that can be resolved only at trial, as the Second Circuit recently made clear in *Aiyer*. The defendant in *Aiyer* made several arguments in the district court relating to the purported procompetitive effects of his conduct, including the existence of an ancillary restraint.[13] As discussed *supra*, Section I.C, Aiyer argued on appeal that the district court had a

---

[13] *See* Br. for Def.-App. at *46, *United States v. Aiyer*, No. 20-3594-cr, 2021 WL 1759216, Jan. 29, 2021 ("[T]he behavior targeted by the Government was ancillary and integral to a continuing productive buy-sell relationship among Appellant and his alleged coconspirators."); *see also* Tr.

26

"pretrial obligation" to consider that evidence to determine whether the indictment properly charged a per se offense. *Id.* at 118. The Second Circuit rejected this argument, holding that a trial court "cannot resolve a factual dispute that is inextricably intertwined with a defendant's potential culpability, as that is a role reserved for the jury." *Id.* at 116. The time for Aiyer to raise his ancillary restraint argument, explained the Second Circuit, was at trial. *Id.* at 120.

The Second Circuit is hardly a judicial outlier. Other courts across the nation—including, most recently, in a criminal no-poach prosecution—have recognized that the ancillary restraints doctrine is a fact-intensive inquiry and inappropriate for adjudication on a motion to dismiss. *See Manahe*, 2022 WL 3161781, at *13 (ancillary restraint defense "is a question of fact that can only be resolved with evidence beyond the four corners of the indictment, not at the motion to dismiss stage"); *United States v. Gaines*, No. 20-CR-20 (MJD/HB), 2020 WL 5215386, at *4 (D. Minn. Aug. 4, 2020), *report and recommendation adopted*, No. CR 20-20 (MJD/HB), 2020 WL 5204284 (D. Minn. Sept. 1, 2020) (existence of ancillary restraint "is, of course, a question of fact that can only be resolved with evidence beyond the four corners of the indictment"); *Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127, 1133 (N.D. Cal. 2005) (ancillary restraint question "is quintessentially one of fact"); *Hunt v. Mobil Oil Corp.*, 410 F. Supp. 10, 22 (S.D.N.Y. 1975), *aff'd*, 550 F.2d 68 (2d Cir. 1977) (ancillary restraint argument "present[ed] an issue of fact which must await trial"); *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d at 484 (declining to rule on ancillary restraints defense at pleading stage in case involving no-poach agreement); *Conrad v. Jimmy John's Franchise, LLC,* No. 318CV00133NJRRJD, 2019 WL 2754864, at *2 (S.D. Ill. May 21, 2019) (same); *Aya*

---

of Hr'g at 15-20, *United States v. Aiyer*, No. 18-cr-333 (Dkt. 66), Jun. 11, 2019 (raising *Salvino* and *Atrium Health* at motion to dismiss argument), 43 (denying defendant's motion to dismiss).

*Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, No. 17CV205-MMA (MDD), 2018 WL 3032552, at *15 (S.D. Cal. June 19, 2018) (same); *eBay, Inc.*, 968 F. Supp. 2d at 1039 (same).

Defendants cite only two cases to the contrary, and both are inapposite. Defs.' Mem. at 20, 22. Both decisions involved the anomalous context of franchise agreements, and were based on the courts' respective assumptions that the franchise model constitutes a "procompetitive" collaboration "between franchisees operating under the umbrella of the same brand." *Deslandes v. McDonald's USA, LLC*, No. 17 C 4857, 2018 WL 3105955, at *7 (N.D. Ill. June 25, 2018); *Ogden v. Little Caesar Enterprises, Inc.*, 393 F. Supp. 3d 622, 635 (E.D. Mich. 2019). The separate, bilateral agreements between each Supplier and Company A that form the basis for Defendants' ancillary restraint argument are self-evidently not franchise agreements, and as the Government discusses in subsection II.B, *infra*, nor would they otherwise fit under the rubric of economically-integrated collaborations between competitors, which is required for the doctrine to apply. Moreover, neither *Deslandes* nor *Ogden* provides a model to follow, given that they plainly erred in finding ancillarity without addressing the "reasonably necessary" prong of the ancillary restraints defense. *See Deslandes*, 2018 WL 3105955 at *7; *Ogden*, 393 F. Supp. 3d at 633 (citing *Deslandes*).[14]

The fact-intensive nature of the ancillary restraints defense manifests throughout the case law, even in cases on which Defendants heavily rely in their motion. In *Aya Healthcare*, for example, the Ninth Circuit affirmed the existence of an ancillary restraint in a civil case only at

---

[14] In the case of *Deslandes*, where the court suggested that the no-poach agreement was "*not necessary* to encourage franchisees to sign," 2018 WL 3105955 at *7 (emphasis added), skipping this element contravened binding Seventh Circuit precedent. *See Blackburn v. Sweeney*, 53 F.3d 825, 828 (7th Cir. 1995) (analyzing "reasonably necessary" element and finding customer non-solicitation agreement was not ancillary because it "was not a necessary condition for the increased competition resulting from the split-up of the partnership").

the summary judgment stage after discovery had been completed, and after the district court had declined to resolve the issue on the defendant's motion to dismiss. *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102 (9th Cir. 2021); *Aya Healthcare Servs., Inc.*, 2018 WL 3032552, at *15 (declining to resolve ancillary restraint defense on motion to dismiss). On appeal, the Ninth Circuit looked to the district court's evidentiary determinations to resolve facts necessary to adjudicating the defense. The Ninth Circuit affirmed the district court's findings that the parties' subcontracting agreement was a "joint venture" between competitors, that the non-solicitation provision in the parties' written subcontracting agreement was "part of a collaboration agreement to fulfill the demand of hospitals for travel nurses" at a time when the hospitals were experiencing a "chronic shortage of nurses," that this purpose was "procompetitive" in nature, and (notwithstanding the district court's sparse analysis on this issue, which could well be criticized) that the parties' non-solicitation provision was "reasonably necessary" to achieve it. *Aya Healthcare Servs v AMN Healthcare, Inc.*, 9 F.4th at 1109-11; *see Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, No. 17CV205-MMA (MDD), 2020 WL 2553181, at *13 (S.D. Cal. May 20, 2020), *aff'd*, 9 F.4th 1102 (9th Cir. 2021). The Ninth Circuit reached these conclusions, as it only could, based on an evidentiary record.

In their attempt to usurp the jury's factfinding role and ask the Court to immediately resolve the pending charge on the merits, Defendants employ three tactics. *First*, they attempt to insert their own inadmissible, self-serving facts to justify the alleged no-poach conspiracy. They claim, for example and with no record support, that the alleged conspiracy was ancillary because it "facilitated the productive output of Company A," "afford[ed] Company A…flexibility in the management of its labor expense," and "made it more practicable to complete contracted-for tasks on a timely basis." Defs.' Mem. at 18. None of these "facts" is alleged in the Indictment.

They are disputed and, thus, cannot be credited on a motion to dismiss. *United States v. Wedd*, 993 F.3d 104, 121 (2d Cir. 2021) ("At the indictment stage, we do not evaluate the adequacy of the facts to satisfy the elements of the charged offense. That is something we do after trial."); *eBay, Inc.*, 968 F. Supp. 2d at 1039 ("[T]he court cannot hold that the agreement is ancillary simply because [Defendants] posit[] that it is."); *In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 636 n.1 (N.D. Ill. 2020) (noting that "defendants' ancillary restraint argument rests largely on their own view of the facts, not on facts alleged in the complaint").

*Second*, in a related maneuver, Defendants claim that the Indictment alleges an ancillary restraint "on its face." Defs.' Mem. at 20. This is plainly incorrect. None of Defendants' conclusory "facts" regarding ancillarity appear anywhere on the face of the Indictment, or are implicit within it. Nowhere does the Indictment allege that the agreement to restrict labor competition was an integral part of the Suppliers' business dealings with Company A, or was reasonably necessary for any procompetitive, efficiency-enhancing purpose. To the contrary, the Indictment alleges facts about the conspiracy that, if proven, would demonstrate the *absence* of an ancillary restraint. It alleges an employee allocation agreement that was not integral to the working of a legitimate business arrangement, but rather one that operated via an "unwritten understanding." Ind. ¶ 29(b). It also describes a conspiracy motivated by *anti*competitive benefits: the suppression of workers' wages and other labor costs, *id.* ¶ 27, including by avoidance of a "price war" between Suppliers, *id.* ¶ 27(b). It also alleges that, in many instances, it was the competing Suppliers and their employee-Defendants who strongly advocated for no-poach rules to be created and enforced among the conspirators (*id.* ¶ 23, 24(b), 27(a), 27(d), 28(g), 29(f)), which contradicts Defendants' suggestion that the Suppliers merely acquiesced in the agreement at the request of Company A "because it was important" to *it* as a customer

30

(Defs.' Mem. at 23). Defendants will have an opportunity to dispute these facts at trial, but they cannot rewrite the grand jury's Indictment to reflect their self-serving reality.

The Indictment does acknowledge legitimate commercial transactions between some of the conspirators—namely, the engineering services contracts between Company A and each Supplier—but, as explained below, this is merely background information that helps explain how and why the crime was committed. *See infra* at 42. Defendants cannot seriously suggest that if an indictment charging a violation of Section 1 so much as mentions that two alleged conspirators had some lawful business relationship—as many do—then an ancillary restraint defense has been achieved "on the face of the indictment." Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (5th ed. 2021) ¶ 1908b ("Clearly, a restraint does not qualify as 'ancillary' merely because it accompanies some other agreement that is itself lawful.").

*Third*, citing the Sixth Circuit's decision in *Atrium Health*, Defendants attempt to water down the controlling "reasonably necessary" requirement for an ancillary restraint defense to a much more lenient "plausibly related" standard. They use this as a launch point to argue, in essence, that if the Court finds the Indictment describes any connection of any kind between the conspiratorial agreement and the business relationships between the Suppliers and Company A, Defendants are entitled to the ancillary restraints defense as a matter of law. Defs.' Mem. at 17. But "plausibly related" is not the standard in the Second Circuit, or in any other Circuit besides the Sixth. In fact, the majority of courts of appeals that have addressed the ancillary restraints doctrine have adopted some version of the "reasonably necessary" standard.[15]

---

[15] *See Rothery Storage*, 792 F.2d at 229 ("[A]ncillary restraints are essential to the efficiency of a contract integration" and concluding that restraints at issue were "reasonably necessary to the [joint venture]"); *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1102 (1st Cir. 1994) ("We

31

Then-Judge Sotomayor's concurrence in *Salvino*—which, as noted *supra* n.3, sets forth the operative standard in the Second Circuit—uses the phrase "reasonably necessary" or "necessary" *eleven* times to describe the requisite relationship between a restraint of trade and its alleged corresponding business collaboration. *Salvino*, 542 F.3d at 335-41. Indeed, some form of the "reasonably necessary" standard appears in other decisions within the Second Circuit, while "plausibly related" appears in none. *See Nat'l Basketball Ass'n v. Williams*, 45 F.3d 684, 690 (2d Cir. 1995) ("Such a belief arguably fits within Rule of Reason analysis that permits 'ancillary restraints' *necessary* to a legitimate transaction" (emphasis added)); *Tower Air, Inc. v. Fed. Exp. Corp.*, 956 F. Supp. 270, 283 (E.D.N.Y. 1996) ("Restraints collateral to but *necessary* for the implementation of a lawful agreement, and which are *no broader in scope than necessary* to accomplish the purpose of the agreement, are termed 'ancillary.'" (emphasis added)). As such, the Court need not take up Defendants' invitation to dismiss the instant charge "on its face."

---

also do not dispute that a 'restraint' that is ancillary to the functioning of such a joint activity—i.e. one that is *required* to make the joint activity more efficient—does not necessarily violate the antitrust laws.") (emphasis added); *In re Ins. Brokerage*, 618 F.3d at 345 (ancillary restraint is one that is a "necessary condition of the joint venture"); *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1368 (5th Cir. 1980) ("Certainly the antitrust laws must allow reasonably ancillary restraints necessary to accomplish these enormously procompetitive objectives."); *Blackburn*, 53 F.3d at 828 (finding customer non-solicitation agreement not ancillary because it "was not a necessary condition for the increased competition resulting from the split-up of the partnership"); *Aya Healthcare*, 9 F.4th at 1109 ("[T]he restraint must be … reasonably necessary to achieving that transaction's pro-competitive purpose.") (cited in *Aiyer*, 33 F.4th at 115); *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 970 (10th Cir. 1994) ("What we ask … is whether the alleged restraint is reasonably related to Visa USA's operation and no broader than necessary to effectuate the association's business."); *Schering-Plough Corp.*, 402 F.3d at 1072 ("Ancillary restraints are generally permitted if they are 'reasonably necessary' toward the contract's objective of utility and efficiency.").

**B.      Defendants Must Meet Their Burden Before Receiving an Ancillary Restraint Instruction, and May Never Even Reach the Jury.**

Presented with a clear Indictment that alleges only a naked market-allocation scheme, and not an ancillary restraint, this Court need not address Defendants' ancillary restraint arguments any further at this stage. Yet assuming these arguments give a preview of what Defendants have in mind for trial, and may be revisited in pretrial motions, the Court should not be misled by Defendants' myriad mischaracterizations of the law. In short, "ancillary restraint" is not a magical phrase that Defendants can simply utter to defeat the pending charge. At trial, should Defendants seek an ancillary restraint jury instruction, they must first satisfy an evidentiary burden, which the law and their ongoing failure to provide reciprocal discovery suggest they may be unable to meet.

Despite repeated requests for defense discovery under the Court's Standing Order and Rule 16, the Government has yet to receive any discovery materials from Defendants. If Defendants intend to put on a defense case, they are obliged to turn over such evidence. *See* Fed. R. Crim. P. 16(b); D. Conn. Standing Order on Discovery Section (B). If, shortly after any ruling by this Court on the motion to dismiss (and, in any event, well in advance of trial), Defendants still cannot articulate any legally sufficient grounds to claim the ancillary restraints defense, or cannot proffer facts sufficient to meet their burden of production at trial, the United States may move to preclude the defense altogether and avoid wasting the Court's and the jury's time and muddying relevant evidence.

The first element of the ancillary restraints defense for which Defendants will need to make an evidentiary showing is "the nature of [the defendants'] greater collaborative activity" from which the restraint of trade allegedly flows. *In re Sulfuric Acid*, 743 F. Supp. 2d at 882; *Manahe*, 2022 WL 3161781 at *13 (ancillary restraint requires evidentiary showing that

33

"Defendants' association was that of a legitimate, pro-competitive venture."). As noted *supra* at IV page 11, not every commercial relationship between two or more companies qualifies as a "procompetitive" collaboration. *See In re Ins. Brokerage*, 618 F.3d at 346. Courts have declined to apply the ancillary restraints doctrine when the purported "collaborations" at issue were nothing more than routine buy-sell transactions between non-competitors, or even transactions between competitors that were not sufficiently "procompetitive." *Id.* at 347 (rejecting application of ancillary restraint defense in hub-and-spoke case based on "preferred provider" agreements between each horizontal competitor insurance company and the insurance broker "hub" with which they separately transacted); *C-E Mins., Inc. v. CARBO Ceramics, Inc.*, No. 1:11-CV-02574-JOF, 2012 WL 13008801, at *5 (N.D. Ga. Mar. 14, 2012) (rejecting ancillary restraint defense in the context of a supply contract because "there is no hint of partnership or joint venture between CARBO and C-E. To the contrary, theirs is an arms-length relationship"); *United States v. Vill. Voice Media, LLC*, No. CIV.A. 1:03 CV 0164, 2003 WL 21659092, at *19 (N.D. Ohio Feb. 12, 2003) (rejecting ancillarity argument where underlying agreement between competing newspaper publishers did not create a "distinctive product" or "increase[] competition in the alternative newsweekly industry generally").

To meet this aspect of its burden, Defendants will have to do better than the unsupported assertions presented in their motion to dismiss that Defendants and their Supplier employers engaged in a unified "outsource collaboration" and "cooperative venture," working together cooperatively for the benefit of Company A. Defs.' Mem. at 16, 22-23.[16] No such factual record

---

[16] Amicus Society of Human Resource Management does not even describe the alleged conspirators' relationship in this way, instead referring repeatedly to the virtues of a customer (presumably like Company A) "utilizing multiple staffing firms for a single project" (*see* Dkt. 212 at 2, 12, 13). This also misses the mark—the Indictment alleges that each Supplier completed *separate* projects, independently, for Company A. Ind. ¶ 3. The Amicus provides no

supporting that assertion exists, nor is it supported by the charge. To the contrary, the Indictment alleges that Defendants and their Supplier employers had no relevant joint business activity of any kind with each other; they were head-to-head competitors, in the markets for both labor and for engineering services projects from Company A. Ind. ¶ 4. The only commercial relationships alleged in the Indictment are the separate, bilateral engineering services contracts between each Supplier (the seller) and Company A (the buyer)—in other words, routine commercial transactions between non-competitors. To date, the business arrangement that Defendants describe in their motion is based entirely on their say-so rather than proffers of admissible evidence, which will be required before the ancillary restraint issue can reach the jury.

Defendants also cannot meet their burden by piggybacking on facts developed by *other* parties in cases presenting very different circumstances, such as *Aya* (Defs.' Mem. at 21-22). *Aya* involved an agreement between two competing healthcare staffing companies that the district court referred to as a "joint venture" and distinguished from transactions made "up and down a supply chain between buyers and sellers." *Aya Healthcare Servs., Inc.*, 2018 WL 3032552, at *10. The district court, moreover, found that the restraint in that case was distinguishable from a broader "cartel of healthcare staffing agencies combining" to restrict hiring between each other. *Aya Healthcare Servs., Inc.*, 2020 WL 2553181, at *12, *aff'd*, 9 F.4th 1102 (9th Cir. 2021). Unless, within short order, Defendants can be ready to proffer admissible and credible facts otherwise, as a matter of law, they will fall far outside the heartland of ancillary restraints. Viable ancillary restraints defenses exist when the same parties engage in both the restraint of trade and the qualifying business collaboration. *See e.g., Salvino*, 542 F.3d at 339 ("[C]ompetitors engaged

---

reason why the completion of separate projects by separate Suppliers necessitates a horizontal employee no-poach agreement, any more than it requires them to engage in price fixing or bid rigging.

in joint ventures may be permitted to engage in a variety of activities that would normally be

illegal under a per se rule"); *Aya*, 9 F.4th at 1110 (restraint in "joint venture" agreement between

competing healthcare staffing companies); *Rothery Storage*, 792 F.2d at 212-15 (restraint as part

of "joint venture" between nationwide moving van line and competitor van lines); *Polk Bros.*,

776 F.2d at 187-90 (restraint as part of agreement establishing "a joint facility" between potential

competitors); Areeda & Hovenkamp, ¶1908b (ancillary restraint accompanies a qualifying

transaction "*between the same parties*." (emphasis added)).

It will also be insufficient, as a matter of law, for Defendants to merely proffer facts

establishing that, taken collectively, the Suppliers' independent buy-sell contracts with Company

A led to a beneficial financial relationship for all. Commercial parties are not privileged under

the ancillary restraints doctrine to engage in whatever restraints of trade they desire among

themselves to further their financial interests, even where their interests converge—which is

otherwise known as collusion. The doctrine of ancillary restraints "promotes, rather than

diminishes, competition" in that it "serves not just to generate profits for the recipient." *In re

ATM Fee Antitrust Litig.*, 554 F. Supp. 2d at 1015.

Next, Defendants must proffer sufficient evidence of the second element, that the market

allocation agreement was "subordinate and collateral" to their legitimate business collaboration.

*Schering-Plough Corp.*, 402 F.3d at 1073. Defendants have not revealed what evidence they

intend to proffer on this element, thus it is well premature to suggest this Court can decide the

issue, or that Defendants will be successful.

Finally, assuming Defendants get past the first two elements of the ancillary restraints

defense, Defendants will also have to produce evidence supporting the third element, that the

alleged conspiracy was "reasonably necessary" to achieve the "procompetitive" or "efficiency-

enhancing" purposes of those transactions. *Salvino*, 542 F.3d at 339. One substantial hurdle for Defendants is already apparent: the no-poach agreement alleged in the Indictment is an "unwritten understanding" (Ind. ¶ 29(b)) not included in any of the relevant parties' lengthy and fully integrated services agreements. *See C-E Mins.,* 2012 WL 13008801, at *5 ("The fact that the parties had a previous Supply Agreement that did not contain a Paragraph 5-like mutual allocation is ample evidence for the fact that Paragraph 5 is not ancillary to the Supply Agreement.").

While it is unclear, at this point, what admissible and credible evidence Defendants will proffer to meet their burden on the "reasonably necessary" element, one point is clear: it cannot be the type of support cited in their brief. Most of the supposed "efficiency-enhancing" benefits that Defendants claim result from restricting movement in the aerospace engineering labor market have nothing to do with efficiency or productivity; they instead relate only to money. Defendants assert that the no-poach agreement gave Company A "flexibility in the management of its labor expense" and "allowed for the [Suppliers'] recoupment of training and recruitment costs." Defs.' Mem. at 18. But these arguments merely reflect a financial motive to avoid the costs of horizontal competition in the labor market, such as wage increases, replacement of lost workers, and the cost of new training. Avoiding the costs of competition is not cognizable as a "procompetitive" justification for a labor cartel. *See PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 836 (9th Cir. 2022) ("Although…dressed up in the language of economics," argument that a restraint "reduc[es] search and transaction costs … is not a procompetitive justification because it does not explain how the Clear Cooperation Policy enhances *competition*."); *Law v. NCAA*, 134 F.3d 1010, 1022 (10th Cir. 1998) ("[C]ost-cutting by itself is not a valid procompetitive justification. If it were, any group of competing buyers could agree on maximum

37

prices."); *Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.*, 80 F. Supp. 3d 1257, 1267 (D. Colo. 2015) (rejecting argument that reduction of costs is "procompetitive" where "the alleged decrease in costs inures to [defendant's] benefit, not that of patients or medical providers" and did not result "in any benefits to competition.").

In sum, Defendants will need to do more than simply invoke the words "ancillary restraint" to submit that defense to the jury. Whether they can do so remains to be seen. Regardless, the Government reserves the right to hold Defendants to the law of ancillary restraints as it actually stands, not Defendants' alternative version of that law. The United States may therefore move *in limine* to bar any ancillary restraint evidence that, as a matter of law, a reasonable juror could not rely upon to find a Defendant not guilty of the crime alleged, and, if warranted, to bar the ancillary instruction to the jury altogether.

### C.   Defendants' Estoppel-Like Argument Against the Government Has no Basis in Fact or Law.

Finally, Defendants claim that the Department of Justice promised never to criminally charge those who engage in no-poach conspiracies affecting outsource workers, because the Department considers all such conspiracies to be ancillary restraints. Defs.' Mem. at 27-31. This argument is baseless, both in fact and law. The Justice Department never made such statements. Rather, in the settlements and other legal filings, publications, and public statements cited by Defendants,[17] the Government describes the state of the law as this memorandum does: naked price fixing, bid rigging, and market allocation between horizontal competitors is per se illegal and may result in criminal charges, whereas restraints ancillary to a qualifying business collaboration are not. Ancillary restraints *may* exist in outsource arrangements, or sales of

---

[17] Several of these statements self-evidently do not support Defendants' position because they were made by the Federal Trade Commission, an independent agency not part of, and not controlled by, the Justice Department. Defs.' Mem. at 28-29.

businesses, or legal settlements, as the statements reflect, but so may naked restraints of trade—as in the case at bar. The Indictment does not allege that Defendants engaged in an ancillary restraint and, if necessary at trial, the United States will dispute any such assertion.

Nor does the Executive Branch have the power to alter laws passed by Congress or grant exemptions under the antitrust laws for certain types of commerce. Congress and the federal courts have clearly communicated, with rare and explicitly stated exceptions not relevant here, that the Sherman Act "establishes one uniform rule applicable to all industries alike." *Socony-Vacuum*, 310 U.S. at 222. Alleged inconsistencies on the part of the Executive Branch in its public statements cannot estop it from prosecuting a crime, change enacted legislation, or alter judicial decisions interpreting those laws. Defendants cite no law to the contrary.

## III.      The Indictment Alleges a Horizontal, not a Vertical, Restraint of Trade.

Defendants' argument that the Indictment must be dismissed because it alleges a vertical and not a horizontal conspiracy serves as another part of their strategy to stretch antitrust law into something unrecognizable by federal courts. The presence of a vertical business relationship somewhere between companies in a horizontal conspiracy is not fatal to an otherwise valid per se charge; indeed, vertical business relationships are common within horizontal conspiracies. The indictment alleges a horizontal restraint of trade in a labor market among Defendants. Any allegations concerning vertical business relationships in the aerospace engineering market is immaterial to the Court's resolution of this claim. It is the orientation of the restraint that controls.

### A.      The Per Se Rule Bars Horizontal Restraints of Trade, which Is the Only Type of Restraint Alleged in the Indictment.

The parties agree that the per se rule condemns only those restraints of trade deemed "horizontal," meaning those that restrain competition between firms found at the same level of

the market. *See Topco Assocs.*, 405 U.S. at 608; *Anderson News, LLC v. American Media, Inc.*, 680 F.3d 162, 182-83 (2d Cir. 2012); *see also* Defs'. Mem. at 9. A horizontal restraint of trade is, at its core, "an agreement among competitors on the way in which they will compete with one another." *NCAA*, 468 U.S. at 99.

"Horizontal" does not necessarily describe the orientation of every member of such a conspiracy vis-à-vis every other member in terms of their *business* relationships. Any two conspirators in a larger conspiracy may be solely horizontal competitors, solely in a vertical buyer-seller relationship, or a mix of the two, and their business relationship may change over time, but it remains a horizontal conspiracy. *See United States v. Koppers*, 652 F.2d 290, 296-97 (2d Cir. 1981) (confirming that defendants were properly charged with a horizontal conspiracy despite their partially vertical, buy-sell relationship; the accused scheme was a classic horizontal bid-rigging arrangement); *United States v. Usher*, No. 1:17-cr-00019, 2018 WL 2424555, *4 (S.D.N.Y. May 4, 2018) (rejecting argument that horizontal price-fixing charge could not stand against currency traders who were occasionally vertically aligned as buyers/sellers; indictment alleged that traders competed at the same level of the currency market and the object of their conspiracy was to "fix[] the market price of the very product over which they compete").

The Indictment alleges a restraint of horizontal competition in a labor market, and nothing else. Paragraph 4 explicitly describes the horizontal competition for labor between each of the Suppliers for whom Defendants worked, *and also* between each of the Suppliers and their common customer, Company A.[18] Ind. ¶ 4 ("Together with Company A," Companies B-F

---

[18] For this reason, Defendants' suggestion (Defs.' Mem. at 36-37) that there is a heightened level of "verticality" with respect to the allegations that Company A and Company B (and Company B's employees, Defendants Harvey and Wasan) agreed to additional no-poach rules between just their two companies, Ind. ¶¶ 23-24, is unavailing. As demonstrated above, Company A is alleged to be a horizontal competitor in the same labor market as Company B (and all the other

"competed against one another to recruit and hire engineers and other skilled workers."). Each

Defendant is accused of knowingly joining a conspiracy "to suppress competition by allocating

employees…specifically by agreeing to restrict the hiring and recruiting of engineers and other

skilled-labor employees between and among" them. *Id.* ¶ 19. The conspiracy alleged is a single

conspiracy in a single count. Each Supplier Defendant is thus accused of conspiring with not just

Defendant Patel/Company A, but also with each other, as part of a single agreement. *Id.* This

conspiracy thus exists between individuals and firms at the same level of the market—a labor

market—where they all compete head-to-head as labor "buyers."

The Indictment also describes the aerospace *engineering services* market—as opposed to

the *labor* market—as containing vertical relationships, namely, the contractual, buy-sell

relationship between common customer Company A and each Supplier. No restraint of trade is

alleged within those vertical relationships; for example, the Indictment does not allege that the

terms in the Master Services Agreement setting the rates at which Company A agrees to pay

Company B (a Supplier) for its engineering services is illegal price fixing. The vertical

relationships between Company A and the Suppliers in the engineering services market are

merely contextual information important to understand the crime alleged. *First*, explaining how,

through whom, and why the conspiring companies and individuals interacted is important factual

context in any conspiracy case. *See, e.g.*, Ind. ¶ 3 (describing the structure of the market and

identifying Company A as the common customer of the Suppliers). *Second*, this information

helps explain how the conspiracy was able to persist for nearly a decade, due in part to the

---

Suppliers), and the object of the entire conspiracy, including the no-poach rules agreed to with
Company B, was to restrict competition horizontally in that *labor* market. Company A and
Company B are vertically aligned in the *engineering services* market; the Indictment describes
no restraint of trade in that market.

central policing and horizontal and vertical economic pressure leveraged by Company A/Defendant Patel. *Id.* ¶ 28(b-d). *Third*, it helps establish the motive for Defendants to commit this crime, including the mutual financial benefits that flowed from preventing wage and other labor costs from rising due to cross-hiring between companies. *Id.* ¶ 27. As Defendant Harvey once phrased it, cross-hiring "puts pressure on [our] and our customers' ability to contain labor cost increases in our joint 'ecosystem' over time." *Id.* ¶ 27(d).

In short, the Indictment alleges that by restraining trade in a purely horizontal fashion (across the labor market, where all conspirators, including Company A, compete at the same level) the conspirators reaped the financial benefits of that crime across both their horizontal and vertical relationships, and thus shared a common motive to commit it.

Given that the Indictment plainly describes only a purely horizontal restraint in the labor market, every authority cited by Defendants regarding vertical or "mixed" restraints, and the fact that such restraints are typically judged under the rule of reason, is irrelevant. Defs.' Mem. at 31, 36-37 (citing *Leegin, State Oil Co., Sylvania, AT&T Corp.*, *Elecs. Commc'ns Corp.*, *Ryko Mfg. Co.*,); *id.* at 32-33 (citing *2238 Victory Corp.*, *In re McCormick & Co.*, and others).[19]

## B.    The Mere Presence of a Vertical Participant in a Horizontal Conspiracy Does Not Disturb Proper Application of the Per Se Rule.

Defendants fail to address the well-settled body of law defining a horizontal conspiracy, and instead seek to carve out a new exception to the per se rule for restraints of trade that "exist in" or "further" any vertical business relationship. Defs.' Mem. at 34. Even if that were a

---

[19] The word "mixed" describes the orientation of the alleged restraint of trade as simultaneously working horizontally and vertically in the same market, an allegation not present here. *See, e.g., 2238 Victory Corp. v. Fjallraven USA Retail, LLC*, No. 19-cv-11733 (PKC), 2021 WL 76334, at *5 (S.D.N.Y. Jan. 8, 2021) (holding that rule of reason applied to allegation that manufacturer-seller conspired with authorized seller of its goods to fix prices by excluding unauthorized discount seller from the market; the complained-of restraint was the "vertical coordination on intrabrand retail prices" despite horizontal competition between all sellers).

reasonable reading of the allegations here, which it is not, accepting Defendants' suggestion would lead to absurd results. For one, if that were true, hub-and-spoke conspiracies, in which the vertically-oriented "hub" joins and orchestrates a conspiracy to restrain competition between horizontal competitor "spokes" for the corrupt benefit of all, would be exempt categorically from per se illegality under Section 1. *In re Ins. Brokerage*, 618 F.3d at 347 (rejecting ancillary restraint argument in hub-and-spoke case because "[i]f all horizontal agreements that exist to facilitate . . . vertical ones . . . must be tested by the rule of reason, then *per se* condemnation of hub-and-spoke conspiracies would appear to be impossible"); *see also Leegin*, 551 U.S. at 893 (recognizing that vertical restraints "might be used to organize cartels at the retailer level") (cleaned up).

This is clearly not the case, as the Second Circuit declared in *Apple*. The United States sued Apple, Inc. and five of the nation's largest publishing houses for engaging in a per se illegal conspiracy to fix the price of ebooks. *Apple*, 791 F.3d at 296. The publishers were, admittedly, horizontal competitors in the book publishing market, but Apple merely provided a platform for the distribution and sale of ebooks to consumers, via an arms'-length contract with each publisher. *Id*. Apple's relationship to each other conspirator was thus entirely vertical; it did not compete with any of them. Apple argued it could not be liable for any horizontal price-fixing agreement given that was a vertically oriented business partner, whose only goal was to "promote 'enterprise and productivity'" in the ebooks market. *Id*. at 314, 321. The Second Circuit disagreed, as had the district court. The question of whether Apple "engaged in 'vertical conduct'" is moot, the court stated. *Id.* at 322. "It is the type of restraint Apple agreed to impose that determines whether the per se rule or the rule of reason is appropriate." *Id.* (citing *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990)). "[T]he relevant 'agreement in

43

restraint of trade' in this case is not Apple's vertical Contracts with the Publisher Defendants…it is the horizontal agreement that Apple organized among the Publisher Defendants to raise ebook prices," which made the conspiracy a per se offense. *Id.* at 323. *Apple*'s reasoning maps to this case closely.[20] The relevant agreement in restraint of trade is not Company A's vertical contracts with the Suppliers, it is the horizontal agreement that Company A and its agent, Defendant Patel, organized among the Suppliers and other Defendants to allocate employees.

This legal principle stated in *Apple* was not new. The Second Circuit relied upon several precedents establishing that horizontal conspiracies, even when flowing from vertical business arrangements and benefitting vertically-oriented parties, are adjudicated under the per se rule. *See id.* at 323-24 (discussing *Klor's, Inc. v. Broadway–Hale Stores, Inc.* 359 U.S. 207 (1959), in which the Supreme Court upheld the liability of a stream of vertically and horizontally related market participants for a per se illegal group boycott; there, "the agreement at issue was not 'simply a 'vertical' agreement between supplier and customer, but [also] a 'horizontal' agreement among competitors.") (citing *NYNEX Corp.*, 525 U.S. at 136). *See also United States v. General Motors Corp.*, 384 U.S. 127, 145 (1966) (affirming that car manufacturer's coordination of agreement between a group of dealers to prevent competing dealers from discounting the price of cars was a "classic" group boycott and per se illegal) and *Toys 'R' Us,*

---

[20] Defendants suggest that *Apple* is inapplicable to the case at bar because Apple's ultimate goal was to disadvantage its own competitor in the ebooks sales market (Amazon), whereas here, there are no allegations that Company A intended to do the same to its competitors in the engineering services market. Defs.' Mem. at 33 n.22. That is a factual distinction, but not a legally significant one. No part of the trial court's or Second Circuit's opinion states that disadvantaging a competitor outside the conspiracy is *required* to find a per se illegal price-fixing conspiracy. To the contrary, both courts' conclusions that Apple, as a vertical player in the market, joined a horizontal price-fixing conspiracy rested on the object of that conspiracy as proven at trial—to fix prices of ebooks among one another—not on any party's unique motives involving a third party. *Apple*, 791 F.3d at 322; *United States v. Apple, Inc.*, 952 F. Supp. 2d 638, 691 (S.D.N.Y. 2013).

*Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000)) (affirming that retail toy store engaged in horizontal conspiracy when it coerced competing toy manufacturers to collude in not selling toys to discount toy stores).

Outside the hub-and-spoke context, many other cases exist in which conspirators leverage their vertical relationships in order to enhance or enforce a horizontal conspiracy, without disturbing proper application of the per se rule. For example, bid-rigging conspiracies commonly involve one competitor agreeing to submit a losing bid, or no bid at all, after which it is awarded a subcontract from the winning bidder. While that subcontract payoff is a vertical transaction between the winning General Contractor conspirator and the losing Subcontractor conspirator, courts recognize this agreement as a classic example of a horizontal restraint of trade. *See, e.g., Philip Morris, Inc. v. Heinrich,* No. 95 CIV 0328(LMM), 1996 WL 363156, at *2-3, *9 (S.D.N.Y. Mar. 13, 2013); *United States v. MMR Corp.*, 907 F.2d 489, 496-98 (5th Cir. 1990).

Defendants' contention that any horizontal antitrust conspiracy that "exists within" or "furthers" a vertical, buy-sell business relationship should be automatically disqualified from per se illegality simply cannot be squared with this abundant precedent. Perhaps in recognition of that fact, Defendants attempt to reword the Indictment to describe an entirely *different* conspiracy—one in which all Defendants were working together, under a single brand, in service of helping Company A compete more efficiently in the aerospace engineering services market. Defs.' Mem. at 34-35. This is a post hoc fiction. Nothing in the Indictment states or even suggests that Defendants' labor-market allocation scheme was a "collaboration among [the Suppliers] to deliver on Company A's projects," "designed for the purpose of facilitating work on projects for Company A" or "tied to the increased output associated with the completion of Company A's projects." Defs.' Mem. at 6, 34. Nor does the Indictment support Defendants'

retelling of the story, whereby the Suppliers who employed Defendants were essentially subsidiaries or franchisees of Company A. Defs.' Mem. at 6, 30. The Indictment plainly alleges that each Supplier is a separately incorporated, independent business with its own employees and executives, which competed against the other Suppliers both for labor and to supply engineering services to Company A. Ind. ¶¶ 4-9. It alleges that an outsource contract between any given Supplier and Customer A was bilateral, not collective. *Id.* at ¶ 3. It alleges that each Supplier had customers other than Company A, for whose business they also competed against other Suppliers, rather than being solely dedicated to promoting Company A and its "brand." *Id.* at ¶ 2. In short, nothing in the Indictment suggests that Defendants, Suppliers, and Customer A did anything collectively or cooperatively other than enter into a no-poach conspiracy. Thus the cases cited by Defendants regarding fast food and other types of franchises, which relate to vertically integrated companies organized under a single franchisor's brand and raise issues regarding "interbrand" versus "intrabrand" competition, Defs.' Mem. at 34-36 (citing *Sylvania*, *Success Sys.*, *Ogden*, et al.), cannot be helpful here.

"My customer made me do it" is no excuse for price fixing, bid rigging, or market allocation. No amount of factual argument that Defendants were working in service of Company A when they engaged in a labor market allocation can transform that restraint from a horizontal one to a vertical one and thereby save it from per se condemnation. And while Company A, like any other business, is entitled to act in its own best interests, it must do so within the law.

## IV.       Defendants' Constitutional Arguments Lack Merit.

As a final argument to avoid a trial on the merits, Defendants again misstate well-settled law when they argue that applying the per se rule criminally to a "no-poach agreement by and among parties engaged in a legitimate business collaboration" would violate their constitutional Due Process rights because "judicial decisions had not recognized the alleged conduct as a *per se*

violation of the Sherman Act." Defs.' Mem. at 37-38. This argument misapplies the concept of "fair notice," and also ignores years of case law explicitly holding that no-poach agreements can constitute per se violations of the Sherman Act.

The Due Process Clause of the Fifth Amendment precludes criminal prosecution for conduct that a defendant "could not reasonably understand to be proscribed.'" *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964) (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954)). This principle "bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997). Defendants concede that "established judicial construction of the Sherman Act may supply the [requisite] fair notice." Defs.' Mem. at 38.

Defendants' Due Process argument is notable for what it does *not* dispute. Defendants do not argue that the per se rule itself is a novel judicial construction of the Sherman Act, nor could they. *See Aiyer*, 33 F.4th at 120 ("In *Koppers*, we explicitly declined the invitation to find that the *per se* rule could not be applied constitutionally . . . and noted that this argument asks us in effect to overrule the Supreme Court's decisions." (cleaned up)).[21] They do not argue that applying the per se rule to horizontal market allocation conspiracies, writ large, is a "novel construction" nor could they. *See supra* at 7 (collecting cases). Defendants also do not contest that courts have applied the Sherman Act to labor markets since at least 1926, nor could they. *See Anderson*, 272 U.S. at 363.

---

[21] The Supreme Court recently denied a petition for certiorari on this very issue in *Lischewski v. United States*, 142 S. Ct. 2676 (2022). *See* Petition for Writ of Certiorari, *Lichewski v. United States*, No. 21-852, 2021 WL 5864558 (U.S.) (2022).

Defendants are left with a mere sliver of an argument: that applying the per se rule to a "no-poach agreement within an outsourcing arrangement" is a "novel construction" of the Sherman Act. Defs.' Mem. at 41, 48. It rests on the notion that applying a well-settled per se category (market allocation) to a purportedly novel set of facts within a well-settled purview of the Sherman Act (labor markets) constitutes a novel interpretation of the statute. This cannot be correct. Applying settled legal principles to new factual contexts is something that courts do every day. As the Fifth Circuit explained, "[t]o find unfair notice whenever a court specified new types of acts to which a criminal statute applied would stifle courts' ability to interpret and fairly apply criminal statutes." *United States v. Kay*, 513 F.3d 432, 444-45 (5th Cir. 2007). The ability of courts to apply established per se rules to novel factual contexts is precisely what the Supreme Court sought to protect when it rejected "the argument that the *per se* rule must be rejustified for every industry that has not been subject to significant antitrust litigation." *Maricopa Cnty. Med. Soc'y*, 457 U.S. at 351.

Regardless of how novel the factual circumstances of any particular case, it does not change the Due Process analysis. *United States v. Kinzler*, 55 F.3d 70, 74 (2d Cir. 1995) ("The claimed novelty of this prosecution does not help [defendant's fair notice argument], for it is immaterial that there is no litigated fact pattern precisely on point."); *Jindal*, 2021 WL 5578687, at *10 ("[T]hat 'no court has found that purported wage-fixing agreements constitute criminal conduct under the Sherman Act' does not mean that Defendants did not have fair notice."). Any true "novelty" here, in any event, is gone. As discussed above (*supra*, Section I.B), courts have recognized that no-poach agreements may fall into the per se category of market allocation since the 1970s and in greater frequency beginning in 2012, nine years before the return of the

Indictment and seven years before the conclusion of the alleged conspiracy in this case. *See Quinonez*, 540 F.2d at 826, 828-29 & n.9; *see also Roman*, 55 F.3d at 543-45.

Not surprisingly, while the judiciary has participated in over 130 years of applying the Sherman Act to new industries and conduct, no court has ever dismissed a Sherman Act prosecution on the constitutional grounds raised by Defendants here. In fact, three district courts recently rejected this very argument in the context of criminal prosecutions of no-poach and wage-fixing conspiracies. *See Manahe*, 2022 WL 3161781 at *24 (in case alleging wage-fixing and employee allocation, rejecting constitutional challenges "[b]ecause the horizontal restraints alleged in the indictment have long been held per se unreasonable"); *DaVita*, 2022 WL 266759, at *9 (rejecting Due Process argument and holding that the indictment "makes no novel construction of Section 1 of the Sherman Act" because "[h]orizontal market allocation agreements have long been held *per se* unreasonable."); *Jindal*, 2021 WL 5578687, at *10 (wage-fixing prosecution "is not a 'novel' construction of the Sherman Act."). Defendants provide no reason for the Court to reach a different conclusion in this case.

Finally, Defendants' argument that the per se rule creates an unconstitutional presumption of guilt because it would prevent the jury from considering the reasonableness of the alleged agreement, Defs.' Mem. at 45, has been rejected by the Second Circuit. *United States v. Koppers Co., Inc.*, 652 F.2d 290, 294-95 (2d Cir. 1981) ("Since the Sherman Act does not make 'unreasonableness' part of the offense, it cannot be said that the judicially-created *per se* mechanism relieves the government of its duty of proving each element of a criminal offense under the Act."). Defendants claim that *Koppers* is outdated (Defs.' Mem. at 45 n.27), but the Second Circuit reaffirmed its holding only three months ago. *Aiyer*, 33 F.4th at 120 ("In

*Koppers*, we explicitly 'decline[d] the invitation' to find that the per se rule could not be applied constitutionally absent a finding that the challenged agreement was factually unreasonable….").

Defendants' suggestion that it would strain credulity as well as violate the Constitution for them to be convicted on proof of just two elements (Defs.' Mem. at 45), aside from being factually incorrect (there are, in fact, three elements) reveals their misinterpretation of the law. The three elements of a Sherman Act Section 1 violation—that (i) a conspiracy to engage in a per se illegal restraint of trade existed during the time alleged in the indictment, (ii) each defendant knowingly joined that conspiracy, and (iii) the conspiracy operated within or substantially affected interstate commerce—are, in substance, the same elements charged to juries in the Second Circuit and throughout the federal court system, on proof of which defendants are routinely tried and convicted, including defendant Aiyer. *See* Tr. of Proceedings of Nov. 20, 2019, *United States v. Aiyer*, No. 18-cr-333(JGK), Dkt. 180, at 2131 (judge's instructions to the jury regarding three elements of Section 1 charge).

## CONCLUSION

For reasons set forth above, the United States respectfully requests the Court deny Defendants' Motion to Dismiss in full and permit this well-pleaded charge to proceed to trial.

Respectfully submitted,


*/s/ Carrie A. Syme*
CARRIE A. SYME
ASSISTANT CHIEF, NEW YORK OFFICE

T. JAKOB SEBROW
TRIAL ATTORNEY
U.S. Department of Justice, Antitrust Division
26 Federal Plaza, Room 3630
New York, NY 10278
Tel.: (646) 714-1906



DAVID T. HUANG
ASSISTANT UNITED STATES ATTORNEY

Federal Bar No. ct30434
United States Attorney's Office
District of Connecticut
157 Church Street
New Haven, CT  06510
Tel.: (203) 821-3700

51

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 10, 2022, a copy of the forgoing MEMORANDUM OF LAW OF THE UNITED STATES IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS was filed electronically and served to anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept filing on the Notice of Electronic filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Carrie A. Syme*
CARRIE A. SYME
ASSISTANT CHIEF, NEW YORK OFFICE
U.S. Department of Justice, Antitrust Division