**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA | : | Case No. |
| | : | 3:21-CR-220 (VAB) |
| v. | : | |
| | : | |
| MAHESH PATEL, ROBERT HARVEY, | : | |
| HARPREET WASAN, STEVEN | : | |
| HOUGHTALING, TOM EDWARDS, and | : | |
| GARY PRUS, | : | |
| | : | August 31, 2022 |
| *Defendants*. | : | |
| | : | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**<u>DEFENDANTS' JOINT MOTION TO DISMISS THE INDICTMENT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ....................................................................................... 1

ARGUMENT ...................................................................................................................... 3

    I.   The Government Has Failed to Establish Longstanding Judicial Experience
        Holding No-Poach Agreements To Be *Per Se* Violations of the Sherman Act, Nor
        Demonstrated That the Alleged No-Poach Agreement in the Indictment Lacks
        Any Redeeming Virtue. ........................................................................................ 3

    II.  The Indictment Must Be Dismissed Because It Pleads an Agreement That Was
        Ancillary to a Legitimate Business Collaboration. ................................................ 8

    III. The Indictment Must be Dismissed Because it Alleges a Vertical, Intrabrand
        Restraint Subject to the Rule of Reason. .............................................................. 24

    IV. Constitutional Concerns Mandate Dismissal of the Indictment. .......................... 30

CONCLUSION ................................................................................................................. 30

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Shipowners' Ass'n of Pacific Coast*,
272 U.S. 359 (1926) ..................................................................................... 6, 7

*Apex Oil Co. v. DiMauro*,
713 F. Supp. 587 (S.D.N.Y. 1989) ................................................................. 5

*Apprendi v. New Jersey*,
530 U.S. 466 (2000) ....................................................................................... 30

*Arizona v. Maricopa Cty. Med. Soc'y*,
457 U.S. 332 (1982) ......................................................................................... 5

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
2020 WL 2553181 (S.D. Cal. May 20, 2020) ............................................... 15

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
9 F.4th 1102 (9th Cir. 2021) ............................................... 15, 18, 20, 22

*Bogan v. Hodgkins*,
166 F.3d 509 (2d Cir. 1999) ................................................................. *passim*

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
441 U.S. 1 (1979) .............................................................................. 6, 17, 22

*Bunker Ramo Corp. v. United Business Forms, Inc.*,
713 F.2d 1272 (7th Cir. 1983) ......................................................................... 5

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
485 U.S. 717 (1988) ................................................................................. 20, 27

*Christian Disposal, L.L.C. v. WCA Waste Corp.*,
2014 WL 651414 (E.D. Mo. Feb. 19, 2014) ................................................. 12

*Continental T.V., Inc. v. GTE Sylvania Inc.*,
433 U.S. 36 (1977) ..................................................................................... 27, 28

*Copy-Data Systems, Inc. v. Toshiba American, Inc.*,
663 F.2d 405 (2d Cir. 1981) ......................................................................... 27

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
363 F.3d 761 (8th Cir. 2004) ......................................................................... 15

*Crane v. Kentucky*,
476 U.S. 683 (1986) ....................................................................................... 23

*Deslandes v. McDonald's USA, LLC*,
2022 WL 2316187 (N.D. Ill. June 28, 2022) ............................................... 28

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*,
129 F.3d 240 (2d Cir. 1997) ......................................................................... 24

*Foreign Trade Corp. v. Otter Prod., LLC*,
2017 WL 11686317 (D. Colo. Feb. 15, 2017) ........................................ 11

*FTC v. Indiana Fed'n of Dentists*,
476 U.S. 447 (1986) .................................................................................. 5

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
17 F. Supp. 2d 275 (S.D.N.Y. 1998) ........................................................ 5

*Hanger v. Berkley Grp., Inc.*,
2015 WL 3439255 (W.D. Va. May 28, 2015) ......................................... 12

*Hertz Corp. v. City of New York*,
1 F.3d 121 (2d Cir. 1993) ...................................................................... 3, 7

*Holmes v. South Carolina*,
547 U.S. 319 (2006) ............................................................................... 23

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010) .................................................................. 19

*In re Schering-Plough Corp. v. F.T.C.*,
402 F.3d 1056 (11th Cir. 2005) ............................................................. 18

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984) ................................................................................... 21

*K.M.B. Warehouse Distrib., Inc., v. Walker Mfg. Co.*,
61 F.3d 123 (2d Cir. 1995) .................................................................... 29

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007) ......................................................................... *passim*

*Major League Baseball Properties, Inc. v. Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008) ........................................................... *passim*

*Med. Ctr. at Elizabeth Place v. Atrium Health Sys.*,
922 F.3d 713 (6th Cir. 2019) .......................................................... *passim*

*Mooney v. AXA Advisors, L.L.C.*,
19 F. Supp. 3d 486 (S.D.N.Y. 2014) ....................................................... 6

*Nat'l Basketball Ass'n v. Williams*,
45 F.3d 684 (2d Cir. 1995) .................................................................... 18

*Nat'l Soc. of Prof'l Eng'rs v. United States*,
435 U.S. 679 (1978) ................................................................................. 3

*Ogden v. Little Caesar Enterprises, Inc.*,
393 F. Supp. 3d 622 (E.D. Mich. 2019).............................. 15, 16, 27, 28

*Palin v. New York Times Co.*,
940 F.3d 804 (2d Cir. 2019) .................................................................. 13

*Polk Bros., Inc. v. Forest City Enterprises, Inc.*,
776 F.2d 185 (7th Cir. 1985) ............................................................ 17, 20

iii

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986) ................................................................. 14, 18

*SCFC ILC, Inc. v. Visa USA, Inc.*,
    36 F.3d 958 (10th Cir. 1994) ....................................................................... 18

*Success Systems, Inc. v. Excentus Corp.*,
    439 F. Supp. 3d 31 (D. Conn. 2020) ........................................................... 29

*Sullivan v. Nat'l Football League*,
    34 F.3d 1091 (1st Cir. 1994) ....................................................................... 18

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) ..................................................................................... 2, 8

*Timken Roller Bearing Co. v. United States*,
    341 U.S. 593 (1951) ..................................................................................... 16

*Tower Air, Inc. v. Fed. Exp. Corp.*,
    956 F.Supp. 270 (E.D.N.Y. 1996) ............................................................... 18

*Ulrich v. Moody's Corp.*,
    2014 WL 12776746 (S.D.N.Y. Mar. 31, 2014) ............................................. 5

*Union Circulation Co. v. FTC*,
    241 F.2d 652 (2d Cir. 1957) ............................................................. 4, 5, 6, 7

*United States v. Addyston Pipe & Steel Co.*,
    85 F. 271 (6th Cir. 1898) ........................................................................ 20, 22

*United States v. Aiyer*,
    33 F.4th 97 (2d Cir. 2022) .................................................................. *passim*

*United States v. Aleynikov*,
    676 F.3d 71 (2d Cir. 2012) ......................................................................... 10

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d. Cir. 2015) ...................................................................... 29

*United States v. Bok*,
    156 F.3d 157 (2d Cir. 1998) ....................................................................... 23

*United States v. Bongiorno*,
    2006 WL 1140864 (S.D.N.Y. May 1, 2006) ............................................. 9, 10

*United States v. Carey*,
    929 F.3d 1092 (9th Cir. 2019) .................................................................... 22

*United States v. Cook*,
    84 U.S. 168 (1872) ..................................................................................... 22

*United States v. Crowley*,
    236 F.3d 104 (2d Cir. 2000) ....................................................................... 23

*United States v. DaVita Inc.*,
    2022 WL 266759 (D. Colo. Jan. 28, 2022) ................................................. 23

*United States v. Dove*,
916 F.2d 41 (2d Cir. 1990) ........................................................................... 24

*United States v. General Motors Corp.*,
384 U.S. 127 (1966).......................................................................................... 30

*United States v. Johnson*,
968 F.2d 208 (2d Cir. 1992) ........................................................................... 22

*United States v. Litvak*,
808 F.3d 160 (2d Cir. 2015) ........................................................................... 23

*United States v. Manahe*,
2022 WL 3161781 (D. Me. Aug. 8, 2022) ........................................................ 11

*United States v. Pirro*,
96 F. Supp. 2d 279 (S.D.N.Y. 1999) ...................................................... 10, 13

*United States v. Realty Multi-List, Inc.*,
629 F.2d 1351 (5th Cir. 1980) ......................................................................... 19

*United States v. Sampson*,
898 F.3d 270 (2d Cir. 2018) ........................................................................... 11

*United States v. Scully*,
877 F.3d 464 (2d Cir. 2017) ........................................................................... 23

*United States v. Stavroulakis*,
952 F.2d 686 (2d Cir. 1992) ...................................................................... 13, 19

*United States v. Visa U.S.A., Inc.*,
163 F. Supp. 2d 322 (S.D.N.Y. 2001) ............................................................ 21

**Statutes**

15 U.S.C. § 45(a) .................................................................................................... 4

**Other Authorities**

Br. of Amicus United States of America in Support of Neither Party, *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
No. 20-55679 (9th Cir. Nov. 19, 2020), ECF No. 14 ............................................ 12

Corrected Statement of Interest of the United States, *Stigar v. Dough Dough, Inc.*,
No. 18-cv-00244 (E.D. Wash. Mar. 8, 2019), ECF No. 34 .................................... 28

First Superseding Indictment, *United States v. Jindal*,
No. 20-CR-358 (E.D. Tex. Apr. 15, 2021) .......................................................... 2

Indictment, *United States v. DaVita, Inc.*,
No. 21-cr-229 (D. Colo. July 14, 2021)................................................................ 2

Indictment, *United States v. Gaines*,
No. 20-cr-20 (D. Minn. Jan. 30, 2020) ............................................................... 11

Indictment, *United States v. Hee*,
No. 21-cr-98 (D. Nev. Mar. 30, 2021)................................................................ 2

Indictment, *United States v. Manahe*,
No. 22-cr-13 (D. Me. Jan. 27, 2022)............................................................................ 2

Indictment, *United States v. Surgical Care Affiliates, LLC*,
No. 21-cr-11 (N.D. Tex. Jan. 5, 2021)......................................................................... 2

Phillip E. Areeda & Herbert Hovencamp,
ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION (4th and
5th Editions, 2015-2021) ............................................................................................. 28

Robert H. Bork,
*Ancillary Restraints and the Sherman Act*, 15 A.B.A. Antitrust Section 211 (1959)................. 9

Defendants respectfully submit this Reply Memorandum of Law in response to the Memorandum of Law of the United States in Opposition to Defendants' Joint Motion to Dismiss the Indictment (ECF No. 216) ("G. Br.").

## PRELIMINARY STATEMENT

The Indictment represents a radical and legally unsupported departure from criminal antitrust law and published enforcement policies. For the first time, the Department of Justice ("DOJ") charges a criminal antitrust conspiracy based on an alleged no-poach and non-solicitation agreement that *it* alleges was derived from contractual relationships between a single purchaser and its outsource suppliers. Specifically, the Indictment alleges such a no-poach agreement (a) among a purchaser of outsource services ("Company A") and five of its outsource suppliers ("Suppliers"), limited to engineers and other skilled-laborers "working on projects for Company A," Ind. ¶ 19, and (b) between one of the outsource suppliers ("Company B") and its customer Company A, whereby Company A agreed not to hire away Company B workers assigned to its projects under certain circumstances. The Indictment describes a legitimate business collaboration of these parties in support of the design, manufacture and servicing of Company A's aerospace products, Ind. ¶ 2, which, according to the Indictment, Defendants and others referred to as a "partners[hip]," Ind. ¶¶ 22(d), 27(b), 28(e), and alleges that a no-poach restraint applied to this collaborative business activity. Ind. ¶ 19.

The law recognizes that hiring-related restraints associated with such outsource and analogous collaborative contractual relationships are not inherently anticompetitive or "naked." Instead, they may increase the competitive viability of the purchaser of outsource services in the market in which it competes (*i.e.*, its *inter*brand competitiveness). It is for this reason that these

1

types of restraints—which are commonplace in U.S. markets[1]—are subject to review under the rule of reason rather than the exceptional criminal *per se* standard.

Notably, this Indictment stands apart from the handful of charges brought by DOJ over the last two years directed at alleged agreements in various labor markets that the government claims all fall into one basket of *per se* violations. The allegations in this Indictment, however, decisively distinguish this case from the allegations made by the government in these other cases. Unlike here, the indictments in those cases did not allege collaborative business activity in furtherance of the productive output of a single firm, but rather alleged naked agreements among competitors engaged in allegedly purely horizontal competition.[2] This is a crucial distinction that bars application of the *per se* rule in this case.

In its opposition brief, the government does not sustain *its* burden to show, as required to support a *per se* contention, that the Indictment pleads a naked restraint "that would always or almost always tend to restrict competition and decrease output," or has "manifestly anticompetitive" effects, and "lack[s] ... any redeeming virtue." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) ; *see also Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)

---

[1] The amicus briefs filed with the Court by the American Staffing Association and the Society of Human Resource Management confirm that outsourcing arrangements like those described in the Indictment are a common feature of the modern U.S. economy, and that multiple staffing firms working for a shared client, with limits on solicitation and hiring of employees working on projects for the client, may yield procompetitive benefits, making rule of reason analysis the apt approach to the review of these arrangements. *E.g.*, Br. of Amicus Curiae American Staffing Association in Supp. of Defs.' Mot. to Dismiss Indictment ("ASA Amicus Br.") at 1-4, ECF No. 195; Br. of Amicus Curiae Society of Human Resource Management in Supp. of Defs.' Mot. to Dismiss Indictment ("SHRM Amicus Br.") at 10-13, ECF No. 212.

[2] First Superseding Indictment, *United States v. Jindal*, No. 20-CR-358 (E.D. Tex. Apr. 15, 2021) (superseding initial Indictment returned Dec. 9, 2020); Indictment, *United States v. Surgical Care Affiliates, LLC*, No. 21-cr-11 (N.D. Tex. Jan. 5, 2021); Indictment, *United States v. Hee*, No. 21-cr-98 (D. Nev. Mar. 30, 2021); Indictment, *United States v. DaVita, Inc.*, No. 21-cr-229 (D. Colo. July 14, 2021); and Indictment, *United States v. Manahe*, No. 22-cr-13 (D. Me. Jan. 27, 2022).

("*Per se* liability is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'") (quoting *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)); *Hertz Corp. v. City of New York*, 1 F.3d 121, 129 (2d Cir. 1993) (*Per se* treatment is appropriate only "in the relatively narrow circumstance where courts have sufficient experience with the activity to recognize that it is plainly anticompetitive and lacks any redeeming virtue."). Strikingly, its attempt to do so (i) effectively ignores Circuit authority holding that no-poach agreements are subject to rule of reason, not *per se*, analysis; (ii) misleadingly dismisses the Indictment's description of the alleged restraint as related to a joint business collaboration, and, by cherry-picked and inapposite citation, seeks to avoid dismissal by limiting the doctrine of ancillary restraints contrary to Circuit case law; (iii) ignores analogous decisions from this Circuit and other courts to undermine the Indictment's allegations of a vertical intrabrand restraint subject to rule of reason analysis; and (iv) responds not at all to the briefs submitted by *amici* staffing and human resource organizations emphasizing the procompetitive benefits associated with outsourcing agreements that include employee mobility restrictions.

Thus, as discussed further below, and for the reasons stated in the Defendants' opening brief, Defs.' Mem. of Law in Support of Defs.' Joint Mot. to Dismiss the Indictment (ECF No. 174-1) ("Br."), the Indictment should be dismissed.

## ARGUMENT

I. **The Government Has Failed to Establish Longstanding Judicial Experience Holding No-Poach Agreements To Be *Per Se* Violations of the Sherman Act, Nor Demonstrated That the Alleged No-Poach Agreement in the Indictment Lacks Any <u>Redeeming Virtue</u>.**

Acknowledging that it cannot proceed with a *per se* allegation absent longstanding judicial experience holding no-poach agreements to be *per se* illegal, the Government takes great pains,

yet fails, to weave together such precedent. Tellingly, in doing so, the Government disregards decisions by and within this Circuit that undermine its position. The Second Circuit Court of Appeals has *never* ruled that a no-poach or non-solicitation agreement constituted a *per se* violation of the Sherman Act and its leading relevant decisions both held that such agreements should be analyzed under the rule of reason, not the *per se* rule. Moreover, *all* of the out-of-circuit no-poach cases cited by the government involve naked restraints between horizontal competitors, not intrabrand arrangements or agreements with vertical components, as alleged here. In light of this Circuit's precedent, the Government simply cannot establish the requisite judicial experience that would permit it to charge this alleged no-poach agreement as a *per se* violation.

As set forth in Defendants' opening brief, in *Union Circulation Co. v. FTC*, 241 F.2d 652 (2d Cir. 1957), the court, applying Sherman Act law under the Federal Trade Commission Act, 15 U.S.C. § 45(a), employed rule of reason analysis with respect to a "no-switching" agreement between agencies engaged in selling periodical subscriptions door-to-door intended to address deceptive sales practices. The court explained, "[b]ecause a harmful effect upon competition is not clearly apparent from the terms of these agreements, we believe them to be distinguishable from those boycotts that have been held illegal per se." 241 F.2d at 657 (citations omitted). Notably, rule of reason applied even though the agreement addressed in *Union Circulation Co.* was entered into by horizontal competitors, and not, as in the current Indictment, as an ancillary agreement among collaborating businesses.

The court next addressed a no-hire agreement in *Bogan v. Hodgkins*, 166 F.3d 509 (2d Cir. 1999). There, examining an agreement among an insurance company's general agents not to recruit and hire each other's existing district or sales agents without the consent of the agent's current general agent, the court held the agreement was subject to the rule of reason and not the

*per se* rule. 166 F.3d at 515. The court explained that although the agreement in *Bogan* was an *intra*firm agreement because the six general sales agents all worked for the same insurance company, *id.* at 515, it would have ruled the same way had the agreement been an *inter*firm agreement among separate companies. As the court explained: "*Even if the Agreement were interfirm, we still would not afford it per se illegal treatment. We have previously identified interagency no-switching agreements as 'distinguishable from [restraints] that have been held illegal per se.*'" *Id.* (emphasis added) (citing *Union Circulation Co.*, 241 F.2d at 657).[3] District courts in the Circuit have followed suit. *See, e.g., Ulrich v. Moody's Corp.*, 2014 WL 12776746, at *26 (S.D.N.Y. Mar. 31, 2014), *report and recommendation adopted as modified on other grounds*, 2014 WL 4977562 (S.D.N.Y. Sept. 30, 2014) (applying rule of reason to alleged interfirm no-poach agreement because "'[n]o-hire' or 'no-switching' agreements" have traditionally been "viewed as a subset of covenants not to compete, and for such allegations courts have used the rule of reason rather than the *per se* rule to determine whether or not a plaintiff has sufficiently alleged a cause of action under section 1 of the Sherman Act"); *Mooney v. AXA Advisors, L.L.C.*, 19 F.

---

[3] As *Bogan* noted, "[t]he Supreme Court is 'slow to ... extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious.'" 166 F.3d at 514 (2d Cir. 1999) (quoting *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458-59 (1986)); *see also Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 344 (1982) ("Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable."). The appropriate focus, accordingly, is on the particular business practice or course of conduct alleged, not whether a litigant simply labels the practice *per se* illegal under a recognized *per se* category. *See Bogan*, 166 F.3d at 514 (citing *Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1284 (7th Cir. 1983) ("A particular course of conduct will not be termed a *per se* violation ... until the courts have had considerable experience with that type of conduct and application of the rule of reason has inevitably resulted in a finding of anticompetitive effects.")); *see also Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 296-97 (S.D.N.Y. 1998); *Apex Oil Co. v. DiMauro*, 713 F. Supp. 587, 596 (S.D.N.Y. 1989) ("mere talismanic invocation of the term 'price-fixing' . . . is [not] sufficient to bring the *per se* rule to bear on the actions of the alleged conspirators").

Supp. 3d 486, 498 (S.D.N.Y. 2014) (applying rule of reason to alleged no-switching agreement between insurance company and competitor authorized to market insurance company's products).

The government attempts to distinguish *Union Circulation Co.* and *Bogan* based on "pleading failures." G. Br. 21-22. But any such analysis ignores that *no* Second Circuit authority has deemed a no-poach agreement a *per se* Sherman Act violation, and that *Bogan* directly speaks to the conduct at issue: "We have previously identified interagency no-switching agreements as 'distinguishable from [restraints] that have been held illegal *per se*.'" *Bogan*, 166 F.3d at 515 (citing *Union Circulation Co.*, 241 F.2d at 657). No subsequent precedent has altered the state of the law in this Circuit. As such, there is no authority in this Circuit characterizing no-poach and non-solicitation agreements as within a category of business practices subject to *per se* analysis. *See Leegin*, 551 U.S. at 886 (citing *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 9 (1979)). Rather, the opposite is true.

The government cites *Anderson v. Shipowners' Ass'n of Pacific Coast*, 272 U.S. 359 (1926). G. Br. 15, 17. But that 1926 opinion sheds little light on the issue. As *Union Circulation Co.* summarized and distinguished *Anderson*:

> There it was alleged that the members of the respondent associations owned, operated or controlled substantially all the merchant vessels of American registry engaged in interstate and foreign commerce between the ports of the Pacific Coast and to and from foreign countries. The associations required every seaman seeking employment to register with them, receive a number, and await his turn before he could obtain employment. A certificate was issued to each seaman reciting in part that no person would be employed unless registered, that the certificate must be delivered to the master of the vessel, and that the certificate was the personal record of the seaman and the basis of his future employment. The shipowners, as members of the associations, were bound to hire in accordance with the terms of the certificates. *In addition, the associations fixed the wages to be paid the seamen*. The Supreme Court, revers[ed] the district court and the court of appeals.

*Union Circulation Co.*, 241 F.2d at 657 n.2 (emphasis added).

In so ruling, however, as the Second Circuit noted in *Union Circulation Co.*, "the decision [in *Anderson*] does not indicate whether this restraint would be invalid *per se* or whether it would be found unreasonable under the particular circumstances of the industry," explaining only that "'each of the shipowners and operators, by entering into this combination, ha[d], in respect to the employment of seamen, surrendered himself completely to the control of the associations.[']" *Id.* (quoting *Anderson*, 272 U.S. at 362). Accordingly, the decision in *Anderson* is not only factually distinguishable but offers no guidance on when the default rule of reason must give way to *per se* analysis, which is the question now before the Court.

*Bogan* and *Union Circulation Co.* control here. The alleged agreement is a limited agreement to restrict competition for labor "in the aerospace industry working on projects for Company A," Ind. ¶ 19, just as the *Bogan* agreement was specific and limited to "experienced [Northwestern Mutual Life] sales agents."[4] *Bogan*, 166 F.3d at 515. Similar to *Bogan*, a plausible—if not likely—effect of the agreement alleged in the Indictment is to increase competition to the benefit of customers of Company A. Indeed, the amicus briefs (which the government likewise chooses to ignore) of the relevant industry organizations—the American Staffing Association and the Society of Human Resource Management—make plain the procompetitive benefits of such an agreement in the context of outsourced labor services. For that reason, the government cannot demonstrate that the alleged agreement "lacks any redeeming virtue." *See Hertz*, 1 F.3d at 129. Accordingly, as in *Bogan*, rule of reason analysis must apply.

---

[4] The government attempts to distinguish *Bogan* by noting that it involved a "single-firm" while "the restraint here is clearly between several independent firms." G. Br. 21. But the restraints in both *Bogan* and the Indictment relate to products and services of a single brand (here, that of Company A), regardless of the corporate affiliation of the outsource entities.

And, given that the government has not alleged a criminal violation under the rule of reason, the case must be dismissed. See Br. 11.

## II. The Indictment Must Be Dismissed Because It Pleads an Agreement That Was Ancillary to a Legitimate Business Collaboration.

The government's effort to disregard the plainly ancillary nature of the agreement charged, and cherry-pick snippets from various opinions to construct a new ancillary restraints doctrine better suited to its policy goals, contradicts the established law of this Circuit and should be rejected. It is totally inappropriate in a criminal case, where bedrock principles mandate that the law's strictures be knowable beforehand, for the government to attempt to shift the goalposts to suit the policy views of particular Administrations. The faulty and unsupported premise on which the Indictment hinges is that courts have long considered the kind of agreement at issue to be *per se* unlawful as a naked restraint on par with criminal price-fixing, bid rigging, and customer and territorial allocations. The government's entire prosecution therefore depends on this Court not looking beyond the *per se* label the government affixed to the Indictment to evaluate the agreement actually alleged. But that is what the law requires this Court to do.

To distract this Court from its duty to look beyond the mere *per se* label and observe the obviously ancillary nature of the alleged restraint, the government incorrectly claims that the ancillary restraints doctrine is a "narrow" and "limited defense" and a "small corner of antitrust law." G. Br. 9, 26. The Supreme Court has repeatedly made clear that, in fact, *per se* analysis is the narrow exception applicable only when the government alleges a naked horizontal restraint. *See, e.g.*, *Texaco*, 547 U.S. at 8 ("the pricing decisions of a legitimate joint venture do not fall within the narrow category of activity that is *per se* unlawful under § 1 of the Sherman Act");

*Leegin*, 551 U.S. at 886 (*per se* analysis reserved for naked restraints which lack "any redeeming virtue").[5]

The requirements the government seeks to impose on the Defendants to establish that the pleaded agreement is ancillary go far beyond the requirements of the law and would lead the Court into error. Under the law of this Circuit, an agreement is ancillary where it may further a legitimate business relationship that increases efficiency and facilitates competition. The Indictment pleads just such an agreement. Because the rule of reason applies to an assessment of the competitive effects of such an ancillary restraint, the Indictment must be dismissed.

A.     Ancillarity Is a Question of Law That May Properly Be Resolved on the Face of This Indictment.

The government seeks to postpone the Court's consideration of the ancillary restraints doctrine, asserting that its hands are tied because the "defense" raises factual questions. G. Br. 26-31. But in addressing a threshold question that both sides agree is a question of law—whether the charged agreement is subject to the rule of reason or the *per se* rule—the Court cannot ignore DOJ's own factual allegations on the face of this Indictment. Courts in this Circuit have long recognized that "there is no reason for the Court to delay ruling on the merits of defendants' arguments" in support of a motion to dismiss where "the government has set forth enough facts in the indictment to rule on defendants' motion and has not averred that it intends to present additional theories . . . at trial." *United States v. Bongiorno*, 2006 WL 1140864, at *4 (S.D.N.Y. May 1, 2006). Where, as here, the allegations of the indictment reveal "there is an infirmity of law undergirding the Government's theory," dismissal is the appropriate remedy. *See United States v.*

---

[5] Indeed, the ancillary restraints doctrine "was almost 200 years old when the Sherman Act was passed in 1890" and was incorporated in foundational early decisions construing the Act. Robert H. Bork, *Ancillary Restraints and the Sherman Act*, 15 A.B.A. Antitrust Section 211, 214-15 (1959).

*Pirro*, 96 F. Supp. 2d 279, 283 (S.D.N.Y. 1999) (internal quotation marks omitted), *aff'd*, 210 F.3d 356 (2d Cir. 2000); *see also United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012) (indictment must be dismissed where the facts alleged "fail[] to allege a crime within the terms of the applicable statute"). Because this Indictment alleges a restraint that is not subject to the *per se* rule, there is no reason for this Court to subject the Defendants to the extraordinary stress and expense of "submit[ting] the case to a jury only to rule on a post-trial motion that the government's theory of criminal liability fails no matter what facts it was able to adduce at trial." *Bongiorno*, 2006 WL 1140864, at *4.[6]

The government's citation to *Aiyer* for the proposition that ancillarity "is a question of fact that can be resolved only at trial," G. Br. 26-27 (citing *Aiyer*, 33 F.4th at 116, 120), is a gross misreading of that decision. *Aiyer* is not an ancillary restraints case, nor does it address the court's role in assessing a motion to dismiss. Instead, the defendant, who did not challenge the district court's denial of his motion to dismiss, argued that the court was required to conduct a pre-trial factual hearing to assess evidence of the potential pro-competitive benefits of the charged agreement before applying the *per se* rule. 33 F.4th at 105. At the outset of its analysis, in describing the general boundaries between the rule of reason and the *per se* rule, the court explained that the ancillary restraints doctrine is a recognized *exception* to the *per se* rule. *Id.* at 115. The court explained that it would have been error for the trial court to conduct a pre-trial inquiry to consider evidence of the claimed procompetitive benefits of the bid rigging and price

---

[6] To the extent this Court does not determine that ancillarity is pleaded on the face of the Indictment, or dismiss the Indictment on the other grounds set forth herein, Defendants reserve the opportunity to contest at trial that the government has met its burden to prove the absence of the ancillarity exception to the agreement charged in the Indictment. *See United States v. Aiyer*, 33 F.4th 97, 115 (2d Cir. 2022) (ancillary restraints doctrine is "exception[]" to application of *per se* rule, "exempt[ing] such agreements from the per se rule, such that the rule of reason applies") (internal quotation marks omitted).

fixing conspiracy alleged in that case "absent a properly asserted exception to the *per se* rule, *none of which are at issue here*." *Id.* at 118 (emphasis added).[7]

What is distinctive here is that the Indictment's allegations describe the charged agreement's relationship to a legitimate business collaboration, a circumstance that the government could not draft around. As such, the alleged agreement is not naked in the first place, but even if it were alleged as such, it would nevertheless fall within an "exception to the *per se* rule" as described in *Aiyer*. *Id*. at 115, 118. Accordingly, the government's insistence that ancillarity is an affirmative defense which cannot be decided on a motion to dismiss is not only legally incorrect, *see Med. Ctr. at Elizabeth Place v. Atrium Health Sys.*, 922 F.3d 713, 727-28 (6th Cir. 2019) (holding that defendants do not bear the burden to show ancillarity),[8] but irrelevant, given that ancillarity here is "clear from the face of the indictment." *See United States v. Sampson*, 898 F.3d 270, 279 (2d Cir. 2018) (an affirmative defense is properly considered on a motion to dismiss where it appears on the face of the Indictment). The Court need not close its eyes to the Indictment's allegation that the alleged restraint is part of a legitimate collaboration and permit the case to proceed on an unsound legal theory. *See, e.g.*, *Foreign Trade Corp. v. Otter Prod., LLC*, 2017 WL 11686317, at *4-5 (D. Colo. Feb. 15, 2017) (dismissing Section 1 claim based on

---

[7] None of the other cases cited by the government involved application of the ancillary restraints doctrine based, as here, on the indictment's allegations, nor did the defendant in each so claim. For instance, the indictment in *United States v. Gaines* did not allege *any* sort of collaboration, transaction, or venture involving defendant and his co-conspirators. *See generally* Indictment, *United States v. Gaines*, No. 20-cr-20 (D. Minn. Jan. 30, 2020). Similarly, in *United States v. Manahe*, 2022 WL 3161781 at *1, *4 (D. Me. Aug. 8, 2022), defendants did not dispute the government's argument that the "case lack[ed] allegations" of ancillarity. The civil cases cited by the government are likewise inapposite.

[8] As set forth in the Reply Memorandum of Law in Further Support of Defendants' Joint Motion for Disclosure of Grand Jury Minutes ("Grand Jury Reply Brief"), incorporated by reference herein, and *infra* at Pt. II.C., the government's characterization of ancillarity as an affirmative defense is incorrect and rests on a misunderstanding of the nature of affirmative defenses in criminal cases.

ancillary restraints doctrine where court found that complaint alleged a restraint that was part of a "cooperative venture" that "defined and regulated the relationships between and among participants" and did not allege a valid rule of reason claim); *Hanger v. Berkley Grp., Inc.*, 2015 WL 3439255, at *5-7 (W.D. Va. May 28, 2015) (dismissing complaint alleging *per se* violation because pleadings made clear that alleged restraint was part of larger agreement and therefore not naked and did not allege a valid rule of reason claim); *Christian Disposal, L.L.C. v. WCA Waste Corp.*, 2014 WL 651414, at *3 (E.D. Mo. Feb. 19, 2014) (concluding on a motion to dismiss that alleged conduct was not *per se* illegal because "[b]ased on a review of the facts as alleged . . . it appears the non-solicitation clause is ancillary to the Agreement"). In fact, the government conceded as much in *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, where it acknowledged that dismissal is proper where ancillarity is "obvious . . . on the face of the complaint." Br. of Amicus United States of America in Support of Neither Party at 29 n.2, *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, No. 20-55679 (9th Cir. Nov. 19, 2020), ECF No. 14 (citation omitted).

The Indictment alleges an agreement to refrain from hiring engineers "working on projects for Company A," the same employees whom Company A "relied upon" via "an outsource arrangement" to "design, manufacture, and service" its complex "aerospace products" and compete effectively in the aerospace industry. Ind. ¶¶ 2, 3, 19. The Indictment further describes the importance of Company A's outsourcing arrangement, acknowledging that Mr. Patel of Company A and a "team of associates" focused on "statements of work and payments for Supplier projects," "master contract negotiations" with Suppliers, and "monitor[ing] the quality of Supplier

work and progress on their projects for Company A." Ind. ¶ 10.[9]  It is in the context of this complex, integrated commercial collaboration that the government alleges that Defendants agreed to allocate engineers "working on projects for Company A." Ind. ¶ 19.  This is not mere background information, as the government would have it (G. Br. 31), but a description of a complex "joint ecosystem," Ind. ¶ 27(d) (internal quotation marks omitted), of outsourced engineers working on projects for Company A in a technologically demanding industrial context.[10] The Court should reject the government's invitation to ignore the plain import of the Indictment's allegations. *See Pirro*, 96 F. Supp. 2d at 282-83.  Instead, "common sense must control," and the "indictment must be read to include facts which are necessarily implied by the specific allegations made." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (internal quotation marks omitted).  The charges must be dismissed because the Indictment fails to allege an agreement that lacks any redeeming virtue—a naked restraint—and instead alleges an ancillary restraint subject to the default rule of reason.

---

[9] Indeed, amici identify common-sense, procompetitive benefits of the outsourcing arrangement alleged here.  *See, e.g.*, SHRM Amicus Br. at 1-2 ("[C]ertain collaboration, including hiring coordination between the company and its staffing partners that supply [its] temporary workers, is necessary and highly beneficial to the successful operation of the projects on which the temporary workers are staffed."); ASA Amicus Br. at 14 ("[H]iring coordination at a shared client … incentiviz[es] the sort of recruiting, training, and other opportunities that make employees and clients more competitive in the broader market.").

[10] The legitimate business collaboration alleged by the Indictment, and the intrabrand nature of that collaboration (*see* Pt. III, *infra*), is further reflected in certain of the emails cited in the Indictment, which reflect that representatives of the Suppliers had *Company A* email addresses. Defendants propose by separate motion to file three such emails as Sealed Exhibits A-C.  In that these documents are referred to in the Indictment, this Court may consider them on this Motion. *Cf. Palin v. New York Times Co.,* 940 F.3d 804, 811 n.16 (2d Cir. 2019) (citation omitted) ("[E]xtraneous material is not 'outside the pleadings' when the material is integral to the complaint and relied on by the plaintiff in framing the complaint.")

B.      Because the Indictment Alleges a Legitimate Business Collaboration and Related No-Poach Agreement That Could Have Procompetitive Effects, the Indictment <u>Must Be Dismissed.</u>

The government's opposition propounds a wish list of barriers to application of the ancillary restraints doctrine that is unsupported by the existing case law. To qualify as ancillary, an agreement need only be subordinate and collateral to a related transaction and "reasonably necessary" to achieving the procompetitive purpose of that transaction. *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 338 (2d Cir. 2008) (Sotomayor, J., concurring); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224, 227 (D.C. Cir. 1986). These requirements are low bars to clear. The ancillary restraints doctrine applies to a broad array of "productive relationship[s]," *Aiyer*, 33 F.4th at 119 n.18, and a restraint is "subordinate and collateral" if it is "related to the efficiency sought to be achieved" and "make[s] the main transaction more effective in accomplishing its purpose." *Rothery*, 792 F.2d at 224. To be "reasonably necessary," a restraint requires only "a reasonable procompetitive justification, related to the efficiency-enhancing purposes of" the business collaboration. *Salvino*, 542 F.3d at 339.

1.   The Indictment Expressly Situates the Alleged No-Poach Agreement in <u>the Context of a Legitimate Business Collaboration.</u>

The government's effort to confine the ancillary restraints doctrine to only "those business relationships between competitors that resemble joint ventures," and that entail a fusion of productive capacities "in ways that achieve otherwise unattainable procompetitive results" (G. Br. 11-12 (emphasis and internal quotation marks omitted)), is another unsupported attempt to narrow existing law. Courts apply the ancillary restraints doctrine in a wide variety of business settings

involving joint activity, not solely those that satisfy the government's invented limitations.[11]  As the Second Circuit has confirmed, the ancillary restraints doctrine applies to "legitimate business collaboration[s]" that may take the form of a "business association" as well as a joint venture or "similar productive relationship[s]" outside of formal joint ventures.  *Aiyer*, 33 F.4th at 115, 119 n.18.[12]  And the government's claim that the collaboration must achieve otherwise "unattainable" benefits (G. Br. 12) is also a newly proposed requirement without basis in existing case law.  *See Salvino*, 542 F.3d at 340 n.11 ("a challenged restraint need not be essential").

In a further attempt to narrow the ancillary restraints doctrine through arbitrary labeling, the government insists that cases decided in the context of franchise agreements bear no relevance to the outsourcing arrangement at issue here.  According to the government, franchises are legitimate joint collaborations because they involve businesses "operating under the umbrella of the same brand."  G. Br. 28 (quoting *Ogden v. Little Caesar Enterprises, Inc.*, 393 F. Supp. 3d 622, 635 (E.D. Mich. 2019)).  But the government's effort to separate franchising from outsourcing is a distinction without a difference.  As described in the Indictment, the Suppliers all provided outsourced labor to Company A—"one of the largest aerospace engine design, manufacture, and service companies in the United States"—to "design, manufacture, and service [Company A's] aerospace products."  Ind. ¶¶ 2, 4.  Thus, the outsource engineers working on projects of Company

---

[11] The court in *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, for example, applied the ancillary restraints doctrine to an overflow staffing contract without any findings of economic integration.  9 F.4th 1102, 1106 (9th Cir. 2021) (citing findings from *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 2020 WL 2553181, at *1 (S.D. Cal. May 20, 2020)).

[12] The same is true in other circuits.  *See, e.g.*, *Med. Ctr at Elizabeth Place,* 922 F.3d at 725-27 (agreements between a jointly operated hospital group and certain health insurers and affiliated physicians not to do business with a particular hospital were reasonably related (and so ancillary) to the parties' legitimate collaborative efforts; *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 775-76 (8th Cir. 2004) (applying same principles to agreements between Ford and a group of limousine manufacturers who participated in a safety program led by Ford).

A operated under the "umbrella of the same brand," in effectively the same way that franchise employees do. *Ogden*, 393 F. Supp. 3d at 635. The government does not, because it cannot, explain how collaborations between franchisees differ meaningfully from the "joint ecosystem" and "cooperation of the outsource companies," Ind. ¶¶ 27(c)-(d) (internal quotation marks omitted), providing outsource engineering staff to design and produce Company A's jet engines and services.

### 2. The Alleged No-Poach Agreement is Subordinate and Collateral to the Alleged Outsourcing Transactions.

The government asserts that Defendants have not "revealed" any evidence demonstrating that the alleged no-poach agreement was subordinate and collateral to any legitimate business arrangement. G. Br. 36. But the Indictment alleges that Company A "*relied* upon … outsource engineering*" to design, manufacture and service its aerospace products. Ind. ¶ 2 (emphasis added). The Indictment further describes the importance of Company A's outsourcing arrangement by alleging that Company A had a "team of associates" focused on "monitor[ing] the quality of Supplier work and progress on their projects for Company A." Ind. ¶ 10. It is solely in the context of this complex commercial relationship that the government alleges that Defendants agreed to allocate engineers "working on projects for Company A." Ind. ¶ 19. In view of these allegations, the government's insinuation (G. Br. 36) that the alleged hiring restriction is the "dominant purpose," *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 597 (1951), of the commercial relationship between Suppliers and Company A is nonsensical.

### 3. Under Controlling Law, the Indictment Alleges a Legitimate Business Collaboration Between Suppliers and Company A and a Related No-Poach Agreement that Could Have Procompetitive Effects.

Proceeding in its effort to dilute the ancillary restraints doctrine, the government claims that an ancillary agreement must be "*necessary* for achieving" the procompetitive purpose, even

where it "*may* have helped achieve a potentially procompetitive purpose." G. Br. 13 (emphasis added and omitted). The "reasonably necessary standard" claimed by the government (G. Br. 31) is not supported by Circuit authority. Instead, as then-Judge Sotomayor explained in *Salvino*— which the government describes as "the operative standard in the Second Circuit" (G. Br. 32)— the ancillary restraints doctrine applies as long as the alleged restraint "*could* have a procompetitive impact related to the efficiency-enhancing purposes of" the business relationship. 542 F.3d at 340 (emphasis added). Other circuits agree. *See Med. Ctr. at Elizabeth Place*, 922 F.3d at 726 (citing *Salvino*, 542 F.3d at 338-39) ("Hospital Defendants, on the other hand, describe the standard as whether there exists a *plausible* procompetitive rationale for the restraint. The Second, Seventh, Eighth, and Ninth Circuits adopt this approach.").

Critically, whether an alleged restraint will ultimately *prove* to be procompetitive is part of a rule of reason analysis, not an issue for threshold determination at the pleading phase of a case. *Salvino*, 542 F.3d at 340 n.10. Instead, once an alleged restraint has "a reasonable procompetitive justification, related to the efficiency-enhancing purposes of the joint venture," it is outside the ambit of the *per se* rule because *per se* treatment is "reserved for practices that '*facially appear* [] to be one[s] that would always or almost always tend to restrict competition and decrease output.'" *Id*. at 339, 340 n.10 (alterations in original) (emphasis added) (quoting *Broad. Music*, 441 U.S. at 19-20). Under *Salvino*, contrary to the unduly restrictive standard the government seeks to impose, "a challenged restraint need not be essential," and instead "is ancillary if it *may* promote the success of the more extensive cooperation." *Id*. at 340 n.11 (citing *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185, 189 (7th Cir. 1985)).

Notably, while the government cites Judge Bork's opinion in *Rothery* as support for its heightened "reasonably necessary standard," G. Br. 31, n.15, it ignores that *Rothery* explicitly

cautions against undue focus on the words "reasonably necessary." 792 F.2d at 227-28 (explaining that despite use of phrase "reasonably necessary" courts should not "calibrate degrees of reasonable necessity"). Thus, rather than assessing the necessity of a restraint, courts must apply the ancillary restraints doctrine where the alleged restraint "*appears capable* of enhancing the group's efficiency." *Id*. at 229 (emphasis added).

The government ignores this clear instruction, instead cherry-picking language from cases using the phrase "reasonably necessary" or "necessary" to urge the Court to adopt a new standard. G. Br. 31 n.15, 32. None of those cases, however, applies the heightened burden advocated by the government. Instead, the government supports its claims with an inapposite district court decision issued ten years before *Salvino*, *Tower Air, Inc. v. Fed. Exp. Corp.*, 956 F.Supp. 270, 285 (E.D.N.Y. 1996) (applying rule of reason analysis "because the anti-competitive aspects of the joint venture and the supplemental agreement in this case are not plainly apparent"), and an even older Second Circuit case that merely mentions the ancillary restraints doctrine in dicta, *Nat'l Basketball Ass'n v. Williams*, 45 F.3d 684, 690 (2d Cir. 1995).[13]

---

[13] The out-of-circuit decisions cited by the government that use the words "necessary" or "reasonably necessary" also do not apply the heightened burden suggested by the government in this case. *See, e.g., Aya*, 9 F.4th at 1110-11 (hiring restraint was reasonably necessary simply because it promoted collaboration by "ensur[ing] that [defendant] will not lose its personnel during the collaboration" and rejecting government's suggestion that "court must engage in a distinct reasonable-necessity analysis that includes a less restrictive means consideration" (internal quotation marks omitted)); *In re Schering-Plough Corp. v. F.T.C.*, 402 F.3d 1056, 1072-73 (11th Cir. 2005) (restraints in patent-litigation settlement were ancillary because they were "legitimate and reasonable means of accomplishing the settlement"); *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1102 (1st Cir. 1994) (crediting NFL's "public ownership policy" as ancillary in that it "*contributes* to the ability of the NFL to function as an effective sports league" (emphasis added)); *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 970, 972 (10th Cir. 1994) (describing ancillary restraint as "subordinate and collateral" restraint that renders "the main transaction more effective in accomplishing its purpose," and declining to impose liability where Visa had alleged that restrictions were "reasonably necessary to ensure the effective operation of its credit card services" by avoiding "free-riding, [and] an unlevel playing field" and alleged harm could "be better

18

Here, the Indictment alleges a restraint that is "reasonably necessary." The Indictment alleges that Company A "relied upon" Suppliers to "to design, manufacture, and service its aerospace products." Ind. ¶¶ 2, 4. To perform their role, Suppliers needed to "recruit[] and hir[e] a sufficient number of employees with sufficient qualifications to complete the Supplier's outsourced projects." Ind. ¶ 3. The Indictment also describes Company A's focus on the "quality of Supplier work and progress on their projects." Ind. ¶ 10. Given these allegations, the government cannot seriously argue that the alleged agreement not to poach outsource engineers who were "working on projects for Company A," Ind. ¶ 19, is not plausibly related to the ability of Company A and Suppliers to staff and complete projects for Company A. *See Stavroulakis*, 952 F.2d at 693 ("common sense must control," and the "indictment must be read to include facts which are necessarily implied by the specific allegations made") (internal quotation marks omitted).

Likewise, common sense dictates that the alleged hiring restriction would tend to enable Suppliers to provide "sufficient . . . employees with sufficient qualifications to complete the . . . outsourced projects," Ind. ¶ 3, without concern that those employees "working on projects for Company A," Ind. ¶ 19, would be poached by other Suppliers who, the Indictment also alleges, otherwise "competed against one another to recruit and hire engineers." Ind. ¶ 4; *see also* Ind. ¶ 23 (alleging that Company A agreed at times to refrain from hiring and recruiting engineers and other skilled-labor employees of Company B, one of the Suppliers under contract and performing

---

corrected by the marketplace itself"); *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1369 (5th Cir. 1980) (restraint ancillary, in part, because "it is *possible* that" without the alleged restraint "neither brokers nor the public will utilize the service, thus forfeiting the benefits it *may* yield to all.") (emphases added); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 345-46 (3d Cir. 2010) (restraint *not* ancillary where it is "simply an unnecessary, output-limiting appendage" (citation omitted)).

statements of work for Company A). *See Salvino*, 542 F.3d at 340 (restraints were ancillary where they addressed, *inter alia*, "the so-called free-rider problem," because free riding "may lead to inefficiencies because the [parties'] incentive . . . may be distorted"); *see also Polk Bros.*, 776 F.2d at 189 (restraint is ancillary where it allows parties to cooperate without "cutting [their] own throat[s]"); *Aya*, 9 F.4th at 1110 (same) (quoting *Polk Bros.*, 776 F.2d at 189)).

The government does not dispute that the alleged agreement helped promote consistent staffing, avoided disruptions, and incentivized outsource firms to invest in recruitment and training of outsource engineers by preventing free riding. Instead, the government asserts that "[m]ost" of these benefits are irrelevant because they "have nothing to do with efficiency or productivity" and "instead relate only to money." G. Br. 37. This "distinction" has no basis in law or logic. The Supreme Court has made clear that a restraint is ancillary to a legitimate business collaboration where it "enhances the value of the contract, or permits the 'enjoyment of [its] fruits.'" *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 729 n.3 (1988), *holding modified on other grounds by Leegin*, 551 U.S. 877 (quoting *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 282 (6th Cir. 1898), *aff'd as modified on other grounds*, 175 U.S. 211 (1899)). The government's argument also makes little sense in the context of business collaborations, where efficiency and productivity invariably are measured in money: increased efficiency and productivity are procompetitive *because* they create cost savings that are ultimately passed on to consumers and/or result in increased competition in the consumer market. *See Polk Bros.*, 776 F.2d at 190 ("The reason for distinguishing between 'ancillary' and 'naked' restraints is to determine whether the agreement is part of a cooperative venture with prospects for *increasing output*.") (emphasis added); *see also Med. Ctr. at Elizabeth Place*, 922 F.3d at 729 (deeming restraints ancillary where they plausibly "contribute[d] to the efficiency-enhancing purposes of the joint venture," *i.e.,* "improv[ed] cost

effectiveness and efficiencies in the delivery . . . of services" (internal quotation marks omitted)); *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 362 (S.D.N.Y. 2001) (subsequent history omitted) (acknowledging that agreements that result in "cost savings" may be legitimately procompetitive "because such cooperation may reduce prices to the consumer"); a*ccord Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 15 (1984) (noting consideration of restraint at issue "from the standpoint of the consumer—whose interests the statute was especially intended to serve").

Finally, the government's suggestion that the alleged hiring restrictions cannot be ancillary because they were not included as a term in any of the Suppliers' and Company A's written agreements, G. Br. 37, is not supported by the law. Because an ancillary restraint need not be "essential to the success of" Company A's outsourcing agreements, *Salvino*, 542 F.3d at 340 n.11, there would be no reason *a priori* that the law would require it to be reduced to writing.

C.     If this Case Proceeds, the Court Should Reject the Government's Attempt to Preclude Defendants from Presenting Ancillarity Evidence at Trial.

As discussed above, the Indictment amply demonstrates that the charged agreement is an ancillary restraint outside the *per se* rule and thus must be dismissed. However, despite the explicit allegations in the Indictment establishing ancillarity, the government devotes more than five pages of its response (G. Br. 33-38) to arguing that Defendants must make an evidentiary showing on each of the government's posited elements of the ancillary restraints doctrine before being permitted to present any evidence relevant to the exception and securing a jury charge on the issue.

While a fuller response to these arguments would be premature, and we respectfully reserve the opportunity to address the matter more completely, if necessary, at a later stage of this proceeding, we note that, as set forth in the accompanying Grand Jury Reply Brief, the

government's improper attempt to preclude Defendants from raising ancillarity at trial is based on its erroneous and constitutionally flawed assertion that ancillarity is an affirmative defense.[14]

In a criminal case, the Due Process clause requires courts to be particularly cautious to ensure that categorizing a defense theory as "an affirmative defense [does] not, in operation, negate an element of the crime which the government is required to prove." *United States v. Johnson*, 968 F.2d 208, 213-14 (2d Cir. 1992). The *Aiyer* court characterized "the ancillary restraints doctrine" not as an affirmative defense to the *per se* doctrine but as an "exception[] to its application" that "exempt[s] such agreements from" the rule. *Aiyer*, 33 F.4th at 115, 120 (citations omitted); *see also Aya*, 9 F.4th at 1109 (under the ancillary restraints doctrine, a horizontal agreement is "exempt from the per se rule"). As such, it is the government's burden to prove that it does not apply. Where, as here, "the ingredients of the offence cannot be accurately and clearly described if [an] exception is omitted," the burden remains on the government to "show that the accused is not within the exception." *United States v. Cook*, 84 U.S. 168, 173 (1872); *see also United States v. Carey*, 929 F.3d 1092, 1100 (9th Cir. 2019) (same). The government's attempt to duck its own burden of proof makes no sense given the established principles of antitrust law at play—notably, that rule of reason analysis presumptively controls, and that the government must show that an agreement is naked before the *per se* rule even applies. Whether an alleged restraint is naked, as opposed to an ancillary restraint, is a fundamental ingredient of a *per se* offense. *See Broad. Music*, 441 U.S. at 20 (declining to apply *per se* analysis where alleged restraint was not "naked restrain[t] of trade with no purpose except stifling of competition." (citation omitted)); *see also id*. at 9 ("When two partners set the price of their goods or services they are literally 'price fixing,' but they are not *per se* in violation of the Sherman Act." (quoting *Addyston Pipe & Steel*

---

[14] *See also supra* at 11, n.8.

*Co.*, 85 F. at 280)); *United States v. DaVita Inc.*, 2022 WL 266759, at *2 (D. Colo. Jan. 28, 2022) ("Even an agreement that falls into a traditional per se category will not receive per se treatment under the Sherman Act unless it is a 'naked' rather than 'ancillary' agreement."). Thus, Defendants do not bear the burden on ancillarity because the "*plaintiff* must satisfy each element of the per se … test[]." *Med. Ctr. at Elizabeth Place*, 922 F.3d at 728 (citation omitted).

More generally, even under the government's view of ancillarity as an affirmative defense, its suggestion that Defendants should not be permitted to raise ancillarity at trial or obtain an ancillarity instruction would lead this Court into error. Defendants' right to present a defense, regardless of the government's or court's assessment of the strength of defendants' theory, may not be unduly abridged. *See United States v. Scully*, 877 F.3d 464, 474-75 (2d Cir. 2017) (error to preclude advice of counsel defense regardless of possibility that defendant's evidence was of "doubt[ful] . . . credibility and reliability" and "unlikely to sway a jury"); *see generally Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) ("[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense'") (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). And the standard to obtain a jury instruction on a theory of the defense requires only some basis in the record. *See United States v. Bok*, 156 F.3d 157, 163 (2d Cir. 1998); *see also United States v. Crowley*, 236 F.3d 104, 111 (2d Cir. 2000) ("[A] criminal defendant is entitled to have instructions presented relating to any theory of defense for which there is any foundation in the evidence, no matter how weak or incredible that evidence may be." (internal quotation marks omitted)). It is error to preclude the presentation of a defense theory where the theory has any foundation in the evidence. *See United States v. Litvak*, 808 F.3d 160, 184 (2d Cir. 2015) (vacating conviction for securities fraud in part due to preclusion of defendant's expert's testimony relating to defense of absence of materiality); *see also United States v. Dove*, 916 F.2d 41, 47 (2d Cir.

1990) (ordering new trial where the "trial court's jury instructions lacked sufficient balance to incorporate [the] defense theory").

Accordingly, while the matter is premature, should this case proceed past the motion to dismiss stage, the Court should reject the government's misguided attempt to shift the burden to the defense to prove ancillarity, require Defendants to establish a basis for the "defense" in a pre-trial evidentiary hearing, and preclude defense evidence at trial.

## III.   The Indictment Must be Dismissed Because it Alleges a Vertical, Intrabrand <u>Restraint Subject to the Rule of Reason</u>.

The government concedes that if the Indictment alleges a vertical agreement, or even an agreement with both vertical and horizontal components, rule of reason analysis applies and no basis for a criminal antitrust charge exists.  G. Br. 42, 42 n.19.  The government further concedes that the relationship between Company A and Companies B through F is vertical insofar as Company A purchased engineering services from these and other Suppliers.  G. Br. 41.  And there can be no dispute that the agreement alleged in the Indictment related solely to projects that Companies B through F performed for Company A.  Ind. ¶ 19.  It follows inescapably that the Indictment alleges an intrabrand agreement with essential vertical components subject to rule of reason analysis—an agreement that cannot be grounds for a criminal prosecution.  *See, e.g.*, *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 243-44 (2d Cir. 1997) (collecting cases where courts have applied rule of reason analysis to vertical restraints despite competition at horizontal level).  To avoid this straightforward reading of the Indictment, the government distorts the allegations, ignores analogous decisions from the Second Circuit and other courts, and seeks refuge in inapposite case law.

A. Read as a Whole, the Indictment Alleges an Agreement that is Sufficiently Vertical to Undermine the Government's Assertion that the Alleged Agreement Is *Per Se* Unlawful.

The government mischaracterizes the Indictment as predicated on "a restraint of horizontal competition in a labor market, *and nothing else*." G. Br. 40 (emphasis added). To support this claim that the alleged agreement has no vertical components, the government quotes paragraph 19 as referring to an agreement "'to restrict the hiring and recruiting of engineers and other skilled-labor employees between and among' them." G. Br. 41. However, the government omits the pivotal allegation in the paragraph—"*working on projects for Company A*"—which immediately precedes this quotation and defines the vertical framework of the relationship. Ind. ¶ 19. Read in its entirety, paragraph 19 alleges a collaboration with essential vertical components in which the Suppliers provided labor for engineering services, which services were specifically and solely related to Company A's projects.[15]

The government seeks to further minimize allegations of verticality by drawing an artificial distinction between labor and engineering services. Acknowledging that the allegations concerning Company A's purchase of engineering services from Companies B through F reflect a vertical relationship between Company A and its Suppliers, G. Br. 41, the government nonetheless claims that Companies A through F entered into a "purely horizontal" agreement to allocate the labor market. G. Br. 42. But the "labor market" relating to "projects for Company A" is effectively synonymous with the engineering services that Company A purchased from the Suppliers. The two are inextricably tied together and represent the very deliverable that Company A purchased

_____

[15] The government also studiously avoids the allegations of paragraph 23 of the Indictment, which plainly describe a vertical agreement between Company A and Company B, one of the Suppliers that "was responsible … for recruiting and hiring a sufficient number of employees with sufficient qualifications to complete the Supplier's outsourced projects," Ind. ¶ 3, under which Company A, during certain periods, agreed not to hire or recruit Company B employees.

from the Suppliers. Paragraph 19 by itself proves the point. Other allegations drive the point home further. *See, e.g.*, Ind. ¶¶ 2-4, 22 (describing Company A's reliance upon outsourced engineering "to design, manufacture, and service aerospace products," the Suppliers' contractual relationship with Company A to complete such projects, and the role of Company A as the Suppliers' "common customer").

Defendants' reading of the Indictment is consistent with the interpretation and legal analysis provided by amicus the American Staffing Association, which aptly characterizes the Indictment as alleging a "vertically-motivated intrabrand restraint," ASA Amicus Br. at 2, and by amicus the Society of Human Resource Management, which likewise observes that the allegations involve "an *intra*firm agreement where the staffing agencies are all providing temporary workers for the same client in order to enhance that client's *inter*brand competitiveness." SHRM Amicus Br. at 5; *see also* ASA Amicus Br. at 10-14; SHRM Amicus Br. at 6-8. The government ignores these persuasive submissions while maintaining its baseless assertion that the agreement at issue is "purely horizontal." G. Br. 42.

      B.    The Government Fails to Cite a Single Case in Which Conduct Among Multiple Companies Working to Produce a Product for a Single Customer Was Properly <u>Charged as a *Per Se* Violation of the Sherman Act</u>.

The government has not cited any authority for the proposition that hiring restrictions within the ecosystem of a single company—an intrabrand restraint—are *per se* unlawful under the antitrust laws. In fact, no such authority exists. To the contrary, as discussed *supra*, *Bogan* addressed analogous circumstances and held that rule of reason—not *per se*—analysis was applicable. *See Bogan*, 166 F.3d at 516 (agreements restricting mobility of insurance agents within the realm of a single entity "do not trigger *per se* treatment because the Agreement does not fit into any of the established *per se* categories").

The government claims nonetheless that because "each Supplier is a separately incorporated, independent business," the intrabrand concept is inapplicable. G. Br. 46. But the government cites no authority for this proposition and fails even to acknowledge *Bogan*'s relevance to the issue.[16] In fact, *Bogan* involved a "multi-tiered structure of *independent* contractor insurance agents." *Bogan*, 166 F.3d at 511 (emphasis added). The Indictment is expressly limited to "employees in the aerospace industry working on projects for Company A." Ind. ¶ 19. It contains no allegations of a market-wide horizontal conspiracy involving all employees in the aerospace industry. The Indictment is limited to labor and engineering services that the Suppliers provided to a single customer in a vertical relationship. The alleged agreement to restrict hiring within this singular commercial collaboration bears all the hallmarks of an intrabrand restraint. *Bogan,* thus, *is* controlling and undermines completely the theory of prosecution alleged in the Indictment.

The government also asks the Court to marginalize analogous decisions in the franchise context. G. Br. 46. These cases, however, are instructive and consistent with Supreme Court and Second Circuit jurisprudence. In *Ogden*, for example, the court addressed no-poach terms in a franchise agreement requiring Little Caesar franchisees to refrain from hiring each other's

---

[16] In addition to *Bogan*, other courts routinely recognize restraints as intrabrand regardless of whether the entities are separately incorporated independent businesses. *See Leegin*, 551 U.S. at 889-90 (*per se* rule not appropriate for vertical intrabrand price restraints among retailers because primary purpose of antitrust law is to protect interbrand competition); *Bus. Elecs. Corp.*, 485 U.S. at 725 (interbrand competition "would provide a 'significant check' on any attempt to exploit intrabrand market power") (citation omitted); *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 55-59 (1977) (vertical intrabrand restrictions among retailers promote interbrand competition by allowing manufacturers to achieve efficiencies in distribution of products); *Copy-Data Systems, Inc. v. Toshiba American, Inc.*, 663 F.2d 405, 411 (2d Cir. 1981) ("restrictions imposed by this dual distributor on its competitor-customers have sufficient potential for enhancing interbrand competition that they should be judged by the rule of reason notwithstanding the adverse impact that they may have on intrabrand competition").

restaurant managers. 393 F. Supp. 3d 622. The plaintiff claimed that this agreement had the effect of stifling competitive wages and employee mobility. *Id.* at 628. The court granted the franchisor's motion to dismiss because the Complaint alleged relationships with vertical attributes even though the franchise agreement governed the franchisees' hiring decisions on a horizontal plane between them. As the court explained, "the analysis of any agreement having *some vertical component* is complex and not amenable to a *per se* approach." *Id.* at 634 (emphasis added) (citing *Sylvania*, 433 U.S. at 51); *see also Deslandes v. McDonald's USA, LLC*, 2022 WL 2316187, at *5 n.4 (N.D. Ill. June 28, 2022) (alleged restraint "not *per se* unlawful" despite horizontal competition between franchisees and franchisor for labor because such "restraints generally 'serve legitimate purposes without harming market competition'") (quoting Phillip E. Areeda & Herbert Hovencamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶1605c (4th and 5th Editions, 2015-2021)), *appeal docketed*, No. 22-2333 (7th Cir. July 27, 2022).

To avoid application of these decisions to this case, the government baldly asserts that the courts in *Ogden* and *Deslandes* "plainly erred." G. Br. 28. But until quite recently, the government took the contrary view,[17] and in any event, the government's shifting views do not alter the law. These decisions are in line with Second Circuit case law, notably *Bogan*, and offer strong support for the notion that restrictions on hiring among companies in the same ecosystem are subject to rule of reason—not *per se*—analysis. In fact, this Court has relied on the very principles underlying *Bogan* and *Ogden* that the government now seeks to avoid. *See Success Systems, Inc.*

---

[17] As of 2019, the government's view of franchise relationships was aligned with *Ogden* and *Deslandes*. In a court filing, DOJ represented that "[t]he franchise relationship is in many respects a vertical one because the franchisor and franchisee normally conduct business at different levels of the market structure. Restraints imposed by agreement between the two are usually vertical and thus assessed under the rule of reason." Corrected Statement of Interest of the United States at 11, *Stigar v. Dough Dough, Inc.*, No. 18-cv-00244 (E.D. Wash. Mar. 8, 2019), ECF No. 34.

*v. Excentus Corp.*, 439 F. Supp. 3d 31, 64 (D. Conn. 2020) (Bolden, J.) ("Restrictions on intrabrand competition can actually enhance market-wide competition by fostering vertical efficiency and maintaining the desired quality of a product.") (quoting *K.M.B. Warehouse Distrib., Inc., v. Walker Mfg. Co.,* 61 F.3d 123, 127-28 (2d Cir. 1995)).

Ignoring controlling case law, the government turns to *United States v. Apple, Inc.*, 791 F.3d 290 (2d. Cir. 2015), as its primary authority for the proposition that a vertical relationship among alleged conspirators does not always preclude *per se* analysis. G. Br. 43-44. *Apple*, however, is wholly inapposite.

At issue in *Apple* was a price-fixing agreement that sought to limit *inter*brand (not *intra*brand) competition among e-Book publishers in the market for e-Books. *See Apple,* 791 F.3d at 316. The e-Book publishers regarded Amazon's prices for their books as too low and worked with Apple, another e-Book distributor, to fix retail e-Book prices at higher levels. *Id.* at 302. Thus, the publishers and Apple engaged in a horizontal scheme (in the form of a hub-and-spoke conspiracy with Apple acting as the hub) to force Amazon to raise and align its e-Book prices, with the intended result of making e-Book sales more profitable for Apple and the publishers, at Amazon's expense, and strengthening Apple's foothold in the distribution of e-Books in competition with Amazon. *Id.* at 316-17, 324-25. The object of this conspiracy was thus to drive up the prices of e-Books to the detriment of the ultimate consumer. *Id.*

The fact pattern in *Apple* bears no resemblance to the present case. To begin with, the Indictment is not predicated on an industry-wide price-fixing agreement and does not allege a hub-and-spoke conspiracy. Nor does the Indictment allege that Defendants jointly sought to disadvantage Company A's competitors in the aerospace industry (as the e-Book publishers and Apple sought to disadvantage Amazon, Apple's competitor in the distribution of e-Books). This

distinction is underscored by the limitation of the allegations in the Indictment to an agreement involving engineers and other skilled laborers "working on projects for Company A." Ind. ¶ 19. *Apple*, in contrast, had nothing to do with allocating labor within the ecosystem of a single company. The government's reliance on *Apple* is thus misplaced.[18]

## IV. Constitutional Concerns Mandate Dismissal of the Indictment.

Contrary to the government's portrayal, it is not well-settled that no-poach agreements are *per se* illegal, either generally or, as here, within an outsourcing arrangement. Indeed, as described above, the only Second Circuit decisions to consider the question apply the rule of reason to no-poach agreements. *See* Point I, *supra*. Defendants cannot be held accountable to a legal standard that did not exist and that runs counter to the government's own guidance that restraints in the outsource supply industry, in particular, would not be subject to *per se* treatment. *See* Br. 27-29. Accordingly, Defendants have been deprived of adequate notice as a matter of Due Process. Moreover, while Defendants acknowledge there is Second Circuit authority accepting the constitutionality of the *per se* rule in criminal cases, Defendants respectfully preserve their position that the continued application of that authority runs counter to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny. Br. 44-46.

## CONCLUSION

For all of the reasons set forth above, and in Defendants' opening brief, the Indictment should be dismissed.

---

[18] The government also cites *United States v. General Motors Corp.*, 384 U.S. 127, 144-45 (1966), which is likewise inapposite, as it involved a vertical actor orchestrating a naked horizontal conspiracy to punish competitors outside of the General Motors ecosystem, which is far afield from the *Bogan* line of cases and the allegations here. G. Br. 44.

Respectfully submitted,

 /s/ Brian E. Spears
BRIAN E. SPEARS (ct14240)
IVAN LADD-SMITH (ct30982)
LESLIE A. CAHILL (ct31242)
Spears Manning & Martini LLC
2425 Post Road, Suite 203
Southport, CT 06890
T: (203) 292-9766
F: (203) 292-9682
Email: bspears@spearsmanning.com

*Counsel for Mahesh Patel*

/s/ Guy Petrillo
GUY PETRILLO (pro hac vice)
CAELYN STEPHENS (pro hac vice)
Petrillo Klein & Boxer LLP
655 Third Avenue 22nd Floor
New York, NY 10017
T: (212) 370-0330
Email: gpetrillo@pkbllp.com

PAUL MCCONNELL (ct29062)
71 Elm Street, Suite 20
New Canaan, CT 066840
T: (203) 344-7007
F: (203) 344-7009
Email: paul.mcconnell@familylaw.com

*Counsel for Robert Harvey*

/s/ Marc A. Weinstein
MARC A. WEINSTEIN (pro hac vice)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
T: (212) 837-6460
F: (212) 299-6460
Email: marc.weinstein@hugheshubbard.com

CRAIG A. RAABE (ct04116)
Izard, Kindall & Raabe LLP
29 South Main Street,
West Hartford, CT 06107
T: (860) 513-2939
F: (860) 493-6290
Email: craabe@ikrlaw.com

*Counsel for Harpreet Wasan*

*/s/ Richard F. Albert*
RICHARD F. ALBERT (pro hac vice)
PENINA MOISA (pro hac vice)
JORJA KNAUER (pro hac vice)
Morvillo, Abramowitz, Grand, Iason & Anello P.C.
565 Fifth Avenue
New York, NY 10017
T: (212) 880-9560
F: (212) 856-9494
Email: ralbert@maglaw.com

PATRICK A. KLINGMAN (ct17813)
Klingman Law, LLC
280 Trumbull Street, 21st Floor
Hartford, CT 06013
T: (860) 256-6120
Email: pak@klingmanlaw.com

*Counsel for Steven Houghtaling*

*/s/ Marc Siegel*
MARC SIEGEL (pro hac vice)
Farmer Brownstein Jaeger Goldstein Klein & Siegel LLP
235 Montgomery Street, Suite 835
San Francisco, California 94104
T: 415-795-2050
F: 415-520-5678
Email: msiegel@fbjgk.com

CRAIG A. GILLEN (pro hac vice)
ANTHONY CHARLES LAKE (pro hac vice)
Gillen Withers & Lake LLC
400 Galleria Parkway
Suite 1920
Atlanta, GA 30339
T: (404) 842-9700
F: (404) 842-9750
Email: aclake@gwllawfirm.com

JAMES M. MORIARTY (ct21876)
Zeisler & Zeisler, P.C.
10 Middle Street, 15th Floor
Bridgeport, Connecticut 06604
T: (203) 368-4234
F: (203) 368-5485
Email: jmoriarty@zeislaw.com

*Counsel for Tom Edwards*

*/s/ Audrey A. Felsen*
AUDREY A. FELSEN (ct20891)
Koffsky & Felsen, LLC
1150 Bedford Street
Stamford, CT 06905
T: (203) 327-1500
F: (203) 327-7660
Email: afelsen@aol.com

*Counsel for Gary Prus*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2022, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Guy Petrillo*
Guy Petrillo