# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    v.<br><br>MAHESH PATEL,<br>ROBERT HARVEY,<br>HARPREET WASAN,<br>STEVEN HOUGHTALING,<br>TOM EDWARDS, and<br>GARY PRUS | No. 3:21-cr-220 (VAB) |

## RULING AND ORDER ON MOTIONS

Mahesh Patel ("Mr. Patel"), Robert Harvey ("Mr. Harvey"), Harpreet Wasan ("Mr. Wasan"), Steven Houghtaling ("Mr. Houghtaling"), Tom Edwards ("Mr. Edwards"), and Gary Prus ("Mr. Prus") (collectively, "Defendants") have been charged in a one-count indictment with conspiracy in restraint of trade in violation of 15 U.S.C. § 1 (the "Sherman Act"). *See* Indictment, ECF No. 20 (Dec. 15, 2021) ("Indictment").

Defendants have filed a joint motion to dismiss the indictment. *See* Defs. Joint Mot. to Dismiss the Indictment, ECF No. 174 (June 29, 2022) ("Mot.").

Defendants also filed a joint motion for disclosure of the grand jury minutes. *See* Defs. Joint Mot. to Discl., ECF No. 171. The Court granted this motion, in part, to conduct *in camera* review of the relevant portions of the grand jury minutes. *See* Order, ECF No. 244 (Oct. 21, 2022).

For the following reasons, the joint motion to dismiss will be **DENIED**.

Defendants' joint motion for disclosure also will be **DENIED**.

1

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Allegations

Company A is allegedly a wholly owned subsidiary of a parent corporation that was incorporated in Delaware and had a principal place of business in East Hartford, Connecticut, that provides aerospace engine design, manufacturing, and other services. Indictment ¶ 1. To do this, Company A relies on various sources of labor, including its own employees, contract employees, and outsourced engineering. *Id.* ¶ 2.

Companies B through F were allegedly businesses incorporated in various places throughout the United States, such as Florida, California, and Ohio, and with principal places of business in Connecticut and Florida. *Id.* ¶¶ 5–9.

Mr. Patel was allegedly the Manager and then Director of a specific Company A business unit and was allegedly responsible for managing the relationships between Company A and its suppliers, including Companies B through F. *Id.* ¶ 10. Mr. Patel was allegedly the highest-ranking employee in this unit and Mr. Patel and his employees frequently communicated with suppliers, controlled the statements of work and payments, and monitored the quality of supplier work. *Id.*

Mr. Harvey was allegedly the President-Global Business Head of Company B. *Id.* ¶ 11.

Mr. Wasan was allegedly Company B's Vice President and Strategic Client Partner. *Id.* ¶ 12.

Mr. Houghtaling was allegedly the Senior Vice President of Company C. *Id.* ¶ 13.

Mr. Edwards was allegedly the President of Company D's North American operations. *Id.* ¶ 14.

2

Mr. Prus was allegedly the Chief Operating Officer, Executive Vice President, and part owner of Company E. *Id.* ¶ 15.

Mr. Harvey, Mr. Wasan, Mr. Houghtaling, Mr. Edwards, and Mr. Prus allegedly were responsible for maintaining and advancing their companies' business relationships with Company A, as well as hiring and recruiting at their respective companies. *Id.* ¶ 16. Each of these Defendants allegedly communicated with Mr. Patel about these issues. *Id.*

Generally, engineers in the aerospace industry allegedly perform services such as electrical and mechanical engineering, design, testing, software development, supply chain management, and project management. *Id.* ¶ 1. At times, an outsource engineering supplier will allegedly contract with a customer to complete a particular project, assign engineers from its own workforce, and then receive payment from the customer for that work. *Id.* ¶ 3. As part of this arrangement, the supplier is allegedly responsible for paying salary and providing benefits to its employees who worked on the outsource projects, as well as recruiting and hiring the employees needed to complete the projects. *Id.*

Here, Company A allegedly outsourced projects to Companies B through F. *Id.* ¶ 4. Company A and Companies B through F allegedly competed against one another to recruit and hire engineers and other skilled workers. *Id.* Companies B through F also allegedly competed with one another for outsource projects from Company A and allegedly did so based on price, among other things. *Id.*

Between 2011 and 2019, Defendants allegedly agreed to restrict hiring and recruiting engineers and other skilled-labor employees between Companies A through F in the United States. *Id.* Specifically, Defendants allegedly agreed to 1) not hire employees of Companies B

through F and 2) not proactively contact, interview, and recruit applicants who were employed by another alleged co-conspirator company. *Id.* ¶ 21.

Mr. Patel was allegedly the "primary enforcer" of the underlying agreement and was an intermediary for communications among co-conspirators. *Id.* ¶ 22. On several occasions, Mr. Patel allegedly took steps to prevent or remedy violations of the alleged no-poach agreement. *Id.* For example, in February 2017, Mr. Wasan allegedly stated in an e-mail in response to Company C making an employment offer to a Company B engineer "[Company C] is not allowed to poach any of our employees . . . . I will send this to [Mr. Patel] today." *Id.* ¶ 22b. Mr. Wasan allegedly then sent the information about Company C's offer to Mr. Patel and stated that Mr. Wasan was "very concerned" and asked Mr. Patel if he could "please stop this person from being hired by [Company C]." *Id.*

Additionally, as part of the alleged conspiracy, Mr. Patel, Mr. Harvey, and Mr. Wasan allegedly agreed that Company A would not hire or recruit engineers and other skilled labor employees from Company B, at least until the engineer or other skilled labor employee had worked for Company B for an agreed upon period of time. *Id.* ¶ 23.

Defendants allegedly effectuated the agreement by refraining from hiring, contacting, interviewing, and recruiting engineers and other skilled labor workers employed by a co-conspirator company. *Id.* ¶ 25. For example, in September 2017, Mr. Patel allegedly sent an e-mail to the Company A Vice President of Human Resources and directed the "HR team not to hire [Company B] outsource resources currently deployed on [Company A] projects till end of this year." *Id.* ¶ 25a. Additionally, in January 2017, a Company D executive allegedly sent an e-mail to Mr. Patel stating that Company E was "stealing our people" and naming a Company D employee who had been offered a job at Company E. *Id.* ¶ 25b. Mr. Patel allegedly contacted Mr.

4

Prus about the issue and Mr. Prus allegedly contacted a Company E employee telling the employee "[p]lease make sure we stay away from [Company C], [Company D], [and Company F] personnel moving forward." *Id.*

Defendants allegedly rescinded employment offers that violated their agreement. *Id.* ¶ 26. Defendants allegedly discussed the mutual financial benefits of the no-poach agreement, such as preventing wages and labor costs from rising. *Id.* ¶ 27.

To enforce the alleged agreement, Defendants allegedly investigated whether employees were applying for positions with or had received offers from another co-conspirator company, alerted co-conspirators to violations of the alleged agreement, and threatened to reduce, withhold, and disrupt business transactions between Company A and the other co-conspirator companies if they did not conform to the agreement, among other things. *Id.* ¶ 28. Defendants also allegedly attempted to conceal the alleged conspiracy by keeping the agreement unwritten, holding meetings about the agreement in private, and providing false and misleading information to engineers and other skilled-labor employees about the existence of the agreement and the employees' ability to apply for jobs at the co-conspirator companies, among other things. *Id.* ¶ 29.

### B.  Procedural History

On December 15, 2021, the Government indicted Mr. Patel, Mr. Harvey, Mr. Wasan, Mr. Houghtaling, Mr. Edwards, and Mr. Prus in a sealed single-count indictment alleging conspiracy in restraint of trade in violation of the Sherman Act. *See* Indictment.

On December 16, 2021, the Government moved to unseal the case, *see* Mot. to Unseal Case, ECF No. 28, which the Court granted, *see* Order, ECF No. 29.

On December 27, 2021, the Government filed a notice regarding an agreement on initial discovery. *See* Notice, ECF No. 68.

On January 6, 2022, the Government filed a sealed motion to continue sealing, *see* ECF No. 85, which the Court granted, *see* Order, ECF No. 110.

On January 14, 2022, the parties filed a joint motion for protective order, *see* Joint Mot. for Protective Order, ECF No. 92, which the Court granted, *see* Order, ECF No. 94.

On February 1, 2022, the Government submitted a motion for alternative victim notification, *see* Mot. for Alt. Victim Notification, ECF No. 107, which the Court granted on February 2, 2022, *see* Order, ECF No. 109.

On February 2, 2022, the Court held a scheduling conference via videoconference. *See* Min. Entry, ECF No. 111.

On February 8, 2022, the parties filed a joint motion to continue jury selection and for a scheduling order. *See* Joint Mot. to Continue, ECF No. 117. The Court granted the motion on February 9, 2022, and scheduled jury selection to begin on March 27, 2023. *See* Order, ECF No. 118. The Court also entered a scheduling order. *See* ECF No. 120.

On April 5, 2022, Defendants filed a joint motion for bill of particulars. *See* Joint Mot. for Bill of Particulars, ECF No. 150.

On April 26, 2022, the Government filed a memorandum in opposition to the joint motion for bill of particulars. *See* Mem. in Opp'n to Mot. for Bill of Particulars, ECF No. 154.

On May 10, 2022, Defendants filed a joint reply to the Government's opposition. *See* Reply to Resp. to Mot. for Bill of Particulars, ECF No. 155.

On June 29, 2022, Defendants filed a joint motion for disclosure of grand jury minutes, as well as a join motion to seal the motion in part and Exhibits B–G to that motion. *See* Mot. for

Discl.; Joint Mot. to Seal, ECF No. 172. The Court granted the joint motion to seal on June 30, 2022. *See* Order, ECF No. 175.

On June 29, 2022, Defendants filed a joint motion to dismiss the indictment. *See* Mot. to Dismiss.

On July 7, 2022, the American Staffing Association ("ASA") and the National Association of Criminal Defense Lawyers ("NACDL") filed motions for leave to file an amicus brief in support of Defendants' joint motion to dismiss. *See* Mot. for Leave, ECF No. 178; Mot. for Leave, ECF No. 187 ("NACDL Amicus Br."). On July 8, 2022, the Court granted both motions for leave. *See* Order, ECF No. 190. On July 8, 2022, ASA filed a notice enclosing its amicus brief. *See* Notice, ECF No. 196 ("ASA Amicus Br.").

On August 3, 2022, the Society of Human Resource Management ("SHRM") filed a motion for leave to file an amicus brief in support of Defendants' motion to dismiss. *See* Mot. to File Amicus Br., ECF No. 210. On August 4, 2022, the Court granted the motion. *See* Order, ECF No. 210. On August 4, 2022, SHRM filed a notice enclosing its amicus brief. *See* Notice, ECF No. 212 ("SHRM Amicus Br.").

On August 10, 2022, the Government filed a motion to seal its opposition to Defendants' joint motion for disclosure of grand jury minutes, as well as its sealed opposition to Defendants' joint motion for disclosure of grand jury minutes. *See* Mot. to Seal, ECF No. 214; Mem. Of Law in Opp'n to Defs. Joint Mot. for Discl. of Grand Jury Mins., ECF No. 215. On August 11, 2022, the Court granted the motion to seal. *See* Order, ECF No. 217.

Also, on August 10, 2022, the Government filed a memorandum in opposition to Defendants' joint motion to dismiss the indictment. *See* Mem. in Opp'n to Mot. to Dismiss, ECF No. 216 ("Opp'n").

On August 31, 2022, Defendants filed a reply brief in support of the motion for disclosure of grand jury minutes and a reply brief in support of the motion to dismiss the indictment. *See* Reply to Resp. to Joint Mot. for Discl., ECF No. 227; Reply to Resp. to Joint Mot. to Dismiss, ECF No. 227 ("Reply").

On Sept. 15, 2022, Defendants filed a motion to continue the motion hearing and scheduling conference. *See* Mot. to Continue, ECF No. 233. On September 19, 2022, the Court granted in part and denied in part the motion to continue and scheduled the motion hearing and scheduling conference for October 20, 2022. *See* Order, ECF No. 234.

On October 20, 2022, the Court held a motion hearing and scheduling conference at which the parties were given an opportunity to present arguments on the pending motions. *See* Min. Entry, ECF No. 241.

On October 21, 2022, the Government filed a notice of supplemental authorities in support of its motions. *See* Notice of Suppl. Authorities, ECF No. 242.

On October 21, 2022, the Court issued an order denying without prejudice Defendants' joint motion for a bill of particulars and granting in part Defendants' joint motion for disclosure of the grant jury minutes. *See* Order, ECF No. 244. The Court ordered the Government to provide the relevant portions of the grand jury minutes for *in camera* review by October 28, 2022. *Id.*

The Government complied with the Court's order to provide the relevant portions of the grand jury minutes, which the Court has now reviewed *in camera*.

On November 18, 2022, the Government moved for a pretrial scheduling order and provided proposed pretrial deadlines. *See* Mot. for Pretrial Scheduling Order, ECF No. 247.

On November 19, 2022, the Court ordered Defendants to file their response, if any, to the Government's proposed scheduling order. *See* Order, ECF No. 248.

On November 25, 2022, Defendants filed their joint response to the Government's proposed scheduling order. *See* Resp. to Mot. for Pretrial Scheduling Order, ECF No. 249.

## II.   STANDARD OF REVIEW

### A.  Motion to Dismiss

Federal Rule of Criminal Procedure 12(b) permits defendants to raise by pretrial motion "any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1); *United States v. Sampson*, 898 F.3d 270, 278–79 (2d Cir. 2018). "[I]n ruling on a motion to dismiss, a court views the indictment as a whole and assumes its factual allegations to be true." *United States v. Litvak*, No. 3:13-CR-19 JCH, 2013 WL 5740891, at *2 (D. Conn. Oct. 21, 2013) (citing *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952)).

"[A] federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute," *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012), and thus may be decided "solely upon issues of law." *United States v. Was*, 684 F. Supp. 350, 351 (D. Conn. 1988), *aff'd*, 869 F.2d 34 (2d Cir. 1989). A court must dismiss an indictment that fails to state an offense. *See United States v. Pirro*, 212 F.3d 86, 92–93 (2d Cir. 2000); Fed. R. Crim. P. 12(b)(3)(B)(v). "But when such a[n argument] raises dispositive evidentiary questions, a district court must defer resolving those questions until trial." *Sampson*, 898 F.3d at 279 (internal quotation marks omitted).

### B.  Motion for Disclosure

"The court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand-jury matter . . . at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). Under Rule 6(e)(3)(E)(ii), the defendant must make a "showing of particularized need" to justify the disclosure. *See United States v. Sobotka*, 623 F.2d 764, 768 (2d Cir. 1980). "Grand jury proceedings are traditionally conducted in secret . . . [and] the burden is on the party seeking disclosure to show a 'particularized need' that outweighs the need for secrecy." *United States v. Moten*, 582 F.2d 654, 662 (2d Cir. 1978).

## III.    DISCUSSION

### A.  The Joint Motion to Dismiss

Defendants argue the Indictment should be dismissed for five reasons: (1) the alleged no-poach agreement at issue falls outside the "limited categories of conduct" that justify *per se* treatment; (2) the alleged agreement was "ancillary to a legitimate business collaboration," which was Company A outsourcing engineering services from Companies B through F; (3) the alleged agreement was related to a vertical commercial relationship rather than the typical horizontal relationships that are subject to the *per se* rule; (4) prosecuting the conduct alleged in the Indictment violates the notice provisions of the Due Process Clause; and (5) the prosecution of this conduct as a *per se* violation would "unconstitutionally usurp the jury's role to determine all of the facts necessary to establish each element" in violation of the Fifth and Sixth Amendments' prohibition on presumptions. *See* Mot. to Dismiss at 2–3.

The Court will address each of these arguments in turn.

### 1.  The *Per Se* Rule

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States" violates Section 1 of the Sherman Act. 15 U.S.C. § 1. Section 1, despite its expansive language, "outlaw[s] only unreasonable restraints." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (alteration in original) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)); *see also Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) ("[The Supreme] Court has long recognized that, '[i]n view of the common law and the law in this country' when the Sherman Act was passed, the phrase 'restraint of trade' is best read to mean 'undue restraint.'" (alteration in original) (quoting *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 59–60 (1911))). In the civil context, courts analyze restraints of trade under either the *per se* rule or the rule of reason; however, the Department of Justice ("DOJ") typically only criminally prosecutes *per se* restraints of trade. *See* U.S. DEP'T OF JUST., JUST. MANUAL at 7-2.200 (April 2022), available at https://www.justice.gov/jm/jm-7-2000-prior-approvals#7-2.200.

The *per se* rule recognizes that "[s]ome types of restraints . . . have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*." *Khan*, 522 U.S. at 10. The *per se* rule "is confined to restraints," such as price fixing, bid rigging, and market allocations, "that would always or almost always tend to restrict competition and decrease output." *Leegin*, 551 U.S. at 886 (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988)); *see also United States v. Aiyer*, 33 F.4th 97, 115 (2d Cir. 2022).

The *per se* rule is applied only if "courts have had considerable experience with the type of restraint at issue" and "can predict with confidence that it would be invalidated in all or almost

all instances under the rule of reason." *Leegin*, 551 U.S. at 886–87 (internal citations omitted); *see also United States v. Apple, Inc.*, 791 F.3d 290, 321 (2d Cir. 2015) (stating that the *per se* rule "reflect[s] a longstanding judgment that case-by-case analysis is unnecessary for certain practices that, by their nature[,] have a substantial potential to unreasonably restrain competition" (internal citations and quotation marks omitted)). The "*per se* approach permits categorical judgments with respect to certain business practices," *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985), such that these restraints are "unreasonable and therefore illegal" and do not require "elaborate inquiry as to the precise harm they have caused or the business excuse for their use," *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958).

Courts, however, "presumptively appl[y] rule of reason analysis." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). The rule of reason, in contrast to the *per se* rule, requires that "the finder of fact . . . decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *Khan*, 522 U.S. at 10; *see also Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 75 n.8 (2d Cir. 2013) ("When applying the rule of reason, courts weigh all of the circumstances surrounding the challenged acts to determine whether the alleged restraint is unreasonable . . . .").

Defendants argue that the Indictment must be dismissed because courts do not have "longstanding judicial experience" finding that no-poach agreements have "manifestly anticompetitive effects and lack . . . any redeeming virtue" and, instead, courts have appropriately reviewed no-poach and other similar agreements under the rule of reason. *See* Mot.

at 11–15 (quoting *Leegin*, 551 U.S. at 886). More specifically, Defendants rely on *Union Circulation Co. v. FTC*, 241 F.2d 652 (2d Cir. 1957), and *Bogan v. Hodgkins*, 166 F.3d 509, 514 (2d Cir. 1999), two decisions in which the Second Circuit applied the rule of reason to similar agreements. *Id.* at 13–14; *see also Ulrich v. Moody's Corp.*, No. 13 Civ. 0008 (VSB) (MHD), 2014 WL 12776746, at *26 (S.D.N.Y. Mar. 31, 2014); *Mooney v. AXA Advisors, LLC*, 19 F. Supp. 3d 486, 498 (S.D.N.Y. 2014). Defendants argue that it is more logical to apply the rule of reason because no hire and no solicitation agreements are not "obviously anticompetitive." *Id.* at 15. Finally, Defendants argue that the Indictment fails to plead a restraint of trade that has manifestly anticompetitive effects because the no-poach agreement, which was limited to employees working on projects for Company A, "could not have harmed competition in the labor market in which the alleged coconspirators competed." *Id.* at 15 n.8 (first quoting *Leegin*, 551 U.S. at 886; and then quoting *Bogan*, 166 F.3d at 515).

In response, the Government argues that the proper question at the motion to dismiss phase is not whether the charge is "novel," but whether the Indictment properly alleges a *per se* illegal restraint. *See* Opp'n at 13–16. More specifically, the Government cites to language in the Indictment stating that the no-poach agreement was intended to "suppress competition by allocating employees in the aerospace industry working on projects for Company A," *see* Indictment ¶¶ 19, which, in the Government's view, describes "an agreement between employers to allocate employees in a labor market in which they directly competed"—a horizontal market allocation, which is a recognized category subject to *per se* treatment. *See* Opp'n at 13–14.

The Government also argues that Defendants are improperly focusing on the underlying facts, when the proper inquiry at the motion to dismiss phase is "whether the indictment properly charged conduct that . . . would establish a *per se* violation of the law," which only "depends on

the category of restraint pleaded." *See id.* at 15 (first citing *Nw. Wholesale Stationers, Inc.*, 472 U.S. at 290; and then citing *Aiyer*, 33 F.4th at 117). The Government then states that the Supreme Court in *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940), "foreclosed any attempt to avoid the *per se* rule merely because the precise means and methods by which the conspirators achieved an illegal restraint look different from ones past." *See* Opp'n at 15–16.

The Government next argues that a no-poach agreement pleaded as a market allocation is properly subject to the *per se* rule. *See id.* at 16–22. Citing *Anderson v. Shipowners' Association of the Pacific Coast*, 272 U.S. 359 (1926), and *NCAA v. Alston*, 141 S. Ct. 2141 (2021), the Government argues that the Supreme Court has repeatedly recognized that agreements between competing employers regarding when, why, and how to hire workers can constitute a horizontal market allocation, and therefore, can properly be subject to the *per se* rule. *See* Opp'n at 16–17. Additionally, the Government emphasizes that the *Anderson* decision, and other more recent Second Circuit decisions, properly analogized employee no-poach agreements to customer no-poach agreements, which are "unquestionably illegal." *See id.* at 17.

The Government states that courts have specifically held that no-poach agreements are *per se* illegal as early as the 1970s in *Quinonez v. National Association of Securities Dealers, Inc.*, 540 F.2d 824 (5th Cir. 1976), and continuing in more recent civil cases brought in the 2010s. *See* Opp'n at 18–19. This type of allegation is now being brought in criminal actions and, to date, each of these claims has survived a motion to dismiss. *See id.* at 19–20 (first citing *United States v. DaVita, Inc.*, No. 1:21-cr-00229 (RBJ), 2022 WL 266759 (D. Colo. Jan. 28, 2022); then citing *United States v. Manahe*, No. 2:22-cr-00013 (JAW), 2022 WL 3161781 (D.

Me. Aug. 8, 2022); and then citing *United States v. Jindal*, No. 4:20-CR-358, 2021 WL 5578687 (E.D. Tex. Nov. 29, 2021)).

Finally, the Government argues that procompetitive justifications are irrelevant to the motion to dismiss because the Indictment properly pleads a *per se* illegal offense and "in a criminal antitrust case, a district court has no pretrial obligation to consider a defendant's evidence of competitive effects in order to determine whether or not the indictment properly charges an actual *per se* offense." *See id.* at 22–25 (quoting *Aiyer*, 33 F.4th at 116–17).

In their reply, Defendants emphasize that the cases cited by the Government fail to address the fact that the Second Circuit "has never ruled that a no-poach or non-solicitation agreement constituted a *per se* violation of the Sherman Act." *See* Reply at 3–8.

The Court agrees in part and disagrees in part.

At the outset, and to clarify an issue inherent to the parties briefing but not explicitly stated, the Indictment properly alleges a *per se* agreement only if the Court either finds that the alleged conduct falls within the well-established categories that historically have required *per se* treatment, such as price fixing, bid rigging, or market allocation; or if the Court finds that the alleged conduct is the type of restraint that should be considered a new category of restraint that is always subject to *per se* treatment.

To find that a new category of restraint exists, it must be a type of restraint that "courts have had considerable experience with" such that courts "can predict with confidence that [the conduct] would be invalidated in all or almost all instances under the rule of reason." *Leegin*, 551 U.S. at 886–87 (internal citations omitted); *see also Apple*, 791 F.3d at 321 (stating that the *per se* rule "reflect[s] a longstanding judgment that case-by-case analysis is unnecessary for certain

practices that, by their nature[,] have a substantial potential to unreasonably restrain competition" (internal citations and quotation marks omitted)).

To the extent that Defendants argue that the no-poach agreement alleged in the Indictment is insufficient to create a new type of conduct categorically subject to *per se* treatment, the Court agrees.

"Courts have been reluctant to expand the categories of *per se* illegality." *Bogan*, 166 F.3d at 514 (citing *Bunker Ramo Corp. v. United Bus. Forms, Inc.*, 713 F.2d 1272, 1284 (7th Cir. 1983)). In fact, the Supreme Court has specifically "warned against 'indiscriminately' expanding 'the category[ies] of restraints,'" and has been "slow to . . . extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." *Id.* at 514. "To justify a *per se* prohibition a restraint must have manifestly anticompetitive effects and lack . . . any redeeming virtue." *Leegin*, 551 U.S. at 886 (internal citations and quotation marks omitted). Additionally, application of the *per se* rule "is appropriate only after courts have had considerable experience with the type of restraint at issue, and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Id.* at 886–87 (internal citations omitted); *see also Hertz Corp. v. City of New York*, 1 F.3d 121, 129 (2d Cir. 1993) (finding that *per se* treatment is applicable "in the relatively narrow circumstance where courts have sufficient experience with the activity to recognize that it is plainly anticompetitive and lacks any redeeming virtue").

The parties have not identified, and the Court has not located, any case in which the Supreme Court or any Court of Appeals, including the Second Circuit, has found that agreements to not hire or solicit employees should be categorically subject to *per se* treatment. In different contexts, courts have found the rule of reason applies to a no hire or no solicitation agreement,

*see Union Circulation Co.*, 241 F.2d 652; *Bogan*, 166 F.3d at 509; *Ulrich*, 2014 WL 12776746, at *26, or that either the *per se* rule or the rule of reason could apply to a no hire or no solicitation agreement, *see In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103 (N.D. Cal. 2012); *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030 (N.D. Cal. 2013). Additionally, courts regularly uphold no hire and no solicitation agreements under the rule of reason analysis. *See, e.g.*, *Mooney*, 19 F. Supp. 3d 486. Therefore, this Court cannot "predict with confidence that" no hire or no solicitation agreements "would be invalidated in all or almost all instances under the rule of reason," *Leegin*, 551 U.S. at 886–87, and no hire and no solicitation agreements are not categorically "plainly anticompetitive and lack[ing] any redeeming virtue," *Hertz Corp.*, 1 F.3d at 129.

While the no-poach agreement alleged in the Indictment does not qualify as a new category of restraint subject to *per se* treatment, the alleged conduct is subject to *per se* treatment because it is properly pled as a market allocation.

"One of the classic examples of a *per se* violation of s[ection] 1 is" a market allocation, or "an agreement between competitors at the same level of the market structure to allocate" the market "in order to minimize competition." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972). Markets can be allocated by territory, customers, and services, among other things. *See id.* at 609–11 (allocating territory); *United States v. Koppers Co.*, 652 F.2d 290, 293 (2d Cir. 1981) (allocating territory); *United States v. Consol. Laundries Corp.*, 291 F.2d 563, 574–75 (2d Cir. 1961) (allocating customers); *New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 399, 416 (S.D.N.Y. 2000) (allocating healthcare services).

Additionally, while the Second Circuit has not explicitly held that allocation of the labor market can be considered market allocation, another *per se* category, price-fixing, has been

properly applied in the labor market as wage-fixing. *See, e.g.*, *Todd v. Exxon Corp.*, 275 F.3d 191, 201 (2d Cir. 2001) (Sotomayor, J. concurring) ("If the plaintiff in this case could allege that defendants actually formed an agreement to fix . . . salaries, [the] *per se* rule would likely apply."); *Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 157 (N.D.N.Y. 2010) ("Generally, price-fixing [or in this case wage-fixing] agreements are considered a *per se* violation of the Sherman Act." (alterations in original) (internal quotations and citations omitted)); *see also Alston*, 141 S. Ct. at 2167–68 (Kavanaugh, J. concurring) ("Price-fixing labor is price-fixing labor. And price-fixing labor is ordinarily a textbook antitrust problem because it extinguishes the free market in which individuals can otherwise obtain fair compensation for their work.").

In another analogous context, customer allocation, courts regularly find that allocating the market of customers can constitute market allocation. *See Anderson*, 272 U.S. at 362–63 (analogizing employee no hire agreements to customer no-poach agreements and stating that if the shipowners had agreed not to transport goods for certain customers, rather than hire certain persons, "the unlawful restraint would be clear"). In *Consolidated Laundries*, the Second Circuit found that the alleged customer allocation should be considered a market allocation by comparing it to territory allocation. 291 F.2d at 574–75. The court reasoned that it "fail[ed] to see any significant difference between an allocation of customers and an allocation of territory" and therefore, found that, "[a]ssuming that customers were allocated in the case at bar, no more need be proved; we agree that the *per se* rule should be applied." *Id.*

Since then, courts in other Circuits have relied in part on the Second Circuit's reasoning when analyzing customer allocation agreements that are analogous to the employee allocation agreement alleged here. For example, in *United States v. Cooperative Theatres of Ohio*, the

18

defendants, two movie theater booking agents, allegedly agreed not to compete for customers who were already receiving services from each agent. 845 F.2d 1367, 1368 (6th Cir. 1988). On appeal, the defendants argued that the *per se* rule should not apply because the no-solicitation agreement was not a horizontal market allocation because it only prevented the defendants from "actively soliciting" each other's current customers. *Id.* at 1371. The defendants further emphasized that this type of restraint on trade had never been challenged before and therefore, should be subject to the rule of reason rather than the *per se* rule. *Id.* The court ultimately found that the alleged "horizontal agreement between two competitors to refrain from seeking business from each other's existing accounts . . . is plainly a form of customer allocation and, hence, is the type of 'naked restraint' which triggers application of the *per se* rule of illegality." *Id.* at 1372; *see also United States v. Cadillac Overall Supply*, 568 F.2d 1078, 1087–90 (5th Cir. 1978) (applying the *per se* rule to customer allocation agreement that defendants argued "was simply a method of assuring non-interference with the service contracts . . . between the customer and the other particular company" because the alleged agreement was "easily observed" to be "a purely horizontal market division").

The Second Circuit has also explicitly stated that it considers it "well-known" and "settled" that "employers who were horizontal competitors for labor [are] prohibited from agreeing upon terms and conditions of employment." *Nat'l Basketball Ass'n v. Williams*, 45 F.3d 684, 690 (2d Cir. 1995) (citing *Anderson*, 272 U.S. 359).

More recent courts have recognized that agreements to not hire competitors' employees could constitute employee allocation such that the *per se* rule applies. *See In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1121–23 (N.D. Cal. 2012) (finding that the plaintiffs "successfully pled a *per se* violation . . . for purposes of surviving a 12(b)(6) motion" where the

plaintiffs alleged the defendant tech companies agreed to not cold call competitors' employees to solicit applications); *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1038–40 (N.D. Cal. 2013) (finding the government stated a civil *per se* claim where the defendants allegedly agreed not to solicit or hire each other's skilled high-tech employees because the alleged agreement is a "horizontal market allocation agreement"); *see also DaVita*, 2022 WL 266759, at *5–7 (denying the defendants' motion to dismiss and applying the *per se* rule to employee non-solicitation agreement because, as alleged, the agreement operated as a horizontal allocation of the labor market).

Here, Defendants allegedly allocated employees in the labor market. The Government alleges that Defendants "competed against one another to recruit and hire engineers and other skilled workers" and "knowingly entered into . . . [a] conspiracy . . . to suppress competition by allocating employees in the aerospace industry working on projects for Company A." Indictment ¶¶ 4, 19. More specifically, the Government alleges Defendants agreed to "restrict the hiring and recruiting of engineers and other skilled-labor employees between and among Companies A–F." *Id.* ¶ 19. The Indictment goes on to describe specific instances in which the agreement was enforced. *See, e.g.*, *id.* ¶¶ 20–29.

The *per se* rule does not need to be "rejustified for every industry that has not been subject to significant antitrust litigation," *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 351 (1982), and market allocation can occur when parties agree not to hire employees in a specific labor market. *See Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948) ("The [Sherman Act] does not confine its protections to consumers, or to purchasers, or to competitors, or to sellers. . . . The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated."

(internal citations omitted)). Therefore, this agreement, as described in the Indictment, is sufficient because it describes a horizontal agreement to allocate employees in a specific labor market.[1]

Nonetheless, not all no poach agreements are market allocations subject to *per se* treatment and therefore, determining whether a no poach agreement is a market allocation is highly fact specific. For example, in *Bogan*, the Second Circuit found that a horizontal agreement between Northwestern Mutual Life Insurance ("Northwestern") agents was subject to the rule of reason, in part, because the conduct did not fit squarely into any of the established *per se* categories. 166 F.3d at 516.[2]

*Bogan*, however, is distinct from the agreement alleged here. In *Bogan*, while the agents were independent contractors, they were paid by a uniform commission rate that was defined by the vertically related Northwestern and "incorporated into the agents' contracts." *Id.* at 511. Here, each of the Companies are responsible for hiring, training, and recruiting their own employees. *See* Indictment ¶ 3. Each Company is also responsible for defining the benefits and pay for their employees. *Id.* In *Bogan*, because all agents were paid by the uniform commission rate set by Northwestern, the no poach agreement did not negatively impact the agents by suppressing wages.

---

[1] Notably, in other recent prosecutions brought under similar factual circumstances, courts have similarly found that no hire and no solicitation agreements can be plead as a tool or method used to allocate the labor market such that the *per se* rule applies. *See DaVita*, 2022 WL 266759, at *5–7; *United States v. Manahe*, 2022 WL 3161781, at *6–10.

[2] Notably, the court focused its discussion on determining if the alleged agreement was a group boycott. *Bogan*, 166 F.3d at 515. The court found that the agreement was "clearly not a territorial or customer allocation" and that it could not be a "supplier allocation" because "the [a]greement permits transfers, and experienced . . . agents do not comprise the entire set of suppliers of their services." *Id.* Ultimately, while the agreement "constrain[ed] [agents] to some degree, it [did] not allocate the market . . . to any meaningful extent." *Id.* The court did not explicitly consider the agreement as allocating the labor market.

Here, however, the no poach agreement has allegedly prevented engineers and other highly skilled workers from working for any of the other alleged co-conspirators' companies that perform outsourcing work for Company A. Therefore, these employees are denied the higher wages or promotions that are often achieved by laterally moving through the labor market. Indeed, the Indictment alleges this was one of the purposes of the agreement. *See* Indictment ¶ 27 (noting that Defendants considered "the mutual financial benefits of the agreement" such as "prevent[ing] wages and labor costs from rising"); *id.* ¶ 27a (quoting an e-mail in which an alleged co-conspirator states that the "general aim is NOT to recruit from the local 'competition' because no one wins; salaries rise, the workforce get unstable, and our margins all get hurt").

This conduct, as alleged, operates as "an agreement between competitors at the same level of the market structure to allocate" the labor market "in order to minimize competition." *Topco Assocs., Inc.*, 405 U.S. at 608.

As a result, while the alleged conduct may constitute a novel means of allocating a market, the *per se* rule still applies, at least in this instance, because the Government alleges Defendants allocated employees in a properly defined labor market. *See Socony-Vacuum*, 310 U.S. at 223 ("[T]he machinery employed by a combination for price-fixing is immaterial" because price fixing "is illegal *per se*."); *see also Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 771 (2d Cir. 2016) ("The unfamiliar context of appellants' horizontal price-fixing claims provides no basis to disturb application of the *per se* rule.").

Accordingly, the Court will deny the motion to dismiss because the new factual context can, as a matter of law, constitute a *per se* violation.

### 2.   The Ancillary Restraints Doctrine

Even if the alleged conduct fits into a recognized *per se* category, such as market

allocation, the restraint will not be subject to the *per se* rule if it is ancillary to a legitimate

business collaboration. The ancillary restraints doctrine "governs the validity of restrictions

imposed by a legitimate business collaboration, such as a business association or joint venture,

on nonventure activities." *Aiyer*, 33 F.4th at 115 (quoting *Dagher*, 547 U.S. at 7). Restraints that

are ancillary are analyzed under the rule of reason. *Id.* (citing *Aya Healthcare Servs., Inc. v. AMN*

*Healthcare, Inc.*, 9 F.4th 1102, 1109 (9th Cir. 2021)).

Defendants argue that the no-poach agreement, as alleged, is ancillary to the outsource

agreement described in the Indictment because the no-poach agreement "made it more

practicable to complete the contracted-for tasks on a timely basis; supported Company A's

ability to make commitments to future projects; allowed for the recoupment of training and

recruitment costs; and mitigated the risk of 'disintermediation' between a customer and supplier

(*i.e.*, the process of 'eliminat[ing] the middleman')." *See* Mot. at 16–19. Defendants cite to

examples of restrictions on hiring and solicitation between members of firms or corporate

families, franchisor and franchisees, corporate transactions, and employers. *Id.* at 20–21.

Specifically, Defendants emphasize *Aya Healthcare Services, Inc.*, as an example of a non-

solicitation agreement in the outsourcing context that was found to be ancillary. *Id.* at 21–23.

Additionally, Defendants argue that the policy purposes underlying the Sherman Act

support finding that the no-poach agreement alleged here is an ancillary restraint because "some

restrictions on employee attrition are often necessary for firms to invest efficiently in human

capital, and enable training 'that otherwise would not take place.'" *Id.* at 23–27. Finally,

Defendants argue that before this case, executive branch policy appeared to exempt ancillary no-

poach agreements from enforcement and the Government itself in *DaVita* and *United States v. Hee*, No. 21-cr-00098 (D. Nev. filed Mar. 30, 2021), argued that a factual context, such as the outsourcing arrangement here, would put a no-poach agreement outside the purview of the *per se* rule. *Id.* at 27–31.

In response, the Government argues that the ancillary restraint defense is inherently fact-intensive and cannot be found from the face of the Indictment. *See* Opp'n at 9–10, 26–32. Additionally, the Government argues Defendants must meet "at least a burden of production" by "making an initial showing on each key element of the [defense] theory." *Id.* at 10 (internal citations and quotation marks omitted). The Government argues Defendants cannot simply "point[] to some contract between the conspirators," instead, in the Government's view, Defendants must establish that the outsourcing agreement is the type that is covered by the ancillary restraints defense, i.e., business relationships that "resemble joint ventures" due to their "economic integration." *Id.* at 11–12.

The Government also argues that Defendants must provide facts demonstrating that the charged market allocation was collateral to a business relationship, and that the restraint was "reasonably necessary" to enhance efficiency or promote the procompetitive purpose of the business relationship. *Id.* at 12–13. In the Government's view, the Defendants' argument improperly relies on facts outside the Indictment and the facts within the Indictment "demonstrate the *absence* of an ancillary restraint" because the Indictment "alleges an employee allocation agreement that was not integral to the working of a legitimate business arrangement, but rather one that operated via an 'unwritten understanding'" and that was "motivated by *anti*competitive benefits." *Id.* at 29–30 (emphasis in original).

The Government further argues that the Indictment does not allege a collaborative business venture between Companies A through F. *Id.* at 34–35. Instead, the Indictment alleges that "Defendants and their Supplier employers had no relevant joint business activity of any kind with each other" because "they were head-to-head competitors, in the markets for both labor and for engineering services projects from Company A." *Id.* at 35 (citing Indictment ¶ 4). Moreover, the Government argues that Defendants cannot meet the reasonably necessary element of the ancillary restraints defense with evidence that the no-poach agreement gave Company A flexibility in its labor expenses and allowed the Suppliers to manage training and recruiting costs. *Id.* at 37. The Government argues that these reasons are "a financial motive to avoid the costs of horizontal competition in the labor market," and therefore, are "not a cognizable . . . procompetitive justification." *Id.* (internal quotation marks and citations omitted).

Finally, the Government argues that Defendants misstated the Government's prior statements on the ancillary restraints defense, which were "describ[ing] the state of the law[,] as this memorandum does." *Id.* at 38. Alternatively, the Government argues that inconsistent statements by the executive branch "cannot estop it from prosecuting a crime." *Id.* at 39.

In their reply, Defendants argue that the Court can and must consider the factual allegations in the Indictment to determine whether the alleged agreement is naked, and therefore justifies *per se* treatment, or if it is ancillary, and therefore subject to the rule of reason. *See* Reply at 8–9. More specifically, Defendants argue that the alleged agreement's relationship to the outsourcing relationship between Company A and Companies B through F shows that the alleged agreement is ancillary. *Id.* at 10–13. Defendants claim that ancillary restraints can apply to a wide variety of "legitimate business collaboration[s]" such as a joint venture or "similar productive relationship." *Id.* at 15 (citing *Aiyer*, 33 F.4th at 115, 119 n.18). Further, Defendants

25

argue that, to be ancillary, the alleged agreement only needs to be "necessary," but does not need to be essential. *Id.* Finally, Defendants emphasize that the alleged no-poach agreement could have procompetitive effects such as enabling Companies B through F to "provide 'sufficient . . . employees with sufficient qualifications to complete the . . . outsourced projects" without worrying that the workers would be poached by a competing supplier. *Id.* at 19 (citing Indictment ¶¶ 3, 19). In other words, the alleged agreement "promote[d] consistent staffing, avoided disruptions, and incentivized outsource firms to invest in recruitment and training of outsource engineers by preventing free riding." *Id.* at 20.

The Court agrees in part and disagrees in part.

The parties dispute, and there appears to be a split in authority, concerning whether the ancillary restraints doctrine is a defense that negates an element of the crime or is an affirmative defense. *Compare Bd. of Regents of Univ. of Okla. v. NCAA*, 707 F.2d 1147, 1154 n.9 (10th Cir. 1983) ("We believe" the defendants bears the burden "when considering whether to apply per se or rule of reason analysis to admitted price restraints that the defendant attempts to justify as properly ancillary to a legitimate integration."); *with Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 727–28 (6th Cir. 2019) (noting that the plaintiff bears the burden to show "that the challenged conduct ha[s] the characteristics necessary to justify *per se* condemnation" including that the restraint is naked rather than ancillary). The Court need not dispositively answer this question at this stage, however, because Defendants' argument fails regardless.

An Indictment is properly dismissed if it fails to allege the elements of a crime, *see United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012), or an affirmative defense is apparent from the fact of the Indictment, *see Sampson*, 898 F.3d at 279 (stating that defendants

can succeed in moving to dismiss an Indictment based on a statute of limitations defense if "the defense is clear from the face of the indictment"). Here, the Government has stated a claim that the alleged agreement was, as discussed above, part of a *per se* category and that the agreement was not ancillary to a legitimate business collaboration.

More specifically, from the face of the Indictment, the alleged agreement is not ancillary to a legitimate business venture because Companies B through F compete, rather than cooperate, with one another to work on particular outsource agreements for different Company A projects. *See* Indictment ¶ 4 ("As Suppliers, [Companies B through F] also competed against one another for outsource work projects from certain customers, including Company A, including on the basis of low price.").

This is a meaningful distinction from *Aya Healthcare Services, Inc.*, where the alleged no solicitation agreement was determined ancillary to "a collaboration agreement to fulfill the demand of hospitals for travel nurses, which constitutes a procompetitive purpose." 9 F.4th at 1109–10 (internal quotation marks omitted). The two parties in *Aya Healthcare*, Aya and AMN, were healthcare staffing agencies that temporarily assigned travel nurses to particular hospitals in need of additional staff. *Id.* at 1106. AMN was a managed service provider for "an increasing number of hospitals" and also directly placed nurses into hospitals. *Id.* Aya placed nurses directly in hospitals, or placed nurses into managed service providers, such as AMN, who would then work directly with the hospitals. *Id.* When AMN was no longer able to fulfill the demand for its own travel nurses, it referred requests for travel nurses to its subcontractors, one of which was Aya. *Id.* The subcontract between Aya and AMN expressly prohibited Aya from soliciting AMN employees. *Id.*

27

The Ninth Circuit found that the no solicitation term of the agreement was ancillary to the subcontract, which was intended to fulfill the growing demand for travel nurses, because the no solicitation agreement "ensure[d] that AMN [would] not lose its personnel during the collaboration" *Id.* at 1110. The court further noted that "[w]ithout the restraint, AMN 'would likely be less willing or unwilling to deal with other agencies to supply travel nurses to hospitals,'" but "with the restraint, AMN may collaborate with its competitor for the benefit of its client without 'cutting [its] own throat.'" *Id.*

The conduct alleged here is also different from the franchisor-franchisee context for similar reasons. For example, in *Ogden v. Little Caesar Enterprises, Inc.*, 393 F. Supp. 3d 622, 628 (E.D. Mich. 2019), the Little Caesar's franchisee restaurants were subject to a no poaching agreement as a provision of the franchise agreement. The franchisees were typically independently owned, but "operate under a comprehensive franchise agreement" which was subject to a ten-year term and includes an agreement that the franchisee will operate at a specific site chosen by the franchisor, at times with "a limited radius of 'exclusive territory,'" depending on the franchisor's discretion. *Id.* at 627–28. The court found "the franchise agreements here allegedly were part of the overall scheme of 'legitimate collaboration' between franchisees operating under the umbrella of the same brand." *Id.* at 635; *see also Deslandes v. McDonald's USA, LLC*, No. 17 C 4857, 2018 WL 3105955, at *7 (N.D. Ill. June 25, 2018) ("Because the restraint alleged in plaintiff's complaint is ancillary to an agreement with a procompetitive effect, the restraint alleged in plaintiff's complaint cannot be deemed unlawful per se."); *Butler v. Jimmy John's Franchise, LLC*, 331 F. Supp. 3d 786, 797 (S.D. Ill. 2018) (declining to decide the question of whether the rule of decision should apply, but observing that the franchise agreements likely could not be subjected to *per se* analysis).

Here, there are no allegations of coordination among Companies B through F. In each of the cases discussed above, the no hire or no solicitation agreement is ancillary to a cooperative agreement that includes each of the horizontal parties. Here, the Indictment alleges that Companies B through F do not cooperate in the outsourcing agreements, but instead compete to win the outsourcing agreements. *See* Indictment ¶ 4 ("As Suppliers, [Companies B through F,] also competed against one another for outsource work projects from certain customers, including Company A, including on the basis of low price."). Therefore, based on the allegations in the Indictment, the alleged no poach agreement is not ancillary.

To the extent Defendants wish to contest these allegations with facts not included in the Indictment, such arguments are better suited for a later stage of the proceedings. *See Sampson*, 898 F.3d at 279 ("[W]hen such a defense raises dispositive 'evidentiary questions,' a district court must defer resolving those questions until trial.").

Accordingly, the Court will deny the motion to dismiss on these grounds.

### 3. The Nature of the Relationship Between Company A and Companies B Through F

Even if the alleged no-poach agreement is a naked agreement to allocate the labor market, application of the *per se* rule may be inappropriate if the restraint is vertical rather than horizontal. Horizontal restraints are those imposed between competitors at the same level of the market which restrict "the way in which they will compete with one another" and are subject to the *per se* rule. *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 99 (1984); *Topco Assocs., Inc.*, 405 U.S. at 608. Vertical restraints are those that are "imposed by agreement between firms at different levels of distribution" and are subject to the rule of reason. *See Am. Express Co.*, 138 S. Ct. at 2284; *see also Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 360 (S.D.N.Y.

29

2018) ("Vertical agreements are not *per se* violations of the antitrust laws."). "[D]etermining the orientation of an agreement can be difficult as a matter of fact and turns on more than simply identifying whether the participants are at the same level of the market structure." *Apple*, 791 F.3d at 314.

Defendants argue that the alleged outsourcing relationship between Company A and Companies B through F is vertical rather than horizontal and therefore, *per se* treatment is inappropriate. *See* Mot. at 31–37. Defendants rely on cases in which courts have found *per se* treatment of vertical market participants inappropriate even though the entities compete horizontally at another level of the market. *See id.* at 31–34 (citing, for example, *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 243–44 (2d Cir. 1997), and *2238 Victory Corp. v. Fjallraven USA Retail, LLC*, No. 19-cv-11733 (PKC), 2021 WL 76334, at *5 (S.D.N.Y. Jan. 8, 2021)). Additionally, Defendants argue that the alleged no poach agreement "w[as] effectively an intrabrand restraint that fostered interbrand competition" because the no poach agreement was limited "to employees in the aerospace industry working on projects for Company A." *Id.* at 34–36. In a narrower sense, Defendants also argue that the allegations that Company A and Company B agreed to restrict Company A's ability to hire Company B employees was itself a vertical restraint of trade and therefore cannot be subject to *per se* treatment. *Id.* at 36–37.

In response, the Government argues the Indictment alleges a horizontal market allocation agreement between Companies A through F, who all compete with one another for employees. *See* Opp'n at 39–42 (citing, for example, *Koppers*, 652 F.2d at 296–97, and *United States v. Usher*, No. 1:17-cr-00019, 2018 WL 2424555, at *4 (S.D.N.Y. May 4, 2018)). The Government states that, to the extent the Indictment refers to the outsourcing relationships between Company

A and Companies B through F, this is irrelevant because "[n]o restraint of trade is alleged within those vertical relationships." *Id.* at 41. Additionally, the Government argues that the "mere presence" of a vertical relationship in an otherwise horizontal conspiracy does not alter the analysis. *Id.* at 42–46 (citing *Apple*, 791 F.3d at 296).

In their reply, Defendants argue the Indictment alleges an "intrabrand agreement with essential vertical components" and therefore, the *per se* rule is inapplicable. *See* Reply at 24. More specifically, Defendants argue that the Indictment alleges a mixed vertical and horizontal agreement because the Indictment alleges the employee allocation agreement applies to employees "working on projects for Company A," which implies an "essential vertical component[]." *Id.* at 25. Defendants emphasize that allocating the labor market is no different from allocating the engineering services market because "[t]he two are inextricably tied together and represent the very deliverable that Company A purchased from the Suppliers." *Id.* at 25–26. Additionally, Defendants argue that multiple companies working to produce a product for a single customer has never been a *per se* violation because such a relationship is an intrabrand restraint. *Id.* at 26–30 (comparing the facts alleged here to those in *Bogan*, 166 F.3d at 511, as well as franchisor-franchisee cases).

The Court disagrees.

Both parties agree that "when alleged conduct seems to have some characteristics of both horizontal and vertical restraints" *per se* analysis is inappropriate. Mot. at 32 (quoting *In re: McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 136 (D.D.C. 2016)); *see* Opp'n at 42. For the *per se* rule to be inapplicable, however, the restraint itself, not just the parties' relationship, must have vertical and horizontal characteristics. *See Apple*, 791 F.3d at 297 ("[T]he Sherman Act outlaws *agreements* that unreasonably restrain trade and therefore requires evaluating the nature

31

of the restraint, rather than the identity of each party who joins in to impose it, in determining

whether the *per se* rule is properly invoked." (emphasis in original)).

The allegations here are analogous to the hub-and-spoke conspiracy upheld by the

Second Circuit in *Apple*. There, Apple allegedly organized a conspiracy to fix electronic book

("eBook") prices among five of the six major book publishing companies in an effort to compete

with Amazon, which, at the time was already selling eBooks at a price the publishing companies

believed was too low. 791 F.3d at 296. Apple negotiated individual contracts with each of the

five publishing companies that included two identical provisions: one that stated that Apple

could lower the price of any eBook to match that of a competitor, namely Amazon, and a second

that capped the price of eBooks relative to the pricing of the hardcopy book. *Id.* at 304. The first

provision was intended to force the publishers to negotiate better pricing from Amazon or suffer

lower short-term revenue and the second provision was intended to fix eBook prices across the

market at a higher price point. *Id.* at 305. Throughout negotiations, Apple was speaking

individually with the five publishers, updating them on the status of the other publishers'

negotiations and confirming that the companies were all offered the same terms because Apple

would not launch its eBook platform without at least five of the six major publishing companies.

*Id.* at 305–08. Additionally, the publishing companies knew that they would have more

bargaining power to impact Amazon's eBook pricing if they acted together. *Id.* at 304–05.

The Second Circuit found that Apple had organized a horizontal price-fixing conspiracy,

despite its use of the vertical contracts, because the "relevant 'agreement in restraint of trade'"

was "not Apple's vertical contracts with the Publisher Defendants," but the horizontal agreement

to fix prices. *Id.* at 325. The court emphasized that the competitive effects of a horizontal

restraint are "just as significant when a vertical market participant organizes the conspiracy." *Id*

at 323. The court relied in part on the Supreme Court's consistent and specific distinctions between vertical restraints and vertically related players organizing a horizontal restraint. *Id.* (citing, for example, *Bus. Elec. Corp.*, 485 U.S. at 734 (stating that "a facially vertical restraint imposed by a manufacturer only because it has been coerced by a horizontal carte[l] . . . is in reality a horizontal restraint" (alteration in original)), and *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136 (1998) (distinguishing restraints that were not "simply a 'vertical' agreement between supplier and customer, but a horizontal agreement among competitors")).

Here, the alleged restraint is a no poach agreement in the labor market for engineers and high-skilled workers working on projects for Company A. Despite Company A's vertical relationship in the outsourcing agreements between itself and Companies B through F, the no poach agreement operates across the market in which the companies horizontally compete: the labor market. Company A allegedly operates not only as an organizer and "enforcer" of the horizontal agreement, but, because it also horizontally competes in the labor market against Companies B through F, it also agreed not to hire Company B's employees. Similar to Apple's position relative to the publishing companies, Company A's vertical relationship to Companies B through F allegedly created a position of power that enabled Company A and Mr. Patel to convince the other companies to participate and ensure the companies are abiding by the agreement. As alleged, the restraint does not operate in a vertical market because there are no allegations that Company A is vertically related to Companies B through F in terms of the labor market. Therefore, the restraint, as alleged, is appropriately considered a horizontal restraint. *See Apple*, 791 F.3d at 297 (noting that it would be incorrect to determine "that one who organizes a horizontal price-fixing conspiracy . . . among those competing at a different level of the market has somehow done less damage to competition than its co-conspirators").

Notably, the court in *Apple* did not base its analysis of the restraint on the presence of Amazon as Apple's competitor. *See id.* at 322–25 (analyzing the vertical restraint arguments without mentioning Amazon). Instead, Amazon was relevant to show that Apple had a motive to fix eBook prices at a higher price point—i.e., to create its own eBook marketplace that would be competitive and profitable despite Amazon's "loss-leadership and below-cost pricing strategy." *See id.* at 343 (Jacobs, J., dissenting) ("Apple did not have to open an e-bookstore when it launched the iPad; and it was willing to enter the market only on the condition that its e-book retail business would be profitable, such that Apple could compete effectively with Amazon . . . ." (internal quotation marks omitted)). Here, the absence of a Company A competitor does not change the nature of the alleged restraint because, as alleged, Company A had a clear motivation: to limit labor costs. Indictment ¶ 27 (stating that Company A allegedly organized the no poach agreement, and Companies B through F allegedly agreed to it, because there were "mutual financial benefits" such as "prevent[ing] wages and labor costs from rising").

Additionally, while *Apple* does not address the distinction between interbrand and intrabrand restraints, the restraint alleged in the Indictment is an interbrand restraint.[3] Intrabrand refers to "the competition among retailers selling the same brand," and interbrand refers to "the competition among manufacturers selling different brands of the same type of product." *Leegin*,

---

[3] It is not clear whether a naked horizontal restraint would not be *per se* illegal simply because the restraint was intrabrand rather than interbrand. The Supreme Court has held that an intrabrand horizontal agreement among General Motors dealers that they would not do business with discounters was *per se* illegal. *United States v. General Motors Corp.*, 384 U.S. 127, 144–45 (1966). Additionally, Justice Stevens in his *Business Electronics Corp.* dissent was more categorical about the distinction in stating that "[t]here is no doubt that horizontal intrabrand price fixing is *per se* illegal, even if the conspirators lack the market power to affect interbrand competition in a manner that would violate the rule of reason." 485 U.S. at 744 n.7 (Stevens, J. dissenting). This Court has not, however, identified a case in which a Supreme Court majority has categorically addressed the interbrand and intrabrand distinction in a horizonal restraint. Notably, lower courts continue to split on the issue of whether a horizontal intrabrand restraint is subject to the *per se* rule. *Compare Bogan*, 166 F.3d at 515–16 (applying the rule of reason), *with Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 220–21 (3d Cir. 2008) (applying *per se* rule). Ultimately, this issue is not dispositive because the Indictment pleads an interbrand restraint.

551 U.S. at 890. "Interbrand competition . . . is the primary concern of antitrust law," *Cont'l T. V., Inc. v. GTE Sylvania*, 433 U.S. 36, 52 n. 19 (1977), because intrabrand restraints "have sufficient potential for enhancing interbrand competition . . . notwithstanding the adverse impact that they may have on intrabrand competition." *Copy-Data Sys., Inc. v. Toshiba Am., Inc.*, 663 F.2d 405, 411 (2d Cir. 1981).

Typically, the distinction between intrabrand and interbrand is somewhat obvious because the relevant market is one for goods or services that have brands attached to the product. *See, e.g.*, *Toshiba Am., Inc.*, 663 F.2d at 411. Here, however, the relevant market is the market for engineers and other skilled laborers working on projects for Company A. In *Bogan*, Northwestern Mutual Life Insurance Company ("Northwestern") operated "a multi-tiered structure of independent contractor insurance agents." 166 F.3d at 511. The agents had "exclusive [Northwestern] policy franchise," were paid a commission based on rates that were "incorporated into the agents' contracts and reflect a uniform commission and fee schedule used by all [Northwestern] agents," and "policy terms and premiums are established by" Northwestern. *Id.* Northwestern contracted with six General Agents who in turn contract with Special and District Agents who contracted with Soliciting Agents. *Id.* General Agents paid for recruiting and training their own District and Sales Agents. *Id.* Typically, General Agents have exclusive territories, however, the New York City area had six General Agents. *Id.*

The New York City area General Agents agreed among one another to not recruit and hire each other's existing District or Sales Agents without the consent of the agent's current General Agent. *Id.* The Second Circuit ultimately found that the agreement was "akin to an *intra* firm agreement" between "General Agents of the same company to restrain trade only in experienced sales agents of that company." *Id.* at 515.

While the agents in *Bogan* were independent contractors, they were the Northwestern "brand" of employee because they sold the same uniform product that was defined by Northwestern, had exclusive franchise of the Northwestern policies, and were paid a uniform commission defined by Northwestern. The agents were holding themselves out as Northwestern insurance agents. Here, however, the engineers were not the Company A, or any other single company, "brand." Company A did not hire the employees to work on their projects, they selected a supplier company to complete a project and that supplier used its own employees to do the work. Indictment ¶ 4. Additionally, the suppliers were responsible for hiring, recruiting, paying, and providing employment benefits to their own employees. *Id.* ¶¶ 3–4. While Company A presumably defined the work to be done, there is nothing in the Indictment to suggest that this is the only work that engineers at Companies B through F performed. Instead, Companies B through F allegedly performed outsourced engineering work for many companies, not just Company A. *Id.* ¶ 4 ("[The Suppliers] competed against one another for outsource work projects from certain customers, including Company A."). Therefore, the employees are interbrand rather than intrabrand.[4]

Finally, this case is distinct from the "dual distributor" cases in which the courts apply the rule of reason because the restraints have intertwined horizontal and vertical components. A dual distribution arrangement is a relationship in which "the distributor and manufacturer also compete at the distribution level." *See Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 243 (2d Cir. 1997). For example, in *2238 Victory Corporation v. Fjallraven*

---

[4] To the extent Defendants argue that engineering services and engineers are essentially synonymous, this is not apparent from the face of the Indictment. *See* Reply at 25–26. If there are additional facts that would illuminate the vertical nature of the alleged restraint, such arguments are better suited for a later stage of the proceedings. *See Sampson*, 898 F.3d at 279 ("[W]hen such a defense raises dispositive 'evidentiary questions,' a district court must defer resolving those questions until trial.").

*USA Retail*, the complaint alleged a dual distributor relationship in which Fjallraven produced and sold Fjallraven products and Netrush also sold Fjallraven products. 2021 WL 76334, at *4. The plaintiff alleged that Fjallraven and Netrush conspired to remove the plaintiff, also a seller of Fjallraven products, from the Amazon marketplace so that the average sales price of Fjallraven products on Amazon increased, and Fjallraven and Netrush's profits increased. *Id.* The court found that the complaint "describe[d] purported vertical coordination on intrabrand retail prices." *Id.* at *2. In the "dual distributor" cases, the alleged restraint operates both horizontally and vertically in that the alleged restraint impacts both parties as distributors, as well as the party operating at the manufacturing level. Here, however, as discussed above, the restraint operates only horizontally. Company A, unlike the manufacturer-distributors in the "dual distribution" cases, is not supplying labor to Companies B through F.

Accordingly, the Court will deny the motion to dismiss on the grounds that the Indictment alleges a vertical rather than horizontal restraint.[5]

### 4. The Due Process Clause

The Due Process Clause of the Fifth Amendment states that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. AMEND. V. "[A] criminal statute must give fair warning of the conduct that it makes a crime" and "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Bouie v. City of Columbia*, 378 U.S. 347, 350–51 (1964) (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954)).

A criminal statute is "impermissibly vague under the Due Process Clause of the Fifth Amendment" when "the statute . . . fails to provide a person of ordinary intelligence fair notice

---

[5] In light of the above, Defendants' argument that the no poach agreement between Company A and Company B should be subject to a different analysis fails for the same reasons.

of what is prohibited." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18 (2010) (internal citation and quotation marks omitted). The inquiry is objective and turns on whether the "law presents an ordinary person with sufficient notice of or the opportunity to understand what conduct is prohibited and proscribed, not whether a particular plaintiff actually received a warning that alerted him or her to the danger of being held to account for the behavior in question." *United States v. Smith*, 985 F. Supp. 2d 547, 587 (S.D.N.Y. 2014), *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016) (summary order).

Defendants argue that they lacked constitutional notice that the alleged conduct was illegal because "judicial decisions had not recognized the alleged conduct as a *per se* violation of the Sherman Act." Mot. at 38. Defendants argue the Sherman Act does not provide notice because the Indictment alleges conduct that falls within "the gray zone of socially acceptable and economically justifiable business conduct." *Id.* (citing *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 438 (1978)). Additionally, Defendants argue that it would violate due process if the Sherman Act imposed liability for conduct that has never previously been identified as a *per se* violation. *Id.* (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (stating that laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning")). More specifically, Defendants argue that a person of ordinary intelligence would not have been on notice to potentially criminal liability for the alleged conduct because Second Circuit courts before 2021 had only applied the rule of reason to alleged no-poach, non-solicitation agreements and in 2016, five years after the alleged start of the conspiracy, the Government first announced that it intended to prosecute naked no-poach agreements. *Id.* at 39–40.

Finally, Defendants also argue that the Department of Justice's ("DOJ") 2016 Guidance, which announced that the DOJ intended to prosecute naked no-poach agreements, itself is improper because the executive branch "does not possess the authority unilaterally to declare that conduct is criminal or *per se* illegal under the Sherman Act." *Id.* at 42 (first citing *Krzalic v. Republic Title Co.*, 314 F.3d 875, 883 (7th Cir. 2002); and then citing *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, No. 17-cv-00205 (MMA) (MDD), 2020 WL 2553181, at *13 (S.D. Cal. May 20, 2020)). In the alternative, Defendants argue that, even if the executive branch could unilaterally declare new categories of criminal conduct, the DOJ's 2016 Guidance does not provide the fair warning required by the Due Process Clause because when the Guidance was announced, the executive branch explicitly identified outsourcing arrangements as an exception to the Government's general position on no-poach agreements. *Id.* at 43.

In response, the Government argues that Defendants do not lack constitutional notice because the *per se* rule is not a novel judicial construction of the Sherman Act, the *per se* rule's application to horizontal market allocation conspiracies is not a novel judicial construction, and courts applied the Sherman Act to labor markets as early as 1926. Opp'n at 47. The Government states that, at bottom, Defendants are arguing that "applying a well-settled *per se* category (market allocation) to a purportedly novel set of facts within a well-settled purview of the Sherman Act (labor markets) constitutes a novel interpretation of the statute," but that this does not violate the Due Process Clause because courts regularly apply new factual contexts to settled legal principles. *Id.* at 48 (citing *United States v. Kay*, 513 F.3d 432, 44–45 (5th Cir. 2007) ("To find unfair notice whenever a court specified new types of acts to which a criminal statute applied would stifle courts' ability to interpret and fairly apply criminal statutes.")). The Government also emphasizes that courts have applied the Sherman Act to new industries and

conduct for more than 130 years and "no court has ever dismissed a Sherman Act prosecution on [Due Process notice] grounds," and "courts have recognized that no-poach agreements may fall into the *per se* category of market allocation since the 1970s." *Id.* at 48–49.

In reply, Defendants argue that application of the *per se* rule to no-poach agreements is not well-settled in general or within an outsourcing arrangement, such as the one alleged here, and Second Circuit courts that have considered no-poach agreements in the outsourcing context continue to apply the rule of reason. Reply at 30.

The Court disagrees.

"With certain exceptions for conduct regarded as *per se* illegal because of its unquestionably anticompetitive effects, the behavior proscribed by the [Sherman] Act is often difficult to distinguish from the gray zone of socially acceptable and economically justifiable business conduct." *U.S. Gypsum Co.*, 438 U.S. at 440–41 (citation omitted). Because, as discuss at length above, *see supra* Section III.A.1, the alleged no poach agreement is a market allocation and subject to *per se* treatment, Defendants' Due Process argument fails.

Horizontal market allocation agreements have long been held *per se* unreasonable, *see Topco Assocs., Inc.*, 405 U.S. at 608, and the *per se* rule has been constitutionally applied in prosecutions for decades, *see, e.g.*, *Socony-Vacuum*, 310 U.S. 150. Although no poach agreements have rarely been prosecuted as a method of allocating the market, the fact that Defendants allegedly allocated the market in a novel way does not create a Due Process concern. *See United States v. Kinzler*, 55 F.3d 70, 74 (2d Cir. 1995) ("The claimed novelty of this prosecution does not help [defendant's fair notice argument], for it is immaterial that there is no litigated fact pattern precisely in point." (internal quotation marks omitted)).

Accordingly, the Court will deny the motion to dismiss on this basis.

## 5.   The Fifth and Sixth Amendments' Prohibition on Presumptions

The Fifth Amendment guarantees that no one will be deprived of liberty without "due process of law"; and the Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. CONST. AMENDS. V, VI. "[T]hese provisions [of the Constitution] require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *United States v. Gaudin*, 515 U.S. 5060, 510 (1995). Mandatory "presumptions violate the Due Process Clause if they relieve the State of the burden of persuasion on an element of an offense." *Francis v. Franklin*, 471 U.S. 307, 314 (1985). "A permissive inference does not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved" and therefore, "violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." *Id.* at 314–15.

Defendants argue that application of the Sherman Act's *per se* rule in the criminal context would violate the Fifth and Sixth Amendments' prohibition of conclusive presumptions because the presumption inherent in the *per se* rule would remove an element of the crime and foreclose the jury from considering whether the facts proved an element of the offense. Mot. at 44–45. Specifically, Defendants argue that applying the *per se* rule to the charged conduct would mean that a jury would only consider two elements of the crime: 1) whether the charged conspiratorial agreement existed, and 2) whether the Defendants intentionally joined the conspiracy. *Id.* at 45. The jury, Defendants argue, would not consider "whether the alleged market existed as alleged, whether [D]efendants intend to unreasonably restrain trade and whether the charged agreement

41

was in fact an unreasonable restraint of trade." *Id.* Defendants note that the Second Circuit, in *United States v. Koppers Co.*, has previously accepted the constitutionality of the *per se* rule in criminal cases, but argue that continued application of this 1981 case "cannot be squared with modern Supreme Court jurisprudence." *Id.* at 45 n.27 (citing *Koppers*, 652 F.2d 290).

The Government responds that this question has already been squarely addressed by the Second Circuit in *Koppers*, and, despite Defendants' argument that subsequent Supreme Court jurisprudence requires a different analysis, the Government notes that the Second Circuit "reaffirmed [the *Koppers* decision] only three months ago." Opp'n at 49 (citing *Aiyer*, 33 F.4th at 120 ("In *Koppers*, we explicitly 'decline[d] the invitation' to find that the per se rule could not be applied constitutionally absent a finding that the challenged agreement was factually unreasonable . . . .").

Defendants respond that, despite the recent *Aiyer*'s decision, "continued application of th[is] authority runs counter to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny." *See* Reply at 30.

The Court disagrees.

In *Koppers*, the Second Circuit expressly held that "[s]ince the Sherman Act does not make 'unreasonableness' part of the offense, it cannot be said that the judicially-created *per se* mechanism relieves the government of its duty of proving each element of a criminal offense under the Act." 652 F.2d at 294. While *Koppers* was decided in 1981 and, as Defendants note, subsequent Supreme Court decisions have addressed the prohibition on presumptions in other contexts, *see, e.g., Apprendi*, 530 U.S. 466, the Second Circuit reaffirmed *Koppers* earlier this year. *See Aiyer*, 33 F.4th at 120 ("In *Koppers*, we explicitly 'decline[d] the invitation' to find that the per se rule could not be applied constitutionally . . . . To be sure, the absence of a

42

'reasonableness' element in a *per se* violation does not alter the government's burden to prove

each of the existing elements of a *per se* violation to the jury beyond a reasonable doubt.'"

(alterations in original) (citing *Koppers*, 652 F.2d at 293–94)).

Due to the *Aiyer* decision, and in the absence of a Supreme Court decision expressly

addressing the application of the Sherman Act's *per se* rule in criminal prosecutions, this Court is

bound to uphold the constitutionality of the *per se* rule here.

Accordingly, the motion to dismiss will be denied on this basis.

### B.  The Joint Motion for Disclosure of the Grand Jury Minutes[6]

"Grand jury proceedings are presumptively secret, and a defendant seeking the disclosure

of grand jury materials bears a heavy burden." *United States v. Schlegel*, 687 F. App'x 26, 30 (2d

Cir. 2017) (citing *In re Petition of Craig*, 131 F.3d 99, 104 (2d Cir. 1997)). "[T]he grand jury sits

not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a

criminal charge . . . and to make the assessment it has always been thought sufficient to hear only

the prosecutor's side." *United States v. Williams*, 504 U.S. 36, 51 (1992) (internal citations

omitted).

While "[t]he government need not provide the grand jury with legal instructions," *United

States v. Hoey*, No. 11-cr-337 (PKC), 2014 WL 2998523, at *3 (S.D.N.Y. July 2, 2014) (citing

*United States v. Lopez–Lopez*, 282 F.3d 1, 9 (1st Cir.2002)), if the Government does provide

legal instruction, it is error to do so incompletely or erroneously. *See United States v. Brito*, 907

F.2d 392, 394 (2d Cir. 1990) ("[C]areless instructions, such as those given here, tend to hamper

the grand jury's understanding of the importance of evaluating the reliability of the evidence and

to discourage it from demanding eye witness testimony.").

---

[6] The Court discussed the parties' arguments at length in its prior ruling and therefore, will not repeat them here. *See* Order at 14–15, ECF No. 244

The Court has reviewed the relevant portions of the grand jury minutes. From this review, there is nothing in them to suggest that the Government was "careless" and "tend[ed] to hamper the grand jury's understanding of the importance of evaluating the reliability of the evidence." *See Brito*, 907 F.2d at 394; *see also* Order, *United States v. Hoey*, No.11-cr-337 (PKC) (S.D.N.Y. July 25, 2014), ECF No. 160 (finding the Government's instructions proper after *in camera* review).

Accordingly, Defendants' joint motion for disclosure will be denied.

## IV.   CONCLUSION

For the foregoing reasons, the joint motion to dismiss is **DENIED**.

Defendants' joint motion for disclosure is also **DENIED**.

**SO ORDERED** at Bridgeport, Connecticut, this 2nd day of December, 2022.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE