UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 3:21-CR-220 (VAB) |
| | : | |
| v. | : | |
| | : | |
| MAHESH PATEL, | : | February 23, 2023 |
| ROBERT HARVEY, | : | |
| HARPREET WASAN, | : | |
| STEVEN HOUGHTALING, | : | |
| TOM EDWARDS, and | : | |
| GARY PRUS | : | |

## PRETRIAL MEMORANDUM OF UNITED STATES OF AMERICA

Concurrent with its motions *in limine*, the United States of America summarizes its anticipated case-in-chief evidence and alerts the Court to certain additional legal and evidentiary issues that may arise at or before trial.

## I.  Background

### A.  Procedural Background and Anticipated Trial Length

On December 15, 2021, a grand jury returned an indictment charging Defendants Mahesh Patel, Robert Harvey, Harpreet Wasan, Steven Houghtaling, Tom Edwards, and Gary Prus with one count of conspiracy to restrain trade, in violation of 15 U.S.C. § 1.  Following the Court's pretrial order, the parties have exchanged preliminary witness and exhibit lists.  The Defendants have also made certain expert disclosures, although the adequacy and nature of those disclosures are the subject of a Motion to Compel Defendants' Expert Discovery re Dennis Carlton (Dkt. No. 278) and certain motions the Government is filing concurrently with this pretrial memorandum.  *See* Gov't Motion *in Limine* #1 to Preclude Inadmissible "Procompetitive Benefits" Evidence; Gov't Motion *in Limine* #2 to Exclude or Limit the Expert Opinions of Ty Lopez and Gregg Cohen.

Jury selection is scheduled for March 27, 2023 with evidence to begin thereafter.  A pretrial conference is scheduled for March 22, 2023 at 10 a.m.  At this time, and consistent with the parties' email to the Court dated December 21, 2022, the Government anticipates that its case-in-chief will take approximately 15 trial days, give or take a few days, depending on the Court's pretrial rulings and the number and length of any cross-examination of the Government's witnesses.  The parties have agreed that trial should not be held on April 6, 7, 12, and 13 to allow for observance of religious holidays and on April 14 (a.m.) and April 27 (p.m.) for medical appointments for Patel.  On the teleconference with the Court on February 15, the Defendants indicated they may put in a defense case lasting approximately one week.  Depending on the nature and scope of any defense case, the Government may seek to put on a rebuttal case, particularly if the Court were to permit a fulsome ancillary restraint defense by one or more Defendants.

### B.  Evidence to be Presented at Trial

The Government's evidence will prove that, from approximately 2011 to 2019, the Defendants conspired to limit the employment prospects of workers in the aerospace engineering industry who performed work for Company A—and whom the Defendants should have competed to employ and maintain as employees—effectively trapping many of those engineers and other skilled laborers[1] in their jobs they no longer wanted and stalling their careers.  This conspiracy was in the mutual financial interests of its members, in that it helped outsource engineering service companies (Companies B-F or "Suppliers" in the indictment) to stabilize

---

[1] During the charged period, many workers at Companies A-F had engineering degrees and titles that referred to them as "engineers."  Others did not have engineering degrees and/or had a title other than "engineer."  Witnesses might refer to this entire group of technical workers colloquially as "engineers," as the Government will in the remainder of this Pretrial Memorandum.

labor costs, including wages, for their own benefit as well as for the benefit of co-conspirator Company A, their common customer who demanded this cost containment, including through unlawful means.  This conspiracy is a violation of Section 1 of the Sherman Act, 15 U.S.C. section 1, which outlaws agreements among competitors to restrict competition between them.

The Government's case will include the testimony from victim-witnesses, the Defendants' co-conspirators (including, potentially, current and former managers at co-conspirator companies, human resource professionals at those companies, and witnesses from a co-conspirator company that has received conditional leniency), and other fact witnesses who will testify about the existence of the conspiracy and the relationship between and among the Defendants and their co-conspirators.  The Government also expects to call one or more case agents to put in exhibits (consisting primarily of business records and/or emails) for the jury.

More specifically, the Government expects to call multiple victim-witnesses—who reside across the country and not simply in Connecticut—who observed the conduct charged in the indictment first hand.  As they will testify to the jury, each of them worked at one of the co-conspirator companies B through F described in the indictment.  They applied for jobs at another Supplier or at Company A and either heard nothing back on their applications or had job offers blocked or revoked.  Some of them were informed by the Defendants or their co-conspirators that they could not or would not get their desired jobs because of the charged no-poach conspiracy.  Some victims were lied to or misled by the Defendants or their co-conspirators and told that the reason why they were not being hired was *not* because of any sort of agreement, but because of the unilateral decisions by the hiring company not to hire them.  In all cases, these victims were not able to get jobs they wanted for reasons other than their qualifications or merit,

in particular because of the Defendants' collusive "gentlemen's agreement" to keep these engineers in their places.

At trial, the Government also expects to call several co-conspirators who previously testified before the grand jury to describe the Defendants' roles and participation in the conspiracy.  The Government expects that they will testify about specific meetings and events that show each Defendant's conduct.  These witnesses, each of whom testified subject to a previous court order of immunity under 18 U.S.C. §§ 6002 and 6003 or a letter immunity agreement with the Government, will also likely assert their right against self-incrimination at trial and the Government may apply to the Court for an immunity order for their trial testimony. As discussed in more detail in the Government's Motion *in Limine* #6 to Permit Questioning Under Fed. R. Evid. 611(c)(2), none of these witnesses is a Government cooperator and all are aligned with an adverse party.  In addition, by the time of trial, at least some may have refused to work with the Government to prepare for their appearance at trial.  Allowing the Government to lead these adverse witnesses would be an appropriate and efficient way to present their testimony to the jury.

Finally, the Government expects to introduce into evidence at trial numerous emails and documents sent between and among the Defendants, their co-conspirators, victims, and others. These documents corroborate and support the testimony of the victim, co-conspirator, and fact witness testimony the Government expects the jury will hear.  Some of this documentary evidence, which the Government anticipates will be admitted through an agent, is important to explain the context of events other witnesses have described or will describe.  As discussed below, the Government proposes to call a case agent at several junctures in the Government's

case to admit exhibits in order to streamline the Government's case and help the jury understand the evidence.

Taken together, this evidence—as well as other evidence the Government will present through other witnesses and documents—will prove beyond a reasonable doubt that Patel, Harvey, Wasan, Houghtaling, Edwards, and Prus conspired to suppress competition by allocating employees in the aerospace industry working on projects for Company A.

**C. Authenticity and Admissibility of Documentary Evidence**

The Government has provided the Defendants with a trial exhibit list of approximately 1400 documents;[2] as is customary at trial, however, the Government expects ultimately to seek admission of a smaller portion of these records.  Most of these documents—emails and other correspondence, presentations, reports, and corporate records—were obtained through grand jury subpoenas served on Companies A-F.

To demonstrate that these records are authentic, and, in some cases, also business records within the meaning of Fed. R. Evid. 803(6), the Government has obtained, and is still in the process of obtaining, affidavits from Custodians of Records from the producing parties.  In some instances, these certifications may be sufficient to render certain documents self-authenticating under Fed. R. Evid. 902, but that may not be the case for every Government trial exhibit.

The Government intends to engage defense counsel on this issue with the goal of reaching a stipulation regarding the authenticity and/or admissibility of certain records, or, at least, resolving that there is no substantive basis for any objection to authenticity and/or admissibility.

---

[2] The Defendants have served a similar list of 523 potential trial exhibits.

### D.  Corporate Leniency Witnesses

As the Government has previously disclosed to the Defendants, co-conspirator Company F identified in the indictment has received a letter of conditional leniency from the Department of Justice's Antitrust Division.  The Antitrust Division has a long-standing policy of affording leniency to organizations or individuals that self-report their participation in a criminal conspiracy in violation of Section 1 of the Sherman Act and meet certain conditions.  An organization or individual that meets the criteria for leniency will not be charged criminally for the illegal activity.  In this case, several individuals who are officers or employees of Company F share in Company F's grant of conditional leniency.

At trial, the Government may call one or more of those individuals to testify.  These individuals are not "cooperators" in the traditional sense that they have pled guilty, entered into a cooperation agreement with the Government, and will testify pursuant to that cooperation agreement.  Rather, the Government has agreed that, subject to several conditions, these covered individuals will not be prosecuted criminally by the Antitrust Division for the conduct for which they have reported and admitted.  However, these witnesses—if called—have an agreement with the Government under the leniency program that obligates them, among other things, to testify truthfully if called to do so by the Government.  Because the Government anticipates that the existence and nature of the conditional leniency that applies to these witnesses may arise at trial, the Government is bringing it to the Court's attention now.

The Leniency Policy and Procedures, plus a Frequently Asked Questions and answers regarding the program, is publicly available at: https://www.justice.gov/atr/leniency-program.

### E.  Live Remote Witness Testimony

As the Court is aware, the Government filed a motion for a Rule 15 deposition of a potential Government witness ("Witness") on January 24, 2023 based on the Witness's medical condition.  *See* Dkt. No. 264.  The parties have since agreed upon a stipulation to permit the Witness to provide live, remote testimony at trial.  *See* Dkt. No. 273.  The parties understand that the Court can facilitate such live but remote testimony through use of the Court's technology. The Government will provide notice to the Court and the Defendants if and when the Witness will be called.  The parties will confer on how exhibits will be handled with this Witness and advise the Court closer to trial of any agreement or issues the Court needs to address.  The Government will also discuss with the Defendants an instruction the Court can give to the jury in advance of the Witness's testimony.

### F.  Admitting Exhibits Through Case Agents

As discussed above, and depending on the Court's pretrial rulings and developments leading up and during trial, the Government expects that it will seek to admit several dozen exhibits through a case agent to provide context and corroboration to the conspiracy.  Many of these exhibits consist of emails written by the Defendants themselves, but for which the Government does not anticipate calling a fact witness to provide testimony.  Given the anticipated length of the trial and the scope of the charged conduct over several companies involving dozens of coconspirators, the Government will seek leave for case agents to testify several times over the course of the Government's multi-week case-in-chief to admit certain exhibits relevant to the testimony the jury is hearing around that time.  For example, the Government may ask an agent to admit an email that reveals what Defendants and co-

conspirators were doing to block the hiring of a victim-witness by a competing company, while that victim-witness (as he or she will reveal on the witness stand) was unaware of those events. As another example, the Government may ask an agent to admit a business presentation from a Defendant's employer that shows the economic argument that he and the company were making to co-conspirators as inducement to enter into or maintain an aspect of the conspiracy that a witness has just testified existed. To orient the jurors and move efficiently to the relevant portions of these documents, the Government may display the (admitted) exhibit and ask the agent to point out relevant names or read relevant portions. The agent will not be asked to provide independent factual testimony concerning such exhibits.

The admission of these documents in this way, rather than mechanically admitting exhibits in bulk or merely displaying them with no context, will aid the jury in understanding the substantial evidence in this case in more discrete blocks and facilitate the streamlining of the Government's case. Under Rule 611 of the Federal Rules of Evidence, district courts have broad discretion in controlling the mode and order of the presentation of evidence to "make those procedures effective for determining the truth" and "avoid wasting time." Fed. R. Evid. 611(a). Permitting such case agent testimony—which the Government understands the Court has permitted in other trials—will help achieve those goals.[3]

## II.     Principles of Criminal Antitrust Law

### A.  Sherman Act Section 1 and the *Per Se* Rule

The Sherman Act, 15 U.S.C. section 1, *et seq.*, was enacted by Congress 130 years ago as

---

[3] None of the Defendants made statements to the Government and thus, the Government does not expect that the case agents will testify as to any statement by a Defendant. Thus, the case agents should not be subject to any witness sequestration order.

one of the primary means of ensuring economic justice in the United States.  Section 1 of the Sherman Act outlaws "[e]very contract, combination . . . or conspiracy" that unreasonably restrains trade.  *NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 98 (1984). Restraints can be unreasonable in one of two ways.  Some restraints, as the Court has determined was alleged here, are *per se* unreasonable based on their inherently anticompetitive "nature and character."  *Standard Oil Co. v. United States*, 221 U.S. 1, 64-65 (1911); *see also State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) ("Some types of restraints . . . have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*.").  Restraints that are not unreasonable *per se* are judged under the "rule of reason," which involves a "fact-specific assessment" of "the restraint's actual effect on competition."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018).

"Horizontal" restraints are those imposed by agreements between actual or potential competitors, located at the same level of the market, regarding "the way in which they will compete with one another."  *NCAA*, 468 U.S. at 99; *United States v. Topco Assocs.*, 405 U.S. 596, 608 (1972).  Certain horizontal restraints of trade—including price fixing, bid rigging, and market allocations—have, for decades, been considered *per se* illegal, and thus subject to criminal penalties.

As the Court well knows, market allocation is the *per se* illegal restraint at issue in this case.  An "allocation" refers to an agreement between horizontal competitors to divide between them any aspect of a market, whether by territory, resources, products, services, customers, or— in this case—labor.  *Topco Assocs.*, 405 U.S. at 609-11 (allocation of marketing rights by territory); *United States v. Koppers Co., Inc.*, 652 F.2d 290, 295-96 (2d Cir. 1981); *United States*

*v. Consolidated Laundries Corp.*, 291 F.2d 563, 574-75 (2d Cir. 1961) (customer allocation); *United States v. DaVita, Inc.*, No. 1:21-cr-0029-RBJ, 2022 WL 266759, at *3 (D. Colo. Jan. 28, 2022) (allocation of labor market).  Allocation agreements need not wholly *eliminate* competition over a given aspect of the market in order to be *per se* illegal.  *See United States v. Apple, Inc.*, 791 F.3d 290, 326 (2d Cir. 2015) (holding that even if price-fixing agreement is unsuccessful or "not . . . aimed at complete elimination of price competition," it nonetheless poses a "threat to the central nervous system of the economy") (cleaned up).  Agreements to merely restrict or "minimize" competition qualify as per se offenses.  *Topco Assocs.*, 405 U.S. at 608; *Ace Arts, LLC v. Sony/ATV Music Pub., LLC*, 56 F. Supp. 3d 436, 447 (S.D.N.Y. 2014).

Whether a particular restraint of trade is *per se* illegal, as pleaded in an indictment, is a question of law for the court.  *See United States v. Aiyer*, 33 F.4th 97, 116-17 (2d Cir. 2022).  In this case, the Court has already held, as a matter of law, that the Defendants have been charged with a horizontal and *per se* illegal market allocation conspiracy.  *See* Dkt. No. 257 at 17 ("[T]he alleged conduct is subject to *per se* treatment because it is properly pled as a market allocation."); *id.* at 33 ("[T]he restraint, as alleged, is appropriately considered a horizontal restraint.").

### B.  Elements of the Charged Conspiracy

At trial, the Government must prove beyond a reasonable doubt that: (1) a conspiracy to engage in a *per se* illegal restraint of trade existed during the time alleged in the indictment, (2) each Defendant knowingly joined that conspiracy, and (3) the conspiracy operated within or substantially affected interstate commerce.  *See United States v. Aiyer*, No. 18-cr-333 (JGK), Dkt. No. 180 at 2131 (judge's instructions to the jury regarding three elements of Sherman Act

Section 1 charge).  *See also* Model Jury Instructions in Criminal Antitrust Cases at 47 (Am. Bar Ass'n 2016).

A violation of Section 1 of the Sherman Act is a general intent crime.  The Government must prove only that each Defendant intended to conspire in restraint of trade, that is, that he knowingly joined a conspiracy, the nature of which was to restrict competition in some manner deemed illegal as a matter of law.  *See Koppers*, 652 F.2d at 295 n.6, 298 (in criminal antitrust case, "nothing more is required than a showing that the defendant intentionally engaged in conduct that is a per se violation of the Sherman Act," meaning that the Defendant "had known the objective of the conspiracy to rig bids and had intentionally become a member of it"); *Aiyer*, 33 F.4th at 121 (citing *Koppers* as authority on the intent required to be proven in a criminal Section 1 case).  A Defendant acts "knowingly" when he acts voluntarily and without mistake. *See United States v. George*, 386 F.3d 383, 389 n.6 (2d Cir. 2004).  "[S]pecific intent to restrain trade is not required."  *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 507 (2d Cir. 2004) (citing *Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 545 (2d Cir. 1993)).

### C.  Procompetitive Justifications are Barred.

"Per se" illegal restraints are exactly that: restraints "unreasonable and therefore illegal" by their nature, "without elaborate inquiry as to the precise harm they have caused or the business excuse for their use."  *N. Pacific Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). Competitors are thus forbidden to enter into *per se* illegal agreements even if, in an individual case, there is a possibility that the agreement is benign or even beneficial.  *See Maricopa Cnty. Med. Soc'y*, 457 U.S. at 351 ("The anticompetitive potential inherent" in all *per se* illegal

agreements "justifies their facial invalidation even if procompetitive justifications are offered for some."). As a result, "a lack of anticompetitive effects and/or the presence of procompetitive benefits" is not a relevant inquiry. *Aiyer*, 33 F.4th at 123. Consistent with this well-settled law, the Government has filed Motion *in Limine* #1 to Preclude Inadmissible "Procompetitive Benefits" Evidence.

**D. The Doctrine of Ancillary Restraints Provides a Limited Defense.**

The doctrine of ancillary restraints provides a limited defense to the *per se* rule. It applies when a restraint of trade is (1) subordinate and collateral to (2) a legitimate joint venture or similar business collaboration between competitors, and (3) is "reasonably necessary" to achieve one of the collaboration's "legitimate and competitive purposes." *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006); *MLB Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 339 (2d Cir. 2008) (Sotomayor, J., concurring); *Aiyer*, 33 F.4th at 115-16; *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986). The doctrine is limited to this narrow application because, as then-Judge (now Justice) Sotomayor noted in her concurrence in *Salvino*, which has been cited as encapsulating the Second Circuit view of ancillary restraints, it permits "competitors engaged in joint ventures … to engage in a variety of activities that would normally be illegal under a per se rule." *Salvino*, 542 F.3d at 337; *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 345 (3d Cir. 2010) ("The quintessential example of an ancillary restraint is a restrictive agreement that is an integral part of a joint venture."). If the restraint of trade is found to be ancillary, it is "exempt…from the per se rule." *Aiyer,* 33 F.4th at 115-16 (cleaned up); *see also Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1395 (9th Cir. 1984).

When a defense tends to negate an element of the offense, the defendant bears at least a burden of production before the jury can be charged regarding the potential defense. *See United States v. Carr*, 582 F.2d 242, 246 (2d Cir. 1978); *Januszewski v. Manson*, 525 F. Supp. 805, 810-11 (D. Conn. 1981). A defendant may satisfy the burden of production by making "an initial showing on each key element of the [defense] theory" with "credible" and "admissible evidence" so that the court can determine that "an adequate basis in fact exists for the [jury] charge." *United States v. Bok*, 156 F.3d 157, 163-64 (2d Cir. 1998) (discussing "return of capital theory" defense to tax evasion). A defendant's burden of production will require him or her to produce evidence on each element of the ancillary restraints defense.

The Government's Motion *in Limine* #1 to Preclude Inadmissible "Procompetitive Benefits" Evidence discusses the doctrine of ancillary restraints in further detail, including its potential inapplicability in this trial.

## III.   Coconspirator Statements

### A.  Background

Because the indictment charges a conspiracy, the evidence at trial will include testimony and documents concerning the Defendants' own statements to co-conspirators, victims, and other witnesses, including testimony from victim-witnesses who dealt with some of the Defendants directly, testimony from co-conspirators who will be subpoenaed to testify at trial, and emails to and from the Defendants concerning the charged conduct. Thus, there will be substantial evidence to prove that each charged Defendant participated in the conspiracy.

It is well-settled that statements of co-conspirators are admissible at trial as non-hearsay under Fed. R. Evid. 801(d)(2)(E), provided that the statements satisfy the prerequisites. It is

13

equally well-settled that the Court may admit such co-conspirator statements on a conditional

basis and subject to connection, prior to the Court's determination that the prerequisites for

admissibility have been established.  In the Second Circuit, district courts customarily make this

determination—commonly referred to as a "*Geaney* ruling"—at the close of the Government's

case-in-chief.  *See United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969).  The contours of

the co-conspirator-statements rule and pertinent facts from the case at bar are addressed herein.

### B.  Rule 801(d)(2)(E)

Pursuant to Federal Rule of Evidence 801(d)(2)(E), "[a] statement is not hearsay if . . .

[t]he statement is offered against a party and it is a statement by a coconspirator of a party during

the course and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E).  For a statement to

be admissible as a co-conspirator statement under Rule 801(d)(2)(E), the Court must find the

following by a preponderance of evidence: (1) a conspiracy existed at the time of the statement;

(2) both the declarant and the defendant against whom the statement is offered were members of

that conspiracy; (3) the statement must have been made in furtherance of the conspiracy; and (4)

the statement must have occurred during the course of the conspiracy.  *See Bourjaily v. United*

*States*, 483 U.S. 171, 175-76 (1987) (enumerating four prerequisites for admissibility of co-

conspirator statements and establishing preponderance of evidence standard); *see also United*

*States v. Coppola*, 671 F.3d 220, 246 (2d Cir. 2012); *United States v. Tellier*, 83 F.3d 578, 580

(2d Cir. 1996); *United States v. Tracy*, 12 F.3d 1186, 1196 (2d Cir. 1993).

The Supreme Court has held that in determining whether the requirements to admit a

proposed co-conspirator statement are met, courts may take into consideration the content of the

co-conspirator's statement itself.  *Bourjaily*, 483 U.S. at 181.  In 1997, Federal Rule of Evidence

14

801(d)(2)(E) was amended to respond to the issues raised by *Bourjaily* and codified the Supreme Court's holding by stating that a court shall consider the contents of a co-conspirator's statement in determining "the existence of the conspiracy and the participation therein of the declarant and the party against whom statement is offered. . . ."  Fed. R. Evid. 801(d)(2)(E).

Although the *Bourjaily* court declined to decide whether co-conspirator statements alone suffice to establish the existence of a conspiracy, 483 U.S. at 181, Rule 801(d)(2)(E) states that the statement's contents are "not alone sufficient" to establish the existence of the conspiracy and the participation of the declarant and the defendant in the conspiracy.  Rule 801(d)(2)(E).  Thus, while the co-conspirator statement itself may be considered in establishing the existence of the conspiracy, "there must be some independent corroborating evidence of the defendant's participation in the conspiracy," *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999); *Tellier*, 83 F.3d at 580; *see also Coppola*, 671 F.3d at 247 ("A preponderance of the evidence, including the challenged out-of-court statements and independent corroborating evidence, easily established the existence of a racketeering conspiracy.").

### 1.  *A conspiracy existed when the co-conspirator statements were made.*

Before using one co-conspirator's statement against another in a criminal prosecution, the Court must find that a conspiracy existed when the statement was made.  *See Bourjaily*, 483 U.S. at 175; *Tracy*, 12 F.3d at 1196; *Tellier*, 83 F.3d at 580; *Rivera*, 22 F.3d at 435–36.  As indicated, the co-conspirator statement itself may be considered in establishing the existence of the conspiracy.  *Gigante*, 166 F.3d at 82; *Tellier*, 83 F.3d at 580.

The evidence at trial will prove, by the requisite standard (preponderance of the evidence), that the charged conspiracy existed when the statements at issue in this case were

made.  As indicated above, the United States anticipates that testimony from witnesses and from the documents themselves will offer details about the nature and scope of the conspiracy and the roles of the members of the conspiracy.

### 2. *The Defendants and the declarants were members of the charged conspiracy.*

Second, the Court must find that the individual who made the statement, and the defendant against whom the statement is offered, were members of the conspiracy at the time of the statement.  *See Bourjaily*, 483 U.S. at 175; *Tracy*, 12 F.3d at 1196; *Paredes*, 176 F. Supp. 2d at 186; *United States v. Lombardozzi*, No. S1 02 CR. 273, 2003 WL 1956290, at *1 (S.D.N.Y. 2003); *United States v. Millan-Colon*, 836 F. Supp. 1007, 1015 (S.D.N.Y. 1993).  The co-conspirator statement will be considered along with other evidence in deciding the question of the defendant's membership in the conspiracy.  *See United States v. Cota*, 953 F.2d 753, 758 (2d Cir. 1992); *Tellier*, 83 F.3d at 580.  In order to prove membership in the conspiracy, the other evidence need only show "a likelihood of an illicit association between the declarant and the defendant," *United States v. Ragland*, 375 F.2d 471, 477 (2d Cir. 1967); *see also United States v. Borelli*, 336 F.2d 376, 387 (2d Cir. 1964); *United States v. DeJesus*, 806 F.2d 31, 34 (2d Cir. 1986); *Lombardozzi*, 2003 WL 1956290, at *1; and the proof of the illicit association may be "totally circumstantial," *Ragland*, 375 F.2d at 477 (independent evidence includes acts of the accused occurring after the time the association is alleged to exist); *see also DeJesus*, 806 F.2d at 34.

Due to the secretive nature of a multi-defendant fraud conspiracy such as here, its existence as well as a defendant's membership may be established entirely by circumstantial evidence.  *United States v. Miranda-Ortiz*, 926 F.2d 172, 175–76 (2d Cir. 1991); *United States v.*

*Labat*, 905 F.2d 18, 21 (2d Cir. 1990).  The government does not have to prove that a defendant "knew all the members of the conspiracy or all the details of its operation . . . so long as it proves that the coconspirators agreed on the essential nature of the plan."  *United State v. Miranda-Ortiz*, 926 F.2d at 175-76 (citations omitted); *see also Labat*, 905 F.2d at 21.  "Once a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming."  *United States v. Reyes*, 302 F.3d 48, 53 (2d Cir. 2002); *United States v. Casamento*, 887 F.2d 1141, 1156 (2d Cir. 1989); *Cota*, 953 F.2d at 758.  The government must fulfill two separate inquiries: (1) that the defendant intended to engage in the charged scheme; and (2) that the defendant had some knowledge of the unlawful aims of the conspiracy.[4]  *See Reyes*, 302 F.3d at 53.  The defendant's "presence, together with evidence of other circumstances permitting an inference that he 'knew about the enterprise and intended to participate in it or to make it succeed,' will support a finding of his membership in the conspiracy."  *United States v. Bull*, 12 Fed. Appx. 64, 65 (2d Cir. 2001).

Finally, the government need *not* show that the person who heard the declarant's statement was also a member of the conspiracy.  *See United States v. Minicone*, 960 F.2d 1099, 1110 (2d Cir. 1992); *United States v. Beech-Nut Nutrition Corp*., 871 F.2d 1181, 1199 (2d Cir. 1989); *Lombardozzi*, 2003 WL 1956290 at *2.

Here, the evidence at trial will prove by the requisite standard (preponderance of the evidence) that each Defendant was a member the charged conspiracy, and that his co-

---

[4] As discussed in more detail in Section II.B above, in a Sherman Act Section 1 conspiracy—a crime of general intent—the "unlawful aim of the conspiracy" is the *actus reus*, that is, the restraint of trade deemed illegal as a matter of law.  Thus to be found guilty of a Section 1 conspiracy, each Defendant need only know that the conspiracy's object is to act in a way to fix prices, rig bids, or, as here, allocate a market between competitors.  The Government need not prove that the Defendant knew he was acting unlawfully.

conspirators whose statements the Government seeks to admit were also members of the conspiracy.  This evidence will include the testimony of co-conspirators, victim-witnesses, and other witnesses, and the explicit content of the co-conspirators' statements themselves.

### 3.  The co-conspirator statements were made in furtherance of the conspiracy.

Third, the statement must have been made in furtherance of the conspiracy.  *See Bourjaily*, 483 U.S. at 175; *Tracy*, 12 F.3d at 1196; *Tellier*, 83 F.3d at 580; *Rivera*, 22 F.3d at 435–36.  The statement must be intended to prompt the listener to respond in a manner that promotes the goals of the conspiracy or facilitates the carrying out of the criminal activity.  *See United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990); *see also United States v. Edwards*, 214 Fed. Appx. 57, 64 (2d Cir. 2007); *United States v. Rahme*, 813 F.2d 31, 35 (2d Cir. 1987); *Katsougrakis*, 715 F.2d 769, 778 (2d Cir. 1983); *Beech-Nut Nutrition Corp.*, 871 F.2d at 1199; *Millan-Colon*, 836 F. Supp. at 1016; *United States v. Persico*, 832 F.2d 705, 716 (2d Cir. 1987); *Lombardozzi*, 2003 WL 1956290 at *1.

The Second Circuit has held that statements between co-conspirators "that provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy" may be deemed "in furtherance of" the conspiracy.  *Maldonado-Rivera*, 922 F.2d at 958-59; *Rahme*, 813 F.2d at 35-36; *United States v. Salerno*, 868 F.2d 524, 535-36 (2d Cir. 1989); *Tracy*, 12 F.3d at 1196; *United States v. Paone*, 782 F.2d 386, 391 (2d Cir. 1986); *Persico*, 832 F.2d at 716 (statements informing conspirator of the identity and activities of coconspirators are "in furtherance" of conspiracy); *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989) (concluding the same).

Similarly, statements designed to promote or facilitate achievement of the goals of the conspiracy by communicating with a person who is not a member of the conspiracy are also considered to have been made "in furtherance of" the conspiracy. *See Rivera*, 22 F.3d at 436; *Beech-Nut Nutrition Corp.*, 871 F.2d at 1199; *Katsougrakis*, 715 F.2d at 778; *Paredes*, 176 F. Supp. 2d at 187. A trial court's determination that a co-conspirator statement is "in furtherance" of the conspiracy is a question of fact that will not be disturbed on appeal absent a finding that the determination was clearly erroneous. *Persico*, 832 F.2d at 716; *Rahme*, 813 F.2d at 36.

The documents to be admitted at trial as well as the testimony of co-conspirators, victim-witnesses, and other witnesses will define the approximate terms of the charged conspiracy in this case. And this testimony, as well as the explicit nature of the co-conspirator statements sought to be admitted, will prove by the requisite standard (preponderance of the evidence), that the co-conspirator statements sought to be admitted by the United States were made in furtherance of the charged conspiracy.

### 4. The statements were made during the course of the charged conspiracy.

Fourth, the co-conspirator statements must be made during the course of the conspiracy. *See Bourjaily*, 483 U.S. at 175; *Rivera*, 22 F.3d at 435–36; *Tracy*, 12 F.3d at 1196; *Lombardozzi*, 2003 WL 1956290, at *1. Statements made during the course of the conspiracy include statements made by a co-conspirator before the completion of the criminal object of the conspiracy. *See Haywood v. Portuando*, 2003 WL 1563770, at *22 (S.D.N.Y. 2003) (statements are made during the course of the conspiracy if made prior to the realization of overall goal). Generally, a statement is not made during the course of the conspiracy when it is made after the main objective of the conspiracy has been accomplished. *See Lombardozzi*, 2003 WL 1956290,

at *1.  However, where particular crimes have already been committed, "the conspiracy does not necessarily end; it continues until its aim has been achieved, it has been abandoned, or otherwise terminated." *United States v. Arrington*, 867 F.2d 122, 130 (2nd Cir. 1989).  Absent affirmative evidence of withdrawal from the conspiracy, a conspirator's participation is presumed to continue until the last overt act by any of the conspirators." *United States v. Greenfield*, 44 F.3d 1141, 1150 (2d Cir. 1995).  Additionally, events occurring after the statement may be used to show that the statement was made during the course of a conspiracy.  *Casamento*, 887 F.2d at 1171.

The evidence at trial, including the various categories of evidence described above, will prove by the requisite standard (preponderance of the evidence), that the co-conspirator statements here at issue were made during the course of the charged conspiracy.

## C. Defendant's Hearsay

In this case, the Defendants have included on their exhibit list dozens of emails written by one of the charged Defendants or a co-conspirator.  It is improper, however, for Defendants at trial to introduce their own self-serving hearsay.  Consistent with Rules 801 and 803, the Court should not permit any Defendant to introduce any of his own prior statements—including through witness testimony, emails, or any other documentary evidence—because it is inadmissible hearsay not subject to an exception.  By the same rationale, the Court should not permit any Defendant to introduce any co-conspirator statements.

Under the rules, the Government is entitled to introduce each Defendant's own prior statements as evidence against the speaker under Rule 801 as statements made in an individual capacity offered against an opposing party.  *See* Fed. R. Evid. 801(d)(2)(A).  Moreover, and as

discussed above, the Government intends to offer numerous statements of the Defendants' co-conspirators made during and in furtherance of the conspiracy.  *See* Fed. R. Evid. 801(d)(2)(E). In both instances, the Government may also introduce surrounding or responsive statements because they provide context for the Defendants' or co-conspirators' statements and are not offered for the truth of the matter asserted.  *See United States v. Dupre*, 462 F.3d 131, 137 (2d Cir. 2006) (non-witnesses' emails "provide context for defendants' messages sent in response to them, messages whose admissibility is not contested.  *See* Fed. R. Evid. 801(d)(2)"); *United States v. Paulino*, 445 F.3d 211, 216 (2d Cir. 2006) ("It has long been the rule that '[s]o long as…statements are not presented for the truth of the matter asserted, but only to establish a context…, the defendant's Sixth Amendment rights are not transgressed.'") (*quoting United States v. Barone*, 913 F.2d 46, 49 (2d Cir. 1990)).

In contrast, a Defendant may not introduce his own out-of-court statements.  *See United States v. Kadir*, 718 F.3d 115, 124 (2d Cir. 2013) ("A defendant may not introduce his own prior out-of-court statements because they are 'hearsay, and . . . not admissible.'") (citation omitted); *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible.").  Rule 801(d)(2)(A) excludes "admissions by a party-opponent" from the definition of hearsay only where "offered against a party."  Wright, Miller & Graham, Federal Practice & Procedure: Evidence § 7015 (Interim Edition) ("Obviously, a prior statement of a party offered by the party is not an admission of a party opponent.").  Similarly, a Defendant may not offer into evidence a statement of a co-conspirator under Fed. R. Evid. 801(d)(2)(E) because that rule applies only to statements offered against an opposing party (i.e., the Government) *and* was

made by that party's (i.e., Government's) coconspirator. *See United States v. Daly*, 842 F.2d 1380, 1386 92d Cir. 1988).  Thus, allowing any Defendant to introduce his own or a co-conspirator's prior statements through witnesses or exhibits would provide an end-run around the adversarial process by allowing each an opportunity to "testify" without being subject to "the oath, the witness' awareness of the gravity of the proceedings, the jury's ability to observe the witness' demeanor, and, most importantly, the right of the opponent to cross-examine." *Williamson v. United States*, 512 U.S. 594, 598 (1994).

Accordingly, the Court should preclude the Defendants from offering their own out-of-court statements.

## Conclusion

The Government respectfully reserves the right to raise and respond to any additional issues as they arise.

Respectfully submitted,

CARRIE A. SYME
T. JAKOB SEBROW
TRIAL ATTORNEYS, NEW YORK OFFICE
U.S. Department of Justice, Antitrust Division
26 Federal Plaza, Room 3630
New York, NY 10278
Tel.: (646) 714-1906

*/s/ David T. Huang*
DAVID T. HUANG
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct30434
United States Attorney's Office
District of Connecticut
157 Church Street
New Haven, CT  06510
Tel.: (203) 821-3700

22

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2023, a copy of the foregoing PRETRIAL MEMORANDUM OF UNITED STATES OF AMERICA was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ David T. Huang*

David T. Huang
Assistant United States Attorney

23