UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 3:21-CR-220 (VAB) |
| | : | |
| v. | : | |
| | : | |
| MAHESH PATEL, | : | March 6, 2023 |
| ROBERT HARVEY, | : | |
| HARPREET WASAN, | : | |
| STEVEN HOUGHTALING, | : | |
| TOM EDWARDS, and | : | |
| GARY PRUS | : | |

**THE UNITED STATES' REPLY REGARDING ITS
MOTION TO COMPEL
<u>DEFENDANTS' EXPERT DISCOVERY RE DENNIS CARLTON</u>**

The United States of America respectfully submits this reply to Defendants' Joint Response to the Motion to Compel Defendants' Expert Discovery regarding Dennis Carlton. Last Friday, Defendants stated to the Court that the motion had been mooted because "[t]he government [] is now in possession of all of the materials it requested through its Motion to Compel." Dkt. 347 at 1. This is incorrect. The Government continues to seek relief pursuant to this motion to cure the outstanding deficiencies in Defendants' disclosures relating to Carlton's proffered opinions, unless and until the Court orders Carlton's testimony excluded in its entirety, which is the subject of an upcoming *Daubert* motion from the United States.

By letter dated February 16, 2023,[1] two weeks after serving a summary of Carlton's proposed expert testimony with no supporting data or other materials, Defendants listed six categories of such materials that they would produce "promptly." Defendants also listed certain other categories of materials that they refused to produce altogether. As of March 1, 2023,

---

[1] This February 16th letter was attached to Defendants' Joint Response to the Motion to Compel (Dkt. 347) as Exhibit A.

Defendants had produced some of the promised materials in five separate productions, and stated by email to the Government that no more Carlton productions would be forthcoming.

Even with respect to those Carlton materials that Defendants *did* agree to produce in its February 16th letter, that production remains incomplete in significant respects:

1.  **LinkedIn Dataset**: Carlton claims to have used data from the website LinkedIn to calculate the percentage of engineers who left the employ of Companies B-F (as defined in the Indictment) for companies outside the alleged conspiratorial group. He used this analysis to support his proffered expert opinion regarding the size and scope of the "relevant market."[2] *See* Gov't Memo. of Law in support of Mot. to Compel, Dkt. 278, Ex. 1 (hereinafter "Ex. 1") at ¶ 9. In their February 16th letter, Defendants pledged to produce "[d]ata from LinkedIn that Dr. Carlton relied upon in forming the bases of his opinions, as referenced in paragraph 9 of his report." On February 23, 2023, Defendants produced a file allegedly containing Carlton's dataset for this calculation. Yet that file does not actually contain the data that he could have used. Instead, it is a spreadsheet that shows only each person's biographical information and his or her current employer, and does not include any information about historical job-switching.

Defendants also produced over 130,000 PDF files and the same number of HTML files of individual LinkedIn profiles. Even assuming the data that Carlton *actually* used for this calculation resides somewhere in those 130,000 files—for example, a list of jobs held by a particular engineer

---

[2] As the Government will demonstrate in its upcoming motion to exclude Carlton's expert testimony on its merits, the definition of the "relevant market" is not pertinent in the case of an alleged *per se* illegal antitrust violation. Market definition, market power, and procompetitive and anticompetitive market effects are concepts litigated only in rule of reason cases. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998) (the *per se* rule "do[es] not require proof that an agreement . . . is, in fact, anticompetitive in the particular circumstances."); *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984) ("Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused.").

showing that many years ago, she was employed by Company B and then left for a new job at Company D, or somewhere else—the Government has no means of knowing the methodology that Carlton used to collect and analyze that data. Moreover, Carlton does not explain whether the 130,000 PDFs/HTMLs produced is *itself* the culled universe of profiles, or constitutes a larger set of profiles (again, chosen by unknown means) which he then culled to a smaller set based on his subjective criteria. It appears it may be the latter (given that only 69,000 entries exist in the spreadsheet), but the Government is left to guess on that point.

The PDF and HTML files are not substitutes for Carlton's LinkedIn dataset nor do they allow the Government to recreate that dataset. They are, for all practical purposes, useless. It is highly unlikely that Carlton relied on mere webpage images to run his mathematical calculation. He presumably scraped or isolated the data points that he found relevant to his job-switching analysis from the LinkedIn profiles, which would then have been collected in a separate spreadsheet or database. Not only did Defendants not produce that spreadsheet or database, Carlton has never explicitly defined the method he used to create it, which would, in theory, allow the Government to replicate his work—albeit at unnecessary time and expense. While a footnote to Exhibit 1 of his expert summary (Ex. 1, p. 15) hints at some parameters he used to create this dataset, they are too vague to allow for replication. For example, Carlton states that he excluded from his LinkedIn dataset "[job] experiences at universities," but does not define that concept. That could mean exclusion of only those jobs labeled as university internships, any job held while the individual was enrolled in a university, or something else entirely—he provides no further information.

2.      **Additional Regression Analyses**: In his expert summary, Carlton states that he conducted a regression analysis[3] on the data from a single Supplier (Company C) to reach his opinion that the alleged no-poach conspiracy did not lead to suppressed wages. The weakness of his methodology and the fundamental irrelevance of such an opinion in a case of an alleged *per se* illegal market allocation are matters for the Government's upcoming *Daubert* motion.

Taking this opinion at face value, however, Defendants are withholding a substantial set of data underlying Carlton's opinion. In his four-page disclosure describing his regression analysis, produced to the Government on February 23, 2023 (attached hereto as Ex. 2), Carlton states in a footnote that his "Results are robust to alternative assumptions including accounting for heterogenous treatment effects, dependence on lag compensation and cross sectional analysis of changes in compensation." Ex. 2 at 1 n.4. In layperson's terms, Carlton is describing additional regression analyses that he performed that, as he asserts, support his original analysis's accuracy and persuasive power. That is what a "robustness" analysis, sometimes called a "sensitivity check," is: a series of analyses using varying sets of assumptions to test whether the results of the primary analysis are repeatable under different conditions, which, if the answer is yes, suggests that the results are accurate and reliable.[4]

Defendants have not produced any of the parameters of those other regression analyses, their code, or their results. The only basis for Carlton's assertion that these other regressions

---

[3] A regression analysis is a mathematical calculation often used by economists and scientists aimed at determining the effect of a variable on an outcome, after at least attempting to control for the effects of other variables. A classic example of a regression analysis is measuring the effect of a medication on patient health.

[4] *See gen.,* Fed. Judicial Center, Reference Manual on Sci. Evid. 179 (2d ed.), Daniel L. Rubinfeld, 179 Reference Guide on Multiple Regression, 2004 WL 48152, at *13.

showed his results on the Company C data to be "robust" is his own, self-serving statement that they did.

**3.** __Regression Analysis Code and Assumptions__: Defendants have also not provided key portions of the Carlton regression analyses that Defendants have disclosed to the Government: namely, the assumptions on which the regressions were based, and the code that shows how the regressions were performed.

First, Carlton used several assumptions in performing his regression analyses, as is typical. For example, an economist performing a regression analysis of changes in wages over time may reasonably assume that the year in which the wages were earned may be a variable that affects the amount of wages earned, compared to wages earned in other years. That assumption would be turned into a control factor and plugged into the calculation. Carlton has not disclosed most of his assumptions, however. The Government could attempt to guess what other assumptions Carlton made, but the list is infinite; the chances of the Government guessing 100% correctly are essentially nil. Moreover, even small differences between Carlton's assumptions and the assumptions that an outside party could guess that he used could make a significant difference in the results.

Second, the code that Carlton used to run his regression analyses, meaning the equations that arrived at the mathematical results, was not produced. Again, the Government could attempt to recreate that code based on the limited parameters described by Carlton in his disclosures, but this would be, at best, an educated guess, almost assuredly inaccurate in some respects, and also prohibitively and unnecessarily time-consuming. The code must exist, because Carlton used it to derive his opinions. It can be easily saved to electronic files and produced to the Government, as

happens routinely in litigation. In addition, production of the code may address two of Carlton's problems in one step, given that the code would likely reveal his assumptions.

Defendants' continued withholding of Carlton's assumptions and code, well over a month after he first provided his expert summary, cannot be justified. This is especially true, given that Defendants pledged to identify "the calculations performed that form the bases of Dr. Carlton's opinions" (Feb. 16, 2023 letter). The code and the assumptions are those "calculations."

The raw data that Defendants produced underlying Carlton's LinkedIn and regression analyses, while helpful to some degree, are only part of the story. At a fundamental level, his work remains unsupported. The Government cannot replicate Carlton's work with any reasonable degree of certainty, prepare to cross-examine Carlton at trial regarding flaws in his methodology that are not apparent on the face of his brief summary (although many such flaws are), or prepare to rebut his methodology in detail with a rebuttal expert. In sum, Carlton has not "shown his work."

\* \* \*

In addition to these missing disclosures, other key information underlying Carlton's proffered opinions remains unproduced, and Defendants have already stated that they will not produce it. This includes:

4.    **<u>Litigation Materials</u>**: Carlton has yet to identify any of the "materials produced in this litigation" that his opinions are, by his own admission, partly "[b]ased on." Ex. 1 ¶ 6. In their February 16th letter, defense counsel effectively said no to this request, stating only that "Dr. Carlton was provided access to the documents produced by the government pursuant to Rule 16." To date, the Government has no understanding of which of the nearly 900,000 documents that it has produced to Defendants in this case Carlton found relevant to his opinions.

5. **Undisclosed Trial Evidence**: Carlton's opinion regarding the many procompetitive benefits of Defendants' alleged criminal conspiracy appears to be based, in large part, on information that Carlton has received regarding what the evidence at trial will show. *See, e.g.,* Ex. 1 at ¶ 20 (discussing that "Suppliers may have to cooperate among themselves in connection with providing engineering services to" Company A, which "I understand that the evidence at trial will establish examples of"). Indeed, Carlton even presumes to know what the weight of the evidence will be at the end of this multi-week trial, which has not yet begun. *Id.* at ¶ 21 (predicting that "the evidence (that I will be presented at trial) is more consistent with the alleged agreement being due to the expectation of efficiencies that allow [Company A] to better compete" in the product market). When the Government asked defense counsel for an explanation of what trial evidence Carlton refers to, and how he arrived as his "understandings" regarding that evidence, Defendants again refused. In their February 16th letter, they deemed the requested information to be at a "granular level not contemplated by Rule 16."

## CONCLUSION

No litigant may offer expert testimony and then deny its opponent a fair chance to understand, meet, and rebut that testimony. With trial beginning in less than three weeks, the United States respectfully suggests that Defendants' time to cure the deficiencies with respect to the proffered opinions of Dennis Carlton has expired. Nonetheless, unless and until this Court orders the exclusion of his trial testimony, the Government needs to be given as fair an opportunity as possible to meet Carlton's evidence, and remains entitled to the full expert disclosures required under the Federal Rules. While the issue of his trial testimony remains pending, therefore, the Government continues to seek relief under this Motion to Compel as stated above.

This Thursday, March 9, 2023, the Government intends to file a motion *in limine* to exclude Carlton's proffered expert testimony based on the deficiencies and untimeliness of Carlton's expert disclosures, as well as based on their merits, under the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

Respectfully submitted,

*/s/ Carrie A. Syme*
CARRIE A. SYME
T. JAKOB SEBROW
TRIAL ATTORNEYS, NEW YORK OFFICE
U.S. Department of Justice, Antitrust Division
26 Federal Plaza, Room 3630
New York, NY 10278
Tel.: (646) 714-1906

DAVID T. HUANG
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct30434
United States Attorney's Office
District of Connecticut
157 Church Street
New Haven, CT  06510
Tel.: (203) 821-3700

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2023, a copy of the foregoing THE UNITED STATES' REPLY REGARDING ITS MOTION TO COMPEL DEFENDANTS' EXPERT DISCOVERY RE DENNIS CARLTON was filed electronically and served to anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept filing on the Notice of Electronic filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Carrie A. Syme*
CARRIE A. SYME
TRIAL ATTORNEY
United States Department of Justice
Antitrust Division, New York Office