UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 3:21-CR-220 (VAB) |
| | : | |
| v. | : | |
| | : | |
| MAHESH PATEL, | : | |
| ROBERT HARVEY, | : | |
| HARPREET WASAN, | : | March 9, 2023 |
| STEVEN HOUGHTALING, | : | |
| TOM EDWARDS, and | : | |
| GARY PRUS | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
THE UNITED STATES' MOTION *IN LIMINE* #12
TO EXCLUDE OR LIMIT
THE EXPERT OPINIONS OF DENNIS W. CARLTON**

In keeping with the mandate of *Daubert v. Merrell Dow Pharmaceuticals* and Federal Rules of Evidence 401, 403, 702, and 704, the United States respectfully requests that the Court exclude or limit the proffered expert testimony of Dennis W. Carlton. In short, Carlton has written expert opinions for the wrong conduct in the wrong case.

His first and second opinions, relating to the concept of a "relevant market," market share and market power, and lack of anticompetitive effects, assumes the case before this Court is a merger dispute or another civil antitrust case to be judged under the rule of reason. Certain market factors are relevant in such cases, but they are neither relevant nor appropriate considerations in a *per se* case such as this, where the only question is whether Defendants in fact committed the offense, not whether it was economically reasonable or had any effect on the market. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940) ("[T]he law does not permit an inquiry into [] reasonableness" in a *per se* case). Here, the Court has already ruled that this case will proceed to trial as an alleged, *per se* illegal labor market allocation

conspiracy, rendering Carlton's opinions both irrelevant and misleading. In addition, with respect to his opinion that "empirical data" shows no reduction in wages that could have been caused by the alleged conspiracy, this sweeping generalization simply cannot be supported by the paltry data analysis that he conducted from a single conspirator. Rule 702 and *Daubert* require more than back-of-the-envelope guesses by expert witnesses, even when they are well-qualified.

Carlton's third opinion, that the alleged conspiracy can be justified based on the procompetitive benefits enjoyed by co-conspirator Company A flowing from "vertically" imposed restrictions on hiring and recruiting between Suppliers, also fails on multiple grounds. This Court has already definitively ruled that the alleged no-poach agreement is *not* vertical in nature, but horizontal, between direct competitors for labor. Moreover, a long line of Supreme Court and Second Circuit precedent holds that a defendant may not justify horizontal market allocation conspiracies based on any such "efficiencies" or other benefits enjoyed by the members of that conspiracy—that is, unless they are closely tied to a bona fide ancillary restraints defense, which Carlton does not attempt to establish.

Carlton's fourth and final opinion, that it simply "makes no sense" to him that Defendants would, as alleged, intend to suppress competition for labor between and among themselves, would be excludable in any criminal case. No expert may directly opine on the intent of a defendant (Fed. R. Evid. 704(b)), much less with only his unsupported say-so.

To the extent the Court considers any of Carlton's proffered opinions to be admissible on their merits, the Government also respectfully requests that the Court consider the longstanding and substantial lapses in Defendants' discovery obligations as a separate basis for exclusion of his opinions. Defendants did not even begin to produce the crucial data and other underpinnings of Carlton's opinions until two weeks before this motion was due, and still have not produced

major portions of his work. Trial begins in two and a half weeks. There is no longer time for

Defendants to cure these deficiencies and enable this Court to fulfill its gatekeeping obligation

under *Daubert* and Rule 702 to carefully evaluate Carlton's methodology, or provide a fair

opportunity to the Government to cross-examine Carlton and rebut his testimony.

## BACKGROUND

On November 25, 2022, Defendants proposed that any party seeking to offer expert

testimony in its affirmative case would provide expert disclosures under Federal Rule of

Criminal Procedure 16 by January 26, 2023. Dkt. 251. The Court accepted that schedule on

December 1, 2022. Dkt. 255. Defendants sought one additional week before serving the

disclosures of their third and final proffered expert, economist Dennis W. Carlton, which the

Court granted. Dkt. 262. After receiving that extension, Defendants never informed the

Government or the Court that they would need more time to fulfill their expert disclosure

obligations.

On February 2, 2023, Defendants disclosed (i) a 14-page summary of Carlton's proffered

expert opinions, and (ii) Carlton's curriculum vitae, including a list of recent litigations in which

he has provided expert testimony, all of which were civil matters.[1] (See attached as Ex. 1.) None

of the data or calculations underlying Carlton's summary was produced with that summary, or

shortly thereafter. Weeks later, some data and other supporting disclosures began to arrive, but

stopped well before being completed. The Government has detailed its attempts to obtain full

---

[1] One of the cases listed, *United States v. Aiyer*, No. 18 Cr. 333 (JGK) (S.D.N.Y. 2019) was a
criminal case. Carlton proffered opinions in that matter but did not testify at trial. To the
Government's knowledge, Carlton has never testified as an expert in a criminal trial, only in
merger-related and other civil cases.

disclosure of Carlton's opinions and the bases and reasons therefore in its Motion to Compel

Defendants' Expert Discovery re Dennis Carlton (Dkt. 278) and its Reply (Dkt. 348).

In his summary, Carlton states that Defendants asked him to opine on the existence of the

alleged criminal conspiracy from an "economic perspective." Ex. 1 ¶ 6. He reveals no

independent knowledge of Defendants, their employers, or other alleged co-conspirators, nor

does he suggest that he has studied their communications or their behavior. He also reveals no

expertise in the aerospace industry. Instead, Carlton opines that pure data analysis can

demonstrate that Defendants could not have intended to commit that crime. Furthermore (and

without noting the contradiction) he insists that, assuming Defendants *did* engage in the no-

poach conspiracy alleged, in theory, it would have been financially beneficial and economically

efficient for them to do so.

His expert summary is divided into four opinions:

In his first and second opinions, Carlton applies economic theories imported from civil

merger cases to assert that Defendants and Companies A-F represented too small a fraction of

the "relevant market" to wield any "market power" over employment prospects or wages in that

market. According to Carlton's logic, this "calls into question whether an agreement whose

purpose was to suppress competition existed at all." At least, such a conspiracy would be

contrary to what "an economist would [] expect." Ex. 1 p. 3 and ¶¶ 7-9. As "empirical evidence"

of this, Carlton states that he successfully conducted an analysis of wages from a single Supplier

(Company C)[2], which, he claims, shows no decline in wages for Company C engineers working

on projects for Company A, compared to other Company C engineers, during the conspiratorial

---

[2] Carlton reveals that he attempted to run a regression analysis on wage data from a second
Supplier (Company B), but found the data "insufficient." Ex. 1 p. 8 n.12.

period. *Id.* at ¶¶ 10-12. Here, Carlton describes performing a regression analysis, a mathematical calculation often used by economists and scientists aimed at determining the effect of a variable on an outcome, after at least attempting to control for the effects of other variables.[3] Other than Carlton's vague, narrative description of that regression and its results, Defendants produced no other support for this opinion along with Carlton's summary. Even now, as described in Section IV below, after belatedly supplying some of the raw data that Carlton used, Defendants continue to withhold major portions of Carlton's underlying work.

In his third opinion, Carlton implicitly abandons his premise that Defendants must not have intended to suppress competition for labor; if they did so intend, he claims, they may have had good reasons for it. Carlton identifies procompetitive benefits ("efficiency justifications") of Defendants' alleged conspiracy to restrict employment between their respective companies, such as avoidance of "free riding" and "reduction in delays" on Company A's projects. As he explains, these benefits flow primarily to Company A based on the fundamental nature of the conspiracy—as misdefined by Carlton—as a "vertical" restraint of trade, in which, as he describes the situation, Company A controls the hiring and recruiting functions of its Suppliers in vertical fashion. *Id.* at ¶¶ 13-21. Carlton explicitly describes these opinions as based, in large part, on predictions about what the trial evidence will show, the source of which Defendants refuse to reveal (discussed more below in Section IV).

Finally, as a fourth opinion, Carlton seeks to tell the jury that Defendants could not have intended to commit the crime alleged, because if they had in fact intended to "suppress competition and prevent labor compensation from rising," they did not act in a way that an

---

[3] *See gen.* Fed. Judicial Center, REFERENCE MANUAL ON SCI. EVID. (2d ed.), Daniel L. Rubinfeld, 179 Reference Guide on Multiple Regression, 2004 WL 48152.

economist, like he, would predict. Carlton argues, based solely on his own logic as an economist, that if Defendants had the requisite criminal intent, they would have been much more successful in committing the no-poach crime and prevented more, if not all, of their employees from getting new jobs. *Id.* at ¶ 22.

In sum, Carlton's proposed opinions, along with those of the first two experts proffered by Defendants (Ty Lopez and Gregg Cohen) generally seek to support the reasonableness of Defendants' conduct and their lack of ill intent; the lack of anticompetitive effects of any no-poach restrictions in fact agreed to between them; and procompetitive benefits that such a no-poach agreement brings to conspirators. As the Government has argued in its *Daubert* motion directed to the opinions of Lopez and Cohen (Dkt. 303) and its separate motion *in limine* to exclude evidence of procompetitive benefits (Dkt. 289), none of that evidence is relevant in a case of a *per se* illegal market allocation. Instead, its greatest value lies in its capacity to distract the jury from relevant issues in the case, if not create outright jury nullification.

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

While this is a "liberal standard of admissibility," *Nimely v. City of New York*, 414 F.3d 381, 395–96 (2d Cir. 2005), it is not an open doorway to speculation, unsupported conclusions, and overbroad conjecture. District courts have a gatekeeping responsibility to ensure that an expert witness is qualified and that his or her testimony is relevant and reliable such that it will assist—

6

not confuse or mislead—the trier of fact. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 590-93 (1993); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (district court is "charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'") (quoting *Daubert*, 509 U.S. at 597).

District courts must also be mindful of other federal rules that may militate against admitting an expert's testimony, consistent with the courts' goal of maintaining an efficient and orderly trial that is fair to all parties. Expert testimony that does not make any fact pertinent to the case at hand more or less probable may be precluded both as a failure of the relevance prong of the *Daubert* and Rule 702 analysis, as well as under Federal Rule of Evidence 401. *See Amorgianos*, 303 F.3d at 265. Expert evidence that is more prejudicial than probative under a Rule 403 analysis, or threatens to confuse the jurors, may likewise be excluded. *See Nimely*, 414 F.3d at 397 (noting "the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations"); *Richard Parks Corrosion Tech., Inc. v. Plas-Pak Indus., Inc.*, No. 3:10-cv-437 (VAB), 2015 WL 5708541, at *7 (D. Conn. Sept. 29, 2015) (excluding damages expert's lost profits calculation, which was based on "insufficient facts and an unreliable method and, therefore, would have an unduly prejudicial impact on a jury").

Excluding an expert's opinion that fails on one or more of these requirements is a decision that "rests soundly with the discretion of the trial court and shall be sustained unless 'manifestly erroneous.'" *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (citation omitted).

A party's fulfillment of its expert disclosure obligations, or failure to do so, also affects the courts' gatekeeping function under *Daubert*. Under Federal Rule of Criminal Procedure

16(b)(1)(C)(iii),[4] any defendant proffering expert testimony in a criminal case is required to provide a summary that "describe[s] the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." One important reason such disclosures are required is to provide a fair opportunity for the opposing side to prepare to challenge, cross-examine, or rebut that expert testimony. *See* Fed. R. Crim. P. 16, Adv. Comm. Notes to 1993 Amend. But another important reason why parties must fulfill their expert disclosure obligations is to enable the Court to fulfill its gatekeeping role under Rule 702 and *Daubert*, which should be "a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267.

Without a full understanding of how and why an expert reached his or her conclusions, it is impossible for the court to fulfill this gatekeeping job, and, thus, impossible for the proponent of the expert testimony to fulfill its burden under Rule 702. *See United States v. Kaufman*, 19-cr-504 (LAK), 2021 WL 4084523, *19 (S.D.N.Y. Sept. 8, 2021) (excluding defense expert opinion and noting the many deficiencies in his disclosures that failed to satisfy Rule 16(b)(1)(C) and to "enable the Court to properly perform its gatekeeping role under *Daubert*."); *United States v. Wilson*, 493 F. Supp. 2d. 484, 489 (E.D.N.Y. 2006) (excluding defense expert opinions as irrelevant, but also noting that his lack of disclosure of the basis for those opinions "makes it impossible to conduct the analysis required by" *Daubert,* which is one function Rule 16).

---

[4] Defendants were indicted on December 15, 2021. Rule 16 was amended as of December 1, 2022 to include more specific requirements for expert disclosures for both the government and defense, including with regard to their timing and contents. The Government does not believe the recent amendment affects any matter raised in this motion, however. The missing materials supporting Carlton's opinions, as part of the "bases and reasons" for those opinions, would be required under either version of the rule.

8

**ARGUMENT**

I.      **Carlton's Opinions on Market Definition and Market Share are Irrelevant to a *Per Se* Analysis and Could Mislead or Nullify the Jury.**

A.      **The *Per Se* Rule Precludes Consideration of Market Factors and Other Issues Relating to "Reasonableness."**

In his first and second opinions (paragraphs 7 through 12 of his expert summary), Carlton attempts to apply concepts from civil rule-of-reason or merger cases to Defendants' alleged criminal conspiracy. This is inappropriate and misleading, given that the Court has already determined that the alleged conduct is properly analyzed under the *per se* rule, and as a criminal violation of the Sherman Act. *See* Order, Dkt. 257, at 17 ("the alleged conduct is subject to *per se* treatment because it is properly pled as a market allocation"). This analysis has the potential to confuse or prejudice the jury, and so the Government respectfully requests that the Court exclude this testimony from trial in its entirety.

There are significant differences between a jury's analysis in a *per se* case and other antitrust cases. *Per se* cases reflect the Supreme Court's judgment that certain offenses, including price fixing, bid rigging, and market allocation, pose an "actual or potential threat to the central nervous system of the economy"; *per se* offenses therefore are illegal on their face. *Socony-Vacuum Oil Co.*, 310 U.S. at 224 n.59; *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 50 (1990) (*per curiam*); *see also Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 351 (1982) (*per se* unlawful agreements are subject to "facial invalidation"). As a result, in a *per se* case, the Government need prove only that the alleged conduct occurred. There are "no other elements to the offense." *United States v. Aiyer*, 33 F.4th 97, 115 (2d Cir. 2022) (quoting *United States v. Koppers Co.*, 652 F.2d 290, 294 (2d Cir. 1981)). Indeed, "the law does not permit an inquiry into [] reasonableness," including any economic justifications for the conduct that might exist. *Socony-Vacuum*, 310 U.S. at 224 n.59; *see also Aiyer*, 33 F.4th at 114 (quoting *Leegin Creative*

9

*Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007)); *Copperweld Corp. v.*

*Independence Tube Corp.*, 467 U.S. 752, 768 (1984) ("Certain agreements, such as horizontal

price fixing and market allocation, are thought so inherently anticompetitive that each is illegal

per se without inquiry into the harm it has actually caused.").

In contrast, for many other antitrust claims not adjudicated under the *per se* rule, the

factfinder must undertake an extensive evidentiary study of market power and market structure

in order to establish the reasonableness, or lack thereof, of the restraint of trade. *Ohio v.*

*American Express ("Amex")*, 138 S. Ct. 2274, 2283 (2018); *Copperweld*, 467 U.S. at 768. The

goal of that evidentiary study is "to 'distinguis[h] between restraints with anticompetitive effect

that are harmful to the consumer and restraints stimulating competition that are in the consumer's

best interest.'" *Amex*, 138 S. Ct. at 2284 (quoting *Leegin*, 551 U.S. at 886).

Here, the Court has already determined that Defendants' conduct was properly charged as

a market allocation—a *per se* offense. Order, Dkt. 257, at 17. Any of Carlton's opinions that

attempt to analyze Defendants' conduct as if this were a rule-of-reason case should therefore be

barred as irrelevant and misleading. *See* Fed. R. Evid. 401; Fed. R. Evid. 403; *Nimely*, 414 F.3d

at 397.

      **B.**     **Market Definition is Not an Element of a *Per Se* Case.**

Carlton's first proffered opinion, in which he offers to define a "relevant market" in this

case that is different from the "alleged market," ignores the nature and posture of this criminal

matter. He asserts that the relevant market should not be limited to employees of the alleged

conspirator Companies B-F who worked on projects for Company A, but instead should be

expanded to include all engineers and skilled-labor employees at those companies, or perhaps

even all such employees across the entire aerospace industry. Ex. 1 ¶¶ 7-8. This, he claims,

reveals that Defendants' true "market share" is very small, and thus Defendants had little market power to affect employment opportunities and wages in the larger market. *Id*.

As discussed above, Carlton is wrong to assume that the jury in this case will engage in any analysis of market definition or market power at all. While these concepts are integral to a factfinder's analysis under the rule of reason, *see, e.g.*, *NCAA v. Alston*, 141 S. Ct. 2141, 2160 (2021), they are barred here. *Socony-Vacuum*, 310 U.S. at 224 n.59. As the Supreme Court has explained, the *per se* rule avoids "'an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable,'" including "the enormous complexities of *market definition*." *FTC v. Superior Ct. Trial Laws. Ass'n*, 493 U.S. 411, 430 (1990) (emphasis added) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)). In a *per se* case, "the Supreme Court has consistently held that courts need not even conduct an extensive analysis of 'market power' or a 'detailed market analysis' to demonstrate its anticompetitive character." *United States v. Apple*, 791 F.3d 290, 328 (2d Cir. 2015) (citing *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986)). Instead, "the government 'need prove only that [the offense conduct] occurred in order to win [its] case, there being no other elements to the offense and no allowable defense.'" *Aiyer*, 33 F.4th at 115 (quoting *Koppers*, 652 F.2d at 294) (alterations in original); *Koppers*, 652 F.2d at 295 n.6 ("the per se rule makes certain conspiracies illegal without regard to their actual effects on trade").

Because Carlton's first opinion implicitly suggests to the jury that it should pass judgment on Defendants' conduct under concepts strictly limited to the rule of reason, and barred by the *per se* rule, it will inevitably contradict this Court's legal instructions, leading to confusion or a nullified verdict. It is therefore also properly excludable under Rule 403. *See*

*United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (expert testimony that "usurp[s]" either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it" does not aid the jury and should be excluded). Courts should exclude expert testimony that "give[s] the appearance that the court was shifting to witnesses the responsibility to decide the case… It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988), *quoting Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2d Cir. 1976).

Carlton's market opinion also fails to "fit" the allegations of the case, in the way required by Rule 401, Rule 702, and *Daubert*. By using data to broaden the labor market in which Defendants' alleged conspiratorial conduct occurred, and then declaring by fiat that Defendants had no economic power to affect that market and thus no logical intent to do so, Carlton seeks to absolve Defendants of committing a different, hypothetical crime. The grand jury has already declared the nature and scope of the crime alleged in this case; it is not Carlton's prerogative to second-guess it. In plain language, the grand jury has charged Defendants with conspiring "to suppress competition by ***allocating employees in the aerospace industry working on projects for Company A***, specifically by agreeing to restrict hiring and recruiting of engineers and other skilled-labor employees ***between and among Companies A-F in the United States***." Ind. ¶ 19 (emphasis added). The Court recognized this as a "properly defined labor market" sufficient to state a *per se* case. Order, Dkt. 257, at 22.

Carlton offers no opinion whether Defendants committed ***that*** crime, whether they had the practical ability to commit ***that*** crime, or whether data suggests they could have intended to commit ***that*** crime. His opinion is out of place here as it would be in any other criminal case when an expert ignores the metes and bounds of the crime charged. In a bank robbery case, there

is no larger "bank market" that the jury need be concerned with, only the bank that the

defendants are accused of robbing. In a fraud case, the jury need not consider all the customers

who a defendant did not defraud, only the ones that he did. Here, accordingly, the jury will find

that Defendants either did or did not commit the charged market allocation conspiracy. They

need not look to portions of the aerospace or labor market outside that alleged crime to do so.

Carlton's first opinion, in short, is a strawman. Surely Defendants and their employers

constituted a very small portion of, and had little market power in, the nation's engineering labor

market writ large, or the entire workforce of the United States. No data on that point is relevant,

though, because Defendants are not accused of engaging in any no-poach conspiracy of that

scope. Carlton's opinion on market definition and market share, therefore, in addition to being

out of place in a *per se* case from the outset, fail for lack of relevance and *Daubert* "fit." *See*

*Amorgianos*, 303 F.3d at 265 (district court is "charged with 'the task of ensuring that an expert's

testimony both rests on a reliable foundation and is relevant to the task at hand.'") (quoting

*Daubert*, 509 U.S. at 597); Fed. R. Crim. P. 401, 702.

### C.     Lack of Adverse Effects is Not Relevant in a *Per Se* Case.

For similar reasons, Carlton's second opinion—that there is no "statistical support" for

the suggestion that the alleged conspiracy had any adverse impact on wages of engineers, based

on his analysis of data from a single company (Company C), Ex. 1 ¶¶ 10-12—should be barred

from trial as irrelevant, misleading, and contrary to law.

Section 1 of the Sherman Act makes it a crime to conspire in restraint of trade. As with

all conspiracy-based offenses, the agreement itself is the crime. It does not matter whether the

conspirators succeeded or failed in reaching the goal of that agreement. *See United States v.*

*Rosa*, 17 F.3d 1531, 1543 (2d Cir. 1994). In fact, a defendant may be convicted of joining a

conspiracy even if the commission of the underlying offense was "impossible" "because an essential event did not come to pass…or because the coconspirators were mistaken in their view of the facts." *Id. See also United States v. Giordano*, 693 F.2d 245, 249 (2d Cir. 1982) (given that "the conspiratorial plan itself raises the danger" to society, "it does not matter that the ends of the conspiracy were from the beginning unattainable.").

Accordingly, when a defendant is accused of joining an antitrust conspiracy with an object that is illegal *per se*, such as market allocation, the Supreme Court has consistently ruled that an analysis of whether that conspiracy caused adverse effects in the market is not required or appropriate. *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998) (the *per se* rule "do[es] not require proof that an agreement . . . is, in fact, anticompetitive in the particular circumstances."); *Copperweld*, 467 U.S. at 768 ("Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused."). Again, this is different in the context with which Carlton is more familiar, civil antitrust cases decided under the rule of reason. In such cases, because the reasonableness of the restraint of trade is a disputed question of fact, factfinders must weigh the evidence as to whether the challenged conduct does, in fact, have an adverse impact on competition in the relevant market. *See, e.g.*, *Amex*, 138 S. Ct. at 2284 (explaining that the first step of the rule of reason considers whether a challenged restraint "has a substantial anticompetitive effect that harms consumers in the relevant market").

The Court should exclude Carlton's second opinion as irrelevant to a *per se* analysis and thus lacking "fit" under the *Daubert* and Rule 702 standard, as well as Rule 401. *See Daubert*, 509 U.S. at 590-93; *Amorgianos*, 303 F.3d at 265. In addition, because Carlton's opinions would implicitly contradict legal instructions given to the jury regarding the *per se* nature of this case

14

and fundamentally alter the Government's burden of proof, the Court may also appropriately bar these opinions under Rule 403. *See* cases, *supra* at 11-12.

Aside from being moot in this *per se* case, Carlton's limited examination of wage effects falls far short of the type of well-supported methodology that *Daubert* and Rule 702 require. Carlton broadly declares that "the evidence does not provide statistical support for the claim that the alleged agreement adversely impacted compensation of the Supplier Employees who worked on [Company A] projects." But in truth, he did not try very hard to find (or find lack of) such support.

Carlton relies upon analysis of wage data from only *one* of the five Suppliers accused of engaging in the charged no-poach conspiracy, Company C. He had access to data from Company B, but claims it was insufficient to analyze; he relegates it to a footnote. Ex. 1 p. 8 n.12. He also had access to data from the other companies—both from the Government and Defendants' own sources, which they produced only recently—but reports no results from any analyses of that data.[5] He also discloses no analysis of whether Company C's wages may be different than those of other Suppliers, such that wage effects would be less likely to be seen there, even if present elsewhere. In sum, Carlton declared that he would examine the "empirical evidence" of the charged conspiracy, but then performed just one calculation on one corner of that conspiracy, and called it a day. Not surprisingly, Carlton refers to no authority that would support an economist's broad opinion on the presence or absence of price (wage) effects based on a small,

---

[5] It is not clear that such analysis has *not* been done. Carlton states that he worked with staff in this matter, presumably at his consulting firm, Compass Lexecon. Ex. 1 p. 3. Carlton's summary purports to describe only the facts and data that he relied upon in coming to his conclusions. Whether his staff conducted additional data analysis and did not provide Carlton with certain results is something that Defendants have not disclosed, one way or the other. The Government may need to address this subject, for the first time, during Carlton's cross-examination on the witness stand, if he does testify.

nonrandomized, and potentially aberrant slice of the much larger set of available data, simply because (taking his word for it) it was the best he could get. Like any other expert, an economist is expected to "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

Expert data analyses this limited, and with this low level of rigor, are routinely excluded as unreliable and unhelpful to the jury under Rule 702 and *Daubert*, including by this Court. *See Miller v. City of New London*, No. 3:13-cv-619 (VAB), 2015 WL 2179773, at *4 (D. Conn. May 8, 2015) (excluding expert's opinion for lack of a "rigorous analytical connection" between the opinion and the plaintiff's particular case); *Lassen v. Hoyt Livery, Inc.*, No. 13-cv-1529 (VAB), 2016 WL 7165716, at *11 (D. Conn. Dec. 8, 2016) (allowing expert testimony about nine plaintiffs whose records the expert analyzed, but excluding testimony about 38 others in plaintiff class where analysis was based on unsupported extrapolation; such extrapolation was not a method based on "good grounds").

While some flaws in an expert's methodology are best left to be exposed through cross-examination, when they are so significant that the expert appears to lack "good grounds" for the opinion, a court cannot ignore its duty to exclude it. *See Amorgianos*, 303 F.3d at 267. *See also Pitterman v. General Motors LLC*, 3:14-CV-00967 (JCH), 2016 WL 11546543, *4 (D. Conn. Sept. 30, 2016) (excluding portion of expert opinion based on methodological flaws in expert's testing procedure, including inconsistencies in test conditions and fact that expert failed to run supporting tests); *Castelluccio v. IBM Corp.*, 3:09CV1145 (DJS), 2012 WL 5408420, *4-*5 (D. Conn. Nov. 6, 2012) (excluding portion of economist's opinion regarding plaintiff's employment prospects after being fired for failing to use the type of statistical information "pertinent to [his] field" and failing to justify his insufficient efforts to control for certain factors).

## II.  Carlton's Opinion that Procompetitive Benefits Can Flow from Vertical Restraints is Irrelevant and Prejudicial.

In his third opinion, Carlton again attempts to introduce a concept from rule-of-reason cases: procompetitive benefits, or "efficiencies." Ex. 1 ¶¶ 13-21. Specifically, Carlton suggests that restricting hiring and recruiting between the conspirator companies could have created many benefits to the members of the conspiracy, particularly to their common customer, Company A. When the Suppliers (Companies B-F) restrict their hiring and recruiting between one another, or when Company A restricts is own hiring from a Supplier, Carlton opines, Company A may enjoy a reduced risk of delays (¶ 14), reduced risk of disruption of its projects (¶ 15), and reduced "free riding" on the training and other resources provided by others (¶¶ 17-19).

In civil merger and other rule-of-reason cases—but not in *per se* cases—such matters may become relevant to the issue of reasonableness. After a civil plaintiff has established that challenged conduct has a substantial anticompetitive effect, the burden shifts to the defendant to prove "a procompetitive rationale for the restraint." *Amex*, 138 S. Ct. at 2284; *Alston*, 141 S. Ct. at 2160. The Second Circuit, relying on Supreme Court precedent, has stated clearly and recently that evidence of procompetitive benefits has no place in a criminal antitrust case. *See Aiyer*, 33 F.4th at 123-24 ("[R]estraints of trade that are subject to the *per se* rule, such as price fixing and bid rigging, are *categorically unreasonable*, such that proof of reasonableness—which is to say, a lack of anticompetitive effects and/or the presence of procompetitive benefits—is not required."). Moreover, none of the evidence that Defendants appear poised to admit on that subject, including Carlton's third opinion, is sufficient to create or support a bona fide defense to that *per se* charge under the doctrine of ancillary restraints, rather than a nonexistent "business justification."

Without question, price fixing, bid rigging, and market allocation conspiracies are beneficial to their members; they are also illegal. To the extent Defendants and their corporate co-conspirators wished to enjoy the benefits of undisrupted, on-time aerospace engineering projects with limited free-riding, there was a lawful path they could have followed: compete to maintain a satisfied and stable workforce.

The Government has separately moved *in limine* to preclude all evidence, including Carlton's third opinion, regarding alleged procompetitive justifications for the alleged conspiracy, and we hereby incorporate those arguments and authorities here. Dkt. 289 (Gov't Motion in Limine #1). As respectfully requested in Motion in Limine #1, if the Court allows any portion of this procompetitive effects evidence to be admitted at trial, including Carlton's third opinion, it should exercise its gatekeeping function prior to trial to ensure that such evidence is appropriately tailored to an ancillary restraints defense, on which Defendants bear a burden of production to even warrant an instruction to the jury. Dkt. 289 at 20-22.

An additional reason exists to exclude Carlton's third opinion: it rests on his mischaracterization of the charged conspiracy as a series of *vertical* no-poach agreements between each Supplier (Companies B-F) and Company A, rather than a *horizontal* no-poach agreement between and among Companies A-F, all of which compete at the same level of the market for labor. Carlton states this outright: "The alleged agreement can therefore be regarded as an agreement between a producer [Company A] and its input suppliers (Suppliers). Such agreements are called vertical restrictions in the economics literature. It is well established in the economic literature that vertical restrictions can produce efficiencies by better aligning the incentives of all parties." Ex. 1 ¶ 13. Accordingly, every "efficiency" of the no-poach conspiracy that Carlton identifies is solely or primarily a benefit flowing *vertically to Company A*, such as

reduction in delays on Company A projects that "increas[e] reliability of the delivery of [Company A's] final product to its customers." *Id.* at ¶ 14. Suppliers, at best, share a derivative, "collective interest" in Company A's success. *Id.* at ¶ 20.

Defendants have already tried, and failed, to dismiss the Indictment on the ground that it describes a vertical restraint of trade and thus falls out of the *per se* rubric. As this Court held:

> Despite Company A's vertical relationship in the outsourcing agreements between itself and Companies B through F, the no poach agreement operates across the market in which the companies horizontally compete: the labor market. . . . As alleged, the restraint does not operate in a vertical market because there are no allegations that Company A is vertically related to Companies B through F in terms of the labor market. Therefore, the restraint, as alleged, is appropriately considered a horizontal restraint. Order, Dkt. 257, at 16.

Nowhere does Carlton posit that the charged agreement—a horizontal no-poach agreement between and among Companies A-F—is recognized in the economic literature as providing procompetitive benefits. This is not surprising, given that such conspiracies are *per se* illegal. A customer may, at times, lawfully restrict its vertical trade with a supplier. But as this Court has already observed, when that customer joins or orchestrates an agreement to restrict trade in horizontal fashion, like Apple was found to have done with respect to its suppliers of ebooks in *United States vs. Apple, Inc.*, it has violated the law, notwithstanding the benefits it enjoyed as part of that bargain. Order, Dkt. 257, at 32.

Carlton may not, in the guise of expert testimony, usurp the law of the case or this Court's role to instruct the jury as to the law. *See Bilzerian*, 926 F.2d at 1294. This Court has excluded expert testimony on that ground, under Rule 403. *See Learning Care Group, Inc. v. Armetta*, No. 3:13-cv-1540(VAB), 2016 WL 3248178, *7 (D. Conn. June 12, 2016) (relying upon *Bilzerian* to exclude expert opinions as to which legal theories of recovery match with which monetary damages "because they are legal conclusions."); *Richard Parks Corrosion*

*Tech.*, 2015 WL 5708541, *7 (excluding expert's opinion under Rules 403 and 702 because "he uses a term ['lost profits'] with a legal definition, in a different way than the law defines it. The prejudicial nature of his testimony, therefore, cannot be cured properly on cross examination.")

## III.  Carlton's Fourth Opinion about Intent is Nothing More than the *Ipse Dixit* of an Expert.

Carlton concludes his report with a brief opinion that because the conspiracy was not comprehensive enough, or because Defendants made exceptions to their no-poach agreement, Defendants appear to have lacked "an anticompetitive purpose." In a nutshell, Carlton suggests that if Defendants had truly wanted to restrain hiring and recruiting in the manner alleged, they would have done it more, and been better at it. Ex. 1 ¶ 22 (stating that if Defendants intended to suppress competition for workers and wages, "it would make no sense to limit [the no-poach agreement] to only employees at the Suppliers who worked on [Company A] projects"). Not surprisingly, he cites no support for this argument, other than a vague reference to "economic theory."

This opinion is merely Carlton's say-so. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Carlton reveals no methodology in reaching this opinion; he approaches it simply as an exercise in personal logic. In addition, it cannot be helpful for the jury to hear anyone, even an otherwise well-qualified expert, declare that the alleged crime makes no "sense" to him, personally. Rule 401, Rule 703, and *Daubert* would thus bar this opinion.

Carlton's final opinion is also an improper attempt by an expert to comment directly on the intent of a defendant. *See* Fed. R. Crim. P. 704(b); *United States v. DiDomenico*, 985 F.2d

20

1159, 1164 (2d Cir. 1993) (Rule 704(b) serves to "disable[] even an expert from expressly stating the final conclusion or inference as to a defendant's actual mental state at the time of a crime") (cleaned up). Here, Carlton comments directly on the alleged "purpose," "incentives," and "goals" of Defendants, and whether he believes those purposes, incentives, and goals strike him as economically rational.

Finally, Carlton's last opinion implicitly contradicts the law, and likely will run afoul of one or more instructions that the Court will give to the jurors regarding the nature of criminal conspiracies. A conspiracy need not cover every possible target to be illegal, contrary to Carlton's suggestion. *Cf.* Ex. A ¶ 22 (claiming "it would make no sense to limit [the no-poach agreement] to only Employees at the Suppliers who worked on [Company A] projects"). In addition, occasional lapses in a conspiracy's conduct or deliberate cheating by conspirators does not disprove its existence; in fact, sometimes they help prove its existence, when the lapses are closed, or the cheating remedied. *Cf. id.* ("If the purpose of the alleged agreement were instead to restrict worker mobility in order to suppress labor compensation, then [Company A] would have had an incentive to allow no exceptions."). A defendant may be convicted of stealing a Honda, even if he could have stolen a Lexus. A defendant may be convicted of defrauding one client, even if he provided good and honest service to others. Accordingly, in this case of *per se* illegal market allocation, all the Government needs to prove is that the offense occurred, *Aiyer*, 33 F.4th at 115, not that it occurred in all possible areas, affected all possible targets, or was executed without exception.

To avoid confusing the jurors on these points of law, the Court should exclude the opinion. *See Aiyer*, 33 F.4th at 126 (noting that introducing irrelevant evidence "would have risked 'cloud[ing] the issue' of whether Aiyer was guilty of a *per se* violation of the Sherman

Act and would have potentially confused or misled the jury, otherwise resulting in unfair prejudice to the government") (quoting *United States v. Gatto*, 986 F.3d 104, 117-18 (2d Cir. 2021)).

## IV.     This Court Retains Discretion to Preclude Carlton's Opinions Due to Deficient Disclosures.

The Government has recently provided an update to the Court regarding the continuing deficiencies in Defendants' production of the data and other materials that Carlton relied upon in reaching his conclusions. *See* Gov't Reply Regarding Its Motion to Compel Defendants' Expert Discovery re Dennis Carlton (Dkt. 348). Whereas Defendants finally, belatedly, produced some of the raw data on which Carlton conducted his work, the heart of his opinions remains unsupported. The following categories of data and other materials underlying Carlton's opinions remain unproduced or unidentified:

(1)  The LinkedIn dataset that Carlton used for his calculation supporting his market definition (first opinion);

(2) The additional regression analyses relied upon by Carlton to support his claim that his primary analysis of wage data from Company C (second opinion) was "robust" in certain respects;

(3) The code and assumptions that comprise the calculations underlying Carlton's regression analyses of Company B and C data (second opinion);

(4) The "materials produced in this litigation" that Carlton claims his opinions are generally "based on" (Ex. 1 ¶ 6); and

(5) The evidence to be presented at trial that Carlton relied on to reach his opinions regarding the many procompetitive benefits of Defendants' alleged criminal conspiracy (third opinion).

At this point, two and a half weeks away from jury selection, the Government respectfully suggests that any reasonable grace period that Defendants may have had to cure these deficiencies has expired. By failing to produce expert discovery to this significant a degree, this close to trial, Defendants have denied the Government a fair opportunity to prepare to meet or rebut Carlton's evidence, as the Federal Rules require. Defendants have also denied the Government a fair opportunity to expose methodological problems with Carlton's analysis in this *Daubert* motion that potentially could have been found if Defendants had actually disclosed that methodology. Finally, by not producing the full underlying datasets, calculations, and litigation materials that Carlton relied upon to reach his conclusions, Defendants make it impossible for the Court to engage in the expected "rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267.

Trial courts in this Circuit use their discretion to disallow expert testimony when it has not been sufficiently disclosed. *See, e.g., Kaufman*, 2021 WL 4084523 at *23 (noting that defense expert's failure to meet disclosure requirements of Rule 16(b)(1)(C) "alone warranted exclusion" of his testimony); *United States v. Mahaffy*, No. 05-CR-613(S-3)(ILG), 2007 WL 1213738, *3 (E.D.N.Y. Apr. 24, 2007) (excluding defense expert testimony on its merits, but also "due to [defendant's] late submission" of the expert's opinions and his incomplete disclosure under Rule 16(b)(1)(C)).

Defendants have provided no explanation for their failure to provide complete disclosures for Carlton, despite having been granted extra time to prepare them. Whatever the source of the problem, the result is clear: to this day, neither the Government nor this Court has the

information that the Federal Rules require every expert to provide before he or she may take the witness stand and address a jury at trial.

## V.        No New, Undisclosed Opinions from Carlton Should be Admitted at Trial.

In his expert summary, Carlton suggests he may seek to offer new, undisclosed opinions at trial. *See* Ex. 1 ¶ 6 ("I have reached several conclusions…though I, together with my staff, continue to analyze these issues.") Defendants have also produced data to the Government in connection with Carlton's expert opinions that he does not comment on in his expert summary, raising the question of whether that data is among the things that Carlton and his staff "continue to analyze." Defendants were required, by order of this Court, to disclose all expert opinions by January 26, 2023, with a limited, one-week extension for Carlton. No new opinions, amended opinions, or additional bases and reasons for the disclosed opinions, should be accepted at this late date, much less in the middle of trial.

## CONCLUSION

For the reasons stated above, the United States respectfully requests that the Court enter an order as follows:

(1)        Excluding all the proffered opinions of Dennis Carlton, and precluding any new or amended opinions; or

(2)        To the extent the Court permits any of Carlton's opinions, ordering Defendants to produce all unproduced disclosures relating to his admissible opinion(s), as set forth in this Motion and the Motion to Compel Defendants' Expert Discovery re Dennis Carlton (Dkt. 278).

Respectfully submitted,

*/s/ Carrie A. Syme*
CARRIE A. SYME
T. JAKOB SEBROW

TRIAL ATTORNEYS, NEW YORK OFFICE
U.S. Department of Justice, Antitrust Division
26 Federal Plaza, Room 3630
New York, NY 10278
Tel.: (646) 714-1906

DAVID T. HUANG
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct30434
United States Attorney's Office
District of Connecticut
157 Church Street
New Haven, CT  06510
Tel.: (203) 821-3700

**CERTIFICATE OF SERVICE**

I hereby certify that on March 9, 2023, a copy of the foregoing UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES' MOTION IN LIMINE #12 TO EXCLUDE OR LIMIT THE EXPERT OPINIONS OF DENNIS W. CARLTON was filed electronically and served to anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept filing on the Notice of Electronic filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Carrie A. Syme*
CARRIE A. SYME
TRIAL ATTORNEY, NEW YORK OFFICE
U.S. Department of Justice