# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA | : | Case No. |
| | : | 3:21-CR-220 (VAB) |
| v. | : | |
| | : | |
| MAHESH PATEL, ROBERT HARVEY, | : | |
| HARPREET WASAN, STEVEN | : | |
| HOUGHTALING, TOM EDWARDS, and | : | |
| GARY PRUS, | : | |
| | : | |
| *Defendants*. | : | |
| | : | March 16, 2023 |

## DEFENDANTS' JOINT OPPOSITION TO THE GOVERNMENT'S MOTION IN LIMINE #12 TO EXCLUDE OR LIMIT THE EXPERT OPINIONS OF DR. DENNIS W. CARLTON

Defendants respectfully submit this opposition to the Government's Motion *in Limine* #12 to exclude or limit the expert opinions of Dr. Dennis W. Carlton ("Motion" (ECF 353-1)).

This Court specifically held in its ruling (the "Ruling") on Defendants' Motion to Dismiss that "not all no poach agreements are market allocations subject to *per se* treatment." 2022 WL 17404509, at *10 (D. Conn. 2022). Only no-poach agreements that are a "tool or method used to allocate the labor market" are *per se* illegal. *Id.* at *10 n.1. The Government must therefore prove beyond a reasonable doubt that the Defendants entered into an agreement to allocate a labor market—not simply that there was an agreement not to hire certain workers. This requires a "highly fact specific" analysis of the circumstances into whether that no-poach agreement was a tool or method used to further a *per se* illegal market allocation agreement. *Id.* at *10. Dr. Carlton's opinion provides critical economic analysis that will assist the trier of fact in making that fact-specific determination. Thus, the Government is incorrect to claim that Dr. Carlton has "written expert opinions for the wrong conduct in the wrong case." Mot. at 1.

1

In fact, Dr. Carlton's opinions will help the jury understand the falsity of the core allegations on which the Court relied in ruling that *the Indictment* pleaded the existence of a market allocation agreement.  The case is no longer on a motion to dismiss constrained by the allegations contained within the Indictment.  The Government must now meet its burden of proof, and Defendants must be permitted to advance evidence to rebut that case and the allegations on which the Government's case is founded.  Dr. Carlton's analysis provides important and robust economic analyses to assist the trier of fact in analyzing that issue.  The jury will be asked to determine whether the evidence is consistent, or inconsistent, with the alleged market allocation agreement. The core of Dr. Carlton's analysis is that the economic evidence is inconsistent with that alleged agreement.

Furthermore, even in a per se case, Defendants are permitted to argue that the alleged agreement is ancillary to a legitimate cooperative relationship among the suppliers.  On this issue, the Court denied Defendants' motion to dismiss because of an allegation—that will be disproven at trial — "that Companies B through F do not cooperate in the outsourcing agreements, but instead compete to win the outsourcing agreements."  Ruling at *14.  *See also* Defendants' Joint Opposition to the Government's Motion *in Limine* #1 to Preclude Inadmissible Procompetitive Benefits, ECF No. 380.  This allegation ignores that Companies B through F are all members of Company A's team working on interconnected projects.  Dr. Carlton's report explains how, as a matter of economics, hiring restrictions in these circumstances encourage investment in training and recruiting employees, reduce production delays, and encourage cooperation among suppliers in order to provide better services to Company A and, ultimately, better products and services to consumers.

The Government's other arguments fail as well.  Dr. Carlton's opinions on the nature of

NYACTIVE-22569147.1

the alleged restraint are not *ipse dixit*, as he will explain the economic reasoning that underpins them, and there have been no disclosure failures for the Court to remedy.

## BACKGROUND

The Government does not dispute Dr. Dennis W. Carlton's qualifications to serve as an economics expert. He is the David McDaniel Keller professor *emeritus* of economics at the University of Chicago with nearly 50 years of experience. From 2006 to 2008, Dr. Carlton served as an economic advisor to the antitrust division of the Department of Justice. He has published more than 150 articles in academic journals and books, and is the author of leading textbooks in industrial organization, the field of economics that focuses on the strategic behavior of firms and is most relevant to this case.

On February 2, 2023, Defendants served a report from Dr. Carlton. Gov. Ex. A. Dr. Carlton applied his "experience as an economist, economic analyses of the available data, application of economic theory, and [his] review of materials produced in this litigation" to evaluate the Government's conspiracy claims from an economic perspective. As described in more detail below, Dr. Carlton's opinions explain that the alleged market allocation agreement is unlikely to materially impact employee compensation, that he has found no statistical support that it has materially impacted compensation, and that its narrow scope and inconsistent enforcement are inconsistent with the goal of diminishing competition and suppressing wages. These analyses conflict with the purpose of the charged conspiracy and strongly suggest Defendants did not enter into an agreement with any intent to allocate the market.

On March 9, 2023, the Government filed the Motion, which seeks to exclude *all* of Dr. Carlton's opinions in this case. Throughout the Motion, the Government ignores and mischaracterizes significant portions of Dr. Carlton's disclosure. Nowhere, for example, does the Government mention Dr. Carlton's multiple analyses of employee turnover data. Dr. Carlton

3

analyzes four different data sets, each of which shows increasing movement from the Suppliers over the relevant time period, Dr. Carlton ¶ 9 & n.8, and that over 90% of employees found employment at other firms.  Dr. Carlton ¶ 9.  The Government also ignores the robustness check that Dr. Carlton performed with Supplier data to test the sensitivity of his regression analysis. Dr. Carlton ¶ 8 n.12.

## LEGAL STANDARD

Federal Rule of Evidence 702 aims to ensure that qualified experts offer relevant and reliable opinions in their areas of expertise that will "help the trier of fact to understand the evidence or to determine a fact in issue."  *See* Fed. Rule Evid. 702; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-48 (1999).  District courts have broad latitude in determining whether expert testimony will aid the trier of fact:  there is no single checklist of factors that expert testimony must be evaluated against.  *See Kumho Tire*, 526 U.S. at 152.

The inquiry under Rule 702 fits within the broader relevance framework of Rule 401, which provides that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence."  *See* Fed. Rule Evid. 401.  The relevance standard is "a liberal one."  *Daubert v. Merrill Dow Pharms. Inc.*, 509 U.S. 579, 587 (1993). Though courts have the discretion under Rule 403 to exclude expert testimony if its probative value is substantially outweighed by danger of prejudice, *see* Fed. Rule Evid. 403, exclusion of expert testimony on this basis is the exception rather than the norm.  *See A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, 364 F. Supp. 3d 291, 326 (S.D.N.Y. 2019); *see also United States v. Litvak*, 808 F.3d 160, 180–85, 187–88 (2d Cir. 2015) (concluding that district court exceeded its discretion in excluding all of one defense expert's proposed testimony and most of other expert's

proposed testimony given, *inter alia*, its clear probative value and tendency to educate the jury about the highly specialized field underlying securities fraud case).

In keeping with the liberal admissibility standards of the Federal Rules of Evidence, expert testimony is admissible unless it is "speculative or conjectural or based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence 'an apple and oranges comparison.'"  *See Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp.*, *LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).  Other criticisms of an expert's testimony go to the weight, not to the admissibility of the evidence, *Boucher*, 73 F.3d at 21, and should be presented to the jury at trial, *see Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

## ARGUMENT

### I.  Dr. Carlton's Opinions That the Economic Evidence is Inconsistent With the Alleged Market Allocation Agreement Are Relevant and Admissible

The Government moves to exclude Dr. Carlton's opinions on the economic effects of the alleged agreement in the labor market because they are purportedly irrelevant to the Government's *per se* case.  The Government is incorrect on the law, and therefore incorrect on the relevance of Dr. Carlton's opinions.  Dr. Carlton is not opining that a market allocation agreement may have existed but was ineffective.  He is opining that the evidence of effects that he has studied is inconsistent with the very existence of the charged agreement — which is of course the central issue in this case and goes to the core of what the jury needs to decide.

The Government also moves to exclude Dr. Carlton's regression analysis, seemingly because Dr. Carlton did not offer additional regressions or use data from multiple suppliers.

Mot. at 15 & n.5.  Setting aside the supplier data limitations that Dr. Carlton explains and the

Government ignores and the fact that his regression analysis finds corroboration in his prior

opinion that the alleged agreement could not have affected wages given the nature of the market,

criticisms that an analysis has too few variations is not grounds for exclusion but rather is

appropriately tested on cross-examination at trial.

### A.  Dr. Carlton's Opinions Are Relevant to the Existence of a Market Allocation Agreement

As this Court has already held, even in a case where the theory is market allocation,

evidence of the effect and purpose of the restraint directly bears on whether the Defendants

entered into a market allocation agreement in the first instance.  In discussing the relevance of an

agreement's effect and purpose on the motion to dismiss, the Court reviewed the Second

Circuit's opinion in *Bogan v. Hodgkins*, explaining that the no-poach agreement there was not a

market allocation agreement because the "no poach agreement did not negatively impact the

agents by suppressing wages."  Ruling at *10.  The Court also explained that, while the restraint

may have "constrained agents to some degree, it did not allocate the market . . . to any

meaningful extent."  *Id.* at *10 n.2 (quoting *Bogan*, 166 F.3d at 515).

By contrast, in this case, *at the motion to dismiss stage*, the Court concluded—based only

on the Indictment—that the Indictment had sufficiently alleged both an anticompetitive effect

and intent sufficient to support the charge that Defendants had conspired to allocate a market.

The Court specifically cited allegations in the Indictment that: (1) the no-poach agreement

"prevented engineers and other highly skilled workers from working for any of the other alleged

co-conspirators' companies that perform outsourcing work for Company A" and (2) one of the

purposes of the agreement was to deny employees "the higher wages or promotions that are often

achieved by laterally moving through the labor market."  Ruling at *11.  In reaching this

NYACTIVE-22569147.1

conclusion, the Court cautioned that the inquiry into the existence of a market allocation agreement would ultimately be "highly fact specific."  *Id.* at \*10.

The Government is no longer shielded by its carefully crafted Indictment.  Dr. Carlton's opinions rebut the allegations in the Indictment on which the Court relied in denying Defendants' motion to dismiss.

*First*, Dr. Carlton opines on the share that Supplier and Company A employees comprise of the broader aerospace industry, the sector the government alleges has been affected by the alleged conspiracy.[1]  This is not – as the Government claims – for the purpose of "pass[ing] judgment on Defendants' conduct under concepts strictly limited to the rule of reason" (Mot. at 11) but rather to rebut the very existence of a market allocation by demonstrating why the alleged agreement never could have achieved the Government's claimed purpose that Defendants sought to suppress wages or allocate a labor market.  Dr. Carlton's analysis— supported by a detailed methodology and data from the Suppliers and the Bureau of Labor Statistics—finds that Employees at the Suppliers and Company A have represented under seven percent of Employees in the alleged aerospace market since 2012.  Dr. Carlton ¶ 8 & n.4.  Other variations of Dr. Carlton's analysis estimate that the share is even smaller.  For example, Supplier employees working on Pratt & Whitney projects (which is the scope of the alleged conspiracy) represent less than 2% of Employees in the alleged aerospace market since 2012.  *Id.* Because Employees at Company A and Suppliers represent such a small share of the alleged aerospace labor market, Dr. Carlton opines that an economist would not expect the alleged

---

[1]     *See* Indictment ¶ 1 (defining engineers and other skilled labor as "employees working in the aerospace industry in the United States [who] performed services such as electrical and mechanical engineering, design, testing, software development, supply chain management, and project management for the purposes of designing, manufacturing, and servicing, among other things, aircraft for both commercial and military purposes").

NYACTIVE-22569147.1

agreement to have a material impact on labor compensation.

Dr. Carlton's opinion as to the small share that Employees at the Suppliers and Company A have represented in the alleged aerospace market is directly relevant to whether the Government can meet its burden to prove, beyond a reasonable doubt, that Defendants entered into an agreement to allocate a labor market, and did so with the intent to suppress wages. Because this directly challenges an element of the charged offense, it is relevant under Rule 401 and the *Daubert* framework.  *See United States v. Aiyer*, 33 F.4th 97, 121 (2d Cir. 2022) (upholding trial court's decision to admit evidence and argument that the defendant lacked the requisite intent and that "any agreement that may have existed was not an agreement among competitors or an agreement to not compete on pricing."); *Continental Baking Co. v. United States*, 281 F.2d 137, 143 (6th Cir. 1960) (holding that the trial court should have permitted defendants "to offer evidence in support of their defense that the prices resulted from uniform operating costs and economic factors and not from agreements"); *United States v. Usher*, No. 17-cr-0019, Dkt. 158 at 33 (S.D.N.Y. Sept. 28 2018) (denying motion to exclude circumstantial evidence of intent in *per se* price fixing case in order not "to infringe on the defense['s] . . . ability to rebut the elements of the crime with which each defendant is charged."); *United States v. Penn*, No. 1:20-cr-00152, Dkt. 642 at 2 (D. Colo. Oct. 14, 2021) (denying government's motion *in limine* and permitting defendants to introduce "evidence that the prices were not fixed as a result of an agreement"); *United States v. Lischewski*, No. 3:18-cr-00203, Dkt. 293 (N.D. Cal. 2019) (admitting evidence in price fixing case that "is not so much a justification of a conspiracy as much as it is an alternative explanation that tends to negate the existence of an agreement.").

*Second*, Dr. Carlton uses available data to show that individuals employed by the

NYACTIVE-22569147.1

Suppliers and Company A successfully sought alternative jobs both before and during the conspiracy period without a noticeable change in rate.[2]  Again, such evidence directly undermines the existence of the alleged market allocation.  Far from being denied opportunities through lateral movement, between roughly 15% and 30% of individuals employed by the Suppliers left for other firms—including other Suppliers—both before and during the purported conspiracy period.  These percentages reflect annual employee "turnover."

Dr. Carlton shows through statistical analysis that turnover generally increased year-over-year during the alleged conspiracy, demonstrating that any no-poach restraint did not eliminate individual movement—either among the Defendants' employers or within the market as a whole. Employee movement among Suppliers and other firms rebuts the Government's allegation that Defendants entered into a market allocation agreement: there is no market allocation agreement proven if the government shows neither a market nor allocation.  *See e.g.*, *United States v. DaVita Inc.*, No. 1:21-CR-00229, Dkt. 291 at 1198-1201 (D. Colo. Mar. 21, 2022) (permitting expert testimony that employee turnover and compensation were inconsistent with an agreement to allocate).

*Third*, Dr. Carlton directly analyzed whether the alleged restraint had an observable statistical effect on compensation using available wage and compensation data.[3]  Dr. Carlton found no "statistical support" in his economic regression for the notion that a restraint had an adverse effect on compensation for the Suppliers' employees working on Company A projects.

Courts routinely permit defendants to present evidence on the lack of anticompetitive harm from a restraint to show that the Government cannot meet its burden to prove the existence

---

[2]     The Government refers to this opinion and the previous opinion on market definition and share as Dr. Carlton's first opinion.

[3]     The Government refers to this opinion Dr. Carlton's second opinion.

NYACTIVE-22569147.1

of an agreement or an intent to conspire.  In *United States v. Aiyer*, for example, the Second

Circuit recently affirmed admission of effects evidence to show that the defendant lacked intent

to enter into an agreement, that there was no agreement, and that any agreement was not an

agreement among competitors to fix prices.  33 F.4th 97, 121 (2d Cir. 2022).  *See also United*

*States v. Penn,* No. 1:20-cr-00152, Dkt. 642 at 2 (D. Colo. Oct. 14, 2021) (defendants not

precluded from "introducing evidence that the prices were not fixed as a result of an agreement

or from introducing evidence that a lack of harm suggests that defendants did not have an

agreement to fix prices."); *U.S. v. Lischewski*, No. 3:18-cr-00203, Dkt. 292 at 1-2 (N.D. Cal.

2019) (permitting defendants to "introduce evidence providing alternative explanations to show

that similar prices or movement in prices were not the result of a price fixing agreement.");

*United States v. DaVita Inc.*, No. 1:21-CR-00229, 2022 WL 833368, at *2 (D. Colo. Mar. 21,

2022) (permitting defendants to introduce evidence "relevant to the question whether the

defendants entered into an agreement to allocate the market" and "whether they entered into an

agreement with purpose of allocating the market for senior executives.").

      The cases that the Government cites to exclude "effects" evidence are inapposite.  Each

of the cases the Government cites involve the relevance of evidence to justify a *per se* illegal

agreement based on its procompetitive effects.  In *United States v. Socony-Vacuum Oil Co.*, 310

U.S. 150 (1940) (cited in Mot. at 9), for example, defendants were major oil companies that

conspired to raise retail gasoline prices by raising the spot market price.  310 U.S. at 169.

Because the existence of the price fixing conspiracy was "indisputable," the Supreme Court

found defendants' explanations that the conspiracy promoted competition by eliminating

"competitive evils" to be legally irrelevant.  *Id.* at 211-12, 220.  In contrast, here, the parties

dispute the categorization of the agreement as *per se*, and introduce Dr. Carlton's opinions to

<u>disprove</u> the existence of such an agreement, not to justify it.[4]  *See*, *Aiyer*, 33 F.4th at 97 (finding that defendants should not be "precluded from legally and factually challenging each of the elements of the alleged *per se* charge in full accord with due process."); *United States v. Penn*, No. 20-cr-00152, 2021 WL 4818917, at *3 (D. Colo. Oct. 15, 2021) (finding that defendants can introduce evidence to support "their theory that there was no agreement among them . . . in the first place.").

When the existence of a market allocation agreement is disputed, the type of data analysis that Dr. Carlton provides is relevant and will assist the trier of fact.  Again, *Bogan* is instructive. There, the Second Circuit considered the nature of the market in affirming that the plaintiff had not shown the existence of a market allocation agreement.  The Second Circuit explained that the plaintiff "suggest[ed] that the [no-poach agreement] may be a supplier allocation, but the facts do not bear this interpretation" because the no-poach agreement "permitt[ed] transfers, and experienced NML agents do not comprise the entire set of suppliers of their services."  *Bogan*, 166 F.3d at 515-16 ("In the end, the problem with the Bogans' proposed submarket is that other insurance companies compete for the services of experienced NML agents, as is clearly evidenced by the Bogans having found other work after being terminated from NML.").  Based on these facts, the Court held that the no-poach agreement was not a market allocation agreement because employees could move both among the general agents that employed NML agents and

---

[4]      The Government cites *Aiyer* to support its propositions that "evidence of procompetitive benefits has no place in a criminal antitrust case." Mot. at 17.  This is misdirected, as the Second Circuit upheld the trial court's decision to admit evidence regarding effects of trading activity as relevant to the defendants' intent to engage in the conduct that comprised the object of the conspiracy, but agreed that "allowing *unlimited* evidence of a lack of anticompetitive effects or the existence of procompetitive benefits in connection with the alleged conduct would have risked "cloud[ing] the issue of whether Aiyer was guilty of a *per se* violation of the Sherman Act."  *Aiyer*, 33 F.4th at 113, 126 (emphasis added).

11

between NML general agents and other insurance carriers.[5]  The same is true here: employees could and did move among employers during the alleged conspiracy, both among the companies allegedly impacted by the conspiracy and to companies beyond the alleged conspiracy.  Such movement disproves the existence of any market allocation and is highly relevant.  Other courts have considered similar evidence to address the question of whether an agreement is a market allocation.  *See Meijer, Inc. v. Barr Pharmaceuticals*, 572 F.Supp.2d 38, 49 & n.14 (D.D.C. 2008) ("Even a cursory examination of the precedents in the text above reveals that courts must evaluate relevant market dynamics prior to condemning a restraint as a per se violation of the antitrust laws.").

In sum, the opinions of Dr. Carlton are admissible under Federal Rules of Evidence 401 and 403 *not* as an attempt to opine "on the reasonableness of the restraint of trade" (Mot. at 14), but rather to demonstrate that the alleged restraint of trade did not constitute a market allocation in the first place.  This evidence is thus at the very heart of the issue identified by the Court in its opinion on the motion to dismiss the Indictment, and its probative importance far outweighs any theoretical prejudice to the Government.  The cases cited by the Government are inapposite because they address evidence that was offered to show whether a *per se* illegal restraint can be justified by its procompetitive benefits and not evidence that is offered for the purpose of rebutting whether any *per se* agreement exists in the first place.  The Government's relevance objections to admission of this evidence therefore lack merit, and the Court should reject the Government's effort to turn a denial of a motion to dismiss pursuant to Rule 12 into a license *not*

---

[5]    The opinion in *Bogan* implies that NML insurance agents could move among NML general agents with consent of the insurance agent's current employer.  *Bogan*, 166 F.3d at 511 (describing "agreement among NML General Agents not to recruit and hire each others' existing District or Sales Agents without the consent of the agent's current General Agent.").

12

to prove elements of its case.

### B.  Dr. Carlton's Regression Analysis is Reliable and Admissible

The Government also seeks to exclude Dr. Carlton's regression analysis under Rule 702 and *Daubert*, though it presents no argument that the regression was outside of Dr. Carlton's areas of expertise or out of step with economic theory, nor could it.  The Government's complaint appears to be that Dr. Carlton failed to conduct or has not shared further regressions on different data that the Government speculates might have yielded different results.  Mot. at 15 & n.5.  Such criticisms relate to the robustness of Dr. Carlton's analysis and at most go to weight, not admissibility, and in any event are rendered moot in light of the Defendants' supplemental disclosures of sensitivity analyses that support the robustness of the underlying regressions.  *See* Exhibit A (filed separately under seal).  The Government's efforts to exclude the Defendants' expert on this ground should be denied.  *See United States v. Romano*, 794 F.3d 317, 333 (2d Cir. 2015) (disputes as to faults in methodology go to weight, not admissibility); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (same).  The Government's speculation also misses the simple reason that Dr. Carlton focuses on regression results based on data from Supplier C: only Supplier C's data contained the information necessary for the analysis.   No other supplier data identified whether an Employee worked on Company A projects both before and during the period of the alleged agreement.  Dr. Carlton ¶ 11 & n.11.  Such information is crucial for the integrity of Dr. Carlton's analysis—without it, Dr. Carlton would not have been able to control for the relative impact of the purported restraints.  Dr. Carlton ¶ 11.  For the other suppliers, Dr. Carlton had no way to assess whether Employees covered by the agreement were affected differently from those who were not.  *Id.*  Despite these

data limitations, Dr. Carlton attempted to run a sensitivity check using data from the supplier, which the Government overlooks.  Dr. Carlton ¶ 12 & n.12.

The Government has access to the same data as Dr. Carlton (Mot. at 15).  If the Government believes that alternative analyses might yield different results, the appropriate path forward is for the Government to present these analyses to the jury at trial on cross-examination, not exclusion.  *See Cedar Petrochems., Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 285 (S.D.N.Y. 2011) ("[Q]uestions over whether there is a sufficient factual basis for an expert's testimony . . . 'go to weight, not admissibility.'"); *Minpeco, S.A. v. Hunt*, 718 F. Supp. 168, 172 (S.D.N.Y. 1989).  The Government should not be allowed to short circuit the adversarial process simply by claiming that different analysis might lead to different results.

Still further, the government ignores the fact that Dr. Carlton's analysis of Company C's data finds full corroboration in his other opinions and analyses.  As noted, in Dr. Carlton's first opinion, he explains that the Suppliers and Company A Employees represent a small fraction of the market alleged in paragraph 1 of the Indictment.  In his first opinion, Dr. Carlton also explains that the Employees had substantial mobility beyond the universe of employment opportunities at Companies A through F.  Dr. Carlton thus opines that the Defendants had no ability to affect wages.  If not paid to their satisfaction, Employees had the ability to seek better pay elsewhere.  These opinions offer strong support for Dr. Carlton's regression analyses performed on Company C's robust data, through which he opines that, in fact, wages were unaffected.  All of this rebuts, with sufficient reliability, the government's express allegation that the Defendants' intended to suppress wages.  In fact, according to Dr. Carlton, the Defendants could not have suppressed wages and did not do so.

The cases that the Government relies on do not support exclusion of Dr. Carlton's

14

regression analysis.  The Government cites this Court's decision in *Miller v. City of New London*, No. 3:13-cv-619 (VAB), 2015 WL 2179773, at *4 (D. Conn. May 8, 2015) for the proposition that there must be a "rigorous analytical connection" between a methodology and a conclusion, but that case involved an expert who disclosed "minimal" techniques or methodologies other than the expert's general understanding of the effects of alcohol.  Here, there is no such disconnect.  Dr. Carlton explained the regression he performed, and the methodology of the regression is not at issue.  The Government's speculation that other regressions on other data might be possible do not change this.  Likewise, in *Lassen v. Hoyt Livery, Inc.*, No. 13-cv-1529 (VAB), 2016 WL 7165716 (D. Conn. Dec. 8, 2016), this Court held that a damages expert did not have "good grounds" to extrapolate damages findings from 9 of 47 class members to the other 38 where data was available for all 47 class members.  *See id.* at *11.  Here, Dr. Carlton has explained the data limitations that required him to focus on data from Supplier C.  *See* Exhibit A.

## II.    Dr. Carlton's Opinions on the Benefits of the Agreement are Relevant to Defendants' Ancillarity Arguments

To the extent that the government is able to prove the existence of an agreement to limit hiring, Defendants expect that the evidence will show that any such agreement was ancillary to the collaborative relationship among Company A and its suppliers.

The Motion seeks to exclude Dr. Carlton's opinions on the benefits to competition that can arise from no-poach restraints among companies in the same supply chain.[6]  Carlton ¶¶ 13-21.  However, Dr. Carlton's opinions are directly probative as to the application of the ancillary restraints doctrine.  Dr. Carlton explains as a matter of industrial economics that no-poach

---

[6] The Government refers to these opinions at Dr. Carlton's third opinion.

restraints involving companies working on the same projects:

> (a) reduce delays in the production of goods by coordinating hiring among labor suppliers (here, companies B-F) in the same way that an outsourcer (here, Company A) could coordinate hiring among its own internal departments (Carlton ¶¶ 14-16),

> (b) discourage free-riding by the outsourcer on the suppliers' investments in training and hiring, which, as a matter of basic economics, encourages suppliers to invest more in those activities to the benefit of the suppliers, Company A, and Company A's end customer (Carlton ¶¶ 17-19), and

> (c) incentivize efficient cooperation among the suppliers on projects for the outsourcer by encouraging them to put forward their best talent to work collaboratively with each other (Carlton ¶¶ 20-21).

The Court does not need to resolve whether any no-poach agreement was ancillary to a legitimate business transaction at this time, and the Court has already concluded that the defendants are entitled to present evidence on ancillarity at trial. Ruling at *14. Defendants intend to rely on Dr. Carlton's opinion to support their argument that any no poach agreement was ancillary to a procompetitive business relationship.

In the Ruling, the Court denied Defendants' ancillarity arguments because of claims in the Indictment that the Suppliers have a strictly competitive relationship. The Court explained that the Indictment contains "no allegations of coordination among Companies B through F." *Id.* However, the Court also made clear that "[t]o the extent Defendants wish to contest these allegations with facts not included in the Indictment, such arguments are better suited for a later stage of the proceedings" beyond the motion to dismiss. *Id.* At trial, the Government will not be able to show that the Suppliers were strictly competitors who never participated in a

NYACTIVE-22569147.1

collaborative manner on projects for Company A, because it is simply untrue. The Suppliers routinely collaborate in the production of engines for Company A, including on-site at Company A's facilities as a single team. Defendants intend to elicit evidence showing extensive collaboration among the Suppliers in the provision of services to Company A. *See* Defendants' Joint Opposition to the Government's Motion *in Limine* #1 to Preclude Inadmissible Procompetitive Benefits, ECF No. 380.

Dr. Carlton's opinions provide important economic context for these facts, as he explains several reasons why economic theory predicts that hiring restrictions enhance the efficiency of the outsourcing model and would plausibly increase the output of engines from the collaboration among the Suppliers and Company A. This includes reducing delays in engine output, encouraging investment by discouraging free riding, and incentivizing collaboration among the Suppliers to provide their best talent to the Company A projects. Case law requires, at most, a plausible connection that "*could* have a procompetitive impact *related* to the efficiency-enhancing purposes of" the business relationship. *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 338 (2d Cir. 2008) (Sotomayor, J., concurring); *Medical Center at Elizabeth Place v. Atrium Health Sys.*, 922 F.3d 713 (6th Cir. 2019) ("Hospital Defendants, on the other hand, describe the standard as whether there exists a *plausible procompetitive* rationale for the restraint. The Second, Seventh, Eighth, and Ninth Circuits adopt this approach." (citing *Salvino*); *Polk Bros. v. Forest City Enters.*, 776 F.2d 185, 189 (7th Cir. 1985) ("[A] restraint is ancillary when it *may* contribute to the success of a cooperative venture that promises greater productivity and output.") (emphasis added).

The Government argues that "[t]o the extent Defendants and their corporate co-conspirators wished to enjoy the benefits of undisrupted, on-time aerospace engineering projects

NYACTIVE-22569147.1

with limited free-riding, there was a lawful way they could have followed: compete to maintain a satisfied and stable workforce." Mot. at 18.  But this hyperbolic statement directly contradicts well-established ancillary restraints case law that instructs courts to look to potential economic benefits and efficiencies in determining whether the restraint was unlawful in the first place.  *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 229 (D.C. Cir. 1986) (applying the ancillary restraint doctrine and determining "these restraints are ancillary to the contract integration or joint venture that constitutes the Atlas van line. The restraints preserve the efficiencies of the nationwide van line by eliminating the problem of the free ride.")  *see also MLB Properties*, 542 F.3d at 340 (Sotomayor, J., concurring) (question is whether restraint "could have a procompetitive impact related to the efficiency-enhancing purposes" of the enterprise).

Courts have recognized the validity of the economic benefits proffered by Dr. Carlton, including in the context of outsourcing arrangements.  As the Ninth Circuit summarized in *Aya Healthcare Servs. v. AMN Healthcare*, 9 F.4th 1102, 1110 (9th Cir. 2021):

> "The non-solicitation agreement is necessary to achieving that end because it ensures that AMN will not lose its personnel during the collaboration. As the district court noted, AMN may want to "guard[] its investments and establish[] AV relationships with only those agencies that agree, inter alia, not to abuse the relationship by proactively raiding AMN's employees, AVs, and customers. Without the restraint, AMN "would likely be less willing or unwilling to deal with other agencies to supply travel nurses to hospitals which, as Aya also recognize[d], already experience a 'chronic shortage of nurses.'" (internal citations omitted)).

*See also Deslandes v. McDonald's*, 2021 WL 3187668, at *9 (N.D. Ill. July 28, 2021) (explaining that hiring restrictions among franchisees can encourage investment and increase output in both markets for labor and hamburgers).   Although the Court distinguished these cases from the allegations presented here, the Court's analysis was limited to consideration of allegations contained within the four corners of the Indictment, which did not include

18

"allegations of collaboration" among the parties.  Ruling at *14.  The evidence at trial will show

the collaborative relationship conveniently omitted from the Indictment.   The economic opinion

provides important context for this evidence, which goes to the heart of the question of whether

any agreement is properly considered to be ancillary to a legitimate business relationship, and is

therefore admissible.  *Aiyer*, 33 F.4th at 120 ("[I]f a defendant seeks to challenge the application

of the per se rule to his offense conduct by arguing to the jury that such conduct fell within one

of the exceptions to the per se rule, he would have had every right to make those arguments and

present evidence on such exceptions at trial.").

Finally, the Motion argues that the same opinions about the benefits of the no-poach

restraints should be excluded because Dr. Carlton's report explains that restraints along a supply

chain are called "vertical restrictions in economics literature."  Dr. Carlton ¶¶ 13.  The

Government seeks to exclude all of Dr. Carlton's opinions on the benefits to competition that can

arise from a no-poach agreement on the basis that the Court has already determined, as a matter

of fact, that Defendants were horizontal competitors for labor.  However, the Court, in its Ruling,

expressly left open the possibility that Defendants could present evidence to "illuminate the

vertical nature of the restraint."  Ruling at *17 n.4.  It is proper for an economist to offer

testimony to assist the jury in making this factual determination.  *See* Trial Tr. at 1732, *United

States v. Aiyer*, No. 18-cr-333-JGK (S.D.N.Y. Nov. 26, 2019), ECF No. 174 (admitting expert

testimony that relationship between defendant and alleged co-conspirator "was effectively a

vertical relationship"); *id.* at 1598, ECF. No 172 (rejecting Rule 29 motion at close of

government's case based on alleged co-conspirators being in a vertical rather than horizontal

relationship with defendant because "the jury could well conclude that in fact the members of the

conspiracy were in a horizontal relationship in offering dollar/ruble pairs to customers and

setting the price at which those dollar/ruble pairs would be offered to customers"); *see also Aiyer*, 33 F.4[th] at 122 n.3 (rejecting appellant's effort to relitigate verticality on appeal where "the jury heard arguments that this was not a horizontal price agreement among competitors and implicitly rejected those arguments as a factual matter with its verdict").

The Government's argument also confuses two separate issues.  Company A is indisputably in a vertical relationship with its Suppliers for the production of engines – Company A purchases services from Companies B-F.  Notwithstanding whether Company A competes with the Suppliers for labor, it is Dr. Carlton's opinion that a "no-poach" agreement in this circumstance can come with legitimate efficiencies by virtue of the vertical relationships at the level of the production process.  This goes directly to whether the restraint "could have a procompetitive impact related to the efficiency-enhancing purposes of" the business venture. *MLB Properties, Inc.*, 542 F.3d at 338.  Thus, far from opining purely on the legal conclusion of whether a particular restraint is a vertical or horizontal restraint as a matter of law, Dr. Carlton describes the business relationship from an economic perspective, which is permissible foundational information for Dr. Carlton's remaining opinions regarding the potential efficiencies that flow from restrictions in such a context.  *See United States v. Aiyer*, No. 1:18-cr-00333, Dkt. 119 at 18-19 (S.D.N.Y. Oct. 1, 2019) (finding that "'horizontal relationship' and 'vertical relationship'" are economic terms although they are certainly building blocks for legal conclusions.  Experts should be permitted to describe, based on their expertise, the economic relationship among the parties. That is not a legal conclusion.").  A quibble over terminology is not a legitimate basis to exclude defense testimony by Dr. Carlton that is well-founded in economics and properly applied to this case.

III.    **Dr. Carlton's Opinions on the Design and Application of the Alleged Restraint is Not *Ipse Dixit***

The Government also seeks to exclude one paragraph at the end of Dr. Carlton's report which explains that the design and application of the contested agreement is inconsistent with the Government's claim about its purpose.  The Government alleges that the Defendants restricted hiring and recruiting for their "mutual financial benefits" of "preventin[ing] wages and labor costs from rising."  Indictment ¶ 27.  The Defendants are entitled to present evidence rebutting that purported financial motive or otherwise undermining the alleged purpose of the agreement.  Dr. Carlton opines that if Defendants were seeking to suppress wages, economic theory predicts that they would attempt to maximize the effect of the agreement by broadening its scope and prohibiting exceptions to its terms.  Dr. Carlton ¶ 22.  Instead, the alleged agreement is limited to Supplier employees working for Company A and it has not been used to bar mobility among the companies.  Based on these facts and the other analyses Dr. Carlton performed, Dr. Carlton opines that the alleged agreement is inconsistent with what an economist would expect to see if there was a conspiracy to suppress wages.  Instead, Dr. Carlton opines, the alleged agreement is more consistent with efficiency-enhancing conduct in the manufacture of jet engines.

The Government challenges Dr. Carlton's opinion not because it is wrong, but because they claim that Dr. Carlton "reveale[d] no methodology in reaching [it]."  Mot. at 20.  Contrary to the Government's assertion, however, Dr. Carlton applied economic reasoning to facts, which is entirely appropriate under *Daubert*.  Moreover, the relevant inquiry concerns the size of the logical leap between the data and the opinion proffered. *Cf. Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) ("The objective of [*Daubert*] is to ensure the reliability and relevancy of expert testimony.").  Experts are permitted to derive conclusions from observations using "general truths derived from . . . specialized experience."  *Kumho Tire*, 526 U.S. at 148-49

(ellipses in original); *see also Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 129 (S.D.N.Y. 2014) (admitting opinions based solely on expert's expertise in economics and understanding of mortgage-backed securities).  Testimony rooted in general truths known in a profession is a not the type of unreliable "junk science" that Rule 702 guards against.  *Cf. id.* at 127, 129; *see also Litvak*, 808 F.3d at 180 n.25.  Such testimony should not be excluded, but should instead be tested by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).

## IV.     Defendants have fully complied with their disclosure obligations

The Government asks the Court to preclude Dr. Carlton's opinions based on its unfounded assertion that "the heart of his opinions remains unsupported."  Mot. at 22.  This argument is flawed on multiple levels.  As detailed in his initial disclosure, Dr. Carlton's opinions are supported by rigorous, robust economic analysis.  *See* Gov. Ex. A.  *All of the data* analyzed in connection with Dr. Carlton's opinions was produced to the government, along with the code, programs, and parameters underlying Dr. Carlton's calculations.  These data sets, code, and programs allow the government to replicate *exactly* Dr. Carlton's methodologies and to test his conclusions.  Far from being deficient, Defendants' disclosures go well beyond that required by Rule 16.

The methodologies Dr. Carlton relied upon are well-established.  His application of economic theory and analyses, including regression analyses, are not novel approaches to testing the existence of a market allocation.  As explained herein, the government is well aware of similar econometric methodologies employed in other recent Section 1 cases, where expert testimony describing data analysis was admitted to assist the trier of fact.   *See e.g.*, *DaVita* Dkt. 291 at 1198-1201; *United States v. Aiyer*, 470 F.Supp. 3d 383, 414-15 (S.D.N.Y. 2020).

Since the inception of its investigation, the government has been entirely capable of collecting and analyzing the employee data underlying its allegations of a market allocation conspiracy at any point.  The government could have exercised its subpoena authority to seek the same data that Dr. Carlton analyzed.  It similarly could have obtained—and perhaps did obtain— the very publicly available LinkedIn data that Dr. Carlton analyzed.[7]  Apparently, it chose not to do so, which is particularly surprising given the nature of the charge (conspiracy to allocate a labor market), the alleged purpose underlying the charge (to suppress competition and wages), and the use of similar data by experts in similar cases.  *See* Indictment ¶¶ 19 & 27; *DaVita* Dkt. 291 at 1198-1201.  Thus, Defendants did not "den[y] the government a fair opportunity to meet or rebut [Dr.] Carlton's evidence."  *See* Mot. at 23.

Moreover, Dr. Carlton's initial disclosure properly summarized his opinions and his methodologies in a manner sufficient to allow the government to challenge their reliability.  At this point, the government's hypothetical concerns with Dr. Carlton's findings and testimony go to the weight of that testimony, which can be properly explored on cross-examination.

Dr. Carlton's initial disclosure provided the government with a proper summary of Dr. Carlton's opinions and the bases thereof as contemplated by Rule 16 of the Federal Rules of Criminal Procedure.[8]  The government is entitled to a summary of Dr. Carlton's expert opinion, not a full-on preview of the defense case.  Fed. R. Crim. P. 16.  The Advisory Committee Notes

---

[7] In fact, it is evident from the Government's Rule 16 disclosures to the defense that the government has done at least some LinkedIn research.

[8] Fed. R. Crim. P. 16.  Rule 16(b)(1)(C), as amended in December 2022, requires that the disclosure for each expert witness contain: (1) a complete statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief; (2) the bases and reasons for them; (3) the witness's qualifications, including a list of all publications authored in the previous 10 years; and (4) a list of all other cases in which, during the previous four years, the witness has testified as an expert at trial or by deposition.

to the 2022 amendment provide that "the amendment is not intended to replicate all aspects of practice under the civil rule in criminal cases, which differ in many significant ways from civil cases. The amendment requires a complete statement of all opinions the expert will provide, but does not require a verbatim recitation of the testimony the expert will give at trial." Advisory Committee Notes (2022 adoption). The Defendants complied with these requirements.

Nonetheless, in the spirit of cooperation, Defendants supplemented their disclosure by providing the government with all of the data analyzed in connection with Dr. Carlton's opinions, including:

- Data from the Suppliers that Dr. Carlton relied upon in forming the bases of his opinions, as referenced in paragraph 6 of his report;

- Data from the Bureau of Labor Statistics that Dr. Carlton relied upon in forming the bases of his opinions, as referenced in paragraph 8 of his report;

- Data from LinkedIn that Dr. Carlton relied upon in forming the bases of his opinions, as referenced in paragraph 9 of his report;

- Data from Belcan that Dr. Carlton relied upon in forming the bases of his opinions, as referenced in paragraph 11 of his report;

- Data from QuEST that Dr. Carlton relied upon in forming the bases of his opinions, as referenced in footnote 12 of his report; and

- Identification of the calculations performed that form the bases of Dr. Carlton's opinions, as referenced in paragraphs 8, 9, 11, 12 and footnote 12 of his report.

On March 14, 2023, Defendants produced additional sets of records, which further detail the econometrics performed by Dr. Carlton. These productions included a 50-page summary of Dr. Carlton's empirical analyses, as well as the formulas, programs, and code he used to cull and process the above data sets. *See* Exhibit A (Summary of Empirical Analyses Supporting Carlton Opinions). Section I of the summary describes regression analyses of Belcan and QuEST employee compensation, including his "base" regression analyses (previously provided in "Carlton Report Calculations – 20230221.pdf") as well as sensitivities of those analyses. This

NYACTIVE-22569147.1

section also includes his regression analysis of Agilis' compensation data, which was produced after Dr. Carlton's report was submitted.  Section II of the document summarizes Dr. Carlton's empirical analysis relating to market definition and market power.  This includes Dr. Carlton's analysis of the shares of Employees in the aerospace industry and Employee turnover (previously provided in "Carlton Report Calculations – 20230221.pdf") and other related analyses. Defendants also produced the backup files and code that generate all of the analyses supplied in this summary and Dr. Carlton's report dated February 2, 2023.  Included in this backup was the program that processes the LinkedIn html files, as well as the programs that analyze those data to produce Dr. Carlton's results.

Although the government is not entitled to this level of granularity under Rule 16, these records establish the extraordinary rigor and expertise Dr. Carlton applied in reaching his conclusions.  In view of these further disclosures, the Court denied the government's Motion to Compel Defendants' Expert Discovery re Dennis Carlton.  [ECF No. 404].

Nor are Defendants' extensive disclosures untimely.  Counsel for the Defendants disclosed Dr. Carlton's qualifications, opinions, and the bases thereof on February 2, 2023, the deadline set by the Court.  Even considering the dates of the Defendants' supplemental disclosures, such disclosures are timely as well.  *See, e.g., United States v. Ferguson*, 20087 WL 4539646, at *1-3 (D. Conn. Dec. 14, 2007) (ordering complete expert disclosures "no later than one week prior to the conclusion of the government's case-in-chief"); *United States v. Mencia*, 861 Fed. App'x 736, 751 (11th Cir. 2021) (twelve days before trial sufficient); *United States v. Kidd*, 385 F. Supp. 3d 259, 262–63 (S.D.N.Y. 2019) (three weeks before trial sufficient); *United States v. Murillo*, 2016 WL 5792692, at *3 (W.D. Wash. Oct. 4, 2016) (five days before trial sufficient); *United States v. Cadden*, 2015 WL 13683816, at *2 (D. Mass. Dec. 4, 2015) (two

NYACTIVE-22569147.1

weeks before trial sufficient); *United States v. Rosario*, 2014 WL 6076364, at *4 (S.D.N.Y. Nov. 14, 2014) (less than two weeks before trial sufficient); *United States v. Peel*, 2014 WL 5473141, at *1 (E.D. Cal. Oct. 23, 2014) (25 days before trial sufficient); *United States v. Mohammed*, 2008 WL 5552330, at *3 (D.D.C. May 6, 2008) (two weeks before trial sufficient).[9]

In short, Defendants' detailed disclosures setting forth Dr. Carlton's expert background, qualifications, opinions, and the bases thereof are both timely and more than sufficient for purposes of Rule 16.  There is no basis to exclude Dr. Carlton's testimony.

## CONCLUSION

For all of the reasons set forth above, and in Defendants' opening brief, the Court should deny in full the Government's Motion *in Limine* #12 to exclude or limit the expert opinions of Dr. Dennis W. Carlton.

Respectfully submitted,
/s/
BRIAN E. SPEARS (ct14240)
IVAN LADD-SMITH (ct30982)
LESLIE A. CAHILL (ct31242)
Spears Manning & Martini LLC
2425 Post Road, Suite 203
Southport, CT 06890
T: (203) 292-9766
F: (203) 292-9682
Email: bspears@spearsmanning.com

*Counsel for Mahesh Patel*

---

[9] To the extent the Government seeks to admit any rebuttal expert testimony, to date the Government has not provided any rebuttal expert notice or disclosure.

/s/                 

GUY PETRILLO (pro hac vice)
CAELYN STEPHENS (pro hac vice)
Petrillo Klein & Boxer LLP
655 Third Avenue 22nd Floor
New York, NY 10017
T: (212) 370-0330
Email: gpetrillo@pkbllp.com

PAUL MCCONNELL (ct29062)
71 Elm Street, Suite 20
New Canaan, CT 066840
T: (203) 344-7007
F: (203) 344-7009
Email: paul.mcconnell@familylaw.com

*Counsel for Robert Harvey*

/s/                 

MARC A. WEINSTEIN (pro hac vice)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
T: (212) 837-6460
F: (212) 299-6460
Email: marc.weinstein@hugheshubbard.com

CRAIG A. RAABE (ct04116)
Izard, Kindall & Raabe LLP
29 South Main Street,
West Hartford, CT 06107
T: (860) 513-2939
F: (860) 493-6290
Email: craabe@ikrlaw.com

*Counsel for Harpreet Wasan*

NYACTIVE-22569147.1

/s/ _____
RICHARD F. ALBERT (pro hac vice)
PENINA MOISA (pro hac vice pending)
JORJA KNAUER (pro hac vice pending)
Morvillo, Abramowitz, Grand, Iason & Anello
P.C.

565 Fifth Avenue
New York, NY 10017
T: (212) 880-9560
F: (212) 856-9494
Email: ralbert@maglaw.com

PATRICK A. KLINGMAN (ct17813)
Klingman Law, LLC
280 Trumbull Street, 21st Floor
Hartford, CT 06013
T: (860) 256-6120
Email: pak@klingmanlaw.com

*Counsel for Steven Houghtaling*

/s/ _____
MARC SIEGEL (pro hac vice)
Farmer Brownstein Jaeger Goldstein Klein &
Siegel LLP

235 Montgomery Street, Suite 835
San Francisco, California 94104
T: 415-795-2050
F: 415-520-5678
Email: msiegel@fbjgk.com

JAMES M. MORIARTY (ct21876)
Zeisler & Zeisler, P.C.
10 Middle Street, 15th Floor
Bridgeport, Connecticut 06604
T: (203) 368-4234
F: (203) 368-5485
Email: jmoriarty@zeislaw.com

NYACTIVE-22569147.1

ANTHONY CHARLES LAKE (pro hac vice)
CRAIG A. GILLEN (pro hac vice)
Gillen Withers & Lake LLC
400 Galleria Parkway
Suite 1920
Atlanta, GA 30339
T: (404) 842-9700
F: (404) 842-9750
Email: aclake@gwllawfirm.com

*Counsel for Tom Edwards*

/s/ _____
AUDREY A. FELSEN (ct20891)
Koffsky & Felsen, LLC
1150 Bedford Street
Stamford, CT 06905
T: (203) 327-1500
F: (203) 327-7660
Email: afelsen@aol.com

*Counsel for Gary Prus*

NYACTIVE-22569147.1

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2023, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.   Parties may access this filing through the Court's CM/ECF system.

/s/Brian E. Spears
Brian E. Spears