UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 3:21-CR-220 (VAB) |
| | : | |
| v. | : | |
| | : | |
| MAHESH PATEL, | : | March 20, 2023 |
| ROBERT HARVEY, | : | |
| HARPREET WASAN, | : | |
| STEVEN HOUGHTALING, | : | |
| TOM EDWARDS, and | : | |
| GARY PRUS | : | |

### THE UNITED STATES' OBJECTIONS TO
### DEFENDANTS' PROPOSED JURY INSTRUCTIONS

The Government respectfully submits its objections to Defendants' proposed jury instructions. The substantive length of this submission requires some explanation: The Government believes that Defendants' proposals significantly misstate the law of Sherman Act per se cases, import significant case-specific information into what should be standard, generalized instructions, and generally read as defense closing arguments rather than instructions to a lay jury. Importantly, both parties use the same two sources for a significant amount of their jury instructions—(1) ABA Section of Antitrust Law, *Model Jury Instructions in Criminal Antitrust Cases* (2009), and (2) the instructions delivered in the price-fixing case of *United States v. Aiyer*, No. 18-cr-333 (JGK) (S.D.N.Y. Nov 20, 2019) (ECF No. 180). The Government, however, hews far more closely to those models, and has articulated specific, well-founded reasons for departing from them.

The Government respectfully submits that those two sources should form the baseline for the Court's instructions with deviations for certain novel issues specific to this case (like the

definition of an employee allocation conspiracy, and a potential ancillary restraint defense) or for specific issues in this case where the weight of the law supports an alternative instruction (for example, on whether a per se offense requires the "elimination," as opposed to the restriction or minimization, of competition). For the Court's convenience, the Government has attached the *U.S. v. Aiyer* instructions to these objections as Exhibit A. The ABA Model Jury Instructions are available on Westlaw under the citation ABA-JI-CRIMANTI 3.

Because of the significance of Defendants' Proposed Jury Instruction No. 4 to this case, and the extent of the Government's objections to it, the Government begins with its objections to that proposed instruction, and follows with objections to the remainder of Defendants' proposed instructions in their consecutively numbered order.

## GOVERNMENT'S OBJECTIONS TO DEFENDANTS' PROPOSED INSTRUCTION NO. 4 ("ALLOCATING A LABOR MARKET")

The Government objects to this proposed instruction in its entirety, for several reasons discussed below. The Government respectfully requests that the Court utilize its proposed instruction on "Employee Allocation Conspiracy, Defined," which is consistent with the law on market allocation conspiracies.

As an initial matter, Defendants' Proposed Instruction No. 4 goes astray from the very beginning, when it purports to instruct the jurors that they, and not this Court, will decide whether the conspiracy alleged in this case constitutes a *per se* offense. That is an issue of law, one that the Court has already decided. *See* Order, Dkt. 257, at 17 ("the alleged conduct is subject to *per se* treatment because it is properly pled as a market allocation"). Certainly, the Government must convince the jury beyond a reasonable doubt that such a conspiracy existed and that Defendants knowingly joined it (and, if necessary, that the restraint as charged is not an ancillary restraint), but the jury will not re-decide that initial, basic question of law. Nor does such a legal issue need to be explained to the jury—that in *other* cases, on *different* allegations, a restriction on hiring or recruiting may not constitute a *per se* offense—in order for the jury to perform its proper function in this case.

## I.   DEFENDANTS' PROPOSED "SUB-ELEMENTS" TO THE FIRST ELEMENT OF A *PER SE* VIOLATION ARE UNSUPPORTED, CONFUSING AND INCORRECT.

Defendants seek improperly to multiply the elements that the Government must prove to establish the existence of a *per se* conspiracy. Defendants recognize that the first element of the charged offense is the existence of an employee allocation conspiracy, but they contend— without any support in any case or model instruction—that this element has three distinct sub-

elements: (1) "the existence of a relevant labor market," (2) "an agreement to end meaningful competition" and (3) that the conspiracy was "for the purpose of eliminating competition for labor within th[e] relevant market." Defs. Proposed Instructions, Dkt. 396 at 9. These unsupported and duplicative sub-elements misstate the Government's burden and will confuse the jury.

### a. <u>The Government Need Not Prove the Existence of a "Relevant Market."</u>

Defendants' assertion that the Government must prove "the existence of a relevant labor market" is incorrect. The Government does not need to define a relevant market to prove a *per se* violation. *See FTC v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 430 (1990) (*per se* rules avoid "an incredibly complicated and prolonged economic investigation," including "the enormous complexities of market definition" (cleaned up)). Rather, under the *per se* rule, the plaintiff "need prove only that [the offense conduct] occurred in order to win [its] case, there being no other elements to the offense and no allowable defense." *United States v. Aiyer*, 33 F.4th 97, 115 (2d Cir. 2022) (quoting *United States v. Koppers Co.*, 652 F.2d 290, 294 (2d Cir. 1981)).[1] Notably, Defendants' proposed market definition "element" does not appear in either the ABA or *Aiyer* models.

---

[1] This conclusion necessarily follows from the nature of a *per se* case. As the Court well knows, the per se rule "do[es] not require proof that an agreement . . . is, in fact, anticompetitive in the particular circumstances," *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998), because "[t]he anticompetitive potential inherent in all" *per se* unlawful "agreements justifies their facial invalidation even if procompetitive justifications are offered for some," *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 351 (1982); *see Aiyer*, 33 F.4th at 118 n.17 ("[I]n a *per se* case, resulting anticompetitive effects need not be proved."). Market definition, which is a tool for assessing competitive effects, is therefore not a necessary element of a *per se* offense. *See Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 53 & n.5 (2d Cir. 2016) (had plaintiffs stated "a *per se* violation of the Sherman Act," they would have been "relieve[d] . . . from the requirement of demonstrating a market-wide anticompetitive effect"); *United States v. Apple, Inc.*, 791 F.3d 290, 321 (2d Cir. 2015) ("case-by-case analysis" of competitive effects "is unnecessary" in *per se* cases).

Even assuming *arguendo* that the Government *was* required to prove that the charged conspiracy occurred within some relevant market, the Court has already identified that market and confirmed that the Indictment sufficiently describes it. Order, Dkt. 257 at 21 ("[T]his agreement, as described in the Indictment, is sufficient because it describes a horizontal agreement to allocate employees in a specific labor market."); *id.* at 33 ("Here, the alleged restraint is a no poach agreement in the labor market for engineers and high-skilled workers working on projects for Company A."). Thus, if the Government proves that Defendants participated in a conspiracy to allocate employees working on projects for Company A, it will have necessarily proven all that it needs to show to establish the existence of the charged conspiracy.

**b.   "Elimination of Meaningful Competition" is Contrary to Law.**

In their second proposed sub-element of the first element of a *per se* offense, Defendants erroneously state that a *per se* employee allocation conspiracy must be an agreement "to end meaningful competition …for the services of each other's employees…."  Defs. Proposed Instructions, Dkt. 396 at 9. While this language was used by the district court in *United States v. DaVita*, Case No. 1:21-cr-00229-RBJ (D. Colo.), it is inconsistent with Supreme Court and appellate case law, and is plainly incorrect.

In *United States v. Topco Assocs., Inc.*, the Supreme Court described the *per se* category of "market allocation" as a conspiracy between competitors "to *minimize* competition," not to eliminate it. *Topco*, 405 U.S. 596, 608 (1972) (emphasis added). Other Supreme Court and appellate case law supports this distinction. In *Socony-Vacuum*, a case involving a conspiracy to fix prices of gasoline, the Supreme Court stated: "*That the volume of purchases did not eliminate all competition*, that the spot market prices were still determined by competitive forces, that the

volume of purchases under the buying programs was relatively small are wholly immaterial." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 235 (1940) (emphasis added).  In *United States v. Coop. Theatres of Ohio, Inc.*, 845 F.2d 1367, 1371, 1373 (6th Cir. 1988), the Sixth Circuit affirmed convictions for a customer allocation conspiracy, holding that the charged agreement between competitors not to solicit each other's current customers was *per se* illegal even though the competitors remained free to accept unsolicited business from those same customers.  In *Blackburn v. Sweeney*, 53 F.3d 825, 827 (7th Cir. 1995), a case involving an agreement between two law firms not to place competing client solicitations in certain geographical areas within the State of Indiana, the Seventh Circuit rejected the defendant's argument that the two firms' ability to continue practicing law across the entire state (notwithstanding their agreement not to *solicit* each other's clients) precluded *per se* treatment— "[t]o fit under the *per se* rule an agreement need not foreclose all possible avenues of competition."

Based on this case law, the "object" or purpose of an employee allocation conspiracy need not be to eliminate competition for the subject employees. Indeed, as *Socony-Vacuum*, *Blackburn* and *Cooperative Theatres* demonstrate, the agreement does not even need to touch all *modes* of competition for those employees. It need only "restrict" or "minimize" one mode of competition.[2] The Government's proposed instruction on "Employee Allocation Conspiracy,

---

[2] *See also In re Ry. Indus. Employee No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 481 (W.D. Pa. 2019) ("An agreement among employers that they will not compete against each other for the services of a particular employee or prospective employee is, in fact, a service division agreement, analogous to a product division agreement." (quoting XII Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 2013b at 148 (3d ed. 2012)); *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19–20 (1979) (the *per se* inquiry applies to practices that appear "to be ones that would always or almost always tend to *restrict* competition and decrease output" as opposed to practices designed to "increase economic efficiency and render markets more, rather than less, competitive." (emphasis added)).

Defined," which uses the word "restrict" to describe the purpose of an employee allocation conspiracy, correctly states the law on this matter.

### c. Defendants' Misuse of the Word "Purpose" Renders Their Instruction Incorrect and Misleading.

Defendants' third sub-element of the first element of a *per se* offense states that the jury must find that the conspiracy was for the "purpose of eliminating competition." Aside from using the incorrect phrase "eliminate" (see above), Defendants' lengthy explication of this so-called third element badly misconstrues the legal concept of "purpose" or "goal" in conspiracy law. What results is an improper instruction to the jury that turns the straightforward question of whether a conspiracy to allocate employees existed, into a multi-factor analysis that hinges on the subjective motive or intent of Defendants, which is irrelevant in a *per se* case.

Defendants' misunderstanding manifests itself in the following erroneous statement in Instruction No. 4, among others:

> The goal of a labor market allocation conspiracy, as opposed to an agreement to restrict hiring or recruiting that does not have the goal of allocating a labor market, is the elimination of competition for labor. Evidence that the restrictions not to hire or recruit had a different purpose, e.g., to benefit or not impede projects for Pratt & Whitney and to ensure that the suppliers had the necessary talent to complete their assigned statements of work, has been admitted to assist you in deciding whether the agreement existed to allocate a labor market for engineers and skilled-labor workers as charged, or something else. Dkt. 396 at 10.

This instruction confuses the basic objective or purpose of a conspiracy—as alleged in this case, the allocation of employees—with the "goals," motivations, or subjective intentions of the individual Defendants. The "object" or "purpose" of a criminal conspiracy is to accomplish an unlawful act—in this case, allocating employees. The *motive* or *intent* of individual conspirators is something quite different. In a money laundering scheme, for example, one

conspirator may join the conspiracy with the intention to pay off his student loans. Another may join the conspiracy to purchase a Ferrari. Perhaps *all* the conspirators joined the money laundering conspiracy in order to maximize the amount of funds they could collectively contribute to a charitable organization. Their individual motives may be different or the same, they may be nefarious or noble, but the "purpose" of the *conspiracy* is to launder money as defined by the relevant statute.

In a *per se* Sherman Act case, just the same, the law does not hinge upon the Defendants' subjective intentions or motives, so long as they knowingly joined the conspiracy—a requirement completely separate from the requirement that the conspiracy existed and best addressed in separate instructions, as the Government has proposed. Under black letter law, it makes no difference whether a conspirator joined the conspiracy with the "goal" of bettering his company's relationship with its client or customer, or even saving his company from financial ruin. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221 (1940) ("[Congress] has not permitted the age-old cry of ruinous competition and competitive evils to be a defense to [*per s*e] conspiracies.").[3] Indeed, the whole point of the *per se* rule is that Congress rendered certain types of conspiracies unreasonable, and thus unlawful, as a matter of law, without regard to the motives or justifications offered by conspirators. *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 101 n.23 (1984) ("[I]t is . . . well settled that good motives will not validate an otherwise

---

[3] *See also Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 754 F. Supp. 1336, 1359 (N.D. Ill. 1991), aff'd, 961 F.2d 667 (7th Cir. 1992) ("'We do it because it's more profitable' is not a defense under the Sherman Act."); *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 870 (N.D. Ill. 2010) ("While Defendants frequently refer to their financial constraints as an element in their defense, an unforgiving market offers no excuse for violating antitrust laws."); *New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 399, 418 (S.D.N.Y. 2000) ("Defendants' [ancillary restraint] argument boils down to an assertion that competition would result in financial hardship on defendants.").

anticompetitive practice."); *United States v. McKesson & Robbins, Inc.*, 351 U.S. 305, 309–10 (1956) ("It makes no difference whether the motives of the participants are good or evil.");*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221–22 (1940) ("[Congress] has no more allowed genuine or fancied competitive abuses as a legal justification for [per se unlawful] schemes than it has the good intentions of the members of the combination."); *United States v. Apple, Inc.*, 791 F.3d 290, 317 (2d Cir. 2015) ("'Antitrust law has never required identical motives among conspirators' when their independent reasons for joining together lead to collusive action."(citation omitted)).

The only question in this case when it comes to the first element of a *per se* violation is whether one object of the charged conspiracy was to allocate employees. If it was, the first element of a *per se* conspiracy charge has been met, no matter what other motivations or intentions might be grafted on top of that basic practical objective. On the other hand, if the charged conspiracy did not have the object of allocating employees, the first element has not been met.  Defendants cannot circumvent this binary question by smuggling concepts of subjective intent and motivation into the straightforward question of a conspiracy's purpose or object.

## II.    <u>"Allocate Employees," Not "Allocate a Labor Market"</u>

The Government also objects to Defendants' Proposed Instruction No. 4's description of the charged offense as a "conspiracy to allocate a labor market," and its reference to a "labor market" several times in the instruction. A "market allocation" refers to an agreement between horizontal competitors to restrict or minimize competition between them in any aspect of a market, whether by territory, resources, products, services, customers, or—in this case—labor. The Indictment charges a conspiracy to "allocate employees," which is *per se* unlawful without

proof of a relevant market, for the reasons explained above. *Supra* at 9. This Court has already held that this allegation suffices to describe a *per se* violation. Order, Dkt. 257 at 21 ("this agreement, as described in the Indictment, is sufficient because it describes a horizontal agreement to allocate employees in a specific labor market."). The simplest and most intuitive way to describe the conspiracy charged in this case is to call it an "Agreement to Allocate Employees."

### III.   Addition to the Government's Proposed "Employee Allocation Conspiracy" Instruction

The Government recognizes that its proposed "Employee Allocation Conspiracy, Defined" instruction could convey more clearly that the charged conspiracy must have involved more than one actual or potential horizontal competitor for the labor of the relevant employees in this case. The Government proposes to correct this ambiguity with the following underlined addition to its instruction:

> The Defendants are charged with participating in a conspiracy **between actual or potential competitors for labor** to allocate employees—that is, an agreement or mutual understanding among them and other individuals and companies to restrict their respective companies' competition for each other's employees

**GOVERNMENT'S OBJECTIONS TO DEFENDANTS' PROPOSED JURY
INSTRUCTION NO. 1 ("ELEMENTS OF THE OFFENSE")**

Defendants' Proposed Jury Instruction No. 1 goes well beyond the elements of a *per se*
Sherman Act offense by seeking to explain legal concepts like "naked agreements" and
"horizontal restraints," none of which are germane to an instruction on the elements of the crime.
Aside from its recitation of the elements, this proposed instruction has no analog in the ABA
model, nor apparently in any case ever brought to trial. The Court should adopt the recitation of
the elements as stated in the Government's instruction, which tracks the instructions from the
ABA model and the district court's instruction in *U.S. v. Aiyer*.

Defendants' Proposed Instruction No. 1 also unnecessarily defines the term "naked
agreement."  Dkt. 396 at 2-3. A "naked agreement" is simply one that is not ancillary. *Major
League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 341 (2d Cir. 2008) (Sotomayor,
J. concurring) ("[T]he ancillary restraints framework is a superior method for analyzing the
challenged restraints here because it effectively isolates when an exclusive arrangement should
be reviewed under the rule of reason, as a reasonably necessary part of a joint venture, and when
it should be reviewed as a naked restraint."); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l
Football League*, 726 F.2d 1381, 1395 (9th Cir. 1984) (the practical "effect of a finding of
ancillarity is to remove the *per se* label from restraints otherwise falling within that category"
(internal quotations omitted)). If Defendants meet their burden of production on their anticipated
ancillary restraint defense, they will have warranted a separate instruction on that defense and
can argue it to the jury.[4] If they do not meet their burden of production, and no ancillary restraint

---

[4] As discussed below, in response to Defendants Proposed Jury Instruction No. 9, the
Government's current position is that the anticipated evidence in this case will not warrant a jury
instruction on ancillary restraints.  If Defendants are able to meet their burden of production on
that issue, the Court should give an instruction consistent with the law as described in the
Government's proposed ancillary restraint instruction, included below.

instruction is given, they cannot then argue that the restraint was not "naked." Either way, the jury will not be charged with deciding, as a *factual* matter, whether the conspiracy charged in the Indictment is a naked restraint of trade—it is, as a matter of law, as this Court has already decided. *See* Order, Dkt. 257 at 29 ("[B]ased on the allegations in the Indictment, the alleged no poach agreement is not ancillary."). The question left for the jury will be whether the Government has proven the existence of that conspiracy beyond a reasonable doubt.

In addition, the Defendants' assertion that a *per se* conspiracy "has no purpose beyond suppressing competition" (Dkt. 396 at 3) is misleading and incorrect. As explained above in response to Defendants' Proposed Jury Instruction No. 4, Defendants repeatedly and improperly conflate the "object" of a conspiracy with the subjective motive and intent of the conspirators. As the Court is aware, the Sherman Act renders certain types of conspiracies unlawful regardless of how well-meaning or "reasonable" they may seem or may have seemed to the members of the conspiracy. The only "purpose" that directly bears on the elements of a *per se* offense is the purpose (or, more accurately, "object") of the charged conspiracy, and that question is binary— was one of the conspiracy's purposes to allocate employees, or was it not to allocate employees? If it was to allocate employees, it is *per se* illegal, regardless of what other subjective motives or intent may have come into the minds of one or more conspirators.

Finally, when it comes to the elements themselves, Defendants' proposed instruction seeks to define the second element ("knowingly joining the conspiracy") as "knowing of [the conspiracy's] goal and intending to help accomplish it." Dkt. 396 at 3. This addition (which appears in neither the ABA nor *Aiyer* models) is both unnecessary and wrong.  Both parties have already included proposed instructions on the second element of a *per se* violation, so there is no need to explain it here. Moreover, Defendants' use of the word "goal"—like its earlier use of the

word "purpose"—is misleading and unhelpful.

**GOVERNMENT'S OBJECTIONS TO DEFENDANTS' PROPOSED JURY INSTRUCTION NO. 2 ("FIRST ELEMENT – EXISTENCE OF CONSPIRACY")**

The Government objects to several statements in this instruction, all of which involve departures from the ABA and *Aiyer* models. The Government requests that the Court instruct the jury using the Government's formulation on the "Existence of Conspiracy," with one inclusion from Defendants' proposal, as noted below.

First, the Government objects (again) to Defendants' use of the word "naked" to describe the conspiracy the Government must prove. "Naked" is unnecessary here because a *per se* illegal agreement that is not ancillary is by definition "naked," and if Defendants meet their burden of production on the ancillary restraint defense, they will get an instruction on that issue. Implying that there is a category between "naked" and "ancillary" has no basis in the law.

The Government also objects to the Defendants' use of the phrase "allocate a market" to describe the charged conspiracy. This phrase incorrectly suggests that the Government must prove the existence of a relevant market, and that the conspiracy's object must have been to allocate that "market." As explained above in the Government's objections to Defendants Proposed Jury Instruction No. 4, both premises are incorrect.

The Government also objects to Defendants' inclusion of the phrase "meeting of the minds," which is not included in the ABA or *Aiyer* models, in their definition of "conspiracy." Dkt. 396 at 4. A reasonable juror might misconstrue such language to require a perfect match in how co-conspirators understood the scope or details of the conspiracy, which is not required and may pose particular confusion in this case, which involves a charged conspiracy that developed over the course of eight years with many participants and changing roles. The "agreement or mutual understanding" language included in the ABA and *Aiyer* models, and used by both

14

parties here, constitutes the standard definition of a conspiracy. *See also United States v. Lischewski*, 860 Fed. App'x 512, 514 (9th Cir. 2021) (upholding "mutual understanding").

The Government has no objection to the final paragraph of Defendants' Proposed Instruction No. 2 regarding the law on "single actors."

## GOVERNMENT'S OBJECTIONS TO DEFENDANTS' JURY INSTRUCTION NO. 3 ("INDEPENDENT ACTION")

The Government objects to Defendants' Proposed Instruction No. 3 in its entirety. This instruction has no analog in the ABA or *Aiyer* models and Defendants provide no citation to any similar jury instruction being given in a Sherman Act case. This instruction is self-serving and appears intended to highlight a potential defense argument rather than explain the elements of the charge to the jury. For one thing, the concept of "independent action" is already covered by the following language included in both parties' proposed general conspiracy instructions (which, in turn, are derived from the ABA model):

> Mere similarity of conduct among various persons, however, or the fact that they may have associated with one another and may have met or assembled together and discussed common aims and interests, does not necessarily establish the existence of a conspiracy. If actions were taken independently by them, solely as a matter of individual business judgment, without any agreement or mutual understanding among them, then there would be no conspiracy. Dkt. 369 at 5.

This language sufficiently covers the field on the independent action issue.  Nothing more is required to convey that point.

Defendants' proposed instruction is also incorrect and misleading because it blurs the crucial difference between "independent action" and "independent decision-making." As reflected in both parties' proposed general conspiracy instruction, the Sherman Act does not outlaw "actions …taken independently…*solely as a matter of individual business judgment.*" Dkt. 396 at 5. However, independent action can just as well constitute conspiratorial activity when it is taken *pursuant to a mutual understanding*. Defendants' instruction wrongly implies that independent action by a co-conspirator, in and of itself, tends to disprove the existence of conspiracy, when in fact the meaning and relevance of such action depends entirely on whether it

16

was taken as part of a mutual understanding.[5]

More broadly, this proposed instruction is overly argumentative and appears designed to embed obvious defense arguments into the court's jury instructions. Jury instructions are not the proper vehicle for Defendants to make such arguments.

---

[5] Relatedly, Defendants propose to instruct the jury that "[a] business may decide based on its own independent business judgment not to hire a person, for example, because the hiring of the person may affect business or customer relationships." Dkt. 396 at 7. This statement wrongly implies that deciding not to hire an individual because it "may affect business or customer relationships" is somehow in conflict with the existence of a conspiracy or Defendants' participation in it. As this Court and others have acknowledged, a party may join a conspiracy based on its desire to ingratiate itself to a co-conspirator, or based on pressure applied by a co-conspirator with power. Order, Dkt. 257 at 33 ("Company A's vertical relationship to Companies B through F allegedly created a position of power that enabled Company A and Mr. Patel to convince the other companies to participate and ensure the companies are abiding by the agreement."); *see In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 344-45 (3d Cir. 2010) (hub and spoke *per se* conspiracy sufficiently pled where "plaintiffs' allegations paint a conspiracy in which the hub, Marsh, held an unusual amount of power and may even have been able economically to "coerce" the insurers into the non-competition agreement."). The key in a conspiracy case is not *why* the conspirators joined the conspiracy, but *whether* they knowingly joined it.

## <u>GOVERNMENT'S OBJECTION TO DEFENDANTS' PROPOSED INSTRUCTION NO.<br>5 ("FIRST ELEMENT—SINGLE V. MULTIPLE CONSPIRACIES")</u>

The Government objects to this proposed instruction because the Indictment in this case alleges a single conspiracy, and Defendants are "'not entitled to a multiple conspiracy charge' when 'only one conspiracy has been alleged and proved.'" *United States v. Pena*, 846 Fed. Appx. 49, 51 (2d Cir. 2021) (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 962 (2d Cir. 1990)).

For a multiple conspiracy charge "to be warranted, there should be evidence of 'separate networks operating independently of each other.'" *United States v. Wiley*, Crim. No. 3:21-cr-98 (JBA), 2022 WL 17736914, at *3 (D. Conn. Dec. 16, 2022) (quoting *Maldonado-Rivera*, 922 F.2d at 962). The appropriate time to argue whether the "proof at trial may show multiple separate conspiracies rather than the single conspiracy alleged in the indictment. . . [is] at the conclusion of the Government's case-in-chief." *United States v. Jones*, 652 F. Supp 1561, 1565 (S.D.N.Y. 1986).

Should the evidence warrant a multiple conspiracy instruction, the Government proposes that the Court utilize the instruction contained in the ABA Section of Antitrust Law, *Model Jury Instructions in Criminal Antitrust Cases*, 4-B-7 (2009), which is a more balanced instruction that the one Defendants have proposed. For the Court's convenience, a copy of that instruction is attached hereto as Exhibit B.

**GOVERNMENT'S OBJECTIONS TO DEFENDANTS' PROPOSED JURY
INSTRUCTION NO. 6 ("SECOND ELEMENT – KNOWINGLY JOINED")**

The Government objects to this proposed instruction because, like other of Defendants' instructions, it improperly conflates the notion of "purpose" in a conspiracy case with concepts of subjective intent and motivation, and includes case-specific argumentation that is not appropriate in a jury instruction. The Government respectfully requests that the Court use its proposed instruction on the second element of a *per se* violation, which derives primarily from the ABA and *Aiyer* models, and Judge Sand's jury instructions on "membership in a conspiracy."

Defendants' proposal includes several improper references to Defendants' subjective intent or motive, in ways that depart significantly from the ABA and *Aiyer* models and obfuscate the simple, core requirement that the Defendants knowingly joined the employee allocation conspiracy with the intent to aid and further its allocation of employees.  For example, Defendants assert that the Government must prove that "Defendant joined the alleged market allocation conspiracy as charged in the Indictment that is, the alleged conspiracy to eliminate competition for the labor of engineers and skilled-labor workers working on projects for Pratt & Whitney, **as opposed to some other purpose.**" Dkt. 396 at 15. But as described above, this formulation strongly implies that the Government must prove a Defendant's subjective intent or motive to accomplish an anticompetitive end, when what is required under controlling case law is merely that the Defendant knowingly joined a conspiracy that had the "object" of allocating employees. *Aiyer*, 33 F.4th at 124-25 ("[B]ecause conspiring to" engage in a *per se* offense "is illegal without regard to [its] actual effects on trade, there is likewise no need for the government to prove that a defendant in a criminal case was consciously aware that anticompetitive effects would most likely result from his alleged misconduct."); *United States v. Koppers Co.*, 652 F.2d

290, 295 n.6 (2d Cir. 1981) ("Where per se conduct is found, a finding of intent to conspire to commit the offense is sufficient; a requirement that intent go further and envision actual anti-competitive results would reopen the very questions of reasonableness which the per se rule is designed to avoid.").

Once again, Defendants are trying to turn a binary question—whether or not Defendants knowingly joined an employee allocation conspiracy—into a multi-factor analysis of what Defendants' "conscious objective" was. Dkt. 396 at 15. This conflation of subjective intent and conspiratorial purpose infects most of Defendants' Proposed Jury Instruction No. 6.  It enables them, for example, to assert that "evidence of procompetitive benefits or lack of harm might be relevant to determining whether one or more Defendants knowingly entered into an agreement with the purpose of allocating the market." Dkt. 396 at 16. But as explained by the Government in its Motion *in Limine* # 1, under the Second Circuit's opinion in *Aiyer*, pure procompetitive benefits evidence—as opposed to limited types of evidence regarding the absence of *anticompetitive* effects— is irrelevant to a *per se* Sherman Act violation precisely because such evidence goes only to the "reasonableness" of Defendants' conduct, and "reasonableness" is not a factor in *per se* cases. Dkt. 289-1 at 19-20.

The Government also objects to Defendants' statement that the jury's determination of the second element "must be based solely on the actions of that Defendant, as established by the evidence." Dkt. 396 at 16. As the Government notes in its corresponding instruction, Judge Sand's jury instructions on "Membership in the Conspiracy" contain a different, and more accurate instruction, that "the defendant's participation in the conspiracy must be established by independent evidence of his own acts or statements, as well as those of the other alleged co-conspirators, and the reasonable inferences that may be drawn from them." *See* Govt. Proposed

Jury Instructions, Dkt. 398 at 37. The Government respectfully submits that the Court should adopt Judge Sand's instruction on this important issue.

## GOVERNMENT'S OBJECTIONS TO DEFENDANTS' PROPOSED JURY INSTRUCTION NO. 7 ("THIRD ELEMENT – INSTERSTATE COMMERCE")

The Government objects to this proposed instruction because it does not sufficiently explain the "within the flow of interstate commerce" and "effect on interstate commerce" tests, which are not intuitive concepts to a lay jury. The Government believes that these concepts require a more fulsome explanation, and thus respectfully requests that the Court use its proposed instruction on this element, which is supported by relevant Supreme Court case law and the ABA model.

## GOVERNMENT'S OBJECTIONS TO DEFENDANTS' PROPOSED JURY INSTRUCTION NO. 8 ("PROOF OF MOTIVE")

The Government objects to this proposed instruction as unnecessary, given that the jury will be instructed on the proper elements of a Sherman Act violation. This instruction is also factually and legally incomplete. First, it only partly describes the Government's proof of Defendants' motive to join the charged conspiracy. While the Government anticipates offering evidence that some or all Defendants were motivated by a desire to suppress employee wages, the Government anticipates that other motives will be shown as well, including that some of the Defendants were motivated to enter into the charged conspiracy to please their common customer (Pratt & Whitney) and, in particular, Defendant Mahesh Patel. Any instruction that describes the Government's evidence of motive should include *all* such evidence, which will not be determinable until the close of trial.

Second, and relatedly, if the Court deems it necessary to discuss the issue of motive in its instructions to the jury, such instruction should ensure that the jury does not confuse the question of Defendants' "motive" with the question of the conspiracy's "purpose."  Specifically, any such instruction should state the black-letter law that "[i]t makes no difference whether the motives of the participants [in the conspiracy] are good or evil," *United States v. McKesson & Robbins, Inc.*, 351 U.S. 305, 309–10 (1956), and "good motives will not validate an otherwise anticompetitive practice," *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 101 n.23 (1984). Any such instruction should also make clear that it is irrelevant whether all Defendants had the same motive, or different motives, to enter into the conspiracy. *United States v. Apple, Inc.*, 791 F.3d 290, 317 (2d Cir. 2015) ("'Antitrust law has never required identical motives among conspirators' when their independent reasons for joining together lead to collusive action.").

23

## GOVERNMENT'S OBJECTIONS TO DEFENDANTS' PROPOSED JURY INSTRUCTION NO. 9 ("ANCILLARY RESTRAINTS")

The Government objects to this proposed instruction in its entirety, unless and until Defendants have met their burden of production through evidence admitted at trial. As explained in the Government's opposition to Defendants' motion to dismiss the Indictment (Dkt. 216 at 10–11), if the defendant asserts that he or she has a defense that tends to negate an element of the offense—as Defendants appear to be doing here with respect to the doctrine of ancillary restraints[6]—the defendant bears at least a burden of production before the jury can be charged regarding the potential defense. *See United States v. Carr*, 582 F.2d 242, 246 (2d Cir. 1978); *Januszewski v. Manson*, 525 F. Supp. 805, 810-11 (D. Conn. 1981). A defendant may satisfy the burden of production by making "an initial showing on each key element of the [defense] theory" with "credible" and "admissible evidence" so that the court can determine that "an adequate basis in fact exists for the [jury] charge." *United States v. Bok*, 156 F.3d 157, 163-64 (2d Cir. 1998) (discussing "return of capital theory" defense to tax evasion). Accordingly, whether an instruction on ancillary restraints is warranted must wait until all of the evidence is in the record.[7]

Even if an ancillary restraint instruction is warranted at the close of evidence,

---

[6] "Non-ancillarity" is not an element of a *per se* Sherman Act violation, as evidenced by the fact that Defendants do not cite a single Sherman Act case in which the Government was required to prove affirmatively that the charged conspiracy was *not* ancillary. At most, the ancillary restraint doctrine is a defense that negates an element of the charge (the existence of a *per se* conspiracy), and thus—under the case law cited above—imposes the burden of production on Defendants, just like in any other similar type of defense.

[7] The Government maintains its position—stated in its Motion *in Limine* No. 1—that the Court should require Defendants to proffer their ancillary restraint evidence prior to trial in order to ensure that days of prejudicial and irrelevant procompetitive benefits evidence is not unduly admitted for a defense that will ultimately fail to warrant a jury instruction.

Defendants' proposal is legally incorrect, as explained below. In response to Defendants' proposed instruction, the Government has proposed its own alternative ancillary restraints instruction to be given in the event that Defendants meet their burden of production. That proposed instruction is attached hereto as Exhibit C.[8]

Defendants and the Government appear to agree that the ancillary restraints defense has three core elements: (1) there must have been a "legitimate business collaboration" between competing employers; (2) the charged employee allocation agreement must have been "subordinate and collateral" to that legitimate business collaboration; and (3) the charged employee allocation agreement must have been "reasonably necessary" to one of the collaboration's procompetitive benefits. The parties, however, disagree over the meaning of each of these elements.

"Legitimate Business Collaboration"

Defendants interpret the phrase "legitimate business collaboration" in a manner that would bring virtually any "relationship" between any of the parties within the ambit of an ancillary restraint defense. That is clearly not the law, for several reasons. First, as explained in the Government's Motion *in Limine* # 1, under controlling case law and the Court's own

---

[8] During briefing on Defendants' motion to dismiss, the Government noted that, generally, the ancillary restraints defense is treated as a justification or excuse, rather than as a defense that tends to negate an element of the crime. Dkt. 216 at 11 n.4. Defendants could thus fairly bear the burden of persuasion on that defense. *See, e.g., Bd. of Regents of Univ. of Oklahoma v. NCAA*, 707 F.2d 1147, 1154 n.9 (10th Cir. 1983), *aff'd*, 468 U.S. 85 (1984); *United States v. Manahe*, No. 2:22-cr-00013-JAW, 2022 WL 3161781 at *13 ("As an affirmative defense, the burden of proof [regarding ancillary restraints] would be on the Defendants, not on the Government."). Nonetheless, for purposes of this case only, the Government agrees to accept the burden of persuasion on any ancillary restraints defense, if that defense goes to the jury. Defendants must still meet their burden of production in order to reach that point, however, as argued *supra*.

December 2 Order, the "legitimate business collaboration" must "include[] each of the horizontal parties." Order, Dkt. 257 at 29; Dkt 289-1 at 17-18. In all of the pertinent case law, the identities of the parties to the legitimate joint venture/business collaboration and the parties to the *per se* restraint have been one and the same. In fact, the Government has not identified a single case in which an ancillary restraint was found based on isolated agreements involving only some, but not all, of the conspirators. In their reply to the Government's Motion *in Limine* (Dkt. 382) Defendants ignored this key issue entirely. The Government's proposed jury instruction on ancillary restraints clarifies this legal requirement for the jury.

Defendants' proposed instruction on "legitimate business collaboration" also omits that the ancillary restraints defense requires a business relationship that resembles a joint venture, not just any "productive relationship." The prototypical ancillary restraint is one formed as part of a formal joint venture, and while the Second Circuit has noted that the doctrine extends beyond that context, it has repeatedly and explicitly limited that extension to business relationships resembling joint ventures.[9]  Thus, all of the leading ancillary restraint cases involve business relationships or transactions that include some form of "economic integration" between competitors—that is, a "fusion of [the conspirators'] productive capacities"—in ways that achieve otherwise unattainable "procompetitive" results, *Rothery Storage*, 792 F.2d at 214,

---

[9] *United States v. Apple, Inc.*, 791 F.3d 290, 326 (2d Cir. 2015)– ("a joint venture or other similar productive relationship"); *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 337 (2d Cir. 2008) (Sotomayor, J. concurring) ("[C]ompetitors engaged in joint ventures may be permitted to engage in a variety of activities that would normally be illegal under a per se rule when such activities are necessary to achieve the significant efficiency-enhancing purposes of the venture."); *Aiyer*, 33 F.4th at 118, 120 (calling the ancillary restraint defense a "joint venture-related exception," and adding that per se is rule subject to "only a few, narrow exceptions").

230.[10] The Government's proposed ancillary instruction is consistent with the case law on this subject.

<u>"Subordinate and Collateral"</u>

Defendants' definition of "subordinate and collateral" misses the key requirement of that element—that the charged employee allocation agreement must have been formed as part of, and secondary to, the parties' legitimate business collaboration. The leading cases on the ancillary restraints doctrine make clear that an ancillary restraint is one that is "imposed by" and part of the business collaboration itself, and is secondary to the "main transaction"—it is not merely a restraint that is done in parallel with, or adjacent to, the collaboration. *Texaco v. Dagher*, 547 U.S. 1, 7 (2006) ("[T]he ancillary restraints doctrine … governs the validity of restrictions *imposed by* a legitimate business collaboration, such as a business association or joint venture, on nonventure activities." (emphasis added)); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986) ("The ancillary restraint is subordinate and collateral in the sense that it serves to make the *main transaction* more effective in accomplishing its purpose." (emphasis added)); *Salvino*, 542 F.3d at 337-38 ("For example, price fixing between competitors—generally a *per se* illegal restraint—may be justifiable in certain circumstances when done *as part of* a joint venture." (emphasis added)); *id.* at 338 ("When a challenged

---

[10] *See, e.g.*, *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 719, 728-31 (6th Cir. 2019) (join operating agreement between health care facilitites); *Polk Bros. v. Forest City Enterprises, Inc.*, 776 F.2d 185, 189-90 (7th Cir. 1985) (agreements to build joint facilities); Rothery Storage, 792 F.2d at 214, 229-30 (nationally integrated network of moving companies); *see also In re Ins. Brokerage*, 618 F.3d at 345 ("[D]etermining ancillarity requires [courts] to consider first, whether any aspect of the defendants' association contains a significant promise of integration or cooperation yielding an increase in output."); *Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 779 F.2d 592, 601–02 (11th Cir. 1986) (applying ancillary restraints doctrine to business collaboration that "exhibits characteristics of a joint venture … It is an entity that has partially integrated some functions…to develop a product…that none of its members could produce individually.").

restraint is not reasonably necessary to achieve any of the efficiency-enhancing purposes of a joint venture, it will be evaluated *apart from the rest of the venture*." (emphasis added)).

This second element of the ancillary restraints defense has taken on added importance since Defendants' pretrial disclosures, which reveal a defense strategy of leveraging a few minor, one-off formal collaborations between some, but not all, Supplier companies as a *ex post facto* justification for an eight-year employee allocation conspiracy involving six companies. This strategy cannot work, because the ancillary restraint defense requires that the restraint—here, the charged employee allocation agreement—must have been a part of the "main transaction." It cannot have been something formed separately from that transaction that Defendants now—*years* after the fact—claim justifies their otherwise-*per se* conduct.

<u>"Reasonably Necessary"</u>

Defendants concede—as they must—that "reasonably necessary" is the correct standard for the third element of the ancillary restraint defense. Dkt. 396 at 21 ("An agreement is ancillary when it is … reasonably necessary to achieving the pro-competitive purpose of that transaction…."). But Defendants' proposed instruction proceeds to read "necessary" completely out of that element, by claiming that the phrase "reasonably necessary" means only that the restraint "*may* contribute to the success of a legitimate business transaction or agreement." *Id.* at 22 (emphasis in original). This interpretation of "reasonably necessary" defies both the law and plain English. The Government's proposed instruction is both consistent with the Second Circuit's (and almost every other Circuit's) repeated use of the word "necessary" to describe the third element of the defense.[11] The Government's proposed instruction also acknowledges,

---

[11] *See Nat'l Basketball Ass'n v. Williams*, 45 F.3d 684, 690 (2d Cir. 1995) ("Such a belief arguably fits within Rule of Reason analysis that permits 'ancillary restraints' *necessary* to a

consistent with the weight of the case law, that the restraint need not have been "absolutely essential" to achieving the procompetitive benefits of the collaboration, or the only possible way of achieving those ends. The Government respectfully submits that, if an ancillary restraint defense is warranted after the close of evidence, the Court should use the Government's proposed instruction.

---

legitimate transaction" (emphasis added)); *Tower Air, Inc. v. Fed. Exp. Corp.*, 956 F. Supp. 270, 283 (E.D.N.Y. 1996) ("Restraints collateral to but *necessary* for the implementation of a lawful agreement, and which are *no broader in scope than necessary* to accomplish the purpose of the agreement, are termed 'ancillary.'" (emphasis added)); *Blackburn v. Sweeney*, 53 F.3d 825, 828 (7th Cir. 1995) (finding customer non-solicitation agreement was not ancillary because it "was not a necessary condition for the increased competition resulting from the split-up of the partnership"); *Aya Healthcare*, 9 F.4th at 1109 (holding that "the restraint must be … reasonably necessary to achieving that transaction's pro-competitive purpose" and that "the non-solicitation agreement [at issue] is necessary to achieving that end" (cited in *Aiyer*, 33 F.4th at 115)); *Rothery Storage*, 792 F.2d at 229 ("[A]ncillary restraints are essential to the efficiency of a contract integration" and concluding that restraints at issue were "reasonably necessary to the [joint venture]"); *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1102 (1st Cir. 1994) ("We also do not dispute that a 'restraint' that is ancillary to the functioning of such a joint activity— i.e. one that is *required* to make the joint activity more efficient—does not necessarily violate the antitrust laws.") (emphasis added); *In re Ins. Brokerage*, 618 F.3d at 345 (ancillary restraint is one that is a "necessary condition of the joint venture"); *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1368 (5th Cir. 1980) ("Certainly the antitrust laws must allow reasonably ancillary restraints necessary to accomplish these enormously procompetitive objectives.").

## <u>GOVERNMENT'S OBJECTIONS TO DEFENDANTS' PROPOSED JURY INSTRUCTION NO. 10 ("VERTICAL RESTRAINTS")</u>

The Government objects to this proposed instruction in its entirety as unnecessary and inconsistent with the Court's December 2 Order, which rejected Defendants' "verticality" argument and held that the Indictment sufficiently alleges a horizontal employee allocation conspiracy between and among Companies A-F. Dkt. 257 at 33 ("[T]he restraint, as alleged, is appropriately considered a horizontal restraint."). As the Government's proposed jury instructions explain (and the Government's proposed addition to its employee allocation instruction further clarifies, see *supra* at 10) the jury may only find the existence of a conspiracy under the *per se* rule if it finds that the conspiracy was "between actual or potential competitors for labor." Defendants' proposed instruction, which simply restates the same thing in lengthy legalese, would only confuse the jury and prejudice the government by instructing on a fact pattern the Indictment does not allege.

## GOVERNMENT'S OBJECTIONS TO DEFENDANTS' PROPOSED JURY INSTRUCTION NO. 11 ("NON-COMPETE AGREEMENTS")

The Government objects to this instruction in its entirety. This instruction appears to be a companion to Defendants' Motion *in Limine* to Preclude Evidence and Argument Regarding the Unenforceability of Non-Compete Agreements (Dkt. 312). The Government opposed that motion (Dkt. 360) and opposes this proposed instruction for the same reasons. Evidence regarding the subjective belief of certain Defendants, co-conspirators, and victims regarding the unenforceability of non-compete agreements used by certain Supplier companies is highly relevant to this case, and relates directly to one of the "manner and means" of the conspiracy alleged in the Indictment. Defendants' effort through this instruction to neutralize that highly probative evidence is both prejudicial and unnecessary.

In addition, by making the sweeping statement that Connecticut law allows any "reasonable" noncompete provision, Defendants' Proposed Instruction No. 11 is highly misleading in the context of this case. Many noncompete agreements are *unreasonable* as a matter of law. That includes noncompete agreements, like certain of the ones used by relevant companies in this case, that do not protect any legally cognizable interest of the employer (such as intellectual property interests) and serve only to prevent employees from obtaining new employment, which are void on ground of public policy. *See The Walker Group, Inc. v. Hannaford*, HHDCV206124382S, 2021 WL 3722709 at *1, *6 (Conn. Super. Ct. July 15, 2021) (ruling that "[s]eeking to contractually prohibit at-will employees from accepting more advantageous terms of employment from a competitor is not a legally protectable interest in Connecticut" and collecting cases establishing that rule).

**<u>GOVERNMENT'S RESPONSE TO DEFENDANTS' PROPOSED JURY INSTRUCTION
NO. 12 ("TESTIMONY OF LAW ENFORCEMENT WITNESSES")</u>**

The Government has no objection to this proposed instruction, which appears to be

identical to the Government's Proposed General Instruction T ("Testimony of Law Enforcement

Witnesses").

## GOVERNMENT'S OBJECTION TO DEFENDANTS' PROPOSED JURY INSTRUCTION NO. 13 ("CO-CONSPIRATOR TESTIMONY")

The Government objects to this proposed instruction because the issue of leniency witnesses is addressed more completely in the Government's Proposed General Instruction BB ("Informal Immunity of Government Witness").

## <u>GOVERNMENT'S RESPONSE TO DEFENDANTS' PROPOSED JURY INSTRUCTION NO. 14 ("DEFENDANT'S DECISION NOT TO TESTIFY")</u>

The Government has no substantive objection to this jury instruction, which is nearly identical to the Government's Proposed General Instruction V ("Defendant's Testimony"). The Government notes that its Proposed Instruction T provides instructions for both testifying Defendants and non-testifying Defendants.

## <u>GOVERNMENT'S RESPONSE TO DEFENDANTS' PROPOSED JURY INSTRUCTION NO. 15 ("GOVERNMENT AS A PARTY")</u>

The Government has no objection to the substance of this proposed instruction, which is contained within the Government's Proposed General Instruction C ("All Parties Entitled to a Full and Fair Hearing"). The Government respectfully requests that the Court utilize its Proposed Instruction C, which includes Defendants' proposed instruction as well as several other important instructions regarding the entitlement of all parties to a full and fair hearing.

## <u>GOVERNMENT'S OBJECTION TO DEFENDANTS' PROPOSED JURY<br>INSTRUCTION NO. 16 ("CONSIDER ONLY THE CHARGES")</u>

The Government objects to this proposed instruction. To the extent it is directed at "other acts" evidence the Court may admit pursuant to Fed. R. Evid. 404(b), it would be appropriate for the jury to consider such evidence as permitted by the Court. Accordingly, Defendant's request that such evidence not be considered for "any other purpose" (without addressing what permissible purposes may exist) is wrong. In any event, the Government respectfully directs the Court to its Proposed General Instruction L ("What is Not Evidence"), which fairly addresses this issue.

## <u>GOVERNMENT'S OBJECTION TO DEFENDANTS' PROPOSED JURY INSTRUCTION NO. 17 ("MULTIPLE DEFENDANTS")</u>

The Government objects to this instruction to the extent it departs from Judge Sand's corresponding instructions. For example, Judge Sand's corresponding instruction (Instruction 3-7 "Multiple Defendants—One Count") states that "[y]our verdict must be based solely upon the evidence about each defendant," whereas Defendants' proposed instruction replaces the word "about" with "relevant," a term that may be confusing to the jury in this context. Should the Court deem it necessary to include an instruction along the lines proposed by Defendants, the Government respectfully requests that it use Judge Sand's formulation.

**GOVERNMENT'S RESPONSE TO DEFENDANTS' PROPOSED JURY INSTRUCTION NO. 18 ("COMMON COUNSEL AND COUNSEL COOPERATION")**

The Government has no objection to this proposed instruction.

## <u>GOVERNMENT'S OBJECTION TO DEFENDANTS' PROPOSED JURY INSTRUCTION NO. 19 ("STATUTORY IMMUNITY OF GOVERNMENT WITNESS")</u>

The Government objects to this instruction based on its inclusion of the following language: "for such a witness, confronted with the realization that he can win his own freedom by helping to convict another, has a motive to falsify his testimony."  While this language is contained in the relevant model instruction from Judge Sand and in the Government's own proposed jury instructions, the Government notes upon further consideration that a grant of statutory immunity does not provide immunity from future prosecution, only for future prosecution based on the witness's immunized trial testimony. Thus, a statutorily immunized witness is not "winning his freedom" by testifying because (1) he is not currently being prosecuted, and thus his freedom is not in immediate jeopardy, and (2) testifying does not guarantee his freedom in the future. The Government respectfully requests that this language be omitted from any final instruction on statutory immunity.

## <u>GOVERNMENT'S OBJECTION TO DEFENDANTS' PROPOSED JURY INSTRUCTION NO. 20 ("CORPORATE OFFICER—INDIVIDUAL LIABILITY")</u>

The Government objects to this proposed instruction as incomplete and prejudicial, as it highlights legal points helpful to the defense while ignoring elements of a proper instruction that would be helpful to the Government. The Government has proposed an alternative instruction on the issue of corporate officer liability (Dkt. 398 at 43) that is more complete and balanced, and thus preferable to Defendants' proposal.

## <u>GOVERNMENT'S RESPONSE TO DEFENDANTS' PROPOSED JURY INSTRUCTION NO. 21 ("THEORIES OF THE DEFENSE")</u>

The Government has no basis to object to Defendants' Proposed Instruction No. 21, as it is merely a reservation of rights to "propose a summary of the defense theories depending on how the government presents its case-in-chief." The Government reserves its right to object to any such summary instruction at the time it is proposed.