## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| |
|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MAHESH PATEL,<br>ROBERT HARVEY,<br>HARPREET WASAN,<br>STEVEN HOUGHTALING,<br>TOM EDWARDS, and<br>GARY PRUS. |

No. 3:21-cr-220 (VAB)

## RULING AND ORDER ON PRETRIAL MOTIONS

Mahesh Patel ("Mr. Patel"), Robert Harvey ("Mr. Harvey"), Harpreet Wasan ("Mr. Wasan"), Steven Houghtaling ("Mr. Houghtaling"), Tom Edwards ("Mr. Edwards"), and Gary Prus ("Mr. Prus") (collectively, "Defendants") have been charged in a one-count indictment with conspiracy in restraint of trade in violation of 15 U.S.C. § 1 (the "Sherman Act"). *See* Indictment, ECF No. 20 (Dec. 15, 2021) ("Indictment").

In advance of trial, the parties have filed various motions to admit, exclude, or limit certain types of evidence. *See* Gov't Mot. *in Limine* #8 to Preclude Defs. From Offering Undisclosed Disc., ECF No. 288-1 ("Gov't MIL #8"); Gov't Mot. *in Limine* #1 to Preclude Inadmissible Procompetitive Benefits Evid., ECF No. 289-1 ("Gov't MIL #1"); Gov't Mot. *in Limine* #6 to Permit Questioning under FRE 611(C)(2), ECF No. 294 ("Gov't MIL #6"); Gov't Mot. *in Limine* #3 to Admit Victim-Witness Test., ECF No. 297-1 ("Gov't MIL #3"); Gov't Mot. *in Limine* #5 to Admit Grant Jury Test., ECF No. 298-1 ("Gov't MIL #5"); Gov't Mot. *in Limine* #9 to Preclude Cross-Exam. & Impeachment of Victim Under FRE 609, ECF No. 299 ("Gov't MIL #9"); Gov't Mot. *in Limine* #7 to Exclude References to Status of Uncharged Co-

Conspirators, ECF No. 301 ("Gov't MIL #7"); Gov't Mot. *in Limine* #10 to Exclude References to Defs.' Health Conditions, ECF No. 302 ("Gov't MIL #10"); Gov't Mot. *in Limine* #2 to Exclude or Limit Expert Ops. of Ty Lopez & Gregg Cohen, ECF No. 303-1 ("Gov't MIL #2"); Gov't Mot. *in Limine* #4 to Exclude Advice of Counsel & Priv. Commc'ns., ECF No. 308-1 ("Gov't MIL #4"); Defs.' Mot. *in Limine* to Preclude Evid. of Uncharged Conduct Under Rule 404(b) & 801(d)(2), ECF No. 309 ("Defs.' MIL re Uncharged Conduct"); Defs.' Mot. *in Limine* to Preclude Evid. & Argument Regarding Unenforceability of Non-Compete Agreements, ECF No. 314 ("Defs.' MIL re Non-Competes"); Defs.' Mot. *in Limine* to Preclude Gov't from Referring to Alleged Agreement as Collusion, ECF No. 315 ("Defs.' MIL re Collusion"); Defs.' Mot. *in Limine* to Preclude Admission of Calendars Containing Handwritten Entries, ECF No. 316 ("Defs.' MIL re Calendars"); Defs.' Mot. *in Limine* to Preclude Evid. of Hiring Policies, Alleged Remedial Measures, and Other Bus. Practices that Post-Date Alleged Conspiracy, ECF No. 317 ("Defs.' MIL re Hiring Policies and Remedial Measures"); Mr. Patel Mot. *in Limine* to Preclude Gov't from Referring to Alleged Hiring Restriction or Agreement as the Mahesh Patel Rule, ECF No. 318 ("Patel MIL"); Defs.' Mot. *in Limine* to Preclude Gov't from Referring to Employees Allegedly Affected by Conspiracy as Victims, ECF No. 320 ("Defs.' MIL re Victims"); Defs.' Mot. *in Limine* to Exclude Evid. of Other Bad Acts, ECF No. 326 ("Defs.' MIL re Other Bad Acts"); Defs.' Mot. *in Limine* to Exclude Evid. of Alleged Other Hiring or Recruiting Restrictions, ECF No. 327 ("Defs.' MIL re Other Hiring Restrictions"); Mr. Harvey & Mr. Wasan Mot. *in Limine* to Exclude Evid. & Argument Regarding Compensation, ECF No. 331 ("Harvey & Wasan MIL"); Defs.' Mot. *in Limine* to Exclude Certain Lay Op. Testimony, ECF No. 332 ("Defs.' MIL re Lay Op."); Mr. Harvey Mot. *in Limine* to Exclude Evid. of Uncharged Conduct, ECF No. 334 ("Harvey MIL re Uncharged Conduct"); Mr. Harvey Mot. *in*

*Limine* to Exclude Evid. Regarding Separation of Global Acct. Manager, ECF No. 335 ("Harvey MIL re Global Acct. Manager"); Mot. *in Limine* #12 to Exclude or Limit the Expert Ops. of Dennis Carlton, ECF No. 353 ("Gov't MIL #12").

For the following reasons, the [288], [294], [297], [298], [301], [302], [303], [308], [312], [315], [316], [320], [326], [327], [329], [330], [331], [332], [334], [335], and [353] motions will be **DENIED without prejudice to renewal**.

The [299] motion will be **DENIED as moot**.

The [289], [309], and [317] motions will be **GRANTED in part** and **DENIED in part**.

The [318] motion will be **GRANTED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The Court assumes the parties' familiarity with the factual and procedural background, and focuses only on the information relevant to the currently pending pretrial motions.

On December 15, 2021, the Government indicted Mr. Patel, Mr. Harvey, Mr. Wasan, Mr. Houghtaling, Mr. Edwards, and Mr. Prus in a sealed single-count Indictment alleging conspiracy in restraint of trade in violation of the Sherman Act. *See* Indictment.

The Indictment alleges that between 2011 and 2019, Defendants allegedly agreed to restrict hiring and recruiting engineers and other skilled-labor employees between Companies A through F in the United States. *Id.* Specifically, Defendants allegedly agreed to 1) not hire employees of Companies B through F and 2) not proactively contact, interview, and recruit applicants who were employed by another alleged co-conspirator company. *Id.* ¶ 21.

On April 5, 2022, Defendants filed a joint motion for a bill of particulars. *See* Joint Mot. for Bill of Particulars, ECF No. 150.

3

On April 26, 2022, the Government filed a memorandum in opposition to the joint motion for a bill of particulars. *See* Mem. in Opp'n to Mot. for Bill of Particulars, ECF No. 154.

On May 10, 2022, Defendants filed a joint reply to the Government's opposition. *See* Reply to Resp. to Mot. for Bill of Particulars, ECF No. 155.

On June 29, 2022, Defendants filed a joint motion for disclosure of grand jury minutes, as well as a join motion to seal the motion in part and Exhibits B–G to that motion. *See* Mot. for Discl.; Joint Mot. to Seal, ECF No. 172. The Court granted the joint motion to seal on June 30, 2022. *See* Order, ECF No. 175.

On June 29, 2022, Defendants filed a joint motion to dismiss the Indictment. *See* Mot. to Dismiss.

On August 10, 2022, the Government filed a motion to seal its opposition to Defendants' joint motion for disclosure of grand jury minutes, as well as its sealed opposition to Defendants' joint motion for disclosure of grand jury minutes. *See* Mot. to Seal, ECF No. 214; Mem. Of Law in Opp'n to Defs.' Joint Mot. for Discl. of Grand Jury Mins., ECF No. 215. On August 11, 2022, the Court granted the motion to seal. *See* Order, ECF No. 217.

Also, on August 10, 2022, the Government filed a memorandum in opposition to Defendants' joint motion to dismiss the indictment. *See* Mem. in Opp'n to Mot. to Dismiss, ECF No. 216.

On August 31, 2022, Defendants filed a reply brief in support of the motion for disclosure of grand jury minutes and a reply brief in support of the motion to dismiss the indictment. *See* Reply to Resp. to Joint Mot. for Discl., ECF No. 227; Reply to Resp. to Joint Mot. to Dismiss, ECF No. 227.

On October 20, 2022, the Court held a motion hearing and scheduling conference at which the parties were given an opportunity to present arguments on the motion to dismiss, motion for a bill of particulars, and motion for disclosure of grand jury minutes. *See* Min. Entry, ECF No. 241.

On October 21, 2022, the Government filed a notice of supplemental authorities in support of its motions. *See* Notice of Suppl. Authorities, ECF No. 242.

On October 21, 2022, the Court issued an order denying without prejudice Defendants' joint motion for a bill of particulars and granting in part Defendants' joint motion for disclosure of the grant jury minutes. *See* Order, ECF No. 244. The Court ordered the Government to provide the relevant portions of the grand jury minutes for *in camera* review by October 28, 2022. *Id.*

On December 2, 2022, the Court issued an order denying Defendants' motion to dismiss and motion for disclosure of grand jury minutes. *See* Order, ECF No. 257 ("MTD Order").

On January 23, 2023, Defendants filed a motion for extension of time to submit their expert disclosure in part, Joint Mot. for Extension of Time, ECF No. 261, which the Court granted, allowing Defendants an additional week to submit their expert disclosure as to one expert witness and extending the Government's deadline to file any pre-trial motions related to that particular expert, Order, ECF No. 262.

On January 24, 2023, the Government filed a sealed motion for a Rule 15 deposition. Sealed Mot. for Rule 15 Dep., ECF No. 264. On February 13, 2023, the parties jointly filed a stipulation related to this witness's testimony. Joint Stip. re Seal Mot. for Rule 15 Dep., ECF No. 273.

On February 10, 2023, Defendants filed a motion for a jury questionnaire to be sent to prospective jurors in advance of jury selection. Joint Mot. for Jury Questionnaire, ECF No. 271. On February 15, 2023, the Court held a telephonic status conference, Min. Entry, ECF No. 275, and denied the motion for a jury questionnaire. Order, ECF No. 276.

On February 17, 2023, the Government filed a motion to compel information related to Defendants' expert Dennis Carlton. Mot. to Compel Defendants' Expert Disc. re Dennis Carlton, ECF No. 278 ("Mot. to Compel").

On February 23, 2023, the parties each filed various motions *in limine* seeking to admit, exclude, or limit certain categories of evidence. *See* Gov't MIL #1; Gov't MIL #2; Gov't MIL #3; Gov't MIL #4; Gov't MIL #5; Gov't MIL #6; Gov't MIL #7; Gov't MIL #8; Gov't MIL #9; Gov't MIL #10; Gov't Mot. *in Limine* #11 for Opening Statements, ECF No. 300 ("Gov't MIL #11"); Defs.' MIL re Uncharged Conduct; Defs.' MIL re Non-Competes; Defs.' MIL re Collusion; Defs.' MIL re Calendars; Defs.' MIL re Hiring Policies and Remedial Measures; Patel MIL; Defs.' Mot. *in Limine* to preclude Distribution of Indictment to Jury, ECF No. 319 ("Defs.' MIL re Indictment"); Defs.' MIL re Victims; Defs.' MIL re Other Bad Acts; Defs.' MIL re Other Hiring Restrictions; Harvey & Wasan MIL; Defs.' MIL re Lay Op.; Defs.' Mot. *in Limine* for Modified *Geaney* Proced., ECF No. 333 ("Defs.' MIL re Geaney"); Harvey MIL re Uncharged Conduct; Harvey MIL re Global Acct. Manager.

Both parties filed motions to seal certain memoranda and exhibits, *see, e.g.*, Mot. to Seal, ECF No. 336, which the Court granted, *see, e.g.*, Order, ECF No. 344.

On February 28, 2023, the Government moved for an extension of time to file a pretrial motion related to Defendants' expert, Dennis Carlton. Mot. for Extension of Time, ECF No. 345. On March 1, 2023, the Court granted the motion for extension of time. Order, ECF No. 346.

On March 3, 2023, Defendants filed a response to the Government's motion to compel certain information related to Defendants' expert, Dennis Carlton. Resp. to Mot. to Compel re Dennis Carlton, ECF No. 347 ("Opp'n to Mot. to Compel").

On March 6, 2023, the Government filed a reply to Defendants' response to the pending motion to compel. Reply to Resp. to Mot. to Compel, ECF No. 348 ("Reply in Supp. of Mot. to Compel").

On March 9, 2023, the Court ordered the Defendants to respond to the new issues identified in the Government's reply in support of its motion to compel by March 15, 2023. Order, ECF No. 352.

On March 9, 2023, the Government filed a motion *in limine* to exclude or limit the expert opinions of Dennis Carlton. Gov't MIL #12.

On March 9, 2023, Defendants filed oppositions to most of the Government's motions *in limine*. *See* Houghtaling's Mem. of Law in Opp'n to Gov't Mot. *in Limine* #4 to Exclude Advice of Counsel & Priv. Commc'ns., ECF No. 385 ("Houghtaling Opp'n"); Defs.' Joint Opp'n to Gov'ts' Mot. *in Limine* #1 to Preclude Inadmissible Procompetitive Benefits Evid., ECF No. 382 ("Defs.' Opp'n to Gov't MIL #1"); Defs.' Opp'n to Gov't's Mot. *in Limine* #3 to Admit Victim-Witness Testimony, ECF No. 378 ("Defs.' Opp'n to Gov't MIL #3"); Defs.' Opp'n to Gov't's Mot. *in Limine* #5 to Admit Grand Jury Testimony, ECF No. 375 ("Defs.' Opp'n to Gov't MIL #5"); Defs.' Joint Opp'n to Gov't's Mot. *in Limine* #7 to Exclude Refs. To Status of Uncharged Co-Conspirators, ECF No. 373 ("Defs.' Opp'n to Gov't MIL #7"); Defs.' Joint Mem. in Opp'n to Gov't's Mot. *in Limine* #8 to Preclude Defs.' From Offering Undisclosed Disc., ECF No. 372 ("Defs.' Opp'n to Gov't MIL #8"); Defs.' Joint Opp'n to Gov't Mot. *in Limine* #2 to Exclude or Limit Expert Ops., ECF No. 371 ("Defs.' Opp'n to Gov't MIL #2"); Defs.' Joint Resp. to

Gov't Mot. *in Limine* #11 for Opening Statements, ECF No. 368 ("Defs.' Resp. to Gov't MIL #11"); Defs.' Opp'n to Gov't Mot. *in Limine* #6 to Permit Questioning Under FRE 611(c)(2), ECF No. 367 ("Defs.' Opp'n to Gov't MIL #6"); Patel Resp. to Gov't Mot. *in Limine* #10 to Exclude Refs. To Def.'s Health Condition, ECF No. 365 ("Patel Resp.").

Also on March 9, 2023, the Government filed its oppositions to most of Defendants' motions *in limine*. *See* Gov't Omnibus Opp'n to Defs.' Mots. *in Limine* to Exclude Other Act Evid., ECF No. 370 ("Gov't Omnibus Opp'n re Other Acts"); Gov't Omnibus Opp'n to Defs.' Mots. *in Limine* to Preclude Gov't Use of Certain Words, ECF No. 363 ("Gov't Omnibus Opp'n re Certain Words"); Gov't Opp'n to Defs.' Mots. *in Limine* Regarding Noncompete Agreements, ECF No. 361 ("Gov't Opp'n to Defs.' MIL re Non-Competes"); Gov't Mem. of Law in Opp'n to Defs.' Mot. *in Limine* to Exclude Lay Op. Testimony, ECF No. 358 ("Gov't Opp'n to Defs.' MIL re Lay Op."); Gov't Opp'n to Defs.' Mot. *in Limine* to Preclude Admission of Calendars, ECF No. 357 ("Gov't Opp'n to Defs.' MIL re Calendars"); Gov't Opp'n to Defs.' Mot. *in Limine* for Modified *Geaney* Trial Procedure, ECF No. 356 ("Gov't Opp'n to Defs.' MIL re *Geaney*").

On March 10, 2023, the Government filed a motion for Rule 17(c) subpoena. *See* Mot. for Order re: Rule 17(c) Subpoena, ECF No. 389 ("Mot. for Rule 17(c) Subpoena").

On March 11, 2023, the Court ordered the Government to provide additional information in support of its motion for a Rule 17(c) subpoena, Order, ECF No. 391, which the Government provided on March 12, 2023, Gov't Suppl. to Mot. for Rule 17(c) Subpoena, ECF No. 392.

On March 12, 2023, the Court ordered Mr. Houghtaling to submit a response, if any, to the Government's motion for a Rule 17(c) subpoena by March 15, 2023 at 5:00 p.m. Order, ECF No. 393. Mr. Houghtaling submitted a response on March 15, 2023. Houghtaling's Resp. to Gov't Mot. for Issuance of a Subpoena Duces Tecum, ECF No. 401.

8

On March 13, 2023, the parties provided their proposed jury instructions and proposed voir dire. *See* Gov't's Proposed Jury Instructions, ECF No. 398; Gov't Proposed Voir Dire, ECF No. 397; Defs.' Proposed Jury Instructions, ECF No. 396; Defs.' Proposed Voir Dire, ECF No. 395.

On March 15, 2023, Defendants submitted an additional response to the Government's motion to compel. Defs.' Resp. to Gov't Mot. to Compel, ECF No. 402.

On March 16, 2023, the Court granted in part and denied in part the Government's motion for subpoena, allowing the subpoena to issue but extending the response date to March 20, 2023. Order, ECF No. 405.

On March 16, 2023, the Court denied the Government's motion to compel as moot. Order, ECF No. 404.

On March 16, 2023, Defendants filed their memorandum in opposition to the Government's motion *in limine* to limit or exclude the testimony of Dennis Carlton. Defs.' Opp'n to Gov't Mot. in Limine #12 to Exclude or Limit the Expert Ops. of Dennis Carlton, ECF No. 406 ("Defs.' Opp'n to Gov't MIL #12").

On March 17, 2023, the Government submitted a response to Defendants' motions *in limine* related to grand jury testimony and procompetitive benefits. Gov't Resp. to Defs.' Opp'n to Gov't MIL #1 and MIL #5, ECF No. 410 ("Gov't Reply in Supp. for Gov't MIL #5").

On March 18, 2023, the Government filed a reply in support of its motion to exclude or limit the expert opinions of Dennis Carlton. Reply in Supp. of Gov't Mot. in Limine #12 to Exclude or Limit the Expert Opinions of Dennis Carlton, ECF No. 414 ("Gov't Reply in Supp. of MIL #12").

On March 20, 2023, the Government submitted a motion for the court to issue immunity orders for certain witnesses. Gov't Mot. for Order re: Immunity, ECF No. 418. The Court granted this motion and issued the proposed orders on March 22, 2023. Order, ECF No. 433.

On March 20, 2023, both parties submitted objections to the other party's proposed jury instructions. Defs. Resp. to Gov't Proposed Jury Instructions, ECF No. 419; Gov't Resp. to Defs. Proposed Jury Instructions, ECF No. 421. The Government also submitted objections to Defendants proposed voir dire questions. Gov't Resp. to Defs. Proposed Voir Dire, ECF No. 420.

On March 21, 2023, the Government filed a motion to compel Company C to respond to the Rule 17(c) subpoena. Gov't Mot. to Compel, ECF No. 423. On March 22, 2023, the Court ordered Company C to submit a response by March 23, 2023. Order, ECF No. 429.

On March 21, 2023, Mr. Wasan filed a motion to excuse local counsel from attending trial daily. Mot. for Order re: Local Counsel, ECF No. 422. The Court granted this motion on March 22, 2023. Order, ECF No. 428.

On March 22, 2023, the Court held a pretrial conference at which the parties were given an opportunity to argue their respective positions on the pending motions.

On March 22, 2023, the Court ordered the parties to submit briefing on an issue raised during the pre-trial conference related to the Government's proposed use of case agent testimony. Order, ECF No. 430.

On March 22, 2023, Defendants filed a motion *in limine* to exclude testimony by case agents. Mot. *in Limine* to Exclude Testimony of Case Agents, ECF No. 434.

On March 22, 2023, the Court granted in part and denied in part the Government's motion *in limine* for opening statements, allowing each litigant twenty minutes for opening

statements. Order, ECF No. 431. Additionally, the Court denied as moot Defendants motion *in limine* to preclude distribution of the Indictment. Order, ECF No. 432.

On March 23, 2023, Company C filed an appearance and submitted a memorandum in opposition to the Government's motion to compel. Opp'n Mem. to Gov't Mot. to Compel, ECF No. 441.

On March 23, 2023, the Government filed a memorandum in opposition to Defendants' motion *in limine* to exclude case agent testimony. Gov't Opp'n to Defs.' Mot. *in Limine* to Exclude Case Agents, ECF No. 440.

On March 23, 2023, Mr. Harvey filed a motion for order excusing local counsel from attending trial daily. Mot. for Order to Excuse Local Counsel, ECF No. 442.

## II.    STANDARD OF REVIEW

Motions *in limine* provide district courts with the opportunity to rule in advance of trial on the admissibility and relevance of certain forecasted evidence. *See Luce v. United States*, 469 U.S. 38, 40 n.2 (1984); *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). "A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*." *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008) (internal citation omitted).

A court should only exclude evidence on motions *in limine* if the evidence is "clearly inadmissible on all potential grounds." *Levinson v. Westport Nat'l Bank*, No. 3:09-CV-1955 (VLB), 2013 WL 3280013, at *3 (D. Conn. June 27, 2013) (internal citation and quotation marks omitted). The court also retains discretion to reserve judgment on some or all motions *in limine* until trial so that the motions are placed in the appropriate factual context. *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 471, 476 (S.D.N.Y. 2009); *see*

*also, e.g.*, *Nat'l Union Fire Ins. Co. of Pittsburgh v. L.E. Myers Co.*, 937 F. Supp. 276, 286–87 (S.D.N.Y. 1996).

## III.   DISCUSSION

The parties have filed various pretrial motions arguing that certain categories of evidence should be admitted, limited, or excluded based on the following issues: relevance, prior bad acts, remedial measures, questioning, lay and expert opinions, hearsay, and outstanding discovery.

The Court has categorized the motions by the evidentiary rules they implicate and will address each in turn.

### A.  Relevance

Under Federal Rule of Evidence 401, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. "Irrelevant evidence is not admissible." Fed. R. Evid. 402. Evidence that is relevant, however, still may be excluded, for example, in the case of Rule 403. *See* Fed. R. Evid. 403.

Both parties argue that certain categories of evidence should be limited or excluded as irrelevant or, in the alternative, as unfairly prejudicial under Rule 403. These categories include: procompetitive benefits evidence, the status of uncharged co-conspirators, use of certain terms such as "collusion," "victim," or the "Mahesh Patel Rule," handwritten calendars, privileged communications, compensation, Mr. Patel's health, and the separation of a Global Account Manager.

The Court will address each category of evidence in turn.

### 1.  Procompetitive Benefits Evidence

The Government moves to "preclude Defendants' disclosed expert evidence, and other as-yet undisclosed evidence that may be offered at trial, regarding the supposed commercial benefits of the charged labor market allocation conspiracy." Gov't MIL #1 at 1. In the Government's view, any evidence of the procompetitive benefits of the alleged agreement is inadmissible because a *per se* market allocation conspiracy cannot be justified by such evidence. *Id.* at 8–9. More specifically, the Government argues that Gregg Cohen's and Ty Lopez's expert opinions "constitute irrelevant procompetitive benefits evidence because they seek to rationalize and justify the charged *per se* conduct . . . based solely on its commercial utility." *Id.* at 9–10.

Additionally, the Government argues that Defendants' ancillary restraint defense does not change this analysis because there is no proper business collaboration that would justify admitting any evidence relevant to this defense. *Id.* at 10–11. Further, the Government contends that Defendants' experts' opinions are not relevant to an ancillary restraints defense because they "do not describe the horizontal market allocation conspiracy charged in the Indictment" and they "do not relate to a collaboration involving all of the Suppliers." *Id.* at 12–16. In the Government's view, any evidence of "'one off' agreements between some, but not all, Suppliers do[es] not suffice to raise a valid ancillary restraint defense." *Id.* at 16–18.

Alternatively, the Government argues Defendants' expert evidence does not fall within the "extremely limited" exception which allows such evidence to show "a [d]efendant's lack of general intent to join the charged conspiracy." *Id.* at 18–20 (citing *United States v. Aiyer*, 33 F.4th 97, 125 (2d Cir. 2022)). In the Government's view, "Defendants' expert disclosures have nothing to do with whether any of the Defendants knowingly joined the charged conspiracy, and

everything to do with providing impermissible and irrelevant economic justifications for the charged *per se* conduct." *Id.* at 20 (footnote omitted).

In response, Defendants argue that procompetitive benefits evidence is relevant for a few reasons. Defs.' Opp'n to Gov't MIL #1 at 4. First, Defendants argue that such evidence is relevant to support its ancillary restraints defense, specifically as it relates to the allegations that Company A agreed not to hire or recruit Company B's engineers and other skilled-labor employees, and as it relates to the cooperative agreements between Company A and the Suppliers as well as amongst the Suppliers. *Id.* at 5–10. In support of these arguments, Defendants provide exhibits outlining these cooperative agreements. *Id.* at 11–13. Second, Defendants argue that procompetitive benefits evidence is relevant to contest the existence of an agreement to allocate the market. *Id.* at 14–15. More specifically, Defendants argue that evidence of "employee mobility and employee compensation" is relevant to "whether the alleged market allocation conspiracy existed" because such evidence is "inconsistent with an agreement to allocate" and "suggests that defendants did not have an agreement." *Id.*

Third, Defendants argue that this evidence is relevant to rebut the Government's allegation that Defendants' motive to enter the alleged conspiracy was "to suppress wages" and increase their personal "financial benefits" because this evidence is relevant to other motives Defendants may have had, such as "avoid[ing] disruption and delay with respect to [Company A] projects." *Id.* at 15–16. Fourth, Defendants contend that procompetitive benefits evidence is relevant to show "that they lacked the requisite intent to form the alleged agreement" because evidence that the alleged conduct did not lead to a market allocation is circumstantial evidence of intent. *Id.* at 16. Fifth, Defendants argue that this evidence is also relevant to show the vertical characteristics of the alleged agreement. *Id.* at 16–17.

Defendants emphasize that, "[a]s a matter of due process," they "are entitled to present defenses to the jury" and "to instructions relating to [their] theory of defense, for which there is some foundation in the proof, not matter how tenuous that defense may appear to the trial court." *Id.* at 3 (citations and quotation marks omitted).

The Court agrees.

As an initial matter, a few things require clarification. First, in the Court's Ruling and Order denying Defendants' motion to dismiss, the Court relied on the allegations in the Indictment in order to find that the Indictment stated a naked restraint subject to *per se* treatment. *See* MTD Order at 23–29. The Court did not hold, as the Government suggests, that the only context that ancillary restraints operate is one where the agreement is ancillary to a cooperative agreement that includes all of the parties for the full period of the cooperative agreement. Instead, the Court's holding was explicitly based on the allegations in the Indictment that Companies B through F "competed against one another for outsource work projects" and "do not cooperate in the outsourcing agreements." *Id.* at 29. The Court analogized the allegations in the Indictment to the cases before it at that time, but did not address questions not before it, such as whether, to be an ancillary restraint, the cooperative venture needed to exist in a single form throughout the period of the alleged agreement.

To the extent the Government suggests that the Court rejected all of Defendants' ancillary restraints arguments as a matter of law, this is not so. *See* Gov't MIL #1 at 1. Instead, the Court made clear that many of Defendants arguments failed because they were not apparent from the face of the Indictment and, to the extent that the facts tell a different story, Defendants could "contest these allegations with facts not included in the Indictment . . . [at] a later stage of the proceeding." *Id.*

15

Second, the Government contends that Defendants' evidence "do[es] not speak to the utility of the charged no-poach conspiracy." Gov't MIL #1 at 3. Throughout this motion and others, the Government frequently contends Defendants' evidence is not relevant because it does not address the specific eight-year conspiracy involving all Defendants as they exist in horizontal relation to one another, as was alleged in the Indictment. *See e.g.*, *id.* at 12 ("Defendants' disclosed expert opinions do not describe the horizontal market allocation conspiracy charged in the Indictment"); *id.* at 13 (stating that Defendants' expert's statement "contradicts the Indictment, which alleges a horizontal agreement among suppliers"); *id.* at 18 (arguing that "it would be inherently implausible for an eight-year conspiracy involving five Suppliers to be justified based on the commercial needs of a business collaboration between only two of them during a much smaller time period").

This reasoning, however, presumes that the Government has already met its burden to prove beyond a reasonable doubt that the conspiracy existed and operated exactly as it was alleged in the Indictment. *See, e.g.*, *United States v. Doyle*, 130 F.3d 523, 534–35 (2d Cir. 1997) ("The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of our criminal law. . . . Likewise, requiring the Government to carry the heavy burden of proving a defendant guilty beyond a reasonable doubt is sacrosanct law and derives from the Due Process Clause." (citations and quotation marks omitted)).

As it relates to the Government's substantive arguments about procompetitive benefits evidence, relevance is a "very low standard." *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012) (citations and quotation marks omitted); *see also* Fed. R. Evid. 401 ("Evidence is relevant if . . . it has any tendency to make a fact [of consequence] more or less probable than it would be

without the evidence."). Defendants also possess a constitutional right to present a defense. *See United States v. Dove*, 916 F.2d 41, 47 (2d Cir. 1990) (stating that defendants were "entitled to instructions relating to [their] theory of defense, for which there is some foundation in the proof, no matter how tenuous that defense may appear to the trial court").

The procompetitive evidence[1] at issue here is relevant because it relates to whether Defendants joined the charged conspiracy, whether the conspiracy existed as alleged, and whether Defendants had the requisite intent to join such a conspiracy. Evidence concerning the ancillary restraints defense is also likely admissible; however, determining precisely what evidence is relevant requires considering the evidence in light of the Government's evidence of the charged conspiracy.[2] *See Aiyer*, 33 F.4th at 120 ("[I]f a defendant seeks to challenge the application of the *per se* rule to his offense conduct by arguing to the jury that such conduct fell within one of the exceptions to the *per se* rule, he would have had every right to make those arguments and present evidence on such exceptions at trial."). Therefore, the Court cannot definitively determine if all of Defendants' ancillary restraints evidence is relevant and admissible.

To the extent that Defendants present evidence that is only or predominately relevant for the inference that because the alleged agreement had procompetitive benefits, Defendants should not be found guilty, such evidence would be inadmissible. *See, e.g., United States v. Koppers*

---

[1] The Court will more directly address the Government's arguments about Gregg Cohen, Ty Lopez, and Dennis Carlton below, in the section about expert witnesses.

[2] The Court declines to hold a pre-trial hearing to determine if Defendants have provided adequate evidence to support their ancillary restraints defense because the evidence attached to their opposition is sufficient at this stage. *See* Order on Mot. Regarding Ancillary Restraint Defense at 5–8, *United States v. Manahe*, 22-cr-13-JAW, ECF No. 186 (D. Me. Feb. 28, 2023) (declining to hold a pre-trial hearing regarding the sufficiency of the defendants' ancillary restraint evidence even though the Government there "represent[ed] that the Defendants have not produce in discovery any evidence that would allow them to assert a factual basis for the ancillary restraint defense").

*Co.*, 652 F.2d 290, 295 n.6 (2d Cir. 1981) ("[T]he *per se* rule makes certain conspiracies illegal without regard to their actual effects on trade.").

Any prejudice or risk of confusing the issues that might arise from this evidence can be cured with proper instructions to the jury and, therefore, it is also admissible under Rule 403. *See United States v. Yousef*, 327 F.3d 56, 150 (2d Cir. 2003) ("[L]ess drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." (citations and quotation marks omitted)).

Accordingly, this motion will be granted in part and denied in part.

### 2.   Status of Uncharged Co-Conspirators

The Government has moved to "preclud[e] the Defendants from introducing evidence or argument regarding the status of any unindicted co-conspirators because such matters are both irrelevant and prejudicial." Gov't MIL #7 at 1. The Government notes that it "does not seek to exclude evidence of charging decisions relating to" witnesses that are testifying under an immunity order, letter of immunity, or grant of conditional leniency "for the limited purpose of cross-examination." *Id.* at 2 n.1.

In response, Defendants contend that they are entitled to reference "the status of uncharged co-conspirators, including as to witness immunity status and conditional offers of leniency conferred by the [G]overnment" because such references are relevant to "proper cross examination or reference to the same in summation." Defs.' Opp'n to Gov't MIL #7 at 1–2 (quotation marks omitted).

The Court agrees.

A witness's cooperation with the Government can be used to impeach the witness under Federal Rule of Evidence 608. *See, e.g.*, *United States v. Bodnar*, 37 F.4th 833, 844 (2d Cir.

2022) (noting that defense counsel properly "used the cooperation agreements to probe any biases that the government's witnesses might harbor, including that their testimony was given in exchange for the possibility of leniency at sentencing").

Moreover, the parties agree that references to a witness's status as an uncharged co-conspirator is relevant to that witness's credibility and potential bias. *See* Gov't MIL #7 at 2 n.1 (stating that it "does not seek to exclude evidence of charging decisions related to" witnesses that are testifying under an immunity order, letter of immunity, or grant of conditional leniency); Defs.' Opp'n to Gov't MIL #7 at 1 ("The defense is entitled to cross examine witnesses at trial as to bias and credibility.").

Accordingly, this motion will be denied without prejudice to renewal, should the issue arise during trial.

### 3.  Use of "Collusion," "Victim," or the "Mahesh Patel Rule"

Defendants move to "preclude[e] the [G]overnment from referring at trial to the . . . charged conspiracy as anything other than an 'agreement,' 'agreement to allocate employees in the aerospace industry working on projects for Company A,' or similarly non-argumentative term." Defs.' MIL re Collusion at 1. Defendants argue that terms such as collusion, secret agreement, or conspiracy would "mischaracterize the nature of the agreement through the use of conclusory, prejudicial and pejorative terms which suggest that the agreement in and of itself is evidence of a criminal conspiracy." *Id.* at 2. Defendants contend that allowing the Government to use such language would impede Defendants from fairly presenting their defense. *Id.* at 3.

Defendants similarly move to "preclud[e] the [G]overnment from referring at trial to employees who were allegedly affected by the charged conspiracy as 'victims.'" Defs.' MIL re Victims at 1. In Defendants' view, "the charged violation . . . does not involve a crime against a

person," and therefore, "referring to the allegedly affected employee witnesses or other employees as victims does not provide probative value to the core elements of this charged crime." *Id.* at 3–4 (citations and quotation marks omitted). Additionally, Defendants argue that the word victim "would create undue risk that the jury may be led to infer guilt from an improper basis." *Id.* (citations omitted).

Finally, Mr. Patel moves to "preclud[e] the [G]overnment from referring at trial to any alleged hiring restriction or agreement between or among any alleged co-conspirator(s) as the 'Mahesh Patel Rule,' the 'Mahesh Rule,' or any variation thereof." Patel MIL at 1. Mr. Patel contends that the terms are "a post hoc characterization of the charged agreement employed by the [G]overnment as opposed to a term that the participants in the alleged conspiracy actually used when referring to any alleged hiring restrictions." *Id.* at 2. Mr. Patel argues that, even if this evidence is "marginally relevant," it is "not probative because there are [a] myriad [of] alternate ways that the [G]overnment can introduce the existence of an alleged hiring restriction and connect it to Mr. Patel without offering it under the auspices of a self-serving, culpability-connoting term." *Id.* at 2–3.

In response, the Government first notes that the Government's arguments are not evidence and therefore do not implicate Rule 403. Gov't Omnibus Opp'n re Certain Words at 2. In the Government's view, even if Rule 403 applies, none of the words Defendants seek to exclude are unfairly prejudicial because they have "legitimate probative force." *Id.* at 2–3. More specifically, the Government argues that the conspiracy-related terms are not unfairly prejudicial because, while "[s]uch words are . . . highly suggestive," they are "entirely appropriate for oral advocacy geared toward persuading a jury beyond a reasonable doubt." *Id.* at 3. The Government

also notes that the word "collusion" is used by alleged co-conspirators in a 2017 e-mail and therefore, this term "clearly relate[s] to the subject matter of the case." *Id.* at 3–4.

Next, the Government argues that the word "victim" is relevant and not unfairly prejudicial because the alleged conspiracy "is a crime against a person" and therefore, "the word victim is the word that best describes that alleged reality." *Id.* at 4 (quotation marks omitted). The Government argues that it "should be free to advocate zealously for its theory of the case and its view of the evidence." *Id.* at 5.

Finally, the Government argues that use of the phrase the "Mahesh Patel Rule" is highly relevant because the term is "a shorthand expression used by an alleged co-conspirator during the time period of the conspiracy." *Id.* at 5–6. The Government also argues that this term is not unfairly prejudicial because the "Government expects to present evidence that [Mr.] Patel was a driving force behind the inception and enforcement of the charged hiring restrictions, and that co-conspirators complied with [Mr.] Patel's express wishes." *Id.* at 6.

The Court agrees in part and disagrees in part.

As an initial matter, the jury will be instructed that the lawyers' statements are not evidence. Therefore, the Court will not prevent either party from using phrases relevant to the charged conspiracy based on admitted evidence. *See United States v. Suarez*, 588 F.2d 352, 354 (2d Cir. 1978) (noting that lawyers are generally entitled to "broad latitude in the inferences they may suggest to the jury during closing arguments"); *United States v. Helbrans*, No. S2 19-cr-497 (NSR), 2021 WL 4778525, at *15 (S.D.N.Y. Oct. 12, 2021) ("However, counsel may not refer to facts that are not in the record nor may counsel misstate the evidence." (citations and quotation marks omitted)).

21

Additionally, to the extent these terms are features of the underlying conspiracy or a common name for the charged conspiracy, the terms will likely be relevant and probative. *See, e.g.*, *Helbrans*, 2021 WL 4778525, at *16 (finding the use of the terms "kidnapping" and "abduction" permissible because they were "the common name for the crime charged" (quotation marks omitted)). For example, the Government references a 2017 e-mail in which alleged co-conspirators use the word "collusion." Gov't Omnibus Opp'n re Certain Words at 3. The Court will not exclude such evidence.

Similarly, the Court will not prevent the Government from using the word "victim" to the extent the evidence supports its use. *See United States v. Gasperini*, No. 16-CR-441 (NGG), 2017 WL 3140366, at *7 (E.D.N.Y. July 21, 2017) (rejecting the defendant's motion to exclude the term victim because "[t]he Government is within its rights to take and advocate for a different view of the evidence"), *aff'd*, 729 F. App'x 112 (2d Cir. 2018); *Helbrans*, 2021 WL 4778525, at *16 (allowing the Government to use the term victim where the Government "ha[d] a good faith basis for arguing" there were victims and therefore, in light of the Court's jury instruction that the lawyer's statements are not evidence, "use of the word victims . . . [was] fair argument" (quotation marks omitted)).

Where a term has a low probative value, however, courts have excluded the term's use because its probative value was outweighed by its unfairly prejudicial effect. *See MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 570 (S.D.N.Y. 2017) ("[C]ourts often prohibit the use of certain pejorative terms when such categorizations were inflammatory and unnecessary to prove a claim and such statements do not bear on the issues being tried." (internal quotation marks and citations omitted)).

This is the case for the "Mahesh Patel Rule." The parties appear to agree that the term the "Mahesh Patel Rule" was only used by an alleged co-conspirator in 2019. *See* Gov't Omnibus Opp'n re Certain Words at 5–6 (noting that the term is "a shorthand expression used by an alleged co-conspirator" during 2019); Patel MIL at 2 (noting Individual One "reported to have first heard the phrase . . . in 2019"). The Government also makes clear that it "expects to present [other] evidence that [Mr.] Patel was a driving force behind the inception and enforcement of the charged hiring restrictions, and that co-conspirators complied with [Mr.] Patel's express wishes." Gov't Omnibus Opp'n re Certain Words at 6.

In light of the limited time frame in which the phrase was used, the fact that Defendants and many alleged co-conspirators did not use the term, and the Government's stated intent to present ample other evidence of Mr. Patel's role in the alleged conspiracy, the relevance of the term the "Mahesh Patel Rule" is substantially outweighed by its risk of unfair prejudice and is cumulative of other evidence the Government will present on the issue. *See Helbrans*, 2021 WL 4778525, at *17 (prohibiting the Government "from using incendiary and irrelevant" language such as the word "cult" because "suggestions . . . of . . . brainwash[ing] or coerc[ion] . . . are neither evidence of the charged crimes nor do [they] provide context more necessary than it is prejudicial").

Therefore, Mr. Patel's motion on this issue will be granted. If the evidence at trial increases the probative value of this evidence, however, and the Government can establish a more meaningful connection to the alleged conspiracy, particularly to Defendants, the Court may reconsider this issue. *See In re MTBE*, 643 F. Supp. 2d at 476 ("Moreover, a court's ruling regarding a motion in limine 'is subject to change when the case unfolds . . . . Indeed even if

nothing unexpected happens at trial, the district judge is free—in the exercise of sound judicial discretion—to alter a previous in limine ruling.'" (quoting *Palmieri*, 88 F.3d at 139).

Accordingly, Defendants' motions to exclude references to conspiracy-related terms and the word "victim" will be denied without prejudice to renewal during trial. Mr. Patel's motion to exclude references to the "Mahesh Patel Rule" will be granted.

### 4.  Handwritten Calendars

Defendants move to "preclud[e] the [G]overnment from introducing into evidence at trial the 'day timers' of [Individual One] ('[Individual One] Day Timers')." Defs.' MIL re Calendars at 1. Defendants argue that the Individual One Day Timers lack context and contain "immaterial and irrelevant information on various subjects that could confuse and mislead the jury." *Id.* at 2–3. Defendants contend that the Individual One Day Timers should only be used "as a means of refreshing [Individual One's] recollection—not as an exhibit to be submitted to the jury." *Id.* at 3.

In response, the Government contends that the Court "should defer ruling on this motion until trial" because the relevant witness "may testify at trial and . . . provide the context and clarity necessary for the Court to make a determination on the admissibility of the evidence." Gov't Opp'n to Defs.' MIL re Calendars at 1. The Government notes that it "may seek to introduce only certain pages or portions of the calendars/day timers or certain documents contained within them." *Id.* at 1–2.

The Court agrees.

While Defendants have provided an example of the Individual One Day Timers in their filing and offered to provide the Court with all of the Individual One Day Timers for *in camera* review, this would not replace the added context that trial would provide. Therefore, the Court

24

cannot determine the relevance and prejudicial impact of the Individual One Day Timers at this stage. *See In re MTBE*, 643 F. Supp. 2d at 476 ("Indeed, courts considering a motion in limine may reserve judgment until trial, so that the motion is placed in the appropriate factual context." (citation omitted))

Accordingly, the Court will deny this motion without prejudice to renewal during trial.

### 5. Privileged Communications

The Government moves to preclude Defendants from arguing "that the charged conduct should be excused or otherwise rendered non-criminal by reason of advice of counsel," or introducing any evidence that "any Defendant or co-conspirator did or did not seek or receive the advice of legal counsel regarding the alleged crime or similar conduct." Gov't MIL #4 at 15. The Government argues that advice of counsel evidence is irrelevant because the charged conspiracy is a general intent crime to which there is no "good faith" defense. *Id.* at 5–8. Thus, the Government argues that the Court should exclude any evidence or argument that includes a suggestion that "a defendant sought or received legal blessing of his actions" because such evidence or argument "presents a substantial danger of unfair prejudice, juror confusion regarding the law, and outright jury nullification." *Id.* at 9–13.

In response, Mr. Houghtaling[3] argues that the Government's motion is too broad because excluding the entire category of evidence the Government requests would "present a fictionalized view of the facts in which no defendant even talked to a lawyer about the complex employment and hiring issues at play." Houghtaling Opp'n to Gov't MIL #4 at 1. Mr. Houghtaling states that he will not be making a "good faith" argument and instead, he intends to argue that his conversations with Company C in-house counsel "directly bear[s] on . . . the

---

[3] No other Defendant submitted an opposition to the Government's motion *in limine* on this issue.

existence of the alleged conspiracy and whether Mr. Houghtaling knowingly joined that conspiracy." *Id.* at 1, 5–11. More specifically, Mr. Houghtaling argues that evidence of discussions with counsel will show that he "never agreed to a blanket no-hire agreement," show that "competitors' employees were not hired because of non-compete agreements . . . not due to an alleged no hire agreement," show "the central role of [Company C's] HR department and counsel in determining [Company C's] recruiting and hiring practices and rebut the [G]overnment's allegation that Mr. Houghtaling had substantial [hiring] responsibilities," and "refute the [G]overnment's allegation that Defendants took steps to conceal the existence and operation of the conspiracy." *Id.* at 16–19 (citations and quotation marks omitted).

Next, Mr. Houghtaling argues that such evidence is admissible under Rule 106's "rule of completeness" because this other evidence, "in fairness ought to be considered at the same time." *Id.* at 3, 12–15. In Mr. Houghtaling's view, these documents show that he "did not come to any meeting of the minds as alleged and did not agree to any blanket no-hire agreement." *Id.*

The Court agrees.

As initial matter, Mr. Houghtaling states that he will not argue a "good faith" defense based on advice of counsel. Houghtaling Opp'n to Gov't MIL #4 at 1. Further, Mr. Houghtaling has offered several bases for finding this evidence relevant. *See, e.g.*, Houghtaling Opp'n at 16–19. Therefore, the Court considers the portion of the Government's motion challenging, under Rule 401, the use of advice of counsel evidence to support a good faith defense to be moot. *See also* Gov't MIL #4 at 4 ("The Government also does not suggest that these documents should be excluded for all potential purposes.").

Under Rule 106, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing

or recorded statement—that in fairness ought to be considered at the same time." Fed. R. Evid.

106. The rule of completeness requires "that adversaries be allowed to prevent omissions that

render matters in evidence misleading." *Baker v. Goldman Sachs & Co.*, 669 F.3d 105, 111 (2d

Cir. 2012). "[U]nder Rule 106 . . . an omitted portion of a statement must be placed in evidence

if necessary to explain the admitted portion, to place the admitted portion in context, to avoid

misleading the jury, or to ensure fair and impartial understanding of the admitted portion."

*United States v. Thiam*, 934 F.3d 89, 96 (2d Cir. 2019) (quotation marks and citations omitted).

The rule "does not require introduction of portions of a statement that are neither explanatory of

nor relevant to the admitted passages." *Id.* (quotation marks omitted)

According to the Government, it had included only five documents from Company C that

clearly included redacted privileged conversations on its exhibit list. *See* Gov't MIL #4 at 4 n.4.

Mr. Houghtaling has now produced this other evidence. *See* Houghtaling Opp'n to Gov't MIL #4

at 19. The Government stated that it intended to use these exhibits in their redacted form, as

needed, "to show [Mr.] Houghtaling's continued knowledge of and involvement in certain

controversies over Company C's hiring from Company B around that time." Gov't MIL #4 at 4

n.4.

This other evidence tells a much different story. Therefore, this evidence is admissible as

relevant to whether Mr. Houghtaling joined the alleged conspiracy and is necessary for

completeness under Rule 106.

Accordingly, this motion will be denied without prejudice to renewal during trial.[4]

### 6. Compensation

Mr. Harvey and Mr. Wasan jointly move to "preclude the [G]overnment from offering

---

[4] The Court will address the necessity of a limiting instruction about how the jury should consider such evidence during the charge conference, which will occur at the close of evidence.

evidence at trial relating to their respective compensation." Harvey & Wasan MIL at 1. Mr. Harvey and Mr. Wasan argue that evidence of their compensation is not relevant because there is no connection to the alleged agreement. *Id.* at 3. They also note that "[n]o individual identified on the [G]overnment's witness list is competent to explain the structure of [their] compensation or the calculation of its components, much less that their compensation was affected or would be expected to be affected by the alleged agreement." *Id.* at 4.

More specifically, Mr. Harvey contends that he had "responsibilities for developing . . . business with numerous customers around the world" and Company A "was only one of multiple substantial aerospace customers within the scope of his responsibility." *Id.* In Mr. Harvey's view, "no non-speculative basis would support an evidentiary linkage between the alleged conspiracy and [his] compensation." *Id.* Similarly, Mr. Wasan notes that he was in "a management role for which there is no non-speculative evidentiary linkage between the alleged conspiracy and [his] compensation." *Id.*

Mr. Harvey and Mr. Wasan argue, in the alternative, that even if this evidence is relevant, it is unduly prejudicial, could confuse the issues, and may mislead the jury because the Government "has placed the 'wages and labor costs' of rank-and-file engineers and other skilled laborers in issue." *Id.* at 5. Mr. Harvey and Mr. Wasan also contend that the employees at issue "earned considerably less than" them as executives, and therefore, their compensation "would contrast starkly" and may "encourage emotional, class-based animus" from the jury. *Id.* at 6.

In response, the Government argues that Mr. Harvey and Mr. Wasan's motion is premature because "[w]hether there is a factual predicate to connect either [Mr.] Harvey's or [Mr.] Wasan's personal compensation with the alleged conspiracy . . . can reasonably only be decided at trial, in context." Gov't Omnibus Opp'n re Certain Words at 7 (citation and quotation

marks omitted). In the Government's view, Mr. Harvey and Mr. Wasan's compensation is relevant "to the extent . . . [it] depended on the financial success of Company B," in which case this evidence "is squarely implicated . . . to show that the charged no-poach agreement was motived, at least in part, by the conspirators' desire to reap the financial benefits of reducing wages and other labor costs by restricting the free movement of workers." *Id.* (citations omitted). Additionally, the Government argues that this evidence is not unfairly prejudicial such that "jurors . . . could not be expected to render a verdict based on the law." *Id.* at 8.

The Court agrees in part and disagrees in part.

Evidence of compensation can be relevant to Defendants' motive. *See United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006) ("The government offered evidence of Quattrone's salary during 1999 and 2000 in order to argue that Quattrone's substantial salary established a motive for him to obstruct the IPO allocation investigations. Quattrone contends that the evidence was . . . unduly prejudicial because it invited the jury to engage in class-based bias against him. . . . In our view, the district court acted within the scope of its discretion in finding the evidence relevant and consistent with Rule 403."). Therefore, evidence of compensation is relevant and admissible if it is properly linked to the underlying alleged conspiracy. *See United States v. Ferguson*, No. 3:06-CR-137 (CFD), 2007 WL 4240782, at *1 (D. Conn. Nov. 30, 2007) ("Evidence that links a defendant's financial compensation to his possible motives for participating in an alleged fraud is relevant to proving the fraud." (citations omitted)).

Mr. Harvey and Mr. Wasan's arguments that their compensation comes from several areas of their companies' business, not just their projects with Company A, go to the weight of the evidence rather than its admissibility. *See United States v. Schultz*, 333 F.3d 393, 416 (2d Cir. 2003) ("[F]actors which make evidence less than conclusive affect only weight, not

admissibility." (citation and quotation marks omitted)). At this stage, particularly in light of Defendants' arguments about the weight of this evidence, the Court cannot dispositively say whether this evidence would be admissible under Rule 403. *See United States v. Shkreli*, No. 15-CR-637 (KAM), 2017 WL 3623626, at *5 (E.D.N.Y. June 24, 2017) (noting that Rule 403 balancing "is best conducted at trial, when the court has additional factual context about the specific evidence to be offered and its potential for unfair prejudice"); *In re MTBE*, 643 F. Supp. 2d at 476 ("Indeed, courts considering a motion *in limine* may reserve judgment until trial, so that the motion is placed in the appropriate factual context.").

Accordingly, this motion will be denied without prejudice to renewal during trial.

### 7.  Any Defendants' Health

The Government moves to preclude any Defendant from introducing evidence or argument regarding any Defendants' health. Gov't MIL #10 at 1.

Mr. Patel, in response, states that as long as the Government does not present evidence or argument related to any Defendants' health, no Defendant will raise the issue of any Defendants' health during trial. Patel Resp. at 1.

Accordingly, the Court will deny this motion without prejudice to renewal, if the issue should arise during trial.

### 8.  Separation of the Global Account Manager

Mr. Harvey moves to exclude evidence related to "the circumstances at the time of and immediately following the departure to a competitor of [the] Global Account Manager – Strategic Customers" for Company B. Harvey MIL re Global Acct. Manager at 1. Mr. Harvey argues that this evidence is irrelevant because the Global Account Manager was not a "junior engineer" but instead was a "senior manager." *Id.* at 3–4. Therefore, in Mr. Harvey's view, "the

circumstances surrounding [the Global Account Manager's] later departure . . . do not make it more or less probable that Defendants entered into the alleged agreement." *Id.* at 4 (quotation marks omitted). Alternatively, Mr. Harvey argues that even if the evidence is relevant, this evidence would be "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." *Id.* (citing Fed. R. Evid. 403).

The Government, in response, argues that this evidence is relevant because the Global Account Manager worked under two of the Defendants, Mr. Harvey and Mr. Houghtaling, "was personally involved in the conspiracy starting in its early days, and can place [Mr.] Harvey, [Mr.] Patel, and [Mr.] Houghtaling directly at its center." Gov't Opp'n to Defs.' MIL re Non-Competes at 6. The Government states that the Global Account Manager will testify about how he "feared that Company B would find some way of blocking his exit" to a new job. *Id.* at 7. Further, the Global Account Manager will testify that Company B did take steps to enforce his non-compete clause, however, Company B eventually "dropped the issue" allegedly after the Global Account Manager "s[ought] the help of [Mr.] Patel," who the Global Account Manager believed "had certain power . . . over his suppliers." *Id.*

In the Government's view, this testimony is relevant for three reasons: First, Company B's attempt to enforce the non-compete agreement "supports the inference that . . . [Mr.] Harvey/Company B had no comfort that they could rely upon the noncompete clause to prevent employees from leaving." *Id.* at 8. Second, the Global Account Manager "identifying [Mr.] Patel as the problem-solver of the . . . controversy supports other evidence regarding the power and influence that [Mr.] Patel had on the hiring decisions of outsource engineering companies." *Id.* (quotation marks omitted). Third, the Global Account Manager's testimony "will help establish

one of the means and methods of that conspiracy," namely, relying on non-compete agreements. *Id.* at 8–9.

The Court agrees, for now.

Any testimony from the Global Account Manager to support the inference that Mr. Harvey and Company B did not believe they could rely on non-compete clauses to prevent employees from leaving, is likely relevant and admissible.

For this testimony to be relevant to establishing the methods of the conspiracy and Mr. Patel's alleged role in the conspiracy, however, the Government must provide some evidentiary basis to support the inference that Mr. Patel's role and methods used in the situation with the Global Account Manager were the same as those used in the alleged conspiracy. *See United States v. Valle*, 807 F.3d 508, 513 (2d Cir. 2015) ("[S]pecious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty.").

Additionally, to the extent connecting such evidence to the charged conspiracy takes several inferential steps, there is an increased probability that the evidence will be limited or excluded under Rule 403. *See United States v. Kaplan*, 490 F.3d 110, 122 (2d Cir. 2007) ("The length of the chain of inferences necessary to connect the evidence with the ultimate fact to be proved necessarily lessens the probative value of the evidence, and may therefore render it more susceptible to exclusion as unduly confusing, prejudicial, or time-consuming." (citations omitted)).

Accordingly, this motion will be denied without prejudice to renewal during trial.

### 9. Hiring Policies and Remedial Measures

Defendants move to "preclud[e] the [G]overnment from introducing evidence at trial regarding the conduct, hiring, and business practices of Defendants and Companies A-F that postdate the alleged conspiracy." Defs.' MIL re Hiring Policies and Remedial Measures at 1. More specifically, in Defendants' view, evidence that "Defendants and their alleged co-conspirators ceased engaging in the alleged no-poach agreements, received or adopted guidance regarding the same, or . . . 'successfully engaged in the business of aerospace engineering services' without relying upon such no-poach agreements" is irrelevant to proving they participated in the charged conspiracy. *Id.*

Defendants also contend that any evidence purporting to show remedial steps are irrelevant because this "implicates Defendants' attorney-client privilege" and "[t]he fact that Defendants . . . may not have spoken about the matter under investigation or may have ceased communicating altogether after that time period is not a valid basis . . . [for] the jury to infer . . . a conspiracy." *Id.* at 5. Defendants emphasize that there are "many legitimate business reasons why Defendants . . . may have adopted new hiring practices or policies." *Id.* In the alternative, Defendants argue that even if this evidence is relevant, it will confuse the jury and "create prejudice by inviting the jury to infer culpable conduct on an improper basis." *Id.* at 5–6.

In response, the Government argues that this evidence is relevant to prove the existence of the conspiracy, Defendants' membership in the conspiracy, Defendants' intent to join the conspiracy, and lack of mistake in joining the conspiracy. Gov't Omnibus Opp'n re Other Acts at 18–19.

The Court agrees, for the most part.

Evidence about how the conspiracy ended is typically relevant to proving the existence of that conspiracy. *See Koppers*, 652 F.2d at 298 ("The trial court's decision to admit evidence documenting the demise of the conspiracy between [the defendants] and the subsequent change in bidding patterns was correct, since post-conspiracy evidence is admissible if it is probative of the existence of the conspiracy."). Therefore, this evidence, as described in the briefing, is relevant. Defendants' arguments about the other legitimate business reasons for adopting new hiring practices or policies address the weight of the evidence, rather than its admissibility. *See Schultz*, 333 F.3d at 416 ("[F]actors which make evidence less than conclusive affect only weight, not admissibility." (quotation mark omitted)).

Accordingly, this motion will be denied without prejudice to renewal during trial on these grounds.[5]

## B.  Prior Acts

Evidence of prior convictions may be admitted in some circumstances for limited purposes such as proving motive or impeaching a witness's credibility. *See* Fed. R. Evid. 404(b) (noting that evidence of past crimes "is not admissible to prove a person's character" but that such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."). The Second Circuit follows the inclusionary rule for other act evidence under Rule 404(b), "which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity." *United States v. Zhong*, 26 F.4th 536, 551 (2d Cir. 2022) (quotation marks omitted). This rule, however, "is not a carte blanche to admit prejudicial extrinsic act evidence [that] is offered to prove propensity, . . . or otherwise to allow propensity evidence in sheep's clothing."

---

[5] Defendants' arguments that this evidence is inadmissible under Rule 407 will be addressed separately below.

*Id.* (alteration in original) (citations and quotation marks omitted).

At all times, however, such evidence is subject to the balancing test of Rule 403, which provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403; *see also Lewis v. Velez*, 149 F.R.D. 474, 483 (S.D.N.Y. 1993) ("Convictions for crimes or other bad acts that bear a close resemblance to actions alleged in the current case are likely to run afoul of Rule 404(b), because they cause unfair prejudice to the party against whom they are offered by suggesting that the party has a propensity to commit such acts.").

Defendants argue that evidence of an alleged foreign agreement, charitable donations, pre-charge period conduct, certain uncharged conduct of any Defendant, and other hiring restrictions should be excluded because they constitute prior acts in violation of Rule 404(b) for which there is no other purpose, and, even if there is another purpose, such evidence is unduly prejudicial under Rule 403.

The Court will address each category of evidence separately.

### 1. The Alleged Foreign Efforts to Restrict Competition

Defendants move to preclude evidence that certain Defendants allegedly agreed to restrict competition in a foreign country (the "alleged foreign agreement"). Defs.' MIL re Uncharged Conduct at 4. Defendants argue that this evidence is improper propensity evidence that does not have a valid other purpose. *Id.* at 6. More specifically, Defendants argue that their alleged conduct in the foreign country is not evidence of motive because "[t]his is not a case where one act begets another." *Id.* Similarly, Defendants argue that this conduct is not evidence of opportunity because there is ample evidence that the Defendants were in contact with one another "in scores of other documents in the [G]overnment's exhibit list." *Id.* at 6–7. With

respect to knowledge and intent, Defendants argue that their alleged conduct in the foreign country is not relevant to this case. *Id.* at 7. Additionally, Defendants contend that because their alleged conduct in a foreign country is not unlawful there, it would not be evidence of knowledge or intent to commit a crime. *Id.* at 7–8.

Additionally, Defendants argue that, even if the evidence were offered for a proper purpose, it is not relevant because this evidence relates only to conduct in the foreign country. *Id.* at 8–9. And, even if relevant, Defendants argue that this evidence would be unduly prejudicial and could mislead or confuse the jury because the alleged conduct in the foreign country may not be illegal under foreign law and would lead to "a rabbit hole of further disputes." *Id.* at 9–11.

In response, the Government first argues that the alleged conduct in the foreign country is direct evidence of the conduct alleged in the Indictment. Gov't Omnibus Opp'n re Other Acts at 7. In the Government's view, evidence of the foreign conduct is "part and parcel of [the charged] conduct." *Id.*

The Government next argues that, even if the alleged foreign agreement is other act evidence, it is admissible for another purpose under Rule 404(b). *Id.* at 12. More specifically, the Government argues that the alleged foreign agreement is relevant to Defendants' knowledge because "a jury could reasonably infer that Defendants and other co-conspirators knew about the [alleged] conspiracy and had the state of mind to join it." *Id.* at 13. In the Government's view, it is relevant that both alleged agreements "involve the same co-conspirators – namely [certain Defendants]; target [similar conduct] at [some of] the same companies; . . . ; and occur roughly at the same time." *Id.* at 13–14.

The Government also argues this evidence may be relevant to prove Defendants' motive "to suppress wages for the affected employees," Defendants' opportunity by "demonstrating the

36

lack of obstacles preventing the creation of the conspiracy and Defendants' ability to join it," and "to prove the relationship among the co-conspirators." *Id.* at 14.

The Court disagrees.

"[E]vidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (citation and quotation marks omitted). "[W]here it is not manifestly clear that the evidence in question is intrinsic proof of the charged crime, the proper course is to proceed under Rule 404(b)." *United States v. Martoma*, No. 12 Cr. 973 (PGG), 2014 WL 31191, at *2 (S.D.N.Y. Jan. 6, 2014) (citations and quotation marks omitted).

When deciding whether uncharged conduct is "inextricably intertwined" with charged conduct, courts consider whether the "details of the uncharged transaction are necessary to understand the charged transaction." *United States v. Stein*, 521 F. Supp. 2d 266, 271 (S.D.N.Y. 2007); *see also United States v. Newton*, No. S101 Cr. 635 (CSH), 2002 WL 230964, at *2 (S.D.N.Y. Feb. 14, 2002) (finding the charged and uncharged conduct was not inextricably intertwined where "[t]he charged crimes are straightforward and may be fully understood without reference to [the uncharged conduct]"); *Martoma*, 2014 WL 31191, at *3 (finding the charged and uncharged conduct were not inextricably intertwined because "[i]t is not necessary for the jury to know that the doctors provided the Defendant with confidential information about other drugs in order for the jury to understand the Government's theory that the Defendant obtained material, nonpublic information from the doctors about bapineuzumab, which the Defendant then traded on").

The Government has not established that the two alleged agreements are inextricably intertwined because there is no apparent reason the jury would need evidence of a separate foreign agreement in order to understand the charged agreement. For example, in *Carboni*, the Second Circuit affirmed the district court's decision to admit evidence that the defendant "added fictional items to the perpetual inventory" where the defendant was charged with making false statements to secure advances on a line of credit. 204 F.3d at 41, 44. The Court reasoned that the "jury reasonably could have concluded that [the defendant] altered the perpetual inventory as part of his continued effort to create an overly optimistic picture of [his company's] financial system and thus keep the money flowing." *Id.* at 44. The court, therefore, concluded that the prior act evidence was inextricably intertwined with the charged conduct. *Id.*

Here, the Government points to a statement made by a certain Defendant in a single exhibit. Gov't Omnibus Opp'n re Other Acts at 8. Notably, in this statement that Defendant refers to United States-based "agreements" in the plural, and the Indictment charges only a single agreement. *Id.* Even if that Defendant was clearly referencing the underlying conspiracy, simply mentioning both alleged agreements in the same sentence is not sufficient to deem the agreement "inextricably intertwined," particularly where the alleged foreign agreement appears to involve conduct in a foreign country as opposed to the charged agreement, which is specifically based in the United States. *See* Defs.' MIL re Uncharged Conduct at 4. Without more to connect the agreements to one another, the Government has not established that the alleged foreign agreement is direct evidence of the charged agreement. *See, e.g.*, *Martoma*, 2014 WL 31191, at *3 ("[T]emporal proximity alone is not sufficient to establish that charged and uncharged conduct is intertwined." (citations omitted)).

Additionally, it is not clear how the alleged foreign agreement, which seems to have been

formed after the charged agreement already allegedly existed and concerns conduct in a foreign country, could have arisen from the same transaction or series of transactions as the alleged agreement, or would be necessary to complete the story. *Cf. United States v. Barrett*, 153 F. Supp. 3d 552, 567 (E.D.N.Y. 2015) (finding the defendants' alleged tax fraud "arose out of the same transaction or series of transactions" and was "necessary to complete the story" of the charged money laundering because the Government presented evidence that the defendant "misrepresented the nature of the proceeds [he gained from health care fraud] as business expenses on his tax returns," and therefore, "the final link in the money laundering chain leading to defendant's personal bank account is the alleged tax fraud"). Therefore, this evidence is properly considered under Rule 404(b).

Having determined that the evidence of the alleged foreign agreement is other act evidence, the Court next turns to the Government's other purposes and Rule 403 balancing.

The Government offers several other allegedly permissible purposes for admitting this evidence. Because the other purpose must be sufficiently put at issue, *see United States v. Scott*, 677 F.3d 72, 80 (2d Cir. 2012) ("But relevance is not the end of the inquiry: evidence admitted under 404(b) must be relevant to an issue in dispute."),[6] the Court cannot determine at this stage whether evidence of the alleged foreign agreement is admissible under 404(b). *See In re MTBE*, 643 F. Supp. 2d at 476 ("Indeed, courts considering a motion in limine may reserve judgment until trial, so that the motion is placed in the appropriate factual context."). Notably, based on the

---

[6] *See also McCallum*, 584 F.3d at 475 (2d Cir. 2009) ("Where [404(b)] evidence is offered for the purpose of establishing the defendant's knowledge or intent," the Second Circuit requires "that the government identify a similarity or connection between the two acts that makes the prior act relevant to establishing knowledge of the current act." (citations and quotation marks omitted)); *United States v. Garcia*, 291 F.3d 127, 138 (2d Cir. 2002) (finding that admitting a prior conviction was an abuse of discretion because "the government did not establish that [the] prior drug conviction was meaningfully probative of [the defendant's] knowledge" of the charged narcotics conspiracy because "[t]he only similarity between the two drug transactions . . . [was] that both involved cocaine").

evidence the Court has reviewed, it is not clear how the alleged foreign agreement is probative of knowledge, opportunity, or motive other than by an improper propensity inference.[7]

Even if there is a proper purpose to admit the evidence under 404(b), there is a substantial risk of confusing the issues and misleading the jury because the alleged foreign agreement involves a different legal landscape and some, but not all, Defendants. *See Velez*, 149 F.R.D. at 480 (precluding evidence of the plaintiff's disciplinary history in excessive force case where the defendant sought to introduce it as evidence that the plaintiff initiated the encounter at issue). In any event, given the other evidence the Government intends to introduce—an estimated 1,400 trial exhibits and 50 witnesses, over the course of as many as 15 trial days—any probative evidence regarding the alleged foreign agreement likely would be cumulative.

Accordingly, this motion will be granted on this basis.

### 2. Charitable Donations

Defendants move to exclude evidence that a certain Defendant "pressured" members of the other Companies to donate money in a foreign country. Defs.' MIL re Uncharged Conduct at 11 (quotation marks omitted). More specifically, Defendants contend that this evidence is not relevant and, even if relevant, "runs the risk of confusing the jury." *Id.* at 12. Defendants argue that there is no apparent proper purpose for this evidence. *Id.* at 12–13.

In response, the Government first argues that this evidence is directly relevant "to show [that Defendant's] authority over [members of the other companies] and their willingness to comply with [that Defendant's] exercise of . . . authority." Gov't Omnibus Opp'n re Other Acts at 7–8. In the Government's view, this evidence is probative of the alleged relevant conduct, specifically the relationships between and among the various Defendants. *Id.* at 8.

---

[7] Additionally, while the alleged foreign agreement may be probative of "the relationship among the co-conspirators" it is likely cumulative in light of Defendants' years long business relationships.

Next, the Government argues, even if this evidence is other act evidence, "the Government could present this evidence to prove the nature of the relationship between [a certain Defendant] and the other co-conspirators or to provide background and context for the charged conspiracy." *Id.* at 14. The Government contends that "these donations are not the type of serious conduct that raise concerns of unfair prejudice" and the evidence "has great probative value." *Id.* at 15.

The Court agrees in part and disagrees in part.

The Government intends to offer evidence of a certain Defendant exerting influence over alleged co-conspirators with respect to charitable donations for the inference that, because he had such influence in that context, he also had the same type of influence in the charged agreement. *See id.* at 7–8. This is the type of inference that Rule 404(b) addresses, and therefore, this evidence is subject to the 404(b) analysis. *See, e.g.*, *Scott*, 677 F.3d at 79 (stating that Rule 404(b) "prohibits the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character" that is "offered to prove [the defendant's] propensity" to act a certain way).

The evidence is admissible under 404(b), however, for the proper purpose of establishing that Defendant's alleged role in the conspiracy and providing background explaining how the relationships developed. *See, e.g.*, *United States v. Pascarella*, 84 F.3d 61, 72–73 (2d Cir. 1996) (admitting evidence of past gambling dealings between some of the co-conspirators for the purpose of establishing their relationship because the evidence "inform[ed] the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators" (citations omitted)).

As noted elsewhere in this ruling, the Court cannot definitively conclude whether the

evidence is admissible under Rule 403 without the additional context provided by trial. *See In re MTBE*, 643 F. Supp. 2d at 476 ("Indeed, courts considering a motion in limine may reserve judgment until trial, so that the motion is placed in the appropriate factual context."); *Shkreli*, 2017 WL 3623626, at *5 (noting that Rule 403 balancing "is best conducted at trial, when the court has additional factual context about the specific evidence to be offered and its potential for unfair prejudice").

Accordingly, this motion will be denied without prejudice to renewal during trial.

### 3.  Pre-Charge Period Conduct

Defendants first argue that evidence related to an agreement between Individual One and "two senior executives at [Company C] . . . concerning recruiting that began with a meeting . . . in approximately 2003" should not be admissible. Defs.' MIL re Uncharged Conduct at 15. More specifically, Defendants contend that this alleged agreement is not part of the conspiracy alleged in the Indictment because "[i]t takes place across a different period," and "[i]t involves different participants." *Id.* at 16–19. Additionally, Defendants argue, even if there is a proper purpose to admit this evidence under Rule 404(b), "any probative value is far exceeded by its prejudicial effect." *Id.* at 19–20.

Defendants also argue that evidence of "an agreement between [Individual One] and [Company E]" should be excluded because it involves "different individuals, a different period, and a different set of circumstances." *Id.* at 20. Defendants argue that, even if this evidence is admissible for another purpose under Rule 404(b), its "tangential relevance . . . is far exceeded by its prejudicial effect and compounding of confusion." *Id.* at 21.

In response, the Government argues that evidence of these arrangements between Individual One and two of the suppliers is direct evidence of the charged conspiracy because it

"shows the nature and mutuality of the relationships." Gov't Omnibus Opp'n re Other Acts at 9. In the Government's view, it "is necessary to show that the conspiracy was not simply one that was formulated, organized, and control by [a certain Defendant] and that there were other willing participants." *Id.* The Government contends that excluding this evidence "would potentially give a misimpression to the jury of 'the story of the crime on trial.'" *Id.*

Alternatively, the Government argues that even if this evidence is subject to 404(b), it is admissible as background information about the conspiracy, evidence of relationships of mutual trust, intent, "pattern of behavior, and lack of mistake." *Id.* at 15–16.

The Court agrees, for now.

Uncharged conduct is not "other acts" evidence subject to 404(b), if the conduct "arose out of the same transaction or series of transactions as the charged offense, . . . [is] inextricably intertwined with the evidence regarding the charged offense, or if [it is] necessary to complete the story of the crime on trial." *United States v. Curley*, 639 F.3d 50, 58–59 (2d Cir. 2011) (citations and quotation marks omitted); *see also United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment." (citations and quotation marks omitted)).

Here, the pre-charge conduct is relevant and admissible as direct evidence of the conspiracy to the extent that these agreements formed the basis of the charged agreement. *See United States v. Kaiser*, 609 F.3d 556, 570–71 (2d Cir. 2010) (finding that conduct prior to the charged period of conspiracy was not other acts evidence because "the terms of many [pre-charge period] agreements extended into subsequent years" and "the scheme itself was devised by [the defendant] prior to [the charge period]").

This admissibility, however, depends on the Government's ability to connect this pre-charge conduct to the charged conspiracy. *See United States v. Langford*, 990 F.2d 65, 70 (2d Cir. 1993) ("It is within the court's discretion to admit evidence of acts committed prior to the time charged in the indictment to prove the existence of the alleged conspiracy as well as to show its background and history."); *see also* Defs.' MIL re Uncharged Conduct at 15 n.10 (noting that Individual One may not be able to testify to whether this pre-charge conduct actually formed the basis of the charged agreement).

Accordingly, this motion will be denied without prejudice to renewal during trial.

### 4. Other Hiring and Recruiting Restrictions

Defendants move to exclude any and all evidence of extrinsic conduct from the trial of this action including, but not limited to, alleged restrictions on competition before the period alleged in the Indictment and/or involving a certain company. Defs.' MIL re Other Hiring Restrictions at 1. Defendants argue that this is improper 404(b) evidence because the conduct is not connected to the charged conspiracy and the Government cannot establish that this conduct occurred, or that Defendants were involved. *Id.* at 4–6.

Alternatively, Defendants contend that even if the evidence is proper under Rule 404(b), its probative value is substantially outweighed by its prejudicial effect. *Id.* at 6. More specifically, Defendants emphasize that this evidence leads to the inference that "because some of the Defendants and/or entities purportedly engaged in the alleged restriction [on competition] on other occasions, the Defendants must be guilty of the charged conspiracy." *Id.* Defendants emphasize that admitting this evidence "would require an already complex trial to gain additional and unnecessary dimensions" that could confuse the issues, mislead the jury, and waste time. *Id.* at 7–8.

In response, the Government first argues that this evidence is admissible not as 404(b) evidence, but as direct evidence of the charged conspiracy. Gov't Omnibus Opp'n re Other Acts at 8. In the Government's view, the alleged agreements between certain Defendants to restrict competition with respect to a certain company that occurred "during the course of the charged conspiracy" is evidence that "a [certain company]-based conspiracy was strongly intertwined with, if not simply an extension of, the charged conspiracy." *Id.* The Government relies on evidence that a certain Defendant successfully negotiated an agreement with a certain company at the same time he negotiated one with Company A, a certain Defendant "occasionally inserted himself into disputes over [a certain company's] hiring" from one of Company A's suppliers, and alleged co-conspirators "complained directly to [certain Defendants] about" suppliers hiring each others' "engineers working on projects for [a certain company]." *Id.*

Alternatively, the Government contends that, even if this evidence is subject to 404(b), it is admissible "to show Defendants' knowledge of the charged conspiracy, . . . motive, because of the financial incentives to collude[,] and lack of accident or mistake, given that Defendants has similar agreements regarding other companies or projects." *Id.* at 15.

The Court agrees in part and disagrees in part.

As discussed above, when deciding whether uncharged conduct is "inextricably intertwined" with charged conduct, courts consider whether the "details of the uncharged transaction are necessary to understand the charged transaction." *Stein*, 521 F. Supp. 2d at 271. Additionally, "[t]emporal proximity alone is not sufficient to establish that charged and uncharged conduct is intertwined." *See, e.g.*, *Martoma*, 2014 WL 31191, at *3.

Here, the Government relies only on evidence that the alleged agreements with a certain company occurred during the same time period as the charged agreement and involved some of

45

the same participants. *See* Gov't Omnibus Opp'n re Other Acts at 8. This is insufficient to show

that the alleged agreement with a certain company should be considered direct evidence. *See e.g.*,

*Martoma*, 2014 WL 31191, at *3 (finding the charged and uncharged conduct was not

inextricably intertwined because "[i]t is not necessary for the jury to know that the doctors

provided the Defendant with confidential information about other drugs in order for the jury to

understand the Government's theory that the Defendant obtained material, nonpublic information

from the doctors about bapineuzumab, which the Defendant then traded on").

Additionally, while the alleged agreement with a certain company appears to be more

closely tied than the alleged foreign agreements, at least geographically, the Government has not

pointed to any non-speculative evidence that the agreements arose out of the same transaction.

*Cf. Barrett*, 153 F. Supp. 3d at 567 (finding the defendants' alleged tax fraud "arose out of the

same transaction or series of transactions" and was "necessary to complete the story" of the

charged money laundering because the Government presented evidence that the defendant

"misrepresented the nature of the proceeds [he gained from health care fraud] as business

expenses on his tax returns" and therefore, "the final link in the money laundering chain leading

to defendant's personal bank account is the alleged tax fraud"). Therefore, the alleged agreement

with a certain company is not direct evidence of the charged agreement.

Having determined that this evidence is subject to 404(b), the Court next turns to the

Government's other purposes and Rule 403 balancing.

The Government offers several other purposes that they believe are permissible, however,

as noted above, because the other purpose must be sufficiently put at issue, *see Scott*, 677 F.3d at

81 ("But relevance is not the end of the inquiry: evidence admitted under 404(b) must be relevant

to an issue in dispute."), the Court cannot determine at this stage whether evidence of the alleged

46

agreement with a certain company is admissible under 404(b), *see In re MTBE*, 643 F. Supp. 2d at 476 ("Indeed, courts considering a motion *in limine* may reserve judgment until trial, so that the motion is placed in the appropriate factual context.").

Finally, even if there is a proper purpose to admit the evidence under 404(b), at this stage, it seems likely there is a substantial risk of confusing the issues and misleading the jury because the substance of the alleged agreement with a certain company is so similar to the charged conduct, yet the alleged agreement with a certain company involves only a subset of Defendants, a different supplier-contractor relationship, and a different time period. Additionally, as noted above, given all of the other evidence expected to be introduced by the Government, as noted above, it is likely the alleged agreement with a certain company would be cumulative. At this stage, however, the Court cannot definitely determine the admissibility of this evidence. *See Shkreli*, 2017 WL 3623626, at *5 (noting that Rule 403 balancing "is best conducted at trial, when the court has additional factual context about the specific evidence to be offered and its potential for unfair prejudice").

Accordingly, this motion will be denied without prejudice to renewal during trial.

### 5. The Government's 404(b) Notice

Mr. Harvey moves to preclude "404(b) evidence due to the [G]overnment's noncompliance with the notice provision of the Rule," "to defer the consideration of any 'other acts' evidence to late in the trial proceeding on a full record of the evidence," and to preclude the Government from referring "to other act evidence in its opening statement." Harvey MIL re Uncharged Conduct at 5. Mr. Harvey argues that due to the Government's "defective notice" he cannot "assess the potential admissibility of the purported other act material." *Id.* at 3.

Defendants also jointly move to preclude additional evidence of other crimes, wrongs, or

acts not already included in the 404(b) notice. Defs.' MIL re Other Bad Acts at 4.

In response, the Government argues that their notice was "plainly . . . sufficient" because Defendants were able to file extensive briefing on the 404(b) issues. Gov't Omnibus Opp'n re Other Acts at 10. The Government emphasizes that it provided "one or two representative trial exhibits . . . for each category of noticed Rule 404(b) evidence." *Id.* The Government argues that including several bases for each category of Rule 404(b) evidence was necessary because it "does not know what Defendants' claims at trial will be" and therefore, "cannot definitively determine for which permissible purpose . . . it will use the 404(b) evidence." *Id.* at 11. The Government notes that it did not "merely list each non-propensity purpose" but also "explain[ed] how those purposes relate to the charged conduct." *Id.*

The Court agrees.

Under Rule 404(b)(3), in a criminal case, the Government must:

> (A) provide reasonable notice of any such evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it;
> (B) articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose; and
> (C) do so in writing before trial—or in any form during trial if the court, for good cause, excuses lack of pretrial notice.

In 2020, Rule 404(b)'s notice requirement was amended to require the Government to "articulate a non-propensity purpose for which the evidence is offered and the basis for concluding that the evidence is relevant in light of this purpose." Fed. R. Evid. 404 Committee Notes (2020 Amend.). The Committee stated that the amendment was intended to require the Government to provide not only the "general nature" of the evidence but also to "describ[e] the specific act that the evidence would tend to prove, and . . . explain[] the relevance of the evidence for a non-propensity purpose." *Id.* "What constitutes reasonable notice depends upon

48

the circumstances of the particular case." *United States v. Reddy*, 190 F. Supp. 2d 558, 576 (S.D.N.Y. 2002) (citing *United States v. Kevin*, No. 97 Cr. 763, 1999 WL 194749, at *13 (S.D.N.Y. Apr. 7, 1999) (collecting cases)).

The Government's amended Rule 404(b) notice, provided more than a month before trial, is sufficient. In the notice, the Government describes each category of evidence, includes permissible purposes and the reasoning that supports each purpose, and offers examples of relevant evidence that has been produced to Defendants. *See* Harvey MIL re Uncharged Conduct at 8–10. Where the Government did not point to specific exhibits, it noted that the evidence would be "offered primarily by witness testimony," which aligned with the summary included. *Id.* at 9 (charitable donations evidence).

This is sufficient to satisfy the Rule 404(b) notice requirements. *See, e.g.*, *United States v. Martoma*, No. 12 Cr. 973 (PGG), 2014 WL 31213, at *3 (S.D.N.Y. Jan. 6, 2014) (finding the Government's notice sufficient despite the defendant's request for the name of a witness, the name of a drug, the clinical trial at issue, and the date the information was obtained because the notice properly "informed the Defendant of the general nature of the proposed Rule 404(b) evidence" and "[t]he level of detail the Defendant s[ought] is not required by the rule").

To the extent the Government intends to use 404(b) evidence that was not properly noticed before trial, the Court may use its discretion to limit or exclude such evidence, *see United States v. Mamadjonov*, No. 3:18-cr-34 (VAB), 2023 WL 2155852, at *3–4 (D. Conn. Feb. 21, 2023); however, because the Government has not attempted to do so, any ruling on this issue would be premature. *See In re MTBE*, 643 F. Supp. 2d at 476 ("Indeed, courts considering a motion *in limine* may reserve judgment until trial, so that the motion is placed in the appropriate factual context.").

Accordingly, this motion will be denied as to Mr. Harvey's request that the Court exclude other act evidence based on insufficient notice and denied without prejudice as to Defendants' request that the Court exclude evidence the Government did not include in its 404(b) notice.

### C.  Remedial Measures

Under Federal Rule of Evidence 407, "[w]hen measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove . . . culpable conduct." The Court, however, "may admit this evidence for another purpose, such as impeachment or—if disputed—proving ownership, control, or the feasibility of precautionary measures." *Id.* While Rule 407 is typically applied in civil cases, it has been applied in criminal cases. *See Koppers*, 652 F.2d at 298–99 (finding that a co-conspirator's testimony that he was told by another co-conspirator that "the deal we have had is over" and evidence that the bidding pattern changed after the conspiracy ended because this "does not fall within the rubric of 'subsequent remedial measures'" (citation omitted)).

Defendants move to exclude evidence "that Defendants and their alleged co-conspirators ceased engaging in the alleged no-poach agreements, received or adopted guidance regarding the same, or that Defendants and their respective companies 'successfully engaged in the business of aerospace engineering services' without relying upon such no-poach agreements." Defs MIL re Hiring Policies and Remedial Measures at 1. Defendants contend that this evidence should be excluded under Rule 407 because the purpose of Rule 407 is "to encourage and not deter remedial measures." *Id.* at 6–7.

In response, the Government argues that this evidence is admissible for one of the permissible purposes allowed under Rule 407. Gov't Omnibus Opp'n re Other Acts at 17. In the Government's view, these permissible purposes include "impeachment, . . . feasibility of

precautionary measures, purpose, motive, intent, state of mind, and lack of mistake, among

others." *Id.* at 6. More specifically, the Government contends that this evidence is relevant to

prove the existence of the conspiracy, Defendants' membership in the conspiracy, Defendants'

intent to join the conspiracy, and lack of mistake. *Id.* at 17–18. The Government emphasizes that

the Second Circuit in *Koppers* found that evidence about the end of the defendants' conspiracy

and the following "change in bidding patterns" "did not fall within the rubric of subsequent

remedial measures." *Id.* at 18.

The Court agrees in part and disagrees in part.

It is important to distinguish the purpose and requirements of Rule 404(b) from those of

Rule 407. As discussed above, Rule 404(b) is an inclusionary rule meant to admit evidence, even

if susceptible to an impermissible propensity inference, as long as the evidence serves another

purpose such as proving intent, knowledge, or opportunity. *Curley*, 639 F.3d at 56. Consistent

with the inclusionary nature of the rule, Rule 404(b)'s explicit list of other permissible purposes

is not exhaustive. *See id.* at 57. "[E]vidence of uncharged criminal activity is not considered

other crimes evidence" under Rule 404(b) "if it arose out of the same transaction or series of

transactions as the charged offense, if it is inextricably intertwined with the evidence regarding

the charged offense, or if it is necessary to complete the story of the crime on trial." *Carboni*,

204 F.3d at 44.

Rule 407, however, serves a different purpose. Under Rule 407, subsequent remedial

measures are not admissible to prove culpable conduct because "[i]t would turn the law on its

head . . . to embrace a concept where a plaintiff could use allegations of prudent measures to

prove a defendant's imprudence." *Laboy v. Bd. of Trs. of Bldg. Serv.*, No. 11 CIV. 5127 (HB),

2012 WL 3191961, at *3 (S.D.N.Y. Aug. 7, 2012), *aff'd*, 513 F. App'x 78 (2d Cir. 2013). This

rule targets a more limited category of evidence and lists only a few specific exceptions: "negligence; culpable conduct; a defect in a product or its design; or a need for a warning or instruction." Fed. R. Evid. 407.

In *Koppers*, the Second Circuit found that evidence that the defendants ended their conspiracy and evidence that their previously illegal bid rigging patterns changed "does not fall within the rubric of 'subsequent remedial measures.'" 652 F.2d at 298–99 (quoting Fed. R. Evid. 407).

More recently, in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, the court discussed the distinction between impermissible remedial measures and evidence of the end of the conspiracy. No. 13 Civ. 7789 (LGS), 2022 WL 4087842, at *4–5 (S.D.N.Y. Sept. 6, 2022). There, the court found that "[c]losing down chat rooms that allegedly created the conditions for a conspiracy" and "strengthening corporate policies" were "paradigmatic measure[s] that would have made an earlier injury or harm less likely to occur" and therefore were inadmissible under Rule 407. *Id.* at *4 (quotation marks and citations omitted). The court explicitly distinguished the evidence at issue in *Koppers*, stating that the evidence, a statement that "the deal we had is over" is "simply an admission that the parties previously had a deal; it does not make a conspiracy any less likely to occur." *Id.* Similarly, the court reasoned that evidence that the bidding pattern changed was not a remedial measure taken, "[i]t is evidence that a conspiracy had distorted bidding patterns before." *Id.*

Here, evidence that, after the end of the alleged conspiracy, Defendants "receiv[ed] and follow[ed] guidance regarding the [hiring restrictions], hir[ed] and recruit[ed] employees free of restrictions agreed upon with competitors, and successfully engag[ed] in the business of aerospace engineering services without the use of no-poach agreements with competitors" is

inadmissible under Rule 407. These are the exact type of remedial measures "that would have made an earlier injury or harm less likely to occur." *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2022 WL 4087842, at *4; *see also id.* at *5 ("Admitting a conspirator's remedial measures against a co-conspirator would have the same chilling effect on remediation of harmful conditions that Rule 407 guards against, because conspirators are jointly and severally liable." (citation omitted)). Moreover, the evidence does not meaningfully serve any of the permissible purposes outlined in Rule 407.

Evidence, however, that the conspiracy came to an end, "does not fall within the rubric of 'subsequent remedial measures.'" *Koppers*, 652 F.2d at 298–99 (quoting Fed. R. Evid. 407). Therefore, this evidence is admissible under Rule 407.[8]

Accordingly, Defendants' motion will be granted in part and denied in part on these grounds.

### D. Questioning

The Government submitted motions *in limine* requesting permission to asking leading questions of certain witnesses under Federal Rule of Evidence 611 and seeking to exclude the cross-examination and impeachment of a specific witness.

The Court will address each in turn.

#### 1. Leading Questions

"Leading questions should not be used on direct examination except as necessary to develop the witness's testimony," Fed. R. Evid. 611(c), however, "the court should allow leading

---

[8] This category of evidence also likely does not pose a Rule 404(b) issue because it is direct evidence of the underlying conduct, not an other act. *See Carboni*, 204 F.3d at 44 ("[E]vidence of uncharged criminal activity is not considered other crimes evidence" under Rule 404(b) "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.").

questions . . . when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party." Fed. R. Evid. 611(c)(2). "[G]enerally trial judges are afforded a large degree of discretion in overseeing the examination of witnesses." *Sanders v. N.Y.C. Hum. Res. Admin*., 361 F.3d 749, 757 (2d Cir. 2004) (citations omitted).

The Government moves for permission "to ask leading questions on direct examinations of five witnesses . . . who qualify as 'witness[es] identified with an adverse party' under Rule 611(c)(2)." Gov't MIL #6 at 1. The Government contends that these five witnesses are "unindicted co-conspirator[s]" who are "currently or recently employed by an unindicted co-conspirator Supplier company that also currently employs at least one Defendant." *Id.* at 1, 4–5. The Government notes that three of the witnesses "reported directly to one or more Defendants during the time period of the charged conspiracy" and "all five witnesses have refused or declined to meet with the Government in advance of their testimony." *Id.* In the Government's view, this is sufficient to show a "demonstrated connection to Defendants and other adverse parties that could give rise to testimonial bias." *Id.* at 5 (quotation marks omitted).

In response, Defendants argue that the Government has not "offer[ed] any evidence that any of the witnesses are actually adverse." Defs.' Opp'n to Gov't MIL #6 at 4. In Defendants' view, it is insufficient that the five witnesses "currently or formerly worked at some of the non-defendant company employers involved in this case" because this "does not distinguish them in any way from the litany of other Government witnesses for whom the Government does not seek such relief." *Id.* Defendants emphasize that there is "significant variation in the current employment status" of these witnesses, some of the witnesses had only "limited, peripheral involvement . . in the relevant conduct," and it is possible "that one or more of the Government Witnesses will prove to be more adverse to the defense than to the Government." *Id.* at 5.

Defendants argue that the Court lacks pertinent information about the witnesses' role in the alleged conspiracy and their current relationship with Defendants. *Id.* at 6–8. Finally, Defendants emphasize that the witnesses were not "hostile or evasive" during their grand jury testimony. *Id.* at 8–9.

The Court agrees.

"The term 'witness identified with an adverse party' is intended to apply broadly to an identification based upon employment by the party or by virtue of a demonstrated connection to an opposing party." *In re Rsrv. Fund Sec. & Derivative Litig.*, No. 09 MD. 2011 (PGG), 09 Civ. 4346 (PGG), 2012 WL 12354219, at *9 (S.D.N.Y. Sept. 10, 2012) (citations omitted). Here, however, the employers, Companies A through F, are not parties to the case, and therefore, the Government must provide "a demonstrated connection to an opposing party." *Id.*; *see also In re 650 Fifth Ave. & Related Props.*, No. 08 Civ. 10934 (KBF), 2017 WL 6419014, at *2 (S.D.N.Y. May 30, 2017) (finding witnesses adverse where they were "all former board members" of the claimant in the case and two of the witnesses "served as president of [the claimant]" but noting that the witnesses who were not employed by the claimant "present[ed] a different issue").

To establish this connection, the Government must do more than rely on the witness's employment with an unindicted co-conspirator company during the time period of the conspiracy. *See e.g.*, *Harewood v. Braithwaite*, No. 09-CV-2874 (PKC) (RML), 2013 WL 5366391, at *3 (E.D.N.Y. Sept. 23, 2013) (finding the plaintiff had not shown that the witness was adverse in a § 1983 case against a detective because, "[w]ithout more," the witness's employment with the Kings County District Attorney's Office did not make the witness adverse, and reserving ruling "until such time the witness evinces hostility, bias, or recalcitrance during her testimony").

Additionally, the witness's presence at a select few meetings is insufficient to show the requisite nexus to an adverse party under Rule 611, particularly where, as here, the underlying claim is more complex, spanning several years. *Compare Gogol v. City of New York*, No. 15 Civ. 5703 (ER), 2018 WL 4616047, at *1 (S.D.N.Y. Sept. 26, 2018) (finding a probation-officer witness "who was present at the location where Plaintiff was arrested" but was "not a witness to the events that lead to the arrest of [the plaintiff]" was not an adverse party, despite being the partner of the probation officer who allegedly arrested the plaintiff because "she did not witness the critical events and played no role in the decision to arrest Plaintiff," such that there was "no basis to conclude . . . that [the witness] will side with her fellow officer"), *with McLeod v. Llano*, No. 17-CV-6062 (ARR) (RLM), 2021 WL 1669732, at *8 (E.D.N.Y. Apr. 28, 2021) (finding the witness was identified with an adverse party in a § 1983 case because the witness "[was] defendant's partner, witnessed the use of force at issue, and previously was a defendant in this case" (citing *Ellis v. City of Chicago*, 667 F.2d 606, 613 (7th Cir. 1981) (finding that the district court erred in precluding the plaintiff from asking leading questions on direct examination to police officers who "were each present during portions of the incident which gave rise to this lawsuit" and who "had worked closely with [the individual defendant] during the period of their employment"))).

It is also notable that the Government has not shown any evidence of "hostility, bias, or recalcitrance" during the witness's grand jury testimony and, instead, the witnesses each purportedly provided incriminating testimony against Defendants during the portions of grand jury testimony provided. *See In re Reserve Fund*, 2012 WL 12354219, at *9 (finding it relevant to consider whether the witnesses "evidence[] hostility, bias, or recalcitrance"); *McLeod*, 2021 WL 1669732, at *8 (finding it relevant that the witness "provided inconsistent testimony in the

CCRB investigation and the NYPD administrative trial that favored defendant").

At this stage, the Government has not established the required connection between these witnesses and Defendants such that the witnesses may be treated as adverse under Rule 611. If the Government is able to establish the requisite connection during trial, the Government may seek permission at that time to lead without stating in front of the jury the reason why.

Accordingly, this motion will be denied without prejudice to renewal during trial.

### 2. Cross-Examination and Impeachment of Victims

The Government moves to preclude the Defendants from impeaching or cross-examining a victim-witness with several prior convictions under Federal Rule of Evidence 609(b). Gov't MIL #9.

To date, Defendants have not filed a response and during the pre-trial conference defense counsel represented that they have no objection to this motion.

The Court interprets Defendants' lack of response as indication that they do not intend, at least at this time, to impeach this witness using the convictions referenced in the Government's motion.

Accordingly, the Court will deny this motion as moot. The Government may raise the issue at trial, if it should it arise then.

### E. Expert Opinions

Under Federal Rule of Evidence 702,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own." *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008). "It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions." *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005) (citations omitted).

"Other specialized knowledge" includes "many different kinds of experts, and many different kinds of expertise; and in some cases, the relevant reliability concerns may focus upon personal knowledge or experience." *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015) (citations and quotation marks omitted). To determine whether an expert's "specialized knowledge will assist the trier of fact, *i.e.*, [that it] will be not only relevant, but reliable," courts consider "the theory's testability, the extent to which it has been subjected to peer review and publication, the extent to which a technique is subject to standards controlling the technique's operation, the known or potential rate of error, and the degree of acceptance within the relevant scientific community." *Id.* (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993)).

But "the Rule 702 inquiry [i]s 'a flexible one,'" and "*Daubert* makes clear that the factors it mentions do not constitute a 'definitive checklist or test.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (quoting *Daubert*, 509 U.S. at 594, 593 (emphasis in *Kumho*)). "And *Daubert* adds that the gatekeeping inquiry must be 'tied to the facts' of a particular 'case.'" *Id.* at 150 (quoting *Daubert*, 509 U.S. at 591). "[A] trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Zerega Ave. Realty*

*Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213–14 (2d Cir. 2009) (quotation marks and citation omitted).

An expert's proponent bears the burden of satisfying these requirements. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). Specifically, the proponent of the expert testimony must prove by a preponderance of the evidence that it is reliable. *Daubert*, 509 U.S. at 592. "[O]ther contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Zerega Ave. Realty Corp.*, 571 F.3d at 213–14 (citations and quotation marks omitted).

The Government argues that Defendants' three expert witnesses' testimony should be limited or excluded under Rule 702, 401, and 403.

The Court will address each expert in turn.

### 1. Gregg Cohen and Ty Lopez

The Government moves to "exclude or limit the proffered expert testimony of two individuals: Ty Lopez and Gregg Cohen." Gov't MIL #2 at 1. More specifically, the Government requests that "all of the proffered opinions of Ty Lopez and Gregg Cohen, which relate to procompetitive justifications for the alleged conspiracy" be excluded as irrelevant. *Id.* at 24. Alternatively, the Government requests that Gregg Cohen's "Opinion #3 and #4" be excluded and that Gregg Cohen's Opinions #1 and #2 and all of Ty Lopez's opinions be "[p]rovisionally allowed . . . but strictly limited to each witness's first-hand experience and not extrapolated or applied to the facts or parties involved in this case." *Id.*

The Government argues that Gregg Cohen's "Opinion #3" concerning "industry practice" should be excluded as irrelevant because "parties cannot establish by proof a usage or custom which, in their own interest, contravenes the establish law" and therefore, cannot be the basis for

any defense. *Id.* at 7–11. Next, the Government argues that Gregg Cohen's "Opinion #4" about the reasonableness of Defendants' conduct should be excluded as irrelevant because application of the *per se* rule "forecloses consideration of the factual reasonableness of certain conduct." *Id.* at 11–15. In the Government's view, this opinion "does not become any more relevant if Defendants attempt to assert an ancillary restraint defense at trial" because "[r]easonableness of a restraint is very different from the reasonably necessary prong of the ancillary restraint defense." *Id.* at 13–15.

The Government further argues that Ty Lopez's and Gregg Cohen's remaining opinions must be limited to their personal experience because the experts cannot justify "applying their personal experiences to unfamiliar people, companies, and business relationships" and lack sufficient methodology. *Id.* at 15–20.

In response, Defendants argue Ty Lopez's and Gregg Cohen's opinions are relevant to whether "a market allocation existed in the first place," whether "Defendants' motive was to suppress wages," whether Defendants had the requisite intent, whether the ancillary restraints doctrine applies, and whether "the restraint . . . had vertical characteristics." Defs.' Opp'n to Gov't MIL #2 at 3.

More specifically, Defendants argue that Gregg Cohen's testimony about industry is relevant to whether Defendants engaged in the alleged conspiracy because "the jury is entitled to consider whether the practices employed made sense in light of the industry conditions, and whether the benefits from those practices were dependent on other persons doing the same thing." *Id.* at 4. In Defendants' view, Gregg Cohen's testimony is "directly relevant to the question of whether such practices might exist in the absence of a conspiracy" and "[w]hether any alleged restrictions were imposed as a function of each Defendant's individual business

judgment." *Id.* at 5–6. Finally, Defendants contend that this testimony is also relevant to their ancillary restraints defense. *Id.* at 7.

As to Gregg Cohen's "Opinion #4" about "the common industry practice by which an [original equipment manufacturer] may decide to refrain from hiring engineers from one its suppliers for a certain period of time," Defendants argue that such testimony is relevant "to allow the jury to consider the industry conditions in which Defendants and their respective companies operated, and to determine whether such conditions are indicative of a conspiracy." *Id.* Defendants also argue that this testimony is relevant to their ancillary restraints defense. *Id.* at 6–7.

Defendants next argue that both experts are qualified based on their respective experience in the aerospace industry. *Id.* at 8. In Defendants' view, these experts will testify about "a topic well beyond the knowledge of the typical lay juror—namely, industry practices in the field of aerospace engineering services" and it is admissible to "assist the jury in understanding the unique and complex role of outsourced engineering labor in ensuring the successful design, manufacturing, and servicing of jet engines in the aerospace industry." *Id.* at 9.

The Court agrees.

The Court first considers the qualifications and reliability of both experts.

An expert can be considered qualified under *Daubert* based on experience alone. *See U.S. Commodity Futures Trading Comm'n v. Wilson*, No. 13 Civ. 7884 (AT), 2016 WL 7229056, at *9 (S.D.N.Y. Sept. 30, 2016) ("The Court finds that [the expert's] work experience serving as head of U.S. Commodities Valuation and New Business at Barclays Capital qualifies him as an expert."); *E.E.O.C. v. Beauty Enterprises, Inc.*, 361 F. Supp. 2d 11, 19 (D. Conn. 2005)

("[N]othing under the Federal Rules of Evidence or *Daubert* suggests that experience alone cannot provide a sufficient foundation for expert testimony.").

The parties appear to agree that both experts have the proper qualifications to testify about their experience. Gov't MIL #2 at 16 ("If all Lopez and Cohen wish to do is tell the jurors about their firsthand experiences in the Air Force and at Honeywell/Allied Signal . . . the Government does not seek to exclude that testimony at this time."); Defs.' Opp'n to Gov't MIL #2 at 8 ("Defendants do seek to have Lopez and Cohen testify about their firsthand experiences in the Air Force and at Honeywell/Allied Signal as opposed to the facts of this case."). Such testimony is appropriate based on each experts' qualifications. *See, e.g.*, *Wilson*, 2016 WL 7229056, at *9 (finding an expert qualified based on his "work experience serving as head of U.S. Commodities Valuation and New Business at Barclays Capital").

"[I]n many cases, the reliability inquiry may . . . focus upon personal knowledge and experience of the expert." *United States v. Litvak*, 808 F.3d 160, 180 n.25 (2d Cir. 2015) (citation and quotation marks omitted). Moreover, testimony about industry practice that is based on the expert's experience in that industry is often permissible. *See In re Blech Sec. Litig.*, No. 94 Civ. 7696, 2003 WL 1610775, at *21 (S.D.N.Y. Mar. 26, 2003) (admitting securities industry expert's testimony "as to what ordinary broker activity entails and as to the customs and practices of the industry"); *SEC v. U.S. Envtl., Inc.*, No. 94 Civ. 6608, 2002 WL 31323832, at *3 (S.D.N.Y. Oct. 16, 2002) (admitting expert's testimony that "certain trading patterns would raise 'red flags'" based on expert's "knowledge of typical trading activity and the types of trading patterns that an experienced trader would recognize as irregular, and as such, are supported by his 30 years of experience in the securities industry").

Here, both experts explain how their qualifications inform their opinions. For example, Gregg Cohen states that his opinion is based on his "experience managing and sourcing engineering resources for aerospace projects" during his thirty-four years working at Honeywell, Inc. and Allied Signal, an aerospace original equipment manufacturer. Cohen Statement at 1–2.

Similarly, Ty Lopez states his testimony will be "based on [his] extensive experience in managing and providing subject matter expertise to aerospace programs related to contractor and supplier/contractor relationships." Ex. B to Gov't MIL #2 at 1–2, ECF No. 306-2 ("Lopez Statement"). Notably, Ty Lopez previously "served as the Director of Programs & Requirements for Air Force One in the United States Air Force" and has "over 12 years of experience working with aerospace & defense firms to integrate people, processes, and technologies to upgrade, maintain, and operate Air Force One across three Presidential administrations." *Id.* at 1.

Moreover, the Government concedes that the experts' background would qualify them to testify based on their personal experience. *See* Gov't MIL #2 at 20 ("[T]he deficiencies in Lopez's and Cohen's opinions with respect to methodology are fatal to their ability to opine under Rule 702 in any way that goes beyond their personal, direct experience.").

Having addressed qualifications and reliability, the Court now turns to the relevance of the proffered opinions themselves. As discussed elsewhere in this decision, Gregg Cohen's first and second opinions and each of Ty Lopez's opinions are relevant to topics other than justifying the alleged agreement based on procompetitive benefits. The Court thus will focus on the Government's arguments about the relevance of Gregg Cohen's third and fourth opinions.

While Defendants cannot argue that they are not guilty because it was "industry practice" to agree not to hire each other's employees, *cf. Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1171 (2d Cir. 1970) ("[E]ven where a defendant is successful in showing that it has followed a

customary course in the industry, the first litigation of such a practice is a proper occasion for its outlawry if it is in fact in violation."), that is not the proposed relevance of Gregg Cohen's opinions.

In his third opinion, Gregg Cohen states that it is "industry practice for [original equipment manufacturers] that rely on outsourced engineering labor to promote project stability by discouraging their outsourcing suppliers from hiring one another." Ex. A to Gov't MIL #2 at 4, ECF 306-1 ("Cohen Statement"). He then describes situations in which, based on his experience "as an executive responsible for overseeing projects that relied on outsourced labor," an original equipment manufacturer would discourage its suppliers from hiring from one another while working on its projects by "giv[ing] that supplier low grades" which "would likely affect the award of future work to that supplier." *Id.* at 4–5.

This opinion is evidence of an industry practice that would be relevant to determining whether Defendants' conduct and intent were more consistent with a conspiracy or unilateral action by Company A. *See Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, No. 12 Civ. 7372 (AT), 2020 WL 4251229, at *5–6 (S.D.N.Y. Feb. 19, 2020) (permitting expert testimony about "the professional standards applicable to the parties' interactions, and whether a party deviated from those standards" as well as "industry practice and deviations from such practice" because it "g[a]ve the jury a baseline to help evaluate" defendants' conduct, but the expert could not "testify as to what an individual or party's intent, motive, or knowledge was on any given time"); *see also Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) ("Section 1 of the Sherman Act requires that there be a 'contract, combination . . . or conspiracy' . . . in order to establish a violation. . . . Independent action is not proscribed.").

In his fourth opinion, Gregg Cohen states that "it can be reasonable for" a supplier "to limit the [original equipment manufacturer's] hiring of" its employees. Cohen Statement at 5. More specifically, Gregg Cohen describes the potential benefits of limiting hiring between an original equipment manufacturer and a supplier to the supplier's engineers who would "because of limited credentials and experience . . . not be recruited directly by [original equipment manufacturers]" but could "advance their careers by gaining industry experience and then being hired at [original equipment manufacturers] that likely would not have hired them directly out of school." *Id.* Gregg Cohen also states that an original equipment manufacturer "may determine not to hire away an outsource supplier employee before he or she has worked with the outsource supplier for a period of time or before the time require to complete the project to which he or she is assigned." *Id.*

Similar to Gregg Cohen's third opinion, his fourth opinion is relevant to determining whether Defendants' conduct and intent were more consistent with a conspiracy or parallel action that conforms with industry practice. *See Fin. Guar. Ins.*, 2020 WL 4251229, at *5–6 (permitting expert testimony because it "g[a]ve the jury a baseline to help evaluate" defendants' conduct, but the expert could not "testify as to what an individual or party's intent, motive, or knowledge was on any given time" ); *see also Monsanto*, 465 U.S. at 761 (noting that, under the Sherman Act, "[i]ndependent action is not proscribed"). Additionally, his opinion about the potential positive impacts on engineers' career trajectory is relevant to whether Defendants possessed the motive to suppress wages, as the Government suggests.

Gregg Cohen's fourth opinion is also relevant to Defendants' ancillary restraints defense, particularly as it relates to the Government's allegation that one of the "means and methods" of the conspiracy was that Company A agreed to not hire Company B's engineers for a period of

time. *See* Indictment ¶ 23.[9] *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006) (stating that the ancillary restraints doctrine "governs the validity of restrictions imposed by a legitimate business collaboration, such as a business association or joint venture, on nonventure activities" (internal citations and quotation marks omitted)); *see also Aiyer*, 33 F.4th at 120 ("[I]f a defendant seeks to challenge the application of the *per se* rule to his offense conduct by arguing to the jury that such conduct fell within one of the exceptions to the *per se* rule, he would have had every right to make those arguments and present evidence on such exceptions at trial.").

Therefore, Gregg Cohen's opinions are relevant under Rules 702 and 401 because he describes unilateral or parallel but independent action that might cause the same results as the alleged agreement, as well as information that is relevant to Defendants' ancillary restraints defense.

The Court therefore finds that both experts' opinions appear to be properly based on their experience, reliable, and "help[ful] [to] the trier of fact to understand the evidence or to determine a fact in issue." *United States v. Penn*, No. 1:20-cr-152-PAB, 2021 WL 4818917, at *5–6 (D. Colo. Oct. 15, 2021).

To the extent the Government takes issue with either expert's assumptions, such arguments go to the weight, rather than the admissibility, of this testimony. *Zerega Ave. Realty Corp.*, 571 F.3d at 213–14 (stating that arguments that expert's "assumptions are unfounded go to the weight, not the admissibility, of the testimony" (citations and quotation marks omitted)); *see also Romano*, 794 F.3d at 333 ("To be sure, it is possible that Swiatek's methods are not

---

[9] While the Government contends that this is evidence of the broader conspiracy among all parties, Defendants are allowed to argue that this was not the case based on the facts presented at trial. *See, e.g.*, *United States v. Berger*, 224 F.3d 107, 114 (2d Cir. 2000) (stating that "a jury must acquit whenever it finds multiple conspiracies . . . if the jury finds that the charged conspiracy is not one of the conspiracies that has been proved" (citations omitted)). The success of such a defense is a question for the jury, not a reason to preclude Defendants' evidence relevant to such an argument. *Schultz*, 333 F.3d at 416 ("[F]actors which make evidence less than conclusive affect only weight, not admissibility." (quotation mark omitted)).

entirely replicable because they are based in part on his personal experience as a coin dealer for several decades; but Rule 702 itself provides that the court may admit evidence that will assist the jury based on the witness's specialized knowledge," and finding "no abuse of discretion in the district court's conclusion that the criticisms raised by defendants went to the weight of the evidence, not to its admissibility, and were matters for cross-examination and argument to the jury").

If, however, there is sufficient testimony on these issues from other sources, such testimony may be cumulative. *See e.g.*, *United States v. Nouri*, 711 F.3d 129, 145 (2d Cir. 2013) (deeming district court "well within its discretion" to preclude testimony on customary commissions by brokerage firms where cumulative of other evidence at trial); *United States v. Collins*, 581 F. App'x 59, 60 (2d Cir. 2014) (summary order) (same, where court excluded testimony by two lawyers on materiality of corporate agreement, and "the work of transactional lawyers" generally, where "fact witnesses proved sufficient" to explain defense to jury). The Court will make such a determination, if necessary, during trial.

Accordingly, this motion will be denied without prejudice to renewal.[10]

---

[10] In light of Defendants' representation that Gregg Cohen and Ty Lopez will not be applying their testimony to the facts of the case, the Government's request for additional materials related to Company A through F that the experts reviewed is denied as moot.

Additionally, the Government is not entitled to additional materials about the companies' products and services that Gregg Cohen and Ty Lopez worked on because such information goes beyond the scope of what is required under Federal Rule of Criminal Procedure 16, when a witness is testifying based on their professional background. *See e.g.*, *United States v. Hoskins*, No. 3:12-CR-238 (JBA), 2019 WL 5556092, at *2, *7 (D. Conn. Oct. 28, 2019) (finding defense expert disclosure sufficient where it identified writings set forth in expert's CV and list of documents); *see also* Fed. R. Crim. P. 16, advisory committee's note to 2022 amendments ("Although the language of some of these provisions is drawn from Civil Rule 26, the amendment is not intended to replicate all aspects of practice under the civil rule in criminal cases, which differ in many significant ways from civil cases. The amendment requires a complete statement of all opinions the expert will provide, but does not require a verbatim recitation of the testimony the expert will give at trial.").

Finally, the Government is not entitled to additional information under the Jenks Act or Federal Rule of Criminal Procedure 26.2. The Jenks Act, by its terms, applies only to Government witnesses. *See* 18 U.S.C. § 3500 (noting it applies to "statement[s] or report[s] in the possession of the United States which was made by a Government witness or prospective Government witness"). Additionally, even if Rule 26.2 applied to expert witnesses, which the

### 2. Dennis Carlton

The Government argues that Dennis Carlton's expert opinion should be excluded for several reasons. Gov't MIL #12 at 1–2. First, the Government argues that Dennis Carlton's first opinion, "in which he offers to define a 'relevant market' in this case that is different from the 'alleged market,'" is irrelevant because market definition is not an element of a *per se* market allocation agreement. *Id.* at 10–13. More specifically, in the Government's view, "the *per se* rule avoids 'an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable,' including 'the enormous complexities of market definition.'" *Id.* at 11 (citation omitted). The Government argues that this evidence risks confusing the issues and misleading the jury. *Id.* at 11–12.

The Government argues that Dennis Carlton's second opinion, "that there is no 'statistical support' for the suggestion that the alleged conspiracy had any adverse impact on wages of engineers, based on his analysis of data from a single company," is "irrelevant, misleading, and contrary to law." *Id.* at 13–16. The Government emphasizes that it need not prove that the alleged conspiracy "succeeded or failed in reaching the goal of th[e] agreement." *Id.* at 13–14. Additionally, the Government argues that Dennis Carlton's "limited examination of wage effects falls far short of the type of well-supported methodology that *Daubert* and Rule 702 require." *Id.* at 15. In the Government's view, Dennis Carlton used only data from Company C to support the broad notion "that the evidence does not provide statistical support for the claim that

---

Government has not provided any case law to establish, any such request under this rule is premature. *See* Fed. R. Crim. P. 26.2(a) ("After a witness . . . has testified on direct examination, the court, on motion of a party who did not call the witness, must order an attorney for the government or the defendant . . . to produce, for the examination and use of the moving party, any statement of the witness that is in their possession."). Accordingly, the Government's discovery-related requests will be denied.

the alleged agreement adversely impacted compensation of the Supplier Employees who worked on [Company A] projects." *Id.* at 15–16.

As to Dennis Carlton's third opinion, the Government argues that Dennis Carlton's discussion of efficiencies created by the alleged agreement simply amounts to improper procompetitive benefits evidence and is therefore, irrelevant. *Id.* at 17. Additionally, the Government argues that this opinion is inadmissible because it mischaracterizes the alleged agreement as "a series of vertical no-poach agreements between each Supplier (Companies B-F) and Company A, rather than a horizontal no-poach agreement between and among Companies A-F, all of which compete at the same level of the market for labor." *Id.* at 18. In the Government's view, the Court has already found that "the Indictment" does not describe "a vertical restraint of trade and thus" is subject to the *per se* rule. *Id.* at 19–20.

Finally, the Government argues that Dennis Carlton's fourth opinion, "that because the conspiracy was not comprehensive enough, or because Defendants made exceptions to their no-poach agreement, Defendants appear to have lacked an anticompetitive purpose," is not properly supported. *Id.* at 20. In the Government's view, this opinion "is also an improper attempt by an expert to comment directly on the intent of a defendant." *Id.* at 20–21. The Government argues that this opinion risks confusing the issues and misleading the jury. *Id.* at 21–22.

In response, Defendants argue that Dennis Carlton's opinions rebut the allegations in the Indictment in several ways. Defs.' Opp'n to Gov't MIL #2 at 6. First, Defendants argue that Dennis Carlton's opinion on the relevant market share of employees "rebut[s] the very existence of a market allocation by demonstrating why the alleged agreement never could have achieved the Government's claimed purpose that Defendants sought to suppress wages or allocate a labor market." *Id.* at 7–8 ("Because Employees at Company A and Suppliers represent such a small

share of the alleged aerospace labor market, Dr. Carlton opines that an economist would not

expect the alleged."). Defendants argue that this aspect of Dennis Carlton's opinion is directly

relevant to whether Defendants entered into an agreement to allocate the market, and whether

they did so with the intent to suppress wages. *Id.* at 8.

Second, Defendants argue that Dennis Carlton's opinion that the lateral movement of

engineers generally increased year-over-year and such evidence, in Defendants' view, directly

undermines the existence of the alleged conspiracy. *Id.* at 9. Third, Defendants argue that Dennis

Carlton's opinion that he found "no statistical support in his economic regression for the notion

that a restraint had an adverse effect on compensation for the Suppliers' employees working on

Company A projects" is relevant to show that "the Government cannot meet its burden to prove

the existence of an agreement or an intent to conspire." *Id.* at 9–12.

Defendants also argue that Dennis Carlton's regression analysis is reliable and admissible

under Rule 702 and *Daubert*. *Id.* at 13–15. More specifically, in Defendant's view, the

Government's arguments about the reliability of Dennis Carlton's regression analysis go to

weight rather than admissibility because the Government does not contend that the regression

analysis is outside Dennis Carlton's expertise or "out of step with economic theory." *Id.* at 13.

Defendants emphasize that Dennis Carlton's analysis focuses on only Company C's data because

only Company C's data contained the information necessary for the analysis. *Id.* at 14–15.

Next, Defendants argue that Dennis Carlton's opinion, that benefits to competition that

can arise from no-poach restraints among companies in the same supply chain, is relevant to their

ancillary restraints defense. *Id.* at 15–20. Defendants emphasize that courts have "recognized the

validity of the economic benefits proffered by Dr. Carlton, including in the context of

outsourcing agreements." *Id.* at 18–19 (citing *Aya Healthcare Servs., Inc. v. AMN Healthcare,*

*Inc.*, 9 F.4th 1102, 1110 (9th Cir. 2021)). Further, Defendants argue that Dennis Carlton's opinions are relevant to determining whether the relationship between Company A and Companies B through F, in the labor market, is vertical. *Id.* at 19–20.

Finally, Defendants argue that Dennis Carlton's opinions about the design and application of the alleged restraint because these opinions are relevant to "rebutting that purported financial motive or otherwise undermining the alleged purpose of the agreement." *Id.* at 21. As to the methodology underlying these opinions, Defendants argue that Dennis Carlton "applied economic reasoning to facts, which is entirely appropriate under *Daubert*." *Id.*

The Court agrees.

As an initial matter, Defendants offer Dennis Carlton's opinions for reasons other than to justify the charged agreement as procompetitive, and therefore, as discussed at length above, his opinions are relevant to rebut the charges. Because the jury will be instructed on the proper use of such evidence and because the evidence is directly relevant to Defendants' culpability, its high probative value is not substantially outweighed by any potential prejudice or risk of confusing the issues. *See United States v. Yousef*, 327 F.3d 56, 150 (2d Cir. 2003) ("[L]ess drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." (citations and quotation marks omitted)).

Next, Dennis Carlton's second opinion, "that there is no 'statistical support' for the suggestion that the alleged conspiracy had any adverse impact on wages of engineers, based on his analysis of data from a single company," is sufficiently reliable.

The Government's concerns about Dennis Carlton's second opinion, that Dennis Carlton's analysis is applied to broadly and does not rely on the proper variables, go to the weight rather than the admissibility of this opinion. *See Sobel v. Yeshiva Univ.*, 839 F.2d 18, 35

(2d Cir. 1988) ("The failure, by either side, to include a relevant variable (or the inclusion of an irrelevant or multicollinear variable) will go to the probative value of the [expert's] analysis, not its admissibility."); *Allen v. Dairy Mktg. Servs., LLC*, No. 5:09-cv-230, 2013 WL 6909953, at *16 (D. Vt. Dec. 31, 2013) (finding that "the deficiencies in [the expert's] regression model will affect the analysis' probativeness, not its admissibility" (citation and internal quotation marks omitted)).

Dennis Carlton's fourth opinion, that Defendants' conduct is inconsistent with the Government's alleged purpose of the underlying agreement, suppressing wages, is sufficiently reliable because it is based on his extensive experience, including a Ph.D. in economics from Massachusetts Institute of Technology, decades of economics work experience as an economics professor, economics analysis for the Department of Justice's Antitrust Division, and senior managing director at Compass Lexecon, as well as numerous honors, publications, and speaking appearances. *See* Ex. 2 to Gov't MIL #12, ECF No. 355-2 ("Carlton CV").

More specifically, Dennis Carlton has appropriately based this opinion on his specialized experience and economic theory. *See B & R Supermarket, Inc. v. Mastercard Int'l, Inc.*, No. 17-CV-02738 (MKB) (JO), 2021 WL 234550, at *13 (E.D.N.Y. Jan. 19, 2021) (finding the expert's testimony was "necessarily concerned with speculating about how Defendants would have behaved in the but-for world" but that it was nonetheless sufficiently reliable because the expert "d[id] not engage in the types of baseless speculations about a party's state of mind or awareness that courts have found inadmissible under Rule 702"); *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 129 (S.D.N.Y. 2014) ("Where a proposed expert witness bases his testimony on practical experience rather than scientific analysis, courts recognize that [e]xperts of all kinds tie observations to conclusions through the use of . . . general truths derived

from . . . specialized experience." (citations and quotation marks omitted)); *Nicholas v. Bratton*, 376 F. Supp. 3d 232, 290 (S.D.N.Y. 2019) (finding the expert's opinions were sufficiently reliable where they were based on "his over 40 years as a professional journalist and reserve sheriffs deputy, as well as five years as an expert consultant and expert witness on the constitutional rights of citizens and journalists" (quotation marks omitted)).

Additionally, while experts are not permitted to testify to an actor's state of mind, an expert can testify to whether a given practice is consistent with a given state of mind." *Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, No. 09 Civ. 3020, 2011 WL 6288415, at *8–9, *12–14 (S.D.N.Y. Dec. 15, 2011); *see also In re Term Commodities Cotton Futures Litig.*, No. 12-CV-5126 (ALC), 2020 WL 5849142, at *14 (S.D.N.Y. Sept. 30, 2020) ("[A]n expert can testify to whether a given state of mind is consistent with a given practice—i.e., a defendant likely knows X if they do Y."). An expert can also "reference" an actor's state of mind when that state of mind is in "the record" and is "the basis for [the expert's] ultimate opinion." *Bd. of Trs. of AFTRA Ret. Fund*, 2011 WL 6288415, at *8.

Dennis Carlton, therefore, may properly opine that Defendants' conduct was more consistent with one explanation than another, as it appears he plans to do, *see* Ex. 1 to Gov't MIL #12 at 12–13, however, he may not opine about Defendants' specific state of mind or intent as it relates to the alleged conspiracy. *See, e.g.*, *Bd. of Trs. of AFTRA Ret. Fund*, 2011 WL 6288415, at *8.

Therefore, because Dennis Carlton is qualified[11] to make the proffered opinions, and

---

[11] The Government does not dispute Dennis Carlton's qualifications, and, in light of the general description provided above, he is qualified under *Daubert* and Rule 702. *See, e.g.*, *Fort Worth Employees' Retirement Fund*, 301 F.R.D. at 128 (finding economic expert qualified based on his "master's degree in economics[,] . . . Ph.D. in monetary economics, financial institutions, and economic history," and extensive work history in teaching and Government positions).

because his opinions are both relevant and reliable, they are admissible under *Daubert* and Rules 702 and 401.

Accordingly, this motion will be denied without prejudice to renewal during trial.[12]

### F.  Lay Opinions

"[T]he line between [a witness's] opinion and fact witness testimony is often hard to discern." *United States v. Feliciano*, 223 F.3d 102, 121 (2d Cir. 2000). Federal Rule of Evidence 701 states that a lay witness may only offer an opinion that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." The rational-basis requirement "is the familiar requirement of first-hand knowledge or observation." *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992) (citations omitted). The helpfulness requirement is principally "designed to provide assurance[] against the admission of opinions which would merely tell the jury what result to reach." *Id.* The "not based on specialized knowledge" requirement states that "a lay opinion must be the product of reasoning processes familiar to the average person in everyday life." *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005). The proponent of lay opinion testimony must satisfy the rule's three foundation requirements. *See United States v. Grinage*, 390 F.3d 746, 749 (2d Cir. 2004).

---

[12] In light of Defendants' most recent production of materials related to Dennis Carlton, *see* Defs.' Resp. to Gov't Mot. to Compel (noting March 14, 2023 disclosure), the Government's request for additional expert discovery is denied as moot. Additionally, the Court declines to exclude Dennis Carlton's testimony on this basis because the Government has received the materials thirteen days before jury selection and approximately six weeks before Defendants are expected to present their own witnesses. *See e.g.*, *United States v. Rosario*, No. 09-CR-415-2 (VEC), 2014 WL 6076364, at *4 (S.D.N.Y. Nov. 14, 2014) (finding disclosure less than two weeks before trial sufficient); *United States v. Ferguson*, No. 3:06-CR-137 (CFD), 2007 WL 4539646, at *1–3 (D. Conn. Dec. 14, 2007) (ordering complete expert disclosures "no later than one week prior to the conclusion of the government's case-in-chief"). The Court will address any future, previously undisclosed opinions, should they arise and depending on the specific circumstances at issue. To the extent the Government intends to present a rebuttal expert witness, the Government must disclose their rebuttal expert and any relevant opinions to Defendants by **April 7, 2023**. *See* Gov't Reply in Supp. of MIL #12.

Defendants argue that evidence or argument related to non-compete agreements, and other lay opinion testimony should be excluded or limited.

The Court will address each category of evidence in turn.

### 1. Non-Compete Agreements

Defendants move to "preclud[e] the Government from offering lay witness testimony and exhibits at trial concerning the alleged unenforceability of non-compete agreements" because "lay witnesses cannot opine on this subject, and their improper conclusions on this subject pose a risk of substantial prejudice." Defs.' MIL re Non-Competes at 1. More specifically, Defendants argue that the Government's lay witnesses "cannot present legal opinions and conclusions, which on their face require specialized legal training and experience, regarding non-compete agreements." *Id.* at 3 (citing *Foley v. Town of Marlborough*, No. 3:19-cv-01481, 2023 WL 122040, at *9–10 (D. Conn. Jan. 6, 2023)). Defendants also argue that these witnesses do not have the necessary firsthand knowledge and any opinion would not be "based on experience." *Id.* at 4–5.

In response, the Government argues that it will not offer testimony about the legality of non-compete clauses, but instead will offer evidence that "certain Defendants and their co-conspirators used the existence of non[-]compete agreements as a means of concealing the existence of the conspiracy from its victims." Gov't Opp'n to Defs.' MIL re Non-Competes at 1–2. The Government intends to offer evidence that engineers "were told one story regarding non[-]compete agreements, while Defendants and their co-conspirators privately told each other something different." *Id.* at 3. The Government emphasizes that the relevance of this evidence does not depend on whether it is "factually or legally correct," only that "the co-conspirators believed" the substance of their statements about non-compete agreements. *Id.* at 4. Additionally,

the Government argues that Defendants' subjective believe about the unenforceability of these agreements is relevant as "intent and motive to join a no-poach conspiracy" and "to rebut any argument that Defendants may raise regarding this issue." *Id.* at 4–6.

The Court agrees that both parties have valid points, and as a result, this issue will have to be addressed in context during the trial.

Testimony admitted under Rule 701 must be "rationally based on the perception of the witness." Fed. R. Evid. 701(a); *see also United States v. Glenn*, 312 F.3d 58, 67 (2d Cir. 2002) ("[A] lay opinion must be rationally based on the perception of the witness . . . . This requirement is the familiar requirement of first-hand knowledge or observation." (citations and quotations omitted)). A lay witness, however, cannot testify based on "specialized knowledge." *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 181–82 (2d Cir. 2004) (finding error where the district court admitted a lay witness to testify based on the "specialized knowledge [that] he ha[d] because of his extensive experience in international banking," but noting that the same witness could testify to issues "rationally based on [his] perception").

Where, however, a lay witness's testimony is limited to their personal perceptions and does not profess any specialized opinion, such testimony is admissible. *See United States v. Rigas*, 490 F.3d 208, 223–24 (2d Cir. 2007) (finding no error where the district court allowed a witness to "testify[] only to Adelphia's accounting records and not regarding the appropriateness of [the] accounting treatment" (quotation marks omitted)); *E. Point Sys., Inc. v. Maxim*, No. 3:13-cv-00215 (VAB), 2015 WL 8023569, at *2–3 (D. Conn. Dec. 4, 2015) ("[I]n cases where accountants were allowed to testify as fact witnesses, the accountants were personally familiar with the relevant business's records, or the accounting of the transactions at issue.") (collecting cases).

Here, the Government states that it will not introduce testimony about the legality of non-compete agreements and instead will rely on testimony based on personal perceptions to describe Defendants' and their co-conspirators' beliefs about the legality of the non-compete agreements. *See* Gov't Opp'n to Defs.' MIL re Non-Competes at 1–6. This is proper lay witness testimony. *See generally* Fed. R. Evid. 701; Fed. R. Evid. 602. To the extent that any lay witness's testimony extends beyond the scope of personal perception by opining on the legality of non-compete agreements, such testimony is inadmissible. *See, e.g.*, *Ferrari Club of Am., Inc. v. Bourdage*, No. 6:12-CV-06530 (EAW), 2017 WL 1498080, at *1–6 (W.D.N.Y. Apr. 25, 2017) (finding witness's testimony inadmissible as lay witness testimony because it was based on his "professional opinion" and specialized knowledge and finding the same witness's testimony inadmissible as a "late noticed expert").

This analysis, however, is limited to Defendants and their alleged co-conspirators' subjective beliefs about the enforceability of non-compete agreements because such evidence is relevant to whether the conspiracy existed and the methods by which it was enforced. To the extent the Government intends to offer evidence about whether engineers or other non-co-conspirators believed the non-compete agreements were enforceable, such evidence does not bear the same relevance and therefore, may be inadmissible under Rules 701, 401, and 403. *See* Defs.' Opp'n to Gov't MIL #3 at 5–7 (describing engineers' testimony from interview notes and Government exhibits about the engineers' belief that their non-compete agreements were unenforceable).

Accordingly, this motion will be denied without prejudice to renewal, should the issue arise during trial.

### 2.  Other Lay Opinion Testimony

Defendants move to exclude several categories of testimony including testimony that: "has no foundation in the personal knowledge of the witness," "is based on rumors and unidentifiable sources," "concerns hypothetical[s]," "concerns how the witness would 'feel' about the alleged restraint," and "concerns instances of workplace misconduct or criticizing the work environment at Companies A–F." Defs.' MIL re Lay Op. at 10. In Defendants' view, such testimony does "not meet the requirements of Rules 701 and 602, as well as 401, 403, and 802." *Id.* at 2.

More specifically, Defendants contend that testimony that lacks personal knowledge is improper because it is speculative, "does not have any tendency to make a fact more or less probable," and it "is not helpful to the jury in evaluating the elements of the alleged offense." *Id.* at 3 (citations and quotation marks omitted). Defendants argue that testimony based on rumors or unidentifiable sources is improper because such testimony would be inadmissible hearsay, would lack foundation due to no identifiable source for the statement, and, even if otherwise admissible, would be unfairly prejudicial. *Id.* at 4–5. Next, Defendants argue that testimony about hypothetical fact patterns that the witness did not consider during the relevant period is inadmissible because such testimony is "outside the scope of these witnesses' personal knowledge" and, even if otherwise admissible, "any minimal probative value is substantially outweighed by the danger of confusing the issues, misleading the jury, and cause prejudice." *Id.* at 5–7.

Defendants also argue that testimony about how a witness would "feel" or about whether the witness thought the alleged conduct was unfair, unethical, or wrong is inadmissible because such testimony is irrelevant and therefore not helpful to the jury, and, even if relevant, such

testimony would be unfairly prejudicial by "tainting the jury's perception of Defendants as unethical wrongdoers" and "sowing jury confusion." *Id.* at 7–9. Finally, Defendants contend that testimony about workplace misconduct or the professional environment at Companies A-F is inadmissible because such testimony is irrelevant and therefore not helpful to the jury, and would be unduly prejudicial. *Id.* at 9–10.

In response, the Government states that it "does not intend to elicit trial testimony that lacks a foundation or ask witnesses for mere speculation." Gov't Opp'n to Defs.' MIL re Lay Op. at 5. Further, the Government "agrees with Defendants that Rule 701 requires lay witness opinion testimony to be rationally based on the witness's perceptions, and at trial, the Government will establish that any witness's testimony is based on personal knowledge." *Id.* In the Government's view, however, "[n]ot every hypothetical question violates the rules of evidence" and the Government "may ask witnesses . . . questions about what Companies B-F could have done to retain their employees other than by coordinating with their competitors." *Id.* The Government argues that such testimony would be "grounded in [the witness's] actual knowledge of employment practices and working conditions at those companies" and "are relevant because they tend to show that Defendants knowingly chose to join a conspiracy." *Id.*

Additionally, the Government argues that Defendants' argument to exclude testimony based on rumors or with an unidentified source "is overbroad." *Id.* at 6. The Government contends that testimony from an engineer "that he did not apply to a competitor company . . . because he had heard about potential employment restrictions" would be admissible as non-hearsay because it is relevant to show his "state of mind in how he approach[ed] applying to a competitor company and corroborate his decision to keep the search quiet." *Id.* at 6–7.

Next, the Government argues that witness's feelings and perceptions are generally

admissible because the "[t]estimony need not bear on the elements presented[,] [i]nstead, the test is whether the testimony is helpful to determining a fact in issue." *Id.* at 8. In the Government's view, such testimony would help establish "facts about the existence of Defendants' conspiracy and the way in which it was executed." *Id.* For example, the Government states that such testimony could include employees discussing "how they felt when they learned, or perhaps merely came to suspect, that a no-poach agreement may have prevented them from getting a new job." *Id.*

Finally, the Government argues that testimony about "workplace misconduct or poor working conditions at Companies A-F . . . is directly relevant" to explain the high attrition rate that "the conspiracy was designed, in part, to address." *Id.* at 9. In the Government's view, it "should be entitled to explore . . . why attrition was so high at certain Companies A-F; develop evidence from individual employees regarding why they wanted to leave . . . ; and . . . develop the evidence supporting the object of the conspiracy and Defendants' motive for joining it." *Id.* at 9–10.

The Court agrees in part and disagrees in part.

While most of the issues identified in this motion can only be resolved in the context of trial, the Court will provide some guidance on the applicable law.

First, the parties appear to agree that testimony based on speculation would be inadmissible. Defs.' MIL re Lay Op. at 2–4; Gov't Opp'n to Defs.' MIL re Lay Op. at 4–6; As such, the Court will not address this issue further. The parties may object during trial, should either party attempt to elicit testimony based on speculation. *See, e.g.*, *United States v. Graham*, No. 16 CR. 786-2 (NSR), 2019 WL 2366724, at *8 (S.D.N.Y. May 31, 2019) ("Lay witnesses may not speculate in their answers to questions posed and their testimony must be grounded in

observation or other first-hand knowledge; their opinions may not be based on speculation, intuition, rumors or matters remote from their experience." (citation omitted)).

As to testimony based on rumors or unidentifiable sources, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. Under Rule 702, the witness must have personal knowledge of "objective factual bases from which it is possible to infer with some confidence that a person knows a given fact . . . includ[ing] what the person was told directly, what he was in a position to see or hear, what statements he himself made to others, conduct in which he engaged, and what his background and experience were." *Kaplan*, 490 F.3d at 119 (alteration in original) (quoting *Rea*, 958 F.2d at 1216). Therefore, to the extent a witness wishes to testify to what they were told directly or what they overheard, this is permissible lay witness testimony if there is a sufficient foundation of personal knowledge. *See id. But see United States v. Johnson*, 469 F. Supp. 3d 193, 220–221 (S.D.N.Y. 2019) (finding that evidence based on "rumors" did "not meet the test for admissibility under Rule 403" because the Government did not provide the proper foundation, such as how the source "knew that [the defendant and his heroin connection] met in prison" in light of the fact that the "alleged heroin [connection] was not identified").[13]

Next, a lay witness may answer hypothetical questions if "their testimony [is] grounded in observation or other first-hand knowledge," *Graham*, 2019 WL 2366724, at *8, and the hypothetical is based on "independently established fact[s]," *United States v. Cuti*, 720 F.3d 453,

---

[13] This category of testimony would only be admissible under the hearsay rules if the overheard information is not offered for its truth or if it falls within one of the hearsay exceptions, discussed at length below. *Cf. Brown v. Keane*, 355 F.3d 82, 90 (2d Cir. 2004) ("An assertion of fact based on conjecture and surmise, to which the declarant would not be allowed to testify if called to the witness box, does not become admissible under an exception to the hearsay rule.").

459 (2d Cir. 2013) ("[A] witness may testify to the fact of what he did not know and how, if he had known that independently established fact, it would have affected his conduct or behavior."). Therefore, the Government may solicit answer to hypothetical questions that fall within this framework and have the proper foundation.

As to testimony about how a witness would "feel," such evidence is relevant to the extent it is "helpful to . . . determining a fact at issue." Fed. R. Evid. 701. While a witness's feelings may be relevant to understanding how the conspiracy operated or to show that "Defendants took tangible actions in furtherance of the conspiracy," the usefulness of this testimony must be based on the witness's personal knowledge of "objective factual bases from which it is possible to infer with some confidence that a person knows a given fact . . . includ[ing] what the person was told directly, what he was in a position to see or hear, what statements he himself made to others, conduct in which he engaged, and what his background and experience were." *Kaplan*, 490 F.3d at 119 (alteration in original) (quoting *Rea*, 958 F.2d at 1216). Therefore, a witness's testimony cannot be based on speculation about why they were allegedly prevented from getting a new job.

Finally, the probative value of "poor working conditions" evidence is questionable, in light of the number of inferences necessary to connect this evidence to the charged conduct. *Kaplan*, 490 F.3d at 122 ("The length of the chain of inferences necessary to connect the evidence with the ultimate fact to be proved necessarily lessens the probative value of the evidence, and may therefore render it more susceptible to exclusion as unduly confusing, prejudicial, or time-consuming . . . ." (citations omitted)). More specifically, it is not clear why it is necessary to explain why the attrition rate was high or why individual employees wanted to leave the companies, if there is evidence of the high attrition rates which, on its own, would operate as evidence of "Defendants motives for joining [the conspiracy]." Gov't Opp'n to Defs.'

MIL re Lay Op. at 9–10.

The Court, however, cannot dispositively rule on this issue without the context provided in trial. *See Shkreli*, 2017 WL 3623626, at *5 (noting that Rule 403 balancing "is best conducted at trial, when the court has additional factual context about the specific evidence to be offered and its potential for unfair prejudice").

Accordingly, this motion will be denied without prejudice to renewal, if the issue should arise during trial.

### G. Hearsay

"The Federal Rules of Evidence define hearsay as a declarant's out-of-court statement 'offer[ed] in evidence to prove the truth of the matter asserted in the statement.'" *United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) (quoting Fed R. Evid. 801(c)). "Hearsay is admissible only if it falls within an enumerated exception." *Id.* (citing Fed. R. Evid. 802). At all times, this hearsay analysis is subject to Federal Rule of Evidence 403, which provides that, although relevant and admissible hearsay, evidence may be excluded "if its probative value is substantially outweighed by a danger of one of more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Defendants argue that uncharged conduct and handwritten calendars should be excluded because they constitute hearsay for which no exception applies, and, even if this evidence is admissible under the hearsay rules, such evidence is unduly prejudicial under Rule 403.

The Government argues that the Court should issue an order that victim-witness testimony and grand jury testimony are not hearsay and are therefore admissible.

The Court will address each category of evidence in turn.

### 1. Victim-Witness Testimony

The Government moves for a "pretrial ruling regarding the admissibility" of certain "categories of victim's testimony in order to streamline their presentation at trial." Gov't MIL #3 at 1–2. The Government argues that this testimony will be admissible under the hearsay rules for various reasons including that the testimony is not offered for its truth, is admissible under the co-conspirator exception, is admissible under the agency exception, and is admissible as an opposing party statement. *Id.*

In response, Defendants argue that, although they "generally do not dispute the Government's black-letter discussion of hearsay," the Government's motion is premature and too vague to allow the Court to properly assess the arguments. Defs.' Opp'n to Gov't MIL #3 at 4.[14]

The Court agrees.

Without the additional context afforded by trial, and in the absence of any specific hearsay-related objections at this stage, the Court cannot fully assess the admissibility of the category of testimony the Government seeks to admit under the hearsay rules, particularly because the Government must first establish the existence of a conspiracy and that specific statements were made in furtherance of that conspiracy to utilize the co-conspirator exception. *See United States v. Ferguson*, 246 F.R.D. 107, 124 (D. Conn. 2007) (deferring ruling until trial and requiring "additional context" to determine if statements were made in furtherance of the conspiracy under Fed. R. Evid. 801(d)(2)(E)); *In re MTBE*, 643 F. Supp. 2d at 476 ("Indeed, courts considering a motion in limine may reserve judgment until trial, so that the motion is

---

[14] Defendants also contend that certain categories of engineer testimony are inadmissible under Rules 401, 403, 601, and 701, as lay testimony outside of personal knowledge, testimony based on rumors, testimony about witness's beliefs about the fairness of the alleged agreement, negative views of the work environment at the companies, and testimony about the impact of the alleged agreement on employees. *Id.* at 5–13. These arguments are addressed elsewhere in this ruling and therefore, the Court will not address them again here.

placed in the appropriate factual context.").

Accordingly, this motion will be denied without prejudice to renewal.

### 2. Grand Jury Testimony

The Government moves "to admit prior inconsistent statements of a witness before the grand jury as substantive evidence at trial." Gov't MIL #5 at 1. The Government argues that "there is a probability that one or more witnesses the Government intends to call at trial will provide testimony inconsistent with their earlier grand jury testimony." *Id.* at 5. Therefore, the Government argues that, under Rule 801(d)(1)(A), these witnesses' prior inconsistent grand jury testimony is admissible as substantive evidence. *Id.* The Government notes that it "will ask for an instruction from the Court that the jury can consider the grand jury testimony as substantive evidence." *Id.* at 6.

In response, Defendants argue that the Government's motion is premature because the Court "does not have the context necessary to determine whether grand jury testimony may be properly used" under Rule 801. Defs.' Opp'n to Gov't MIL #5 at 6. In Defendant's view, the Court "should consider whether the testimony is sufficiently inconsistent or merely disappointing," and the "Government has not provided . . . a single example of what it anticipates a single witness will state at trial, and why it contends that such anticipated testimony is inconsistent." *Id.*

Additionally, Defendants argue that the Court should exclude the grand jury testimony of five witnesses because the Government has "use[d] the grand jury to test run whether certain individuals would be favorable witnesses for the Government at trial and attempted to lock in those witnesses' testimony before trial starts." *Id.* at 7. Defendants emphasize that the Government has "consistently used the grand jury process" starting "six months after the

indictment was returned (and many months after the Court scheduled this case for trial . . . ) and continuing through at least November 2022." *Id.* at 8. Defendants point to several portions of these five witnesses' testimony that, in their view, indicate the witnesses were being "repeatedly" questioned about Defendants. *Id.* at 9–10.

The Government, in its reply brief, argues that it has not improperly used the grand jury to prepare for trial, but that it has continued to use the grand jury to investigate Companies A through F and "additional individual targets in this case." Gov't Reply in Supp. for Gov't MIL #5 at 1. The Government states that the grand jury's investigatory scope necessarily overlaps with Defendants and therefore, there is nothing irregular about such purposes. *Id.* at 3–4. The Government argues that there is nothing irregular about the timing of these witnesses' testimony because "all but one of the post-indictment grand jury appearances occurred even before oral argument on the Defendants' motion to dismiss . . . and all occurred before the Court's order denying the Defendants' motion to dismiss . . . when the prospect and timing of trial was far from certain." *Id.* at 4. The Government also argues that it has been deliberately and appropriately informing potential subjects of the investigation of their status to ensure that they are aware of their rights, particularly in light of their potential trial testimony. *Id.* at 5–6.

The Court agrees in part and disagrees in part with both parties' arguments.

Rule 801 extends to prior statements before a grand jury. *See United States v. Marchand*, 564 F.2d 983, 997–99 (2d Cir. 1977) ("[I]f a witness has testified to . . . facts before a grand jury and forgets or denies them at trial, his grand jury testimony . . . falls squarely within Rule 801(d)(1)(A)."); *United States v. Bliss*, 188 F. App'x 13, 16 (2d Cir. 2006) ("The court did not err when it admitted [the witness's] prior grand jury testimony as substantive evidence against" the defendant because the witness "was available for cross-examination at trial."). At this stage,

however, the Court cannot determine whether any particular statement is inconsistent because no witness has testified at trial. Therefore, the Court will decide this issue as it arises during trial. *Ferguson*, 246 F.R.D. at 116 (deferring evidentiary ruling because it lacked "the necessary factual context to determine whether certain testimony will properly open the door to the use of this evidence").

Additionally, Defendants have not met their burden to show that the Government has improperly used its grand jury powers as a tool for trial preparation.

A grand jury's investigative power "does not end when it indicts a defendant. Instead, '[p]ost-indictment action is permitted to identify or investigate other individuals involved in criminal schemes or to prepare superseding indictments against persons already charged.'" *United States v. Meregildo*, 876 F. Supp. 2d 445, 448–49 (S.D.N.Y. 2012) (quoting *United States v. Jones*, 129 F.3d 718, 723 (2d Cir. 1997)). "[I]t is improper," however, "to utilize a grand jury for the sole or dominating purpose of preparing an already pending indictment for trial." *United States v. Bin Laden*, 116 F. Supp. 2d 489, 491–92 (S.D.N.Y. 2000); *see also Ben Zvi v. United States*, No. 93-CR-908 (TCP), 2005 WL 8170038, at *2 (E.D.N.Y. Sept. 21, 2005) (noting that an attempt to "freeze witness testimony for use at trial . . . clearly constitute[s] trial preparation").

"[A] grand jury subpoena issued through normal channels is presumed to be reasonable, and the burden of showing unreasonableness must be on the recipient who seeks to avoid compliance." *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 301 (1991). "[A]bsent some indicative sequence of events demonstrating an irregularity, a court has to take at face value the Government's word that the dominant purpose of the grand jury proceedings is proper." *United States v. Ohle*, 678 F. Supp. 2d 215, 233 (S.D.N.Y. 2010) (quoting *United States v. Raphael*, 786 F. Supp. 355, 358 (S.D.N.Y. 1992)).

Based on the evidence currently before the Court, Defendants have not met their burden to show the "dominating purpose" of this grand jury testimony was trial preparation. *See Bin Laden*, 116 F. Supp. 2d at 492 ("Absent some indicative sequence of events demonstrating an irregularity, a court has to take at face value the Government's word that the dominant purpose of the grand jury proceedings is proper."); *see also United States v. Bergstein*, 302 F. Supp. 3d 580, 583 (S.D.N.Y. 2018) (finding "the timing [of the grand jury investigation] . . . suspicious" where a subpoena was issued "more than a year after [the] indictment and approximately two months before trial" because the Government refused to change the return date which "would have guaranteed that the subpoenaed materials were in the [G]overnment's hands comfortably before the [G]overnment was required to produce its trial exhibits").

Accordingly, this motion will be denied without prejudice to renewal during trial.

### 3.  Co-Conspirator Statements

Defendants move to exclude any out-of-court statements concerning the foreign country evidence and the alleged agreements with Individual One, previously discussed in the Prior Acts section, because "they do not satisfy the co-conspirator exception" to hearsay. Defs.' MIL re Uncharged Conduct at 21–22. More specifically, Defendants argue that this evidence is not related to the charged conspiracy, but instead involves other agreements related to restriction of competition. *Id.* at 22–23. Defendants argue that evidence of their alleged foreign agreement is inadmissible because the Government cannot show "that the declarants are part of a conspiracy in" the foreign country and, even if they could, this evidence relates to "an uncharged conspiracy" and "[c]onnecting these statements to the charged conspiracy will involve a complex and highly contested chain of proof." *Id.* at 23–24. As it relates to the alleged agreements with Individual One, Defendants argue that this evidence is inadmissible because these "side

arrangements" are distinct from the charged conspiracy, do not adequately connect to Defendants, and were not in furtherance of the charged conspiracy. *Id.* at 24–27.

In response, the Government argues that statements related to the alleged foreign agreement are admissible as co-conspirator statements under Rule 801(d)(2)(E), as a party admission under Rule 801(d)(2)(A), or admissible not to show the truth of the matter asserted but to show the nature of Defendants' relationship and certain Defendants' state of mind. Gov't Omnibus Opp'n re Other Acts at 20. In the Government's view, statements related to the alleged foreign agreement are co-conspirator statements because they are in furtherance of that alleged agreement. *Id.* Similarly, the Government argues that evidence related to agreements with Individual One is admissible under Rule 801(d)(2)(E) because they are in furtherance of the charged conspiracy. *Id.* at 21. The Government asks that the Court "reserve judgment on [these exhibits] subject to the *Geaney* procedure." *Id.*

The Court agrees in part and disagrees in part.

"A statement is not hearsay if . . . [t]he statement is offered against a party and it is a statement by a co[-]conspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). In order to admit an extra-judicial statement by a co-conspirator under Rule 801(d)(2)(E), the court must find by a preponderance of the evidence "(1) that there was a conspiracy, (2) that its members included the declarant and the party against whom the statement is offered, and (3) that the statement was made both (a) during the course of and (b) in furtherance of the conspiracy." *United States v. Diaz*, 176 F.3d 52, 83 (2d Cir. 1999) (quoting *United States v. Tracy*, 12 F.3d 1186, 1196 (2d Cir. 1993)).

Courts consider the contents of a co-conspirator's statement when determining "the existence of the conspiracy and the participation therein of the declarant and the party against

whom the statement is offered," Fed. R. Evid. 801(d)(2)(E); *see also Bourjaily v. United States*, 483 U.S. 171, 181 (1987), however, "there must be some independent corroborating evidence of the defendant's participation in the conspiracy," *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999).

"It is reasonable to expect that a 'new recruit can be thought to have joined with an implied adoption of what had gone on before to enhance the enterprise of which he is taking advantage.'" *United States v. Badalamenti*, 794 F.2d 821, 828 (2d Cir. 1986) (quoting 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 801(d)(2)(E)[01], at 250–51 (1985)). This rule applies only if there is "sound reason to believe that [the defendant] joined when he was generally aware of what his new partners had been doing and saying on behalf of the enterprise." *Id.* (internal quotation marks omitted). Thus, co-conspirator statements are admissible against Defendants who joined the alleged conspiracy later, so long as those Defendants were "generally aware" of what the alleged co-conspirators "had been doing and saying" on behalf of the alleged conspiracy. *See id.*

Any statements made before the formation of the alleged conspiracy, however, are inadmissible. *See Anderson v. United States*, 417 U.S. 211, 218 (1974) ("The hearsay-conspiracy exception applies only to declarations made while the conspiracy charged was . . . in progress, a limitation that this Court has scrupulously observed."); *see also United States v. Saneaux*, 365 F. Supp. 2d 493, 499 (S.D.N.Y. 2005) (noting that the Rule 801(d)(2)(E) requires that "the statements [were not] made after the cessation of the conspiracy or before its formation").

Therefore, the statements related to the alleged agreement with Individual One may be admissible if the Government can show by a preponderance of evidence that the charged conspiracy existed for a certain time period, the statements were made in furtherance of the

charged conspiracy, and that each Defendant was a member of the charged conspiracy. Any alleged co-conspirator statements made outside of that time period would be inadmissible under Rule 801(d)(2)(E), despite any evidence that each defendant was "generally aware" of the alleged co-conspirators' action and conduct, because the alleged conspiracy would not yet exist. *See United States v. Abu-Jihaad*, 531 F. Supp. 2d 289, 295 n.2 (D. Conn. 2008) ("[T]here are [Second Circuit] decisions that permit introduction of statements made before a participant joined a conspiracy, but such cases involve a pre-existing conspiracy in which at least two other participants had already formed the requisite agreement."). To the extent Defendants contest the Government's ability to properly link this evidence to the charged conspiracy, such arguments are better suited for challenging this evidence when the Court makes a *Geaney* determination.

The evidence related to the alleged foreign agreement is subject to a slightly different analysis because, as the Government makes clear, the statements in the example exhibits are made in furtherance of the alleged foreign agreement. *See* Gov't Omnibus Opp'n re Other Acts at 20–21.

Where there are multiple conspiracies, co-conspirator statements are only admissible against defendants who are proven, by a preponderance of the evidence, to have joined the specific conspiracy that the co-conspirator statements allegedly furthered. *See United States v. Cambindo Valencia*, 609 F.2d 603, 635 n.25 (2d Cir. 1979) (considering whether 801(d)(2)(E) allows statements made by a declarant against a defendant, where the defendant and declarant are connected by a conspiracy other than the conspiracy charged, and opting for a narrower interpretation of 801(d)(2)(E) in which hearsay statements are limited to "only to those made by coconspirators of the conspiracy charged or proved"); *United States v. Pedroza*, 750 F.2d 187, 201–02 (2d Cir. 1984) (statements made in furtherance of an uncharged drug conspiracy not

admissible against defendants who participated only in the charged kidnapping conspiracy).

"It is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator [under Rule 801(d)(2)(E)] need not be charged in the indictment." *United States v. Lyles*, 593 F.2d 182, 194 (2d Cir. 1979). Yet, this general rule is not applicable where the statement admitted based on an uncharged conspiracy "was offered to establish only the performance of a similar act, [n]ot the commission of the crime charged." *Id.* at 195; *see also United States v. Russo*, 302 F.3d 37, 45–47 (2d Cir. 2002) (finding evidence of an uncharged, overarching conspiracy to prove the charged conspiracy was admissible because the statement "furthered a conspiratorial objective [of the charged conspiracy] in which [the defendants] were jointly engaged").

Moreover, allowing the Government to introduce statements about the alleged foreign agreement is highly likely to cause confusion of the issues and mislead the jury about the charged conspiracy, which the Government alleges spans eight years and includes as many as 70 co-conspirators. *See* Fed. R. Evid. 403.[15] Therefore, statements made about the alleged foreign agreement are inadmissible.[16]

Accordingly, this motion will be granted in part and denied in part without prejudice to renewal during trial.

### 4. Handwritten Calendars

Defendants move to "preclud[e] the [G]overnment from introducing into evidence at trial the . . . [Individual One] Day Timers" because they are improper hearsay evidence. Defs.' MIL

---

[15] While some statements may be party admissions under Rule 801(d)(2)(A), they suffer from the same Rule 403 issues identified above, particularly because they would only be admissible against the Defendant who made the statement.

[16] To the extent the Government can show that certain statements are not offered for their truth, the Court will address such statements on a case-by-case basis.

re Calendars at 1. Defendants contend that, even if this evidence is relevant, the Individual One

Day Timers "are peppered with inadmissible hearsay and clearly contain immaterial and

irrelevant information on various subjects that could confuse and mislead the jury." *Id.* at 3. As

noted above, Defendants argue that the Individual One Day Timers should only be used "as a

means of refreshing [Individual One's] recollection—not as an exhibit to be submitted to the

jury." *Id.* at 3.

    In response, the Government contends that the Court "should defer ruling on this motion

until trial" because the relevant witness "may testify at trial and . . . provide the context and

clarity necessary for the Court to make a determination on the admissibility of the evidence."

Gov't Opp'n to Defs.' MIL re Calendars at 1. The Government notes that it "may seek to

introduce only certain pages or portions of the calendars/day timers or certain documents

contained within them." *Id.* at 1–2. The Government does not directly respond to Defendants'

hearsay arguments.

    The Court agrees.

    While there are hearsay exceptions that might apply, such as 803(1) or 803(5), *see, e.g.*,

*Sec. & Exch. Comm'n v. AT&T, Inc.*, No. 21 Civ. 1951 (PAE), 2022 WL 4110466, at *24

(S.D.N.Y. Sept. 8, 2022), at this stage, the Court cannot determine without additional context

whether the Individual One Day Timers will be offered for the truth of the matters asserted

within and, if so, whether the Government can establish that a hearsay exception applies.

Therefore, at this stage, the Court cannot determine if the Individual One Day Timers are

admissible. *See In re MTBE*, 643 F. Supp. 2d at 476 ("Indeed, courts considering a motion in

limine may reserve judgment until trial, so that the motion is placed in the appropriate factual

context.").

Accordingly, the Court will deny this motion without prejudice to renewal during trial.

### H. Reciprocal Discovery

Under Rule 16(b)(1)(A) of the Federal Rules of Criminal Procedure, once the Government complies with Rule 16(a)(1)(E)'s disclosure requirements, "the defendant must permit the [G]overnment, upon request, to inspect and to copy" certain categories of evidence if "the item is within the defendant's possession, custody, or control; and . . . the defendant intends to use the item in the defendant's case-in-chief." Fed. R. Crim. P. 16(b)(1)(A). If either party fails to comply with Rule 16, the court may:

> (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions; (B) grant a continuance; (C) prohibit that party from introducing the undisclosed evidence; or (D) enter any other order that is just under the circumstances.

Fed. R. Crim. P. 16(d)(2). When a party violates Rule 16, the "court has broad discretion in fashioning a remedy." *United States v. Walker*, 974 F.3d 193, 204 (2d Cir. 2020) (citations omitted).

The Government moves to "preclude the Defendants from introducing at trial in their defense case . . . any Rule 16 reciprocal discovery" that was not disclosed as of February 23, 2023, the deadline for motions *in limine*. Gov't MIL #8 at 1–2. The Government emphasizes that the Court "has wide discretion to exclude evidence for non-compliance with Rule 16" and that Defendants have not provided reciprocal discovery, as required by Rule 16(b) and "this Court's Standing Order." *Id.* at 7. In the Government's view, any argument that Defendants are "unable to provide reciprocal discovery prior to trial . . . because the defendant has not yet decided what materials he may use in his affirmative case" is insufficient. *Id.* at 8. The Government contends Defendants "are still withholding documents that are in their possession or control" had have

"repeatedly delay[ed] and evad[ed]" complying with their discovery obligations, and therefore excluding any additional evidence is appropriate. *Id.* at 9.

In response, Defendants argue the Government's motion is premature and it fails to demonstrate that exclusion is the proper remedy under Rule 16. Defs.' Opp'n to Gov't MIL #8 at 3–8. Additionally, Defendants contend that excluding evidence that it relevant to "critical issues" would be an error, particularly in light of Defendants' constitutional rights. *Id.* at 8–9.

The Court agrees.

Defendants state that they have "not disclosed evidence following the filing of the [Government's] Motion, and the [Government] identifies no specific evidence in its Motion to be excluded." *Id.* at 1. Moreover, Defendants have produced a substantial number of defense exhibits, Gov't MIL #8 at 1, 5, and the Government has provided no reason to substantiate its belief that Defendants are withholding evidence in violation of Rule 16. Therefore, the Government's motion is premature.

Notably, the Government also concedes that it has not completed its productions under Rule 16. *See* Gov't MIL #8 at 9 ("[T]he Government has complied substantially with its discovery obligations."). And, as Defendants point out, the Government has continued to produce discovery after the motion *in limine* deadline, as late as February 24, 2023, and March 3, 2023. *See* Defs.' Opp'n to Gov't MIL #8 at 2.

Finally, even if there were specific categories of evidence that Defendants were withholding, excluding such evidence because it was not produced four weeks before jury selection and eight weeks before the Government's case-in-chief is likely to be completed would be an inappropriate remedy. *Compare United States v. Weiss*, 930 F.2d 185, 199 (2d Cir. 1991) (affirming the district court's exclusion of the defendant's evidence that was identified the Friday

before trial began and produced during trial because the "government had already rested its case and the relevant government witnesses who could have provided information about the documents were out of state"), *with Walker*, 974 F.3d at 198, 204 (affirming the district court's refusal to exclude fingerprint evidence that was disclosed "just days before trial was scheduled to begin" where the court found the evidence was "too important to exclude" and, instead, offered to provide the defendant with a continuance to prepare for a *Daubert* hearing concerning the evidence).

Accordingly, the Court will deny this motion without prejudice to renewal, if the issue should arise during trial.

## IV.    CONCLUSION

For the foregoing reasons, the [288], [294], [297], [298], [301], [302], [303], [308], [312], [315], [316], [320], [326], [327], [329], [330], [331], [332], [334], [335], and [353] motions will be **DENIED without prejudice to renewal**.

The [299] motion will be **DENIED as moot**.

The [289], [309], and [317] motions will be **GRANTED in part** and **DENIED in part**.

The [318] motion will be **GRANTED**.

**SO ORDERED** at Bridgeport, Connecticut, this 27th day of March, 2023.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE