**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | : | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. |
| | : | 3:21-CR-220 (VAB) |
| v. | : | |
| | : | |
| MAHESH PATEL, ROBERT HARVEY, | : | |
| HARPREET WASAN, STEVEN | : | |
| HOUGHTALING, TOM EDWARDS, and | : | |
| GARY PRUS, | : | |
| | : | April 24, 2023 |
| *Defendants*. | : | |
| | : | |

**DEFENDANT ROBERT HARVEY'S AND DEFENDANT HARPREET WASAN'S SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR JUDGMENT OF ACQUITTAL**

Defendants Robert Harvey and Harpreet Wasan respectfully submit this Supplemental Memorandum of Law in Support of Defendants' Joint Motion for Acquittal Pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure ("Joint Motion").

The Joint Motion of all Defendants, including Mr. Harvey and Mr. Wasan, addresses the insufficiency of the evidence to support the charge in the Indictment. This Supplemental Memorandum augments the Joint Motion to elaborate on the insufficiency of the evidence to support that part of the Indictment that alleges that Mr. Patel agreed with Mr. Harvey and Mr. Wasan that Pratt would not hire QuEST engineers and skilled labor until the employees had served with QuEST for two years and not to hire QuEST engineers and other skilled labor during certain temporary periods of time ("Hiring Slow-Downs"). *See* Ind. ¶¶ 23, 24.

I. The Evidence is Not Sufficient to Establish that the Alleged Pratt-QuEST Tenure Rule and Pratt Hiring Slow-Downs Arose from an Agreement

The evidence is not sufficient to establish that the alleged one-way tenure rule and Hiring Slow-Downs existed by agreement with QuEST rather than by Pratt-applied rule and decision.

1

Matthew Lavoie, a decade-plus veteran of the Global Engineering Sourcing ("GES") group at Pratt, and the "focal" for QuEST within GES for most of his tenure, testified that Pratt generally applied a two-year tenure rule to hiring from *all* of its outsource suppliers, and that this "practice" was already in place when Lavoie was first assigned to GES *in 2006*, long before the charged conspiracy period and Harvey's and Wasan's association with QuEST.  Tr. 296:4-14; 297:1-17; *see also* Tr. 304:16-23 (two-year rule was a "practice" in the GES department).  Matthew Westergard, the Account Manager at QuEST with responsibility for the Pratt account between 2010 and 2014, did not recall an agreement between Pratt and QuEST under which a two-year tenure requirement would govern transfers from QuEST to Pratt.  Tr. 1048:21-1049:3.

Government exhibits corroborate that any two-year tenure rule was a Pratt practice, not the subject of an agreement.  In September 2011, after QuEST proposed but failed to secure a "farm team" agreement with Pratt (GX-44; Tr. 880:5-6), Al Brockett, the then-Vice President of Engineering of Pratt (a role senior to that of Mr. Patel, Tr. 296:15-21) provided QuEST with Pratt "policy/guidelines" for "Personnel Transfers" that included a "min 24 months and prior approval from Al process."  *See* GX-23.  Likewise, in GX-49, Mr. Harvey asked Messrs. Brockett and Patel to apply Pratt's "ground rules," not follow any agreement, to an employee (Anthonio Foster) who was being recruited by Pratt after working at QuEST for only 5 months.[1]

No witness at trial has recalled the other relevant emails in evidence as reflecting an agreement.  In the case of the two-year tenure rule, several emails reflect communication between

---

[1] It was not until late 2016 that the Department of Justice announced its intention to examine hiring and solicitation agreements as a potential criminal enforcement area under Section 1 of the Sherman Act. *See* https://www.justice.gov/atr/file/903511/download. Accordingly, there is no rational basis to infer that in 2011, a reasonable person would, in the context of any no-poach understanding, intentionally avoid using the word "agreement." When Mr. Harvey reported back to Messrs. Brockett and Patel concerning the "guidelines" Brockett had provided, his usage is strong evidence that Pratt acted unilaterally and not by "agreement." There is no testimony to the contrary.

QuEST personnel and GES in which Mr. Patel or another member of GES provides notification of a prospective hire by Pratt of a QuEST employee, followed by QuEST personnel providing information on the length of service of QuEST employees whom Pratt was recruiting.  *See, e.g.*, DX1008; GX-70; GX-76; GX-407A.  In certain of these emails, the QuEST participant, Westergard, uses the word "agreement," *see* GX-70; GX-76; GX-77, but when shown several such emails at trial, Westergard did not remember a two-year agreement with Pratt.  *See* Tr. 891:13-895:4, 1047:22-1049:3.  And, in GX-125A, while Mr. Wasan refers to a "handshake agreement," he adds in the same communication – twice – that QuEST "recognize[s] that QuEST cannot prevent PW from hiring our team members," thus confirming that QuEST was not a counterparty to an agreement.  *See also* GX-77 (Westergard, without seeking action, informing Mr. Patel as a "courtesy" that a QuEST employee has accepted a position at Pratt after 18 months at QuEST; there is no evidence that anyone intervened).

Next, concerning the periods when Pratt slowed its hiring of QuEST personnel, the evidence is overwhelming that these Hiring Slow-Downs were Pratt measures that arose out of its concern that QuEST's performance on its Pratt projects had been adversely affected by attrition of QuEST personnel to Pratt.  *See* DX1008; GX-8; GX-125A; GX-161A; GX-236B, GX-407E.

In GX-161A (1/28/2016), for example**,** Mr. Patel wrote to his colleagues, including Mr. Lavoie, that "[l]ast year we hired 48 QuEST employees, and that effected them financially and had difficulty supporting P&W customers."  This email was followed by a slow-down in hiring by Pratt of QuEST personnel in 2016.  GX-179; Tr. 313:17-315:4; 315:12-317:12; *see also* Tr. 310:6-13 (Mr. Lavoie testimony that GX-154 reflects that "[a]t times the policy change[d]" with respect to hiring from QuEST and that "we were not hiring from QuEST at this point in time.").

Similarly, in GX-12 (9/6/2017), Mr. Patel wrote to colleagues, "[y]ear to date, we have hired 44 Quest employees which is *impacting work output deliverables & performance on P&W outsourced work*" (emphasis added).

Thus, the Pratt Hiring Slowdowns followed Pratt determinations that attrition had affected and threatened to affect further QuEST's performance on Pratt projects—including by disrupting Pratt's "current SOWs" (Tr. 315:12-23) and "impacting work output deliverables & performance on P&W outsourced work." (GX-12)—and were intended to stabilize QuEST's work force sufficiently to ensure QuEST's adequate performance on Pratt projects.

There is no evidence to the contrary, much less evidence supporting the Indictment's allegation that Mr. Patel and Messrs. Harvey and Wasan entered an agreement for the purpose of suppressing wages or locking engineers in place, as alleged. *See* Tr. 49:10-15 (government opening statement). Indeed, Lavoie testified that what he recalled as annual end-of-year slow-downs in the pace of Pratt hiring of QuEST personnel were not motivated by concerns about wages. He did not consider wages but solely the hourly rates negotiated with QuEST every three years. Tr. 314:9-25; 330:3-7; 396:25-397:11.

II.  Even if the Evidence Permitted the Inference That the Agreement Alleged in Paragraphs 23 and 24 of the Indictment Existed, it Would be Subject to Rule of Reason Analysis, and Thus an Insufficient Basis for Conviction.

Even if the evidence were sufficient to establish the existence of a two-year tenure "agreement" or an "agreement" to effectuate the Hiring Slow-Downs, such agreements would not be subject to the *per se* rule of Section 1 of the Sherman Act. The government has not cited any case – and we are aware of none – that has applied the *per se* rule to a business transaction or collaboration in which a customer agreed not to hire a service provider's employees while that service provider's employees were engaged in work for the benefit of the customer. To the

contrary, such a "restraint" is a (a) vertical or hybrid vertical-horizontal restraint, and (b) an ancillary restraint, and subject to rule of reason analysis, not the *per se* standard.

    A.  <u>The Government Failed to Prove that the Subject Restraints were Horizontal.</u>

As customer and outsource engineering service provider, Pratt and QuEST were situated in a vertical business collaboration. They did not agree to refrain from hiring one another's engineers; rather, Pratt as customer allegedly agreed not to hire QuEST's team members working on Pratt projects. Such a business term, even if deemed a "restraint" under the Sherman Act, is subject to rule of reason analysis, not the *per se* standard, because it exists between vertical market participants, such as a customer and supplier. This remains so even where the entities also compete horizontally at another level of the market. *See, e.g.*, *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 243-44 (2d Cir. 1997) (collecting cases where courts have applied rule of reason analysis to vertical restraints despite competition at horizontal level); *AT&T Corp. v. JMC Telecom., LLC*, 470 F.3d 525, 531 (3d Cir. 2006) ("Vertical restraints are generally not *per se* violations of the Sherman Act, even where a distributor and manufacturer also compete at the distribution level, *i.e.,* have some form of horizontal relationship (a/k/a/ dual distributor arrangement), as is the case here."). Courts deem allegations involving restraints in "mixed" horizontal and vertical relationships, such as the ones alleged here, to be subject to the rule of reason. *Ogden v. Little Caesar Enters., Inc.*, 393 F. Supp. 3d 622, 634 (E.D. Mich. 2019) ("[A]s the Supreme Court has observed, the analysis of any agreement having some vertical component is complex and not amenable to a *per se* approach.").[2]

---

[2] *See also, e.g.*, *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 2011 WL 1044898, at *3 (S.D.N.Y. Mar. 10, 2011) ("[B]ecause Plaintiff has pled that the parties to the alleged agreement have a relationship with both horizontal and vertical elements, Plaintiff's Sherman Act claim must be evaluated under the rule of reason."); *Beyer Farms, Inc. v. Elmhurst Dairy, Inc*., 35 Fed. App'x 29, 29 (2d Cir. 2002) (summary order) ("Contrary to Beyer's argument on appeal, Beyer alleged in its complaint that Elmhurst and Bartlett were

The evidence is that QuEST provided services to Pratt, a customer, and Pratt, in turn, allegedly agreed, for periods of time, not to recruit the very QuEST employees providing those services. Whether Pratt and QuEST competed for labor – which the government has not shown[3] – Pratt's alleged agreement to refrain from recruiting the very service team providing it with services is a vertical restraint – that is, a restraint in the context of a customer decision about how to maximize the productive output of its sources of engineering labor, while avoiding disincentives to QuEST's participation in the business transaction. *See Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 54-56 (1977) (rule of reason applies to non-price vertical restraints). Accordingly, no reasonable jury could find that the allegations in paragraphs 23 and 24 of the Indictment support a *per se* market allocation conspiracy. *See, e.g.*, *2238 Victory Corp. v. Fjallraven USA Retail, LLC*, 2021 WL 76334, at *5 (S.D.N.Y. Jan. 8, 2021) ("Because the Complaint describes a mixed vertical and horizontal relationship between Fjallraven and Netrush, any agreement between them is scrutinized under the rule of reason and is not categorized as per se unlawful under the Sherman Act.").

---

engaged in a dual-distributorship relationship, or both a vertical and horizontal relationship. Had Beyer alleged a purely horizontal relationship between Elmhurst and Bartlett, Beyer would have alleged a per se violation of § 1 of the Sherman Act. Because Beyer did not so plead, its complaint was subject to scrutiny under the 'rule of reason.'").

[3] The testimony of the five QuEST engineers (Inferrera, Salvatore, Ortiz Rosado, Rivera, and Gill) confirms a vertical stratification in the labor market in which QuEST and Pratt did not compete for the same candidates. Each of the witnesses was a recent graduate who did not have prior work experience in the aerospace industry and the option or opportunity to work for Pratt. QuEST was often the *only* aerospace engineering job that they were able to secure. That Pratt did not compete for entry-level engineers such as these government witnesses, whom QuEST was willing to hire despite their absence of prior engineering employment experience, demonstrates that Pratt and QuEST were not horizontal competitors in a labor market. *See* Testimony of Inferrera (158:19-160:1; 203:18-204:10; 204:22-205:2; 205:7-13, 206:2-8; 206:12-207:4); Salvatore (583:16-584:11; 586:3-5; 647:3-5; 647:8-648:13; 649:6-10; 650:6-651:11); Ortiz Rosado (1236:12-1239:2; 1296:16-1299:3); Rivera (1315:5-20; 1316:1-9; 1316:21-1317:11; 1319:5-8); Gill (2241:1-19; 2243:17-2244:10; 2273:21-2274:24).

### B. The Government Failed to Prove that the Subject Restraints were Not Ancillary to a Legitimate Business Collaboration or Transaction.

Moreover, as the Court of Appeals has explained, "'ancillary restraints' necessary to a legitimate transaction" are exempt from the *per se* rule. *Nat'l Basketball Ass'n v. Williams*, 45 F.3d 684, 690 (2d Cir. 1995) (citation omitted). "A restraint is ancillary when it *may* contribute to the success of a cooperative venture that promises greater productivity and output"—that is, when it "*arguably*" promotes such ends. *Polk Bros. v. Forest City Enters., Inc.*, 776 F.2d 185, 189 (7th Cir. 1985) (Easterbrook, *J.*) (emphases added). Such restraints are analyzed under the rule of reason, not the *per se* standard, because they "hold the promise of increasing a firm's efficiency and enabling it to compete more effectively," thus requiring "an inquiry into . . . the combination's actual effect." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984); *United States v. Aiyer*, 33 F.4th 97, 115 (2d Cir. 2022) (ancillary restraints doctrine is "exception[]" to application of *per se* rule, "exempt[ing] such agreements from the *per se* rule, such that the rule of reason applies") (internal quotation marks omitted); *see, e.g.*, *Giordano v. Saks Inc.*, No. 20-cv-833 (MKB), 2023 WL 1451534, *13, 14 (E.D.N.Y. Feb. 1, 2023) (applying ancillary restraints doctrine to a no-hire agreement where Saks and the Brand Defendants were competitors, but also collaborated through a transaction in which the Brand Defendants' sold their luxury "goods and apparel through department stores (including Saks) and through concessions (including concessions at Saks stores")) (internal quotation marks omitted)*.

The government has failed to prove that any alleged restraint on the movement of employees from QuEST to Pratt was not exempted from *per se* treatment under the ancillary restraints doctrine. There was ample documentary and testimonial evidence that in light of the long-term, integrated Pratt-QuEST relationship, any two-year tenure rule or Hiring Slow-Down

7

was designed to stem the effects of excessive attrition on Pratt's productive capacity.[4]  For example:

- In **DX1008**, QuEST's Joe Gomes writes to Lavoie to inform him that a QuEST employee who is being considered for hire at Pratt "does not meet tenure requirements" adding that QuEST "*lost two other employees to UTC in last 6 months and received a lower MFA from customer due to technical depth in this work stream*" (emphasis added).

- In **GX-161A**, Mr. Patel wrote to his colleagues, including Mr. Lavoie, that QuEST was "contesting" Pratt's hire of a QuEST employee at the time because "[l]ast year we hired 48 QuEST employees, and that effected them financially and had *difficulty supporting P&W customers*," (emphasis added), in connection with a moratorium on Pratt hiring of QuEST personnel in 2016.  Mr. Lavoie of Pratt testified that the reference to "difficulty supporting P&W customers" in Mr. Patel's email reflected that "[i]f Pratt was taking too many of their workers, our current SOWs could not be satisfied and our internal customers would be upset." Mr. Lavoie added that the reference to "financial[ ]" effect on QuEST reflected that "if QuEST had to hire more people, they would be younger people that would have to be trained in the SOWs the others were working on." Tr. 315:20-316:4.

- In **GX-12**, Mr. Patel writes that in 2017, "Year to date, we have hired 44 Quest employees which is *impacting work output deliverables & performance on P&W outsourced work*," (emphasis added), in connection with the discussion of a temporary moratorium in late 2017.

- In **GX-407E**, Mr. Patel writes to his colleagues: "Please ask Randstad people to stop recruiting from Quest as this has started hurting financially Quest *and P&W customers are not able to get quality work done on time thru Quest*" (emphasis added).

The alleged tenure rule and Hiring Slow-Downs thus fit comfortably within the wide variety of recognized cooperative business frameworks, including "[j]oint ventures, mergers, systems of distribution . . . and more," that feature agreements that are collateral to collaborative business activity, and are thus not *per se* illegal but subject to a rule of reason analysis. *Polk Bros.*, 776 F.2d at 188.  Any hiring restraints between QuEST and Pratt arose from "productive

---

[4] The business collaboration between Pratt and QuEST was well-integrated.  For example, Mr. Lavoie had an office at QuEST. Tr. 419:6-24.  QuEST personnel were assigned Pratt email addresses (Tr. 368:20-369:4), had access to Pratt facilities (Tr. 442:10-12), and worked directly with Pratt engineers at Pratt worksites (*e.g.,* Tr. 169:18-170:24).  The five QuEST engineers who testified confirmed that they worked closely with Pratt engineers on a regular basis. (Tr. 170:6-24; 586:19-21; 1242:4-1244:3; 1384:1-4; 2278:23-2279:2).

cooperation," *id.* at 190, and were attendant to the fulfillment of QuEST's obligations under the Pratt Statements of Work in support of Pratt's manufacturing of jet engines. *See also id.* ("Polk Bros. and Forest City were cooperating to produce, not to curtail output"). Accordingly, the trial evidence demonstrates that any tenure rule or Hiring Slow-Downs were indisputably "part of a larger endeavor whose success they promote[d]." *Id. See also Major League Baseball Props, Inc. v. Salvino, Inc.*, 542 F.3d 290, 339 (2d Cir. 2008) (Sotomayor, *J.*, concurring) (citing *Polk Bros.*, 776 F.2d at 188-89); *see also Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1110 (9th Cir. 2021) ("The non-solicitation agreement . . . ensures that AMN will not lose its personnel during the collaboration . . . [and] promotes 'competitiveness in the healthcare staffing industry'—more hospitals receive more traveling nurses because [of] the non-solicitation agreement"). Accordingly, the government's evidence is insufficient to support the charged *per se* conspiracy.

\* \* \*

For the above-stated reasons, Defendants respectfully submit that their motion for a judgement of acquittal should be granted.

    Respectfully submitted,

*/s/ Guy Petrillo*
GUY PETRILLO (pro hac vice)
LEONID SANDLAR (pro hac vice)
CAELYN STEPHENS (pro hac vice)
Petrillo Klein & Boxer LLP
655 Third Avenue 22nd Floor
New York, NY 10017
T: (212) 370-0330
Email: gpetrillo@pkbllp.com

9

PAUL MCCONNELL (ct29062)
71 Elm Street, Suite 20
New Canaan, CT 066840
T: (203) 344-7007
F: (203) 344-7009
Email: paul.mcconnell@familylaw.com

*Counsel for Robert Harvey*

*/s/ Marc A. Weinstein*
MARC A. WEINSTEIN (pro hac vice)
KIRAN ROSENKILDE (pro hac vice)
RAQUEL GONORETZKY (pro hac vice)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
T: (212) 837-6460
F: (212) 299-6460
Email: marc.weinstein@hugheshubbard.com

CRAIG A. RAABE (ct04116)
Izard, Kindall & Raabe LLP
29 South Main Street,
West Hartford, CT 06107
T: (860) 513-2939
F: (860) 493-6290
Email: craabe@ikrlaw.com

*Counsel for Harpreet Wasan*

**CERTIFICATION OF SERVICE**

I hereby certify that on April 25, 2023, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Dated: New York, New York
April 25, 2023

                                                /s/ Leonid Sandlar
                                              Leonid Sandlar (pro hac vice)
                                              Petrillo Klein & Boxer LLP
                                              655 Third Avenue 22nd Floor
                                              New York, NY 10017
                                              T: (212) 370-0330
                                              Email: lsandlar@pkbllp.com